# [SEALED] No. 10-40525

## In the United States Court of Appeals
## for the Fifth Circuit

UNITED STATES OF AMERICA, *Plaintiff-Appellee,*

v.

MARK ISAAC SNARR, *Defendant-Appellant*

and

EDGAR BALTAZAR GARCIA, *Defendant-Appellant*

---

CRIMINAL NO. 1:09CR15
APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

## [SEALED] JOINT BRIEF OF APPELLANTS
### August 8, 2011

| | |
|---|---|
| DOUGLAS M. BARLOW | GERALD E. BOURQUE and |
| 485 Milam | ROBERT A. MORROW, III |
| Beaumont, TX 77701 | 24 Waterway Ave., Ste 660 |
| Tel: (409) 838-4259; Fax: (409) 832-5611 | The Woodlands, TX 77380 |
| TBL #                01753700 | Tel: (281) 379-6901 |
| | Fax: (832) 813-0321 |
| | TBL #02716500/14542600 |
| | |
| G. PATRICK BLACK | |
| Federal Public Defender, EDTX | JANI J. MASELLI |
| 110 N. College, Ste 1122 | 808 Travis St., 24th Floor |
| Tyler, TX 75702 | Houston, TX, TX 77002 |
| Tel: (903) 531-9233; Fax: (903) 531-9625 | Tel: (713) 256-7726 |
| TBL #No.02371200 | TBL #00791195 |
| *Attorneys for Appellant Snarr* | *Attorneys for Appellant Garcia* |

# CERTIFICATE OF INTERESTED PERSONS

## United States v. Mark Isaac Snarr and Edgar Baltazar Garcia
## No. 10-40525

The undersigned counsel of record certifies that the persons having an interest in the outcome of this case are those listed below:

1.  Mark Isaac Snarr and Edgar Baltazar Garcia, Defendants-Appellants;

2.  Joseph Batte, Assistant United States attorney, who represented the Government in the district court;

3.  Douglas M. Barlow, attorney at law, and G. Patrick Black, Federal Public Defender, who represented appellant Snarr in the district court; and who represent appellant Snarr in this Court; and

4.  Gerald E. Bourque and Robert A. Morrow, III, attorneys at law, who represented appellant Garcia in the district court and continue before this Court; and Jani J.Maselli, who represents Garcia in this Court.

This certificate is presented so that the judges of this Court may evaluate possible disqualification or recusal.

/s/Douglas M. Barlow                      /s/ Gerald E. Bourque
DOUGLAS M. BARLOW                 GERALD E. BOURQUE

/s/G. Patrick Black                          /s/ Robert A. Morrow, III
G. PATRICK BLACK                        ROBERT A. MORROW, III
*Attorneys for Appellant Snarr*          *Attorneys for Appellant Garcia*

# REQUEST FOR ORAL ARGUMENT

Counsel for appellants Snarr and Garcia in the above-styled and numbered cause request oral argument. This is a capital case where the death penalty was imposed on Snarr and Garcia. This appeal involves a voluminous record relating to two defendants, and fact-intensive issues relating to both. Some of the issues are novel and complex. Snarr and Garcia believe that oral argument will assist the Court's decisional process by allowing the Court the opportunity to ask questions about the underlying record and evidence, and will also eliminate any difficulties caused by the size and content of the record.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . I

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      Nature of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      Course of Proceedings and Disposition in the Court Below . . . . . . . . . . . 5

      Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

SUMMARY OF THE ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

          **ISSUE NO. ONE** -The trial court erred in excluding from the jury prospective juror number # 3 Lacy, who expressed reservations concerning the death penalty. . . . . . . . . . . . . . . . . . . . . 25

          **ISSUE NO. TWO** - The trial court erred in excluding from the jury prospective juror # 66 Stephenson, who expressed reservations concerning the death penalty. . . . . . . . . . . . . . . . . . . . . 25

          **ISSUE NO. THREE** - The trial court erred in excluding from the jury prospective juror # 130 Kimball who expressed reservations concerning the death penalty. . . . . . . . . . . . . 25

          **ISSUE NO. FOUR-** The trial court erred in excluding from the jury prospective juror # 140 Furby who expressed reservations concerning the death penalty. . . . . . . . . . . . . . . . . . . . . 25

**ISSUE NO. FIVE**- The trial court erred in excluding from the jury prospective juror # 200 Blackmon who expressed reservations concerning the death penalty. . . . . . . . . . . . . . . . . . . . . . 25

**ISSUE NO. SIX** - The trial court error in failing to grant appellants' challenges for cause of potential juror # 17 Peveto. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**ISSUE NO. SEVEN** - The trial court error in failing to grant appellants' challenges for cause of potential juror # 132 Himes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**ISSUE NO. EIGHT** - The trial court error in failing to grant appellants' challenges for cause of potential juror # 184 Zeigler. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**ISSUE NO. NINE** - The trial court erred in excluding from the jury potential juror # 130 Kimball based on his disability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**ISSUE NO. TEN** - The trial court erred in excluding from the jury potential juror # 232 Horton based on his disability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**ISSUE NO. ELEVEN -** Snarr's and Garcia's convictions must be reversed because the district court denied appellants' request for a jury instruction on a lesser included offense, in violation of *Beck v. Alabama*, 447 U.S. 625 (1980), thereby violating each of their rights to due process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**ISSUE NO. TWELVE-** There is insufficient evidence to support the jury's findings that the murder was committed in an "especially heinous, cruel, or depraved manner." . . . . . . . . . . 27

**ISSUE NO. THIRTEEN** - There is insufficient evidence to support the jury's findings regarding the non-statutory aggravating factor of future dangerousness. . . . . . . . . . . . . . . . . . . 28

**ISSUE NO. FOURTEEN** - There is insufficient evidence to support the jury's findings regarding the statutory aggravating factor of substantial premeditation and planning. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**ISSUE NO. FIFTEEN** - District court abused its discretion in denying appellant Snarr's and appellant Garcia's motion to sever. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**ISSUE NO. SIXTEEN** - The federal death penalty act is unconstitutional. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**ISSUE NO. SEVENTEEN** - Snarr and Garcia's death sentences must be reversed because the district court reversibly erred in keeping out the prior bad acts of the complainant at sentencing depriving the jury of making an informed vote. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**ISSUE NO. EIGHTEEN** - Snarr and Garcia's death sentences must be reversed because the district court reversibly erred in keeping out execution impact evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**ISSUE NO. NINETEEN** - Garcia's and Snarr's death sentences must be reversed because this Honorable Court denied Garcia due process by overruling the district court and denying the funding necessary for Garcia to present a punishment case, which additionally impinged upon the due process rights of Snarr in the joint trial. . . . . . . . . . . . . . . . . . . 32

ARGUMENTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    **ISSUE NO. ONE** -The trial court erred in excluding from the jury prospective juror number # 3 Lacy, who expressed reservations concerning the death penalty. . . . . . . . . . . . . . . . . . . . . 34

    **ISSUE NO. TWO** - The trial court erred in excluding from the jury prospective juror # 66 Stephenson, who expressed reservations concerning the death penalty. . . . . . . . . . . . . . . . . . . . . 34

    **ISSUE NO. THREE** - The trial court erred in excluding from the jury prospective juror # 130 Kimball who expressed reservations concerning the death penalty. . . . . . . . . . . . 34

    **ISSUE NO. FOUR-** The trial court erred in excluding from the jury prospective juror # 140 Furby who expressed reservations concerning the death penalty. . . . . . . . . . . . . . . . . . . . . 34

    **ISSUE NO. FIVE**- The trial court erred in excluding from the jury prospective juror # 200 Blackmon who expressed reservations concerning the death penalty. . . . . . . . . . . . . . . . . . . . . 34

    **ISSUE NO. SIX** - The trial court error in failing to grant appellants' challenges for cause of potential juror # 17 Peveto. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

    **ISSUE NO. SEVEN** - The trial court error in failing to grant appellants' challenges for cause of potential juror # 132 Himes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

    **ISSUE NO. EIGHT** - The trial court error in failing to grant appellants' challenges for cause of potential juror # 184 Zeigler. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

    **ISSUE NO. NINE** - The trial court erred in excluding from the jury potential juror # 130 Kimball based on his disability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

**ISSUE NO. TEN** - The trial court erred in excluding from the jury potential juror # 232 Horton based on his disability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

**ISSUE NO. ELEVEN -** Snarr's and Garcia's convictions must be reversed because the district court denied appellants' request for a jury instruction on a lesser included offense, in violation of *Beck v. Alabama*, 447 U.S. 625 (1980), thereby violating each of their rights to due process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

**ISSUE NO. TWELVE-** There is insufficient evidence to support the jury's findings that the murder was committed in an "especially heinous, cruel, or depraved manner." . . . . . . . . . 120

**ISSUE NO. THIRTEEN** - There is insufficient evidence to support the jury's findings regarding the non-statutory aggravating factor of future dangerousness. . . . . . . . . . . . . . . . . . 130

**ISSUE NO. FOURTEEN** - There is insufficient evidence to support the jury's findings regarding the statutory aggravating factor of substantial premeditation and planning. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

**ISSUE NO. FIFTEEN** - District court abused its discretion in denying appellant Snarr's and appellant Garcia's motion to sever. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

**ISSUE NO. SIXTEEN** - The federal death penalty act is unconstitutional. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

**ISSUE NO. SEVENTEEN** - Snarr and Garcia's death sentences must be reversed because the district court reversibly erred in keeping out the prior bad acts of the complainant at sentencing depriving the jury of making an informed vote. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192

**ISSUE NO. EIGHTEEN** - Snarr and Garcia's death sentences must be reversed because the district court reversibly erred in keeping out execution impact evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201

**ISSUE NO. NINETEEN** - Garcia's and Snarr's death sentences must be reversed because this Honorable Court denied Garcia due process by overruling the district court and denying the funding necessary for Garcia to present a punishment case, which additionally impinged upon the due process rights of Snarr in the joint trial. . . . . . . . . . . . . . . . . . 215

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 232

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

CERTIFICATE OF NON-COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . 235

# TABLE OF AUTHORITIES

**CASES**             **PAGE**

*Abdul-Kabir v. Quarterman*, 550 U.S. 233, 256 (2007) . . . . . . . . . . . . . . . . . . 227

*Adams v. Texas*, 448 U.S. 38, 45 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Aldridge v. United States*, 283 U.S. 308, 310 (1931) . . . . . . . . . . . . . . . . . . . . 58

*Alexander v. Louisiana*, 405 U.S. 625, 630 (1972) . . . . . . . . . . . . . . . . . . . . . . 85

*Barclay v. Florida*, 463 U.S. 939, 955 (1983) . . . . . . . . . . . . . . . . . . . . . . . . 147

*Barefoot v. Estelle*, 463 U.S. 880, 897 (1983) . . . . . . . . . . . . . . . . . . . . . . . . 139

*Barraza v. Cockrell*, 330 F.3d 349 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . 225

*Batson v. Kentucky*, 476 U.S. 79, 87 (1986) . . . . . . . . . . . . . . . . . . . . . 65,74, 80

*Beck v. Alabama*, 447 U.S. 625 (1980) . . . . . . . . . . . . . . . . . . . . . 93, 98, 104, 167

*Beltran v. State*, 728 S.W.2d 382, 390 (Tex.Cr.App. 1987) . . . . . . . . . . . . . . . 143

*Berghuis v. Smith*, _____ U.S. _____, 130 S.Ct. 1382 (U.S. Mar 30, 2010) . . . . . 88

*Berra v. United States*, 351 U.S. 131 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . 113

*Bowden v. McKenna*, 600 F.2d 282, 284 (1st Cir.1979) . . . . . . . . . . . . . . . . . . 198

*Bowen v. Kemp*, 769 F2d 672, 683 (11th Cir 1985)
    *cert. den* 478 U.S. 1021 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

*Brown v. Sanders*, 546 U.S. 212, 220–21 (2006). . . . . . . . . . . . . . . . . . . . . . . 159

*Cafico v. United States*, 506 U.S. 534 (1993) . . . . . . . . . . . . . . . . . . . . . . . . 183

*California v. Brown*, 479 U.S. 538, 545 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . 209

*California v. Ramos*, 463 U.S. 992, 1008 (1983) . . . . . . . . . . . . . . . . . . . . . . . . 168

*Campbell v. Louisiana*, 523 US 392, 394 (1998) . . . . . . . . . . . . . . . . . . . . . . . . 89

*Carrillo v. People*, 974 P.2d 478, 492 n.10 (Colo. 1999) . . . . . . . . . . . . . . . . . . . 80

*Carter v. Jury Commission*, 396 U.S. 320, 330 (1970) . . . . . . . . . . . . . . . . . . . . 74

*Castaneda v. Partida*, 430 US 482, 494 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Chapman v. California*, 386 U.S. 18 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

*Commonwealth v. Best*, 63 N.E. 1073, 1073 (Mass. 1902) . . . . . . . . . . . . . . . . . 80

*Commonwealth v. Brown*, 332 A.2d 828 (Pa. Super. Ct. 1974) . . . . . . . . . . . . . . 80

*Commonwealth v. Greiner*, 455 A.2d 164, 167 (Pa. Super. Ct. 1983) . . . . . . . . . 81

*Cordova v. Lynaugh*, 838 F.2d 764, 767 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . 118

*DeLong v. R. Bruce Brumbaugh*, 703 F. Supp. 399, 406 (W.D.Pa. 1989) . . . . . . 79

*Duren v. Missouri*, 439 US 357, 364 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . 87, 88

*Eddings v. Oklahoma*, 455 U.S. 104 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

*Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982) . . . . . . . . . . . . . . . . . . . . . . . 206

*Fitzgerald v. State*, 972 P.2d 1157 (Okla. Crim. App. 1998) . . . . . . . . . . . . . . . 227

*Flores*, 63 F.3d at 1357 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Flores v. Johnson*, 210 F.3d 456 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . 141

*Ford v. State*, 658 S.E.2d 428, 429 (Ga. Ct. App. 2008) . . . . . . . . . . . . . . . . . . 80

*Ford v. Wainwright*, 477 U.S. 399 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

*Furman v. Georgia*, 408 U.S. 238, 313 (1972). . . . . . . . . . . . . . . . . . . . . . . . . 124

*Gardner v. Johnson*, 247 F.3d 551, 563 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . 149

*Gardner v. Florida*, 430 U.S. 349 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

*Galloway v. The Superior Court of the District of Columbia*,
    816 F. Supp. 12, 16 (D.D.C. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Gibson v. Zant*,  705 F.2d 1543, 1546 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . 86

*Gibson v. Zant*, 705 F2d 1543, 1546 n 4 (11th Cir 1983) . . . . . . . . . . . . . . . . . . 90

*Glasser v. United States*, 315 U.S. 60, 85 (1942) . . . . . . . . . . . . . . . . . . . . . . . 91

*Glenn v. Tate*, 71 F.3d 1204 (6th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . 230

*Godfrey v.Georgia*, 446 U.S. 420, 428-432 (1980) . . . . . . . . . . . . . . . . . . . . . 125

*Godfrey v. Georgia*, 446 U.S. 420, 433 n.16 (1980) . . . . . . . . . . . . . . . . . . . . 128

*Godfrey v. Georgia*, 446 U.S. 420, 428–29 (1980) . . . . . . . . . . . . . . . . . . . . . 123

*Gray v. Mississippi*, 481 U.S. 648, 658 (1987) . . . . . . . . . . . . . . . . . . . . . . . . 35

*Gregg v. Georgia*, 428 U.S. 153, 190, 96 S.Ct. 2909, 2933,
    49 L.Ed.2d 859 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199

*Gregg v. Georgia*, 428 U.S. 153, 199 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . 209

*Griffith v. Quarterman*, 196 F. App'x. 237, 243 (5th Cir. 2006) . . . . . . . . . . . . 226

*Hall,* 152 F.3d at 408 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Hall,* 152 F.3d at 415 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

*Hernandez v. Texas,* 347 U.S., at 482, 74 S.Ct., at 672-673 . . . . . . . . . . . . . . . . . 66

*Hitchcock v. Dugger*, 481 U.S. 393 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

*Irizzary v. United States*, 58 F.R.D. 65 (D. Mass. 1973) . . . . . . . . . . . . . . . . . . 213

*Jackson v. Dretke*, 450 F.3d 614, 617-18 (5th Cir.2006) . . . . . . . . . . . . . . . . . . 205

*Johnson v. Mississippi*, 486 U.S. 578, 590 & n.8 (1988) . . . . . . . . . . . . . . . . . . 146

*Jones v. United States*, 527 U.S. 373, 407-08, 119 S.Ct. 2090, 144 L.Ed.2d
    370(1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

*Jones v. United States*, 527 U.S. 373, 398, 119 S.Ct. 2090 (1999) . . . . . . . . . . 129

*Jurek v. Texas*, 428 U.S. 262, 274-76 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . 140

*Jurek v. Texas*, 428 U.S. 262 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

*Kelly v. Lynaugh,* 862 F.2d 1126, 1133 n. 12 (5th Cir. 1988) . . . . . . . . . . . . . . 204

*Lankford v. Idaho*, 500 U.S. 110 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

*Lewis v. Jeffers*, 497 U.S. 764, 781 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

*Lockett v. Ohio*, 438 US 586, 604 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*Lockett v. Ohio*, 438 U.S. 586, 605 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

*Lockhart v. McCree*, 476 U.S. 162 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Loyd v. Smith*, 899 F.2d 1416 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . 228

*Loyd v. Whitley*, 977 F.2d 149, 158 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . 229

*Martin v. Dugger*, 686 F. Supp. 1523, 1538-41 (S.D. Fla. 1988) . . . . . . . . . . . . 211

*Mathews v. United States*, 485 U.S. 58, 63  (1988) . . . . . . . . . . . . . . . . . . . . . . 118

*Maynard v. Cartwright*, 486 U.S. 356, 363-364 (1988). . . . . . . . . . . . . . . . . . . 125

*Maynard v. Cartwright*, 363 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

*McCleskey v. Kemp*, 481 US 279, 310 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . 86

*McCleskey v. Kemp*, 481 U.S. 279, 305-06, 107 S.Ct. 1756
    95 L.Ed.2d 262 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

*McCleskey v. Kemp*, 481 U.S. 279, 306 (1987) . . . . . . . . . . . . . . . . . . . . . . . 167

*McCleskey v. Kemp*, 481 U.S. 279, 294 (1987) . . . . . . . . . . . . . . . . . . . . . . . 167

*McGuire*, 608 F.2d at 1032 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

*McKoy v. North Carolina*, 494 U.S. 433, 441, 110 S.Ct. 1227,
    108 L.Ed.2d 369 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

*Merritt v. United States,* 117 S.Ct. 264 (1996) . . . . . . . . . . . . . . . . . . . . . . . 179

*Mills v. Maryland*, 486 U.S. 367 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

*Mitchell*, 484 F.3d at 775 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

*Moore v. Johnson*, 225 F.3d 495 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . 226

*Moore v. State*, 909 So.2d 77, 83 (Miss. Ct. App. 2005) . . . . . . . . . . . . . . . . . . 80

*Morales v. Mitchell*  507 F.3d 916, 931 (6th Cir. 2007) . . . . . . . . . . . . . . . . . 225

*Mu'Min*, 500 U.S., at 428, 111 S.Ct. 1899." . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Neal v. Puckett*, 286 F.3d 230, 241 (5th  Cir. 2002). . . . . . . . . . . . . . . . . . . . 146

*Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) . . . . . . . . . . . . . . . . . . . . . 118

*Parks v. Brown*, 860 F.2d 1545, 1556 (10th Cir. 1988) . . . . . . . . . . . . . . . . . . . 210

*Parish v. State*, 142 P.2d 642, 645-46 (Okla. Crim. App. 1943) . . . . . . . . . . . . 80

*Patton v. Mississippi,* 332 U.S., at 469, 68 S.Ct., at 187 . . . . . . . . . . . . 66

*Payne*, 501 U.S. at 823, 111 S.Ct. 2597 . . . . . . . . . . . . . . . . . . . . . . . . 199

*Payne v. Tennessee*, 501 U.S. 808, 111 S. Ct. 2597 (1991) . . . . . . . . . . . . . . 205

*Penry v. Lynaugh*, 492 U.S. 302 (1989) . . . . . . . . . . . . . . . . . . . . . . . . 167

*Penry v. Johnson*, 532 U.S. 782, 797 (2001)(Penry II) . . . . . . . . . . . . . . . 182

*People v. Green*, 561 N.Y.S.2d 130, 131 (County Ct. 1990) . . . . . . . . . . . . . . 80

*People v. Green*, 561 N.Y.S.2d 130, 133 (1900) . . . . . . . . . . . . . . . . . . . . 77

*People v. Guzman*, 478 N.Y.S.2d 455, 460 (N.Y. Sup. Ct. 1984),
    *aff'd*, 76 N.Y. 2d 1, 555 N.E.2d 259 (1990) . . . . . . . . . . . . . . . . . . . . 91

*People v. Mickle*, 814 P.2d 290, 321 (Cal. 1991) . . . . . . . . . . . . . . . . . . . 211

*People v. Sanchez*, 503 N.E.2d 277, (Ill. 1986) . . . . . . . . . . . . . . . . . . . . 209

*Peters v. Kiff*, 407 US 493 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Pierce v. Underwood*, 487 U.S. 552, 565 . . . . . . . . . . . . . . . . . . . . . . . . 154

*Pizzuto v. Arave*, 385 F.3d 1247, 1267 (9th Cir. 2004) . . . . . . . . . . . . . . 148, 159

*Porter v. McCollum*, 130 S. Ct. 447 (2009) . . . . . . . . . . . . . . . . . . . . . . . 231

*Powell v. Collins*, 332 F.3d 376 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . 229

*Powers v. Ohio*, 499 U.S. 400, 407 (1991) . . . . . . . . . . . . . . . . . . . . . . . . 77

*Powers v. Ohio*, 499 US 400, 415 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Roberts v. State*, 241 A.2d 903, 905-06 (1968) . . . . . . . . . . . . . . . . . . . . . . . . 80

*Ronning v. State*, 748 S.W.2d 633, 636 (Ark. 1988) . . . . . . . . . . . . . . . . . . . . 80

*Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988) . . . . . . 49

*Saffle v. Parks*, 494 U.S. 484, 500, 110 S. Ct. 1257, 1266 (1990) . . . . . . . . . . 209

*Safran v. Meyer*, 103 S.C. 356, 88 S.E. 3 (1916) . . . . . . . . . . . . . . . . . . . . . . . 80

*Sansone v. United States*, 380 U.S. 343, 349-50 (1965) . . . . . . . . . . . . . . . . . 101

*Satterwhite v. Texas*, 486 U.S. 249, 257 (1988) . . . . . . . . . . . . . . . . . . . . . . . 145

*Schad v. Arizona*, 501 U.S. 624, 646-647 (1991) . . . . . . . . . . . . . . . . . . . . . 100

*Schmuck v. United States*, 489 U.S. 705 (1989) . . . . . . . . . . . . . . . . . . . . . . . 100

*Schmuck v. United States*, 489 U.S. 705, 716 (1989) . . . . . . . . . . . . . . . . . . . 101

*Schmuck*, 489 U.S. at 716 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

*School Bd. of Nassau County v. Arline* , 480 U.S. 273, 284 (1987) . . . . . . . . . . 79

*Simmons v. South Carolina*, 512 U.S. 154, 165 n.5 (1994) . . . . . . . . . . . . . . . 139

*Skilling v. United States,* 561 U.S. __, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010) 48

*Skinner v. State*, 33 P.3d 758, 764 (Wyo. 2001) . . . . . . . . . . . . . . . . . . . . . . . 80

*Skipper v. South Carolina*, 476 U.S. 1, 8 (1986) . . . . . . . . . . . . . . . . . . . . . . 148

*Skipper v. South Carolina*, 476 U.S. 1 (1986) . . . . . . . . . . . . . . . . . . . . . . . . 167

*Smith v. Texas*, 311 U.S. 128, 130 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*Snyder v. Massachusetts*, 291 U.S. 97 (1934) . . . . . . . . . . . . . . . . . . . . . . . . . 207

*Southeastern Community College v. Davis* (1979), 442 U.S. 397, 405 . . . . . . . . 79

*State v. Dugar*, 643 So. 2d 870, 871 ((La. Ct. App. 1994) . . . . . . . . . . . . . . . . . 80

*State v. Francis*, 403 So.2d 680, 682-83 (La. 1981) . . . . . . . . . . . . . . . . . . . . . 80

*State v. Laird*, 547 So. 2d 1, 3 (La.App. 3 Cir. 1989) . . . . . . . . . . . . . . . . . . . 212

*State v. Miller*, 722 P.2d 1131 (Kan. Ct. App. 1986) . . . . . . . . . . . . . . . . . . . . 81

*State v. O'Neal*, 718 S.W.2d 498, 502 (Mo. 1986) . . . . . . . . . . . . . . . . . . . . . . 80

*State v. Petary*, 781 S.W.2d 534, 541 (Mo. 1989) . . . . . . . . . . . . . . . . . . . . . 209

*State v. Rogers*, 334 Or 633, 642-43 and n 8, 55 P3d 488 (2002) . . . . . . . . . . . 85

*State v. Speer*, 124 Ohio St.3d 564, 925 N.E.2d 584, 2010-Ohio-649
    (Ohio Mar 03, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*Stevenson v. United States*, 162 U.S. 313, 314 (1896) . . . . . . . . . . . . . . . . . . . 98

*Stevenson v. United States*, 162 U.S. 313, 16 S.Ct. 839, 40 L.Ed. 980 (1896). . 109

*Stringer v. Black*, 503 U.S. 222, 232 (1992) . . . . . . . . . . . . . . . . . . . . . . . 129, 166

*Taylor v. Louisiana*, 419 US 522, 530 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*Taylor v. Louisiana*, 419 U.S. 522, 538 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . 85

*Taylor v. State*, 156 P.3d 739 (Utah 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 231

*Tennessee v. Lane*, 541 U.S. 509, 527 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Thiel v. S. Pac. Co.* 328 U.S. 217, 220 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*Tokio Marine & Fire Ins. Co. v. FLORA M/V*, 235 F.3d 963, 970 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 225

*United States v. Agofsky*, 458 F.3d369, 374 (5th Cir. 2006) . . . . . . . . . . . . 124, 128

*United States v. Agofsky*, 458 F.3d 369 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . 125

*United States v. Allen*, 247 F.3d741, 786 (8th Cir. 2001) . . . . . . . . . . . . . . . . 120

*United States v. Allen*, 247 F.3d741, 786 (8th Cir. 2001) . . . . . . . . . . . . . . . . 130

*United States v. Barnett*, 197 F.3d 138, 145 (5th Cir.1999) . . . . . . . . . . . . . . . 178

*United States v. Barnett*, 197 F.3d 138 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . 181

*United States v. Bernard*, 299 F.3d 467, 474 (5th Cir. 2002) . . . . . . . . . . . . . . . 45

*United States v. Bernard*, 299 F.3d 467, 481 (5th Cir.2002). . . . . . . . 120, 130, 150

*United States v. Bernard*, 299 F.3d 467, 482 (5th Cir. 2002) . . . . . . . . . . . . . 139

*United States v. Bieganowski*, 313 F.3d 264, 287 (5th Cir. 2002) . . . . . . . . . . . 161

*United States v. Bolts*, 558 F.2d 316, 322-23 (5th Cir. 1997) . . . . . . . . . . . . . . 162

*United States v.Booker*, 334 F.3d 406, 415 (5th Cir. 2003) . . . . . . . . . . . . . . . 162

*United States v. Boyles*, 57 F.3d 535, 544 (7th Cir. 1995) . . . . . . . . . . . . . . . . 101

*United States v. Branch*, 91 F.3d 699, 713 (5th Cir. 1996). . . . . . . . . . . . . . . . 105

*United States v. Breinig*, 70 F.3d 850 (6th Cir. 1995) . . . . . . . . . . . . . . . . . . . 166

*United States v. Britt*, 112 Fed. Appx. 352, 355 (5th Cir. 2004) . . . . . . . . . . . . 149

*United States v. Broussard*, 80 F.3d 1025, 1037 (5th Cir.) . . . . . . . . . . . . . . . . 179

*United States v. Broussard*, 987 F.2d 215, 221 (5th Cir.1993) . . . . . . . . . . . . . . 48

*United States v. Browner*, 889 F.2d 549, (5th Cir.1989 . . . . . . . . . . . . . . . . 97, 106

*United States v. Browner*, 937 F.3d 165 (5th Cir. 1991) (*Browner II*). . . . . . . . 107

*United States v. Bryant*, 991 F.2d 171, 174 (5th Cir.1993) . . . . . . . . . . . . . 48. 59

*United States v. Burks*, 470 F.2d 432, 434–38 (D.C.Cir.1972) . . . . . . . . . . . . 198

*United States v. Castro*, 15 F.3d 417, 421 (5th Cir. 1994) . . . . . . . . . . . . . . . 215

*United States v. Causey*, 185 F.3d 407 (5th Cir. 1999) . . . . . . . . . . . . . . . . . 178

*United States v. Causey*, 185 F.3d 407, 412, 423 (5th Cir. 1999) . . . . . . . . . . . 158

*United States v. Chavez*, 119 F.3d 342, 346 (5th Cir. 1997) . . . . . . . . . . . . . . 192

*United States v. Collins*, 690 F.2d 431, (5th Cir.1982) . . . . . . . . . . . . . . . . . . 97

*United States v. Collins*, 690 F.2d 431 (5th Cir. 1982) . . . . . . . . . . . . . . . . . 108

*United States v. Colon*, 268 F.3d 367, 373 (6th Cir. 2001) . . . . . . . . . . . . . 93, 102

*United States v. Davis*, 609 F.3d 663, 689 (5th Cir. 2010). . . . . . . . . . . . . . . 154

*United States v. Davis*, 124 Fed. Appx. 838, 839, 843-44 (5th Cir. 2005) . . . . . 149

*United States v. Davis*, No. 94-381
1995 WL 602881 (E.D. La. October 11, 1995) . . . . . . . . . . . . . . . . . . . 178

*United States v. Davis*, 583 F.2d 190, 197 (5th Cir. 1978) . . . . . . . . . . . . . . . . 58

*United States v. Dellinger*, 472 F.2d 340, 367 (5th Cir. 1972) . . . . . . . . . . . . . . 58

*United States v. Dennis*, 645 F.2d 517, 521 (5th Cir. Unit B May 1981) . . . . . . 179

*United States v. Dempsey*, 830 F.2d 1084, 1088-89 (10th Cir. 1987) . . . . . . . 65, 74

*United States v. Denardi*, 892 F.2d 269, 271 (3rd Cir. Pa. 1989) . . . . . . . . . . . 212

*United States v. Dozier*, 672 F.2d 531, 547-49 (5th Cir. 1982) . . . . . . . . . . . . . 60

*United States v. Duncan*, 191 F.3d 569, 573-75 (5th Cir. 1999) . . . . . . . . . . . . 59

*United States v. Elk*, 658 F.2d 644 (8th Cir. 1981). . . . . . . . . . . . . . . . . . . . . 109

*United States v. Erwin* , 793 F.2d 656, 665 (5th Cir. 1986) . . . . . . . . . . . . . . . 162

*United States v. Fields*, 483 F.3d 313, 357 (5th Cir. 2007) . . . . . . . . . . . . . . . . 45

*United States v. Finley*, 477 F.3d 250 (5th Cir. 2007) . . . . . . . . . . . . . . . . . . 102

*United States v. Flores*, 63 F.3d 1342, 1354 (5th Cir. 1995). . . . . . . . . . . . . . . 45

*United States v. Flores*, 63 F.3d 1342, 1373 (5th Cir. 1995) . . . . . . . . . . . . . 154

*United States v. Free*, 841 F.2d 321, 325 (9th Cir.1988) . . . . . . . . . . . . . . . . 112

*United States v. Frye*, 489 F.3d 201, 205 (5th Cir. 2007) . . . . . . . . . . . . . . . . 148

*United States v. Gilbert*, 120 F.Supp.2d 147, 154-55 (D. Mass. 2000) . . . . . . . 142

*United States v. Greschner*, 647 F.2d 740, 741 (7th Cir. 1981) . . . . . . . . . . . . 198

*United States v. Grisham*, 63 F3d 1074, 1078 (11th Cir. 1995), *cert den* 516 US 1084 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*United States v. Hall*, 152 F.3d 381 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . 124

*United States v. Harrison*, 55 F.3rd 163, Fifth Circuit 1995 . . . . . . . . . . . . . . . 97

*United States v. Harrison*, 55 F.3d 163, 166-68 (5th Cir. 1995) . . . . . . . . . . . 104

*United States v. Hyde*, 448 F.2d 815, 848 n.38 (5th Cir. 1971) . . . . . . . . . . . . . 59

*United States v. Jackson*, 549 F.3d 963, 970 n. 3 (5th Cir. 2008) . . . . . . . . . . . 204

*United States v. Johnson*, 713 F.2d 633, 639 (11th Cir. 1983) . . . . . . . . . . . . . 162

*United States v. Jones*, 132 F.3d 232, 240 (5th Cir. 1998). . . . . . . . . . . . . . . 121

*United States v. Jones*, 132 F.3d at 239-43. . . . . . . . . . . . . . . . . . . . . . . . . 190

*United States v. Kane*, 887 F.2d 568, 571 (5th Cir., 1989) . . . . . . . . . . . . . . . 164

*United States v. Lara*, 181 F.3d 183, 200 (1st Cir.1999) . . . . . . . . . . . . . . . . 150

*United States v. Lemm*, 680 F.2d 1193, 1205 (8th Cir. 1982). . . . . . . . . . . . . . 165

*United States v. Lesina*. 833 F.2d 156, 160-160 (9th Cir. 1987) . . . . . . . . . . . . 113

*United States v. Lewis*, 476 F.3d 369, 383 (5th Cir. 2007) . . . . . . . . . . . . . . . 161

*United States v. Martinez-Salazar*, 528 U.S. 304, 313-18 (2000) . . . . . . . . . . . . 61

*United States v. Martinez-Salazar,* 528 U.S. 304, 310 (2000) . . . . . . . . . . . . . . 124

*United States v. Mason*, 440 F.2d 1293, 1298 (10th Cir.),
    *cert denied*, 404 U.S. 883, 92 S.Ct. 219, 30 L.Ed.2d 165 (1971). . . . . . . . 65

*United States v. McCullah*, 76 F.3d 1087, 1111-1112 (10th Cir. 1996) . . . . . . . 129

*United States v. McVeigh*, 169 F.R.D. 362 (D. CO 1996) . . . . . . . . . . . . . . . . 173

*United States v. Mendoza-Burciaga*, 981 F.2d 192,197-98 (5th Cir. 1992) . . . . . 60

*United States v. Milton*, 27 F.3d 203, 206 (6th Cir. 1994). . . . . . . . . . . . . . . . 111

*United States v. Montgomery*, 635 F.3d 1074 (8th Cir. 2011) . . . . . . . . . . . . . . 128

*United States v. Moran*, 601 F. Supp. 205 (D. Me. 1985) . . . . . . . . . . . . . . . . 212

*United States v. Munoz*, 15 F.3d 395 (5th Cir.  1994), at page 397 . . . . . . . . . . . 48

*United States v. Munoz*, 15 F.3d 395,397-98 (5th  Cir. 1994) . . . . . . . . . . . . . . 59

*United States v. Munoz*, 15 F.3d 395, 398 n. 1 (5th  Cir.1994)  . . . . . . . . . . . . 48

*United States v. Murphy*, 421 U.S. at 800 . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*United States v. Nell*, 526 F.2d 1223,1229 (5th  Cir. 1976) . . . . . . . . . . . . . . . . 58

*United States v. Neil*, 27 F.3d 1035, 1047 (5th Cir. 1994) . . . . . . . . . . . . . . . . 179

*United States v. Nguyen*, 493 F.3d 613 (5th Cir. 2007) . . . . . . . . . . . . . . . . . . 176

*United States v. Odom*, 13 F.3d 949 (6th  Cir. 1994). . . . . . . . . . . . . . . . . . . . 166

*United States v. Odom*, 888 F. 2d 1024, 1018 (4th  Cir. 1989) . . . . . . . . . . . . . 166

*United States v. Olano*, 507 U.S. 725, 1782 (1993) . . . . . . . . . . . . . . . . . . . . . 63

*United States v. Orlando*, 206 F. Supp. 419, 420-21 (E.D.N.Y. 1962 . . . . . . . . 213

*United States v. Peoples*, 74 F.Supp.2d 930, 932-33 (W.D. Mo. 1999) . . . . . . . 143

*United States v. Pepin*, 514 F.3d 193, 206 (2nd  Cir. 2008)  . . . . . . . . . . . . . . . 142

*United States v. Peterson*, 244 F.3d 385, 393 (5th   Cir. 2001) . . . . . . . . . . 161, 162

*United States v. Peveto*, 881 F.2d 844, 856-858 (10th  Cir. 1989) . . . . . . . . . . . 166

*United States v. Purkey*,  428 F.3d 738 (8th  Cir. 2005)  . . . . . . . . . . . . . . . . . 129

*United States v. Quintero*, 21 F.3d 885, 890 n.3 (9th  Cir.1994) . . . . . . . . . . . . 111

*United States v. Ramos*, 605 F. Supp. 277, 279 (S.D.N.Y. 1985)  . . . . . . . . . . . 212

*United States v. Richards*, 204 F.3d 177, 206 (5th Cir. 2000) . . . . . . . . . . . . . . 162

*United States v. Risco*, No. 89-0052-01, 1989 U.S. Dist. LEXIS
16493 at *2 (E.D. Pa. Mar. 16, 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 212

*United States v. Robinson*, 367 F.3d 278,290-91 (5th Cir. 2004) . . . . . . . . . . . . 190

*United States v. Rocha*, 916 F.2d 219, 228-29 (5th Cir. 1990) . . . . . . . . . . . . . 162

*United States v. Rocha*, 916 F.2d 219, (5th Cir. 1990), *cert. denied*,
500 U.S. 936 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

*United States v. Sampson*, 335 F.Supp.2d 166, 203 (D. Mass. 2004) . . . . . . . . 125

*United States v. Scott*, 795 F.2d 1245,1250 (5th Cir. 1986) . . . . . . . . . . . . . . 161

*United States v. Sheffey*, 57 F.3d 1419, 1431 (6th Cir. 1995) . . . . . . . . . . . . . 111

*United States v. Simmons*, 374 F.3d 313 at 317, (5th Cir., 2004). . . . . . . . . . . 164

*United States v. Soler*, 275 F.3d 146, 153 (1st Cir.2002). . . . . . . . . . . . . . . . 150

*United States v.Sudeen*, 434 F.3d 384, 387 (5th Cir. 2005) . . . . . . . . . . . . . . 161

*United States v. Tatum*, 31 Fed. Appx. 156 (5th Cir. 2001) . . . . . . . . . . . . . . 149

*United States v. Taveras*, 488 F.Supp.2d 246, 252-253 (E.D.N.Y. 2007). . . . . . 124

*United States v. Taveras* 488 F.Supp.2d 246 (E.D. NY 2007) . . . . . . . . . . . . . 126

*United States v. Thomas*, 12 F.3d 1350, 1363 (5th Cir. 1994) . . . . . . . . . . . . . 179

*United States v. Ursery*, 109 F.3d 1129, 1136 (6th Cir. 1997). . . . . . . . . . . . . 93

*United States v. Villarin Gerena*, 553 F.2d 723, 727 (1st Cir. 1977) . . . . . . . . 213

*United States v. Vontsteen*, 950 F.2d at 1091-92. . . . . . . . . . . . . . . . . . . . . 188

*United States v. Waldon*, 206 F.3d 597, 604 (6th Cir. 2000) . . . . . . . . . . . . . . 102

*United States v. Waldon*, 206 F.3d 597, 604-05 (6th Cir. 2000) . . . . . . . . . . . 102

*United States v. Weber*, 162 F.3d 308, 354 (5th Cir. 1998), *cert. denied*, 528 U.S. 829 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

*United States v. Webster*, 162 F.3d 308 (5th Cir. 1998) . . . . . . . . . . . . . . . . . 47, 59

*United States v. Wharton*, 320 F.3d 526, 535 (5th Cir. 2003) . . . . . . . . . . . . . . 57

*United States v. Whitten*, 610 F.3d 168 (2nd Cir. 2010) . . . . . . . . . . . . . . . . . . 198

*United States v.Williams*, 523 F.2d at 1209 n.10 . . . . . . . . . . . . . . . . . . . . . . . 59

*United States v. Williams* , 809 F.2d 1072, 1084 (5th Cir. 1987) . . . . . . . . . . . 165

*United States v. Windsor*, 981 F.2d 943, 946 (7th Cir. 1992) . . . . . . . . . . . . . . 101

*Uttecht v. Brown*, 127 S.Ct. 2218 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Vanderbilt v. Collins*, 994 F.2d 189, 195 (5th Cir. 1993) . . . . . . . . . . . . . . . . . 118

*Vickers v. Ricketts* (9th Cir.1986) 798 F.2d 369, 370-374.) . . . . . . . . . . . . . . . 100

*Victor v. Nebraska*, 511 U.S. 1,19 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

*Wainwright v. Witt*, 469 U.S. 412, 424 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Webster*, 162 F.3d . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

*Whitus v. Georgia*, 385 U.S., at 549-550, 87 S.Ct., at 646-47 . . . . . . . . . . . . . . 66

*Wiggins v. Smith*, 539 U.S. 510, 537 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 146

*Williams v. Eau Claire Pub. Sch.*, 397 F.3d 441, 445 (6th Cir. 2005). . . . . . . . . 93

*Williams v. Martin*, 618 F.2d 1021, 1026 (4th Cir. 1980) . . . . . . . . . . . . . . . . . 228

*Witherspoon v. Illinois*, 391 U.S. 510 (1968) . . . . . . . . . . . . . . . . . . . . . . . . 35, 39

*Witherspoon v. Illinois*, 391 U.S. 510,521 88 S.Ct. 1770, 20 L.Ed 2d 776. . . . . . 43

*Woods v. Thaler*, 399 F. App'x. 884 (5th Cir. 2010) . . . . . . . . . . . . . . . . . . . . 227

*Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) . . . . . . . . . . . . . . . . . . 206

*Woodson v. North Carolina*, 428 U.S. 280, 304, (1976) . . . . . . . . . . . . . . . . . 212

*Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991 (1976) . 200

*Wright v. Angelone*, 151 F.3d 151 (4th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . 228

*Yohey v. Collins*, 985 F.2d 222, 227 (5th Cir.1993) . . . . . . . . . . . . . . . . . . . . 224

*Zafiro v. United States* , 506 U.S. 534, 537 (1993) . . . . . . . . . . . . . . . . . . . 161, 165

*Zafiro v. United States*, 506 U.S. 534, 539(1993) . . . . . . . . . . . . . . . . . . . . . . 164

*Zafiro v. United States*, 506 U.S. at 539 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

*Zant v. Stephens*, 462 U.S. 862, 900 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . 168

*Zicree*, 605 F.2d at 1388-89 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

## RULES

Federal Rules of Criminal Procedure

Rule 8. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

Rule 14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

Rule 24(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Rule 31 (c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

Federal Rules of Evidence

Rule 103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192, 201

Rule 401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196

Rule 404 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196

Rule 412 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196

## STATUTES

Alaska Stat. § 09.20.010(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Americans with Disabilities Act of 1990 (ADA) . . . . . . . . . . . . . . . . . . . . . 76

Ark. Code Ann. §16-31-102(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

Cal. Code of Civ. Proc. § 203(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

Cal. Civ. § 54.8(a); Colo. Rev. Stat.§13-71-137 . . . . . . . . . . . . . . . . . . . . 84

Colo. Rev. Stat. §13-90-204 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

Conn. Gen. Stat. § 1-245; Fla. Stat. § 90.6063 . . . . . . . . . . . . . . . . . . . . . 84

Fla. Stat. § 40.013(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

Ill. Comp. Stat. 5/8-1402 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

Iowa Code § 607 A.2  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

Jury Selection and Service Act of 1968, §§ 1861-77 Title 28, U.S. Code  . . . . . . 74

Jury Selection and Service Act of 1968, 28 U.S.C. §§18611-77  . . . . . . . . . . . . 75

Kan. Stat. § 75-4355a; Ky. Rev. Stat. § 30A.410(1)(a)  . . . . . . . . . . . . . . . . . . . 84

La. Code Crim. Proc. art. 401.1; Md. Rules, Rule 4-462  . . . . . . . . . . . . . . . . . . 84

Mass. Gen. Laws ch. 234A, § 69 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

Mo. Rev. Stat. § 476.753 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

Mo. Rev. Stat. § 494.425(5)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

N.J. Stat. Rules of Ct., Directive 3-04 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 85

N.M. Stat., State Court Rules, Uniform Jury Instructions - Civil 13-110A  . 83, 85

N.Y. Crim. Proc. §190.25; Okla. Stat. § 2409(A) . . . . . . . . . . . . . . . . . . . . . . . 85

Or. Rev. Stat. §10.030(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

Rehabilitation Act,  Section 794, Title 29, U.S. Code, §504  . . . . . . . . . . . . . . . 79

R.I. Gen. Laws § 9-9-1.1(d)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

R.I. Gen. Laws § 9-9-1.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

S.D. Codified Laws § 16-13-10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

Tex. Civ. Prac. & Rem. Code Ann. § 21.002 . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

W. Va. Code § 52-1-8(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

W. Va. Code § 57-5-7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

Wis. Stat. § 756.001(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

18 U.S.C §2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

18 U.S.C. §1111 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 94

18 U.S.C. §1111(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

18 U.S.C. §1111(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

18 U.S.C. §1112. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

18 U.S.C. § 3006A(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 215

18 U.S.C. § 3006A(e) (West Supp.1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . 215

18 U.S.C. §3591, 3593 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

18 U.S.C. §§3591(a)(2)(A-D), 3593(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

18 U.S.C. §3591[a][2]). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122, 131

18 U.S.C. §3592(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122, 131

18 U.S.C. §3592(c)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123, 124

18 U.S.C. §3592(c)(6) (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

18 U.S.C. §3593(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

18 U.S.C. §3595(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121, 130

18 U.S.C. 3595(c)(2)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120, 130

42 U.S. C.§504, §12101(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

42 U.S. C.§12101(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

42 U.S.C. §12101(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

42 U.S.C. §12131(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

42 U.S.C. §12131(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

42 U.S.C. §12132 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76, 78

## CONSTITUTIONAL PROVISIONS

United States Constitution

Fifth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 85, 180

Sixth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 85, 180

Eighth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 85

## TREATISES

*Broeder*, The University of Chicago Jury Project,
38 Neb. L. Rev. 744, 753-755 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . 185

National Conference of Commissioner of Uniform State Laws, *Uniform Rules of Criminal Procedure* Rule 472(a) (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166
Note, "Rethinking Criminal Joinder: An Analysis of the
Empirical Research and Its Implications for Justice,"
52 Law & Contemporary Problems 325, 333-36 (1989) . . . . . . . . . . . . . 185

*"Future Dangerousness" at Federal Capital Sentencing: Rates and Correlates of Subsequent Prison Misconduct and Violence*, 32 Law and Hum. Behav. 46, 55-57, 59, 61 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . 141

John H. Blume, Stephen P. Garvey & Sheri Lynn Johnson, *Future Dangerousness in Capital Cases: Always "At Issue,"* 86 Cornell L.R. 397, 398 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

Sally Constanzo & Mark  Constanzo, *Jury Decision Making in the Capital Penalty Phase*, 16 Law & Hum. Behav. 185, 188-89 (1992) . . . . . . . . 144

U.S. Code Cong, and Admin. News, No. 6, September 1990, at 602 . . . . . . . . 77

# SUBJECT MATTER AND APPELLATE JURISDICTION

1.      **Subject Matter Jurisdiction in the District Court.**  This case arose from the prosecution of alleged offenses against the laws of the United States.  The district court therefore had jurisdiction of this case under 18 U.S.C. § 3231.

2.      **Jurisdiction in the Court of Appeals.**  This is a direct appeal from a final decision of the United States District Court for the Eastern District of Texas, entering judgments of conviction and sentences in a criminal case.  This Court therefore has jurisdiction of this appeal under 18 U.S.C. § 3742 and 28 U.S.C. § 1291. Jurisdiction of this Court is also invoked under  18 U.S.C. § 3595, as an appeal of a death sentence.  Notices of appeal were timely filed in accordance with Rule 4(b) of the Federal Rules of Appellate Procedure.

Under Federal Rule of Appellate Procedure 4(b), a criminal defendant shall file notice of appeal in the district court "within 10 days after the entry of (i) the judgment or order appealed from or (ii) a notice of appeal by the Government."  Written Notices of Appeal by appellant Snarr and appellant Garcia were timely filed on June 3, 2010.

# STATEMENT OF ISSUES

**ISSUE NO. ONE** -The trial court erred in excluding from the jury prospective juror number # 3 Lacy, who expressed reservations concerning the death penalty.

**ISSUE NO. TWO** - The trial court erred in excluding from the jury prospective juror # 66 Stephenson, who expressed reservations concerning the death penalty.

**ISSUE NO. THREE** - The trial court erred in excluding from the jury prospective juror # 130 Kimball who expressed reservations concerning the death penalty.

**ISSUE NO. FOUR-** The trial court erred in excluding from the jury prospective juror # 140 Furby who expressed reservations concerning the death penalty.

**ISSUE NO. FIVE**- The trial court erred in excluding from the jury prospective juror # 200 Blackmon who expressed reservations concerning the death penalty.

**ISSUE NO. SIX** - The trial court error in failing to grant appellants' challenges for cause of potential juror # 17 Peveto.

**ISSUE NO. SEVEN** - The trial court error in failing to grant appellants' challenges for cause of potential juror # 132 Himes.

**ISSUE NO. EIGHT** - The trial court error in failing to grant appellants' challenges for cause of potential juror # 184 Zeigler.

**ISSUE NO. NINE** - The trial court erred in excluding from the jury potential juror # 130 Kimball based on his disability.

**ISSUE NO. TEN** - The trial court erred in excluding from the jury potential juror # 232 Horton based on his disability.

**ISSUE NO. ELEVEN -** Snarr's and Garcia's convictions must be reversed because the district court denied appellants' request for a jury instruction on a lesser included offense, in violation of *Beck v. Alabama*, 447 U.S. 625 (1980), thereby violating each of their rights to due process.

**ISSUE NO. TWELVE-** There is insufficient evidence to support the jury's findings that the murder was committed in an "especially heinous, cruel, or depraved manner."

**ISSUE NO. THIRTEEN** - There is insufficient evidence to support the jury's findings regarding the non-statutory aggravating factor of future dangerousness.

**ISSUE NO. FOURTEEN -** There is insufficient evidence to support the jury's findings regarding the statutory aggravating factor of substantial premeditation and planning.

**ISSUE NO. FIFTEEN** - District court abused its discretion in denying appellant Snarr's and appellant Garcia's motion to sever.

**ISSUE NO. SIXTEEN** - The federal death penalty act is unconstitutional.

**ISSUE NO. SEVENTEEN** - Snarr and Garcia's death sentences must be reversed because the district court reversibly erred in keeping out the prior bad acts of the complainant at sentencing depriving the jury of making an informed vote.

**ISSUE NO. EIGHTEEN** - Snarr and Garcia's death sentences must be reversed because the district court reversibly erred in keeping out execution impact evidence.

**ISSUE NO. NINETEEN** - Garcia's and Snarr's death sentences must be reversed because this Honorable Court denied Garcia due process by overruling the district court and denying the funding necessary for

Garcia to present a punishment case, which additionally impinged upon the due process rights of Snarr in the joint trial.

# STATEMENT OF THE CASE

## 1.    Nature of the Case

This is an appeal from convictions of capital murder with a sentence of death, regarding two defendants who were tried in a joint trial. Appellant Mark Isaac Snarr, hereinafter referred as "Snarr," and Edgar Balthazar Garcia, hereinafter referred to as "Garcia," were both indicted in a one count indictment in which it was alleged that each appellant killed one Gabriel Rhone, in violation of 18 U.S.C § 1111, and 2. After a trial, each defendant was convicted and sentenced to death.

## 2.    Course of Proceedings and Disposition in the Court Below.

On January 21, 2009, a Federal Grand Jury for the Eastern District of Texas returned a one-count Indictment against the Appellant, Mark Isaac Snarr, alleging violations of 18 U.S.C. § 18 U.S.C. § 1111 (Murder), and 2 (Principals). The Office of the Federal Defender for the Eastern District of Texas was previously appointed to represent Mr. Snarr on April 2, 2008. Douglas M. Barlow was appointed as co-counsel on April 2, 2008.  The United States Department of Justice authorized the United States Attorney's Office for the Eastern District of Texas to seek the death penalty on February 24, 2009.  The grand jury additionally alleged special findings regarding each appellant, which, if proved, authorized the imposition of the death penalty. Vol.1 p.26; Vol. 1 [Supp. 2], p.41. Appellants entered pleas of not guilty and

the joint trial was to a jury. Following the presentation of evidence, the jury found both appellants guilty of count one of the indictment. Vol. 3, p.698; Vol. 4 [Supp.2], p.915. The jury returned a verdict of guilty on May 7, 2010. The trial continued into Phase II, regarding the eligibility phase as to whether either appellant was eligible for the death penalty. Following the further presentation of evidence, the jury found several of the issues submitted in the court's charge in the affirmative, authorizing the trial to proceed with the consideration of the death penalty. Vol. 1,(sealed envelope); Vol. 1 [Supp. 2], ( sealed envelope); Vol. 28[ Supp. 1], p.4944; Vol. 32 [Supp. 2], p.5996. Following the further presentation of evidence during the selection phase (Phase III) of the trial, and deliberations of the jury, the jury answered the special issues adversely to Snarr and Garcia, and determined a sentence of death should be imposed as to count one, regarding each individual. Vol. 37 [Supp. 1], p.6583-6593; Vol.41[Supp. 2], p.7644-7658. On May 24, 2010, the trial court sentenced appellants to death as to count one of the indictment. Vol. 38[ Supp. 1], p.6615; Vol. 42[Supp.2], p.7666. Appellant Snarr filed timely written notice of appeal on June 3, 2010. Vol. 3, p.843. Appellant Garcia filed timely written notice of appeal on June 3, 2010. Vol. 4 [Supp. 2], p.1078.

Appellants Snarr and Garcia have therefore perfected appeal to this United States Court of Appeals, 5th Circuit, complaining of the issues set forth hereinafter.

3.    **Statement of Facts.**

Appellants Mark Isaac Snarr and Edgar Balthazar Garcia were indicted in a one-count indictment, in which it was alleged that each violated 18 U.S.C. §1111 and 18 U.S.C. §2 by killing Gabriel Rhone. Each indictment contained allegations of special findings, which if proven, authorized the imposition of the death penalty. Vol. 1, p.26; Vol. 1 [Supp.2], p.41.

Trial was to a jury. On April 6, 2010, the general voir dire began. Vol. 8 [Supp.1], p.291 *et seq.* Because of the number of potential jurors summoned, the general voir dire continued before a second group, on April 7, 2010. Vol 9 [Supp. 1], p.480 *et seq.* The individual voir dire began on April 13, 2010, and continued through April 26, 2010. Vol. 11 [Supp 1], p.896 through Vol. 20 [Supp 1], p.3120.

Over 100 witnesses were called to testify during the course of the trial over the ensuing weeks. In order not to belabor this Court with a recitation of the testimony of every witness, a summary of the evidence will follow. As pertinent evidentiary issues and facts become relevant to the issues raised hereinafter, those portions of the record will be properly cited for the benefit of the Court as the issues are raised. On May 3, 2010, the presentation of evidence began with the government  calling an

employee from the United States Penitentiary in Beaumont Texas, Randall Calhoun, who established that Snarr and Garcia were inmates at that federal prison. Vol. 21[Supp. 1], p.3382-3386. He described the layout of the facility and pointed out the special housing unit known as the "SHU," where appellants were housed. Vol. 21 [Supp. 1], p. 3387-3393. The government introduced government's exhibit 3A, a disk containing video footage of the alleged offense. Vol. 21 [Supp 1], p.3402. As the video was published to the jury, the officer described what was depicted. The video and his testimony indicated that Snarr and Garcia were being escorted to their respective cells, when each produced a handmade weapon, known in prison jargon as a "shank," and assaulted several officers to obtain keys to the cells. Vol 21 [Supp 1], p.3404-3437. The testimony and videotape indicated that Snarr used the cell door keys obtained from one of the guards to open the cell door of Gabriel Rhone with the assistance of Garcia. Vol. 21 [Supp.1], p.3439-3442. The evidence indicated that Snarr and Garcia chased Gabriel Rhone down the prison run after he fled his cell and was stabbed repeatedly by both appellants. Vol. 21 [Supp. 1], p.3443-3448. The testimony and video evidence indicated that, once the guards were armed with a gas gun, they opened up the door to the run and removed Gabriel Rhone. Vol. 21 [Supp. 1], p.3451-3452. Following the removal of Rhone, both appellants surrendered their

8

weapons and allowed hand restraints to be reapplied to them without resistance. Vol. 21 [Supp. 1], p.3452-3453.

The government, through investigating witnesses, introduce numerous photographs and items of evidence gathered in the investigation of the alleged offense, including the weapons alleged to be used. Vol. 21 [Supp. 1], p.3465-3466. One of the guards assaulted in the incident, DeWight Baloney, testified to the assault and described the fact that he had been stabbed numerous times during incident. Vol. 21 [Supp. 1], p. 3622-3626. Pathologist Dr. Tommy Brown testified that Gabriel Rhone died from multiple stab wounds to the heart, lung, and liver. Vol. 22 [Supp 1.], p.3741. Upon cross-examination, he admitted the stab wounds of the lung and the liver would have been lethal if not treated in an appropriate time frame, and it was the injury to the heart that was the cause of death. Vol. 22 [Supp. 1], p.3748. He also described other scars from wounds on the body of Rhone including those that would be consistent with a stab wound. Vol. 22 [Supp. 1], p.3749-3753. The government called former correctional officer Josh McQueen to testify that he was another officer assaulted in the incident and from whom the keys were obtained. Vol. 22 [Supp. 1], p.3787-3788. He testified to failures in the security system on the day of the incident. Vol. 22 [Supp. 1], p.3804-3808. Another correctional officer called by the government detailed upon cross-examination the failures of the prison employees and

administration to follow proper security policies, the lack of supervision, and that the mantra was basically being told just to get it done. Vol. 22 [Supp. 1], p.3836-3845. Another officer, Mark Odom, testified about the concern of the possibility of backlashes from the result of the incident because Rhone was actually a Muslim inmate which concerned the administration. Vol. 22 [Supp. 1], p. 3874. He testified that the administration made the determination that there would not be any problem with the Muslim group of inmates following the incident. Vol. 22 [Supp. 1], p. 3881. The government called inmate Keenan Hurt, who had previously been convicted of felon in possession of a weapon, manslaughter, robbery, kidnaping, felony murder, and weapons charges. Vol. 22 [Supp. 1], p. 3894-3895. Hurt testified that he was an inmate in another cell on the same run and described the incident in detail. Vol. 22 [Supp. 1], p. 3916-3931. He testified that "prison is about politics" and described the segregated system and the inmates' self-imposed administration. Vol. 22 [Supp. 1], p.3934-3937. Upon cross-examination, he detailed how the Muslim community intended to deal with the deceased and the system of discipline among the inmates. Vol. 23 [Supp. 1], p. 3956-3964. He described the volatility of the personality of the deceased and set out 3 things that are absolutely prohibited in inmate conduct. Vol. 23 [Supp. 1], p. 3965-3967. He admitted that he had previously told the prosecutors that the Muslims had issued an order for him to violently attack Rhone himself. Vol.

10

23 [Supp. 1], p. 3997-4000. Following that testimony, the government rested. Vol. 23 [Supp. 1], p. 4046.

The presentation of the evidence of the defense began with the testimony of former corrections officer Dawn Gallagher who testified that prior to the incident, Rhone had engaged in offensive behavior including exposing his penis through the food slot. Vol. 23 [Supp 1], p. 4117. She additionally testified that Rhone ejaculated on her shoe. Vol. 23 [Supp 1], p. 4118. Both defendants were upset and offended by the behavior of Rhone. Vol. 23 [Supp. 1], p. 4119-4120. Similar to other witnesses, she also testified that Rhone was not a peaceful and law-abiding inmate. Vol. 23 [Supp. 1], p. 4125. The defense called inmate Ricardo Pallaret who was the cellmate of Rhone around the time of the incident. He testified that Rhone exhibited extreme anger; he was a very controlling manipulator and would direct insults in the direction of others, including appellants. Vol. 23 [Supp. 1], p. 4194-4196. He additionally testified that Rhone said if he could get into the cell with Garcia, he would kill him, and insulted him. Vol. 23 [Supp. 1], p. 4197-4198. He testified that Rhone called the appellants "devils" and his behavior continued through the night before the incident. Vol. 23 [Supp. 1], p. 4119-4120. The defense called former prison official Mark Bezy, who testified to the failings of the Bureau of Prisons security system and policy violations at the subject institution preceding and during the time of the incident. Vol.

11

24 [Supp. 1], p. 4260 *et seq.* The defense thereafter rested. Vol. 24 [Supp. 1], p. 4330.

Following rebuttal testimony presented by the government, the government thereafter rested. Vol. 24 [Supp. 1], p. 4340. Following the arguments of counsel and the deliberations of the jury, the jury found both appellants guilty of count one of the indictment. Vol. 25 [Supp. 1], p. 4430.

The court thereafter began the eligibility phase for the jury to determine if either appellant was eligible for the death penalty. The government introduced evidence to establish that appellant Snarr had previous convictions, including aggravated assault (Vol. 26 [Supp. 1], p. 4486) and violation of a racketeering statute (Vol. 26 [Supp. 1], p. 4513). The government called the alleged victim of one of the convictions, Clinton Alls, who described the altercation with appellant Snarr. Vol. 26 [Supp. 1], p. 4533-4536. The government called correctional officer Christopher Rivers, who testified he observed appellant Snarr stabbing another inmate, Mason, with a homemade weapon on another occasion. Vol. 26 [Supp. 1], p.4544-4545. The government called several other witnesses to document the investigation of the incident, and finally the prosecutor who prosecuted appellant Snarr, not for an assault, but for possession of a weapon. Vol. 26 [Supp. 1], p. 4554-4556, 4571-4574, 4590. The government called a former Assistant U.S. Attorney Tanya Pierce, who testified she prosecuted appellant Garcia regarding a federal drug conspiracy, to which

appellant Garcia had plead guilty and been sentenced. Vol. 26 [Supp. 1], p. 4636-4639. The judgment also contained recitations of convictions of other federal violations. Vol. 26 [Supp. 1], p. 4640-4649. The government additionally introduced evidence of a drive-by shooting, to which appellant Garcia had entered a plea of guilty. Vol. 26 [Supp.1], p. 4654, 4662, 4667, 4682. The government called Assistant U.S. Attorney Rick Mountcastle, who testified he prosecuted appellant Garcia regarding a conviction for possession of a weapon in prison. Vol. 26 [Supp. 1], p. 4689-4691. A participant in the drive-by shooting, Benito Perez, testified that the incident began as he and several others, including appellant Garcia, pulled up to the subjects' house so he could start a fight with an individual; he additionally admitted the only way he could secure his release from prison the day following his testimony was to testify at the behest of the government. Vol. 27 [Supp. 1], p. 4701,4711. The government recalled Assistant U.S. Attorney Dave Henderson to testify that he also prosecuted appellant Garcia for assaulting an individual with a dangerous weapon and possession of the weapon. Vol. 27 [Supp. 1], p. 4739-4740. He testified that appellant Garcia plead guilty to the first count and the second count was dismissed. Vol. 27 [Supp. 1], p. 4741. Bureau of Prisons investigative agent Robert Swain testified that after the offense made the basis of the prosecution in this case, he spoke with both appellants Snarr and Garcia. Vol. 27 [Supp. 1], p. 4751. He testified that both

appellants indicated that the incident was not supposed to "happen that way with the staff" and that they were remorseful about the involvement of the staff in the assault. Vol. 27 [Supp. 1], p. 4752. He testified that he believed that the incident arose out of a "respect issue" and each appellant felt that Rhone had disrespected them and made them look bad in front of other inmates, and they " had to do what they had to do". Vol. 27 [Supp. 1], p. 4768. This portion of the trial concluded with the government calling George Sarro, another inmate with several felony convictions, who testified that he supplied a shank to appellant Snarr by delivering it to him from another inmate prior to the offense. Vol 27 [Supp. 1], p. 4786-4788. The government and appellants Snarr and Garcia thereafter rested. Vol. 27 [Supp. 1], p. 4831-4832. Following arguments of counsel and deliberations of the jury, the jury found several of the special findings in the affirmative, such that each defendant was eligible for the death penalty. Vol. 28 [Supp. 1], p.4944-4947.

In Phase III, the selection phase, the government called witnesses to establish the background of appellant Snarr; his juvenile probation officer Randy Gangwer testified concerning appellant being referred to the adult system. Vol. 29 [Supp. 1], p. 4981-4984. The government additionally called witnesses to establish that appellant had committed other acts of violence including fighting in jail with a shank (Vol. 29 [Supp. 1], p. 4993-5000), participating in the prison gang of Soldiers of

14

Aryan Culture and the racketeering account previously referenced (Vol. 29 [Supp. 1], p, 5021-5024), assaulting another inmate (Vol. 29 [Supp. 1], p. 5056), and shaving the head of another inmate (Vol. 29 [Supp. 1], p. 5087). The government additionally called other witnesses to discuss the facts of the extraneous offenses as well as the disciplinary hearing findings thereon. Vol. 30 [Supp. 1], p. 5122 *et seq*. The government additionally called investigators, as well as the alleged victim David Wengler, to establish that appellant Snarr had stabbed Wengler on another occasion. Vol. 30 [Supp. 1], p. 5268-5272. Assistant U.S. Attorney Dave Henderson was recalled, and he testified that he did not file charges against appellant Snarr for possession of the weapon or the alleged assault on Wengler but that the Bureau of Prisons punished Snarr by taking away 41 days of good conduct time as an administrative procedure. Vol. 30 [Supp. 1], p. 5337-5338. Corrections officer Emmitt Landry testified that he found three "shanks" in a cell occupied by four individuals, including appellant Snarr, and disciplinary action was taking against appellant Snarr and another inmate. Vol. 30 [Supp. 1], p. 5347-5348. Correctional officer Travis Caldwell testified that he observed a fight in prison involving appellant Snarr in which an inmate Hammonds was assaulted and stomped. Vol. 30 [Supp. 1], p. 5369-5370. The disciplinary hearing examiner, Larry Weston, testified that appellant Snarr admitted to his participation in the assault at his disciplinary hearing.

Vol. 30 [Supp. 1], p. 5398. He additionally testified upon cross-examination the code he had reduced the incident to was "assault without serious injury." Vol. 30 [Supp. 1], p. 5402. The government finally called B.O.P. employee Doug Yeomans who testified that appellants Snarr and Garcia were celebratory following the alleged killing of Rhone. Vol. 31 [Supp. 1], p. 5425. The government thereafter rested in the selection phase (Phase II) against appellant Snarr. Vol. 31 [Supp. 1], p. 5427.

The government called Taylor County sheriff deputy L.C. Dobson, who testified regarding drug dealing by appellant Garcia. Vol. 31 [Supp. 1], p. 5475-5488. Daniel Cisneros testified concerning drug dealing among himself, certain Perez brothers and appellant Garcia. Vol. 31 [Supp. 1], p. 5491-5495. He testified that during a transaction concerning a sale of a rifle to Jacob Ponce, Ponce was murdered and he discussed the involvement of appellant Garcia. Vol. 31 [Supp. 1], p. 5497-5503. Eusabio Perez testified to his participation and that he witnessed appellant Garcia kill Jacob Ponce. Vol. 31 [Supp. 1], p. 5528. The government presented testimony that appellant Garcia had Texas Syndicate tattoos (Vol. 31 [Supp. 1], p. 5617) and the background of the Texas Syndicate. Vol. 31[Supp. 1], p. 5625 *et seq*. A B.O.P. corrections officer testified that he located two razor blades in the property of appellant Garcia (Vol. 31 [Supp. 1], p. 5637) and that he admitted that the razor blades belonged to him. Vol. 31 [Supp. 1], p. 5644. The government also presented

evidence regarding appellant Garcia assaulting an inmate (Vol. 31 [Supp. 1], p. 5662-5664) with other Texas Syndicate members, assaulting another inmate (Vol. 31 [Supp. 1], p. 5700) assaulting another inmate in the SHU (Vol. 31 [Supp. 1], p. 5712-5713), the stabbing of another inmate (Vol. 31 [Supp. 1], p. 5729), kicking another inmate while he was being escorted (Vol. 31 [Supp. 1], p. 5780), and possessing a shank in his prison cell (Vol. 31 [Supp. 1], p.5793,5805). B.O.P. Lieutenant Tim Carter testified that following the offense, he participated in the transport of appellant Garcia to Houston. Vol. 31 [Supp. 1], p. 5808. He testified that in response to questioning, appellant Garcia stated that the assault on the staff was not personal, but the staff "just happened to be a victim of circumstance." Vol. 31 [Supp. 1], p. 5810. The government concluded by calling inmate Shaquan Smith, an inmate with several convictions including a life sentence, who testified regarding statements appellant Garcia made regarding the offense of conviction and the reasons behind the incident. Vol. 31 [Supp. 1], p. 5827-5843. Upon cross-examination, he reiterated that appellant Garcia had told him that Rhone was armed in his cell with a knife. Vol. 31 [Supp. 1], p. 5854. The government thereafter rested in Phase III regarding evidence against appellant Garcia. Vol. 31 [Supp. 1], p. 5858.

The defense testimony began with the presentation of evidence relating to appellant Snarr. Lamar University dean and psychologist Oney Fitzpatrick testified

17

regarding the social background of Snarr. Through this witness, a comprehensive family history report prepared by a mitigation specialist was admitted as defendant's exhibit #54. Vol. 33 [Supp. 1], p. 5870. The report and testimony of Dr. Fitzpatrick revealed the dysfunctionality of the family in which appellant Snarr was raised, including drug abuse, sexual abuse, and parenting failures. Vol. 33 [Supp. 1], p. 5871-5893. An employee of the Internal Revenue Service, Christa Frew, testified that she was the ex-girl friend of the appellant and had been close to him for a number of years, up until and including the time of the trial. Vol. 33 [Supp. 1], p. 5921. She detailed acts of kindness by him, including arranging Christmas presents to be delivered to her and her children by writing a letter to a radio station while he was in prison. Vol. 33 [Supp. 1], p. 5922-5923. She expressed extreme love for appellant Snarr, detailed the love he held for his family, and asked the jury to spare his life. Vol. 33 [Supp. 1], p. 5924-5925. Angelique Atmore, the daughter of Christa Frew, testified as to how appellant Snarr took the place of her biological father, described his support to her, and additionally asked the jury to spare his life. Vol. 33 [Supp. 1], p. 5941-5943. The aunt of appellant Snarr, Kayleen Furse, testified that he was born into an abusive, neglectful family life, and was taught hatred and violence. Vol. 33 [Supp. 1], p. 5945. She witnessed verbal and physical abuse in the home and made attempts to have authorities remove the children from the home. Vol. 33 [Supp. 1],

p. 5946-5947. She testified that appellant Snarr was smart, eager to learn, taught himself to read, and eventually took on the role of the protector of the family; she asked that the jury spare his life. Vol. 33 [Supp. 1], p. 5948-5949. The chair of the Criminal Justice Department of the University of Houston and criminal justician Dr. Elizabeth Peltz testified regarding her studies of prison culture and society over twenty years, and provided insight to which few people in the general public had been introduced. Vol. 33 [Supp. 1], p. 5952-5953. She described how a dysfunctional family social life coupled with the stress of prison culture molds a person's adaptation in prison. She described the effects of those factors in particular in appellant Snarr's case. Vol. 33 [Supp. 1], p. 5954-5958. She described in detail the prison culture and why appellant Snarr would have reacted in the manner in which he did in order to cope. Vol. 33 [Supp. 1], p. 5959-5967. She detailed that a B.O.P. internal affairs report indicated that the failures of the B.O.P. may have even promoted the offense. Vol. 33[Supp. 1], p. 5970. She testified that the B.O.P. system could take efforts to assure that the confluence of events would not occur again and that, if policy was followed, there would be little or no chance of appellant Snarr harming anybody in the future. Vol. 33 [Supp. 1], p. 5976. The mother of appellant Snarr, Cindy Bown, testified that appellant was a caring person with a heart of gold, with love for his family, and she asked the jury to spare his life. Vol. 33 [Supp. 1], p. 6002.

19

The defense continued by recalling Ricardo Pallaret who testified regarding offensive threats that Rhone had made concerning appellant Snarr's family, precipitating extreme anger and provocation of appellant Snarr. Vol. 33 [Supp. 1], p. 6008-6010. He testified that Rhone would file his shank in his cell, and drag it along the wall, asking appellant Garcia if he heard the sound of the shank. Vol. 33, [Supp. 1], p. 6010-6011. Upon cross-examination, he testified that Rhone had a different shank everyday. Vol. 33 [Supp. 1], p.6021. The evidence concerning appellant Garcia continued with the testimony of his mother, Graciela Kirkham, who testified to the abuse in her family from appellant Garcia's father and her mother-in-law. Vol. 33 [Supp. 1], p.6031-6035. She testified that her mother-in-law was into witchcraft and abortions, and attempted to kill appellant Garcia when he was two months old but he recovered in the hospital. Vol. 33 [Supp. 1], p. 6039-6041. She testified regarding the effects of the lack of oxygen and his long recovery after rehospitalization before his first birthday. Vol. 33 [Supp. 1], p. 6042-6044. She related problems regarding the relationship between appellant Garcia and her and the father, and problems when appellant Garcia later went to live with his father. Vol. 33 [Supp. 1], p. 6057-6059. The woman with whom appellant Garcia's father was living threatened to kill appellant Garcia. Vol. 33 [Supp. 1], p. 6060. She had problems in her relationship ever since appellant Garcia joined his father in the drug trade. Vol. 33 [Supp. 1], p.

20

6061. Appellant Garcia's brother, Oswaldo Melendez, testified regarding the life of crime his father taught his children, and the change for the worse he observed in appellant Garcia after spending time with his father. Vol. 33 [Supp. 1], p. 6066-6067. He testified that appellant Garcia was a very good father to his children, lead them down the right path in life, and was supportive of them. Vol. 33 [Supp. 1], p. 6068. The uncle of appellant Garcia, Javier Melendez, confirmed how appellant Garcia's father lead him into a life of crime and that his grandmother that dealt in witchcraft tried to kill appellant Garcia with smoke. Vol. 33 [Supp. 1], p. 6085. A former teacher of appellant Garcia, Stephanie Hamilton, testified regarding appellant's participating in school lessons, and his invitation to her to a reception as his teacher later. Vol. 33 [Supp. 1], p. 6090-6091.

Former Bureau of Prisons warden Mark Bezy testified to his extensive experience and career throughout the Bureau of Prisons. Vol. 34 [Supp. 1], p. 6114-6117. He described the B.O.P. process that would be likely to house appellants and what would happen to both appellants if they were sentenced to life without parole. Vol. 34 [Supp. 1], p. 6120-6125. He testified that the B.O.P. could safely house appellant Snarr and that same testimony was adopted on the behalf on appellant Garcia. Vol. 34 [Supp. 1], p. 6126. He testified that repeated recommendations and

findings were not corrected in the B.O.P. system which lead to the "tragic event". Vol. 34 [Supp. 1], p. 6147.

The mother of appellant Garcia's children, Rachal Rodriguez, testified regarding appellant Garcia's attributes as a father. Vol. 34 [Supp. 1], p. 6165-6166. She also related Garcia's extraordinary artistic abilities, including exhibits of examples. Vol. 34 [Supp. 1], p. 6167. The video presentations of interviews of each of the children Audrianna Garcia and Isaiah Garcia, conducted by Dr. Jolie Brams, were published to the jurors; each interview contained detailed statements of the children regarding attributes of their father appellant Garcia. Vol. 34 [Supp. 1], p. 6171-6172.

The defense called forensic psychologist Dr. Jolie Brams who had conducted the interviews with the children of appellant Garcia, and additionally conducted a broad investigation with the assistance of a mitigation specialist into the life of appellant Garcia. Vol. 35 [Supp. 1], p. 6191 *et seq*. She detailed her meetings with appellant Garcia as well as interviews with family members and others and detailed for the jury appellant Garcia's difficult life that had been described by the previous witnesses. Vol. 35 [Supp. 1], p. 6191-6214. She additionally testified about his adaptation in prison life, the terror he experienced in prison, and his hypervigilance. Vol. 35 [Supp. 1], p. 6215-6217. She testified that despite his past behavior, the

influence of being a father to his children was a life-changing experience and appellant Garcia was still maturing as a young man and could have a sense of decency about his own life. Vol. 35 [Supp. 1], p. 6220-6221. Thereafter both appellant Snarr and Garcia rested. Vol. 35 [Supp. 1], p. 6255.

On rebuttal, the government recalled B.O.P. employee Robert Nylen who testified regarding certain personal correspondence that appellant Snarr had written to other persons. Vol. 35 [Supp. 1], p. 6267-6275. B.O.P. Lieutenant Ricardo Martinez testified and a videotape was introduced, concerning appellant Garcia's tearing up bed sheets and being forcibly removed from his cell at the time of the beginning of the trial. Vol. 35 [Supp. 1], p. 6278-6290. On cross-examination, he testified that after the incident, appellant Garcia told him that he was sorry and Martinez indicated "kinda the same thing," that they could have handled the situation better. Vol. 35 [Supp. 1], p. 6306. A retired regional director of B.O.P., Greg Hershberger, testified concerning his perception of the prison procedure and that he expected that if the defendants received life sentences and went to A.D.X., they would eventually be later placed in a regular U.S. penitentiary. Vol. 35 [Supp. 1], p. 6330-6332. On cross-examination, he admitted that some inmates had been held in the control unit for many years, including one inmate who had been in segregation for twenty-seven years. Vol. 35 [Supp. 1], p. 6343-6344. He admitted that the bottom line

23

was that the Bureau of Prisons decides where an inmate was going to serve his time based on a careful review of all the facts and circumstances in each specific case. Vol. 35 [Supp. 1], p. 6354. B.O.P. Lieutenant Christopher Rivers was recalled and he testified concerning security procedures at the various institutions. Vol. 35 [Supp. 1], p. 6378 *et seq*. He testified that he had known appellants Snarr and Garcia while incarcerated in Beaumont as well as Florence, Colorado, and that he was sure that they would be compliant with the program; he believed that they would be able to comply with the rules and regulations. Vol. 35 [Supp. 1], p. 6404. The government thereafter rested on rebuttal. Following the tender of the report of a defense investigator, appellant Snarr and Garcia also rested. Vol. 35 [Supp. 1], p. 6405.

Following the arguments of counsel and deliberations of the jury, the jury found answers to the special issues adversely to appellants Snarr and Garcia, and determined that the appropriate sentence to be imposed on each defendant was the death penalty. Vol. 37 [Supp. 1], p. 6593, 6607. On May 24th, 2010, each defendant was sentenced to death by the trial court. Vol. 38 [Supp. 1], p. 6615; Vol. 42 [Supp. 2], p. 7666. From said judgments of convictions and sentences of death, appellants Snarr and Garcia have perfected this appeal to the United States Court of Appeals, Fifth Circuit, complaining of the issues as set forth hereinafter.

# SUMMARY OF THE ARGUMENTS

**Issues Nos. One through Five**

Issues No. One through Issue Five arose from the trial court granting the government's challenges for cause against venirepersons based upon their reservations concerning the death penalty. Appellants Snarr and Garcia submit that the potential jurors were in fact qualified and should not have been excluded simply because they expressed reservations concerning the death penalty. The removal of each of these potential jurors constituted reversible error. The improper exclusion of even a single potential juror requires reversal. The potential jurors excused here did not demonstrate that they were not qualified to serve. Voir dire is a process of education, and a meaningful assessment of a juror's feelings can only be gained by a complete review of their answers especially after they have been properly informed about the law. Each of these potential jurors was qualified but wrongfully excluded by the erroneous granting of the government's challenges based on their feelings about the death penalty.

**Issues Nos. Six through Eight**

These issues arose from the trial court's failure to grant the appellants' challenges for cause against the above venirepersons based upon their expressed biases and issues of disqualification. Appellants Snarr and Garcia submit that the

potential jurors were in fact disqualified and should have been excluded . The failure to remove each of these potential jurors constituted reversible error.

**Issue Nine and Ten**

Potential jurors Nos. 130 and 232 were excluded from jury service herein because the trial judge simply did not want to deal with each of their disabilities. The trial court was clear that the disabilities of each venireman was nothing more than a nuisance to the trial court and interfered with her administration of the case. No accommodations whatsoever where offered to these disabled citizens who appeared for jury service according to their civic duties. The exclusion of these potential jurors denied appellants due process and a fair trial, and violated the Equal Protection clause of the U.S. Constitution, and other authorities. The error of the trial court additionally caused harm by allowing one potential juror to gain information about the case after being excused, exacerbating the error.

**Issues No. Eleven**

In *Beck v. Alabama*, 447 U.S. 625 (1980), the Supreme Court held that criminal defendants in capital murder cases have a constitutional right to jury instructions on lesser-included offenses. The Supreme Court held that the failure to give a lesser-included-offense instruction in a capital murder case can violate due process. Appellants Snarr and Garcia requested a jury instruction on the lesser

included offense of second degree murder; this request was denied by the District Court. The evidence in this case showed that Gabriel Rhone, the inmate who was killed, was violent and mentally disturbed. The evidence also revealed that he had threatened and taunted Snarr and Garcia from his cell for hours on end the evening before he was killed. He specifically threatened to kill them. There is an inference from the videotaped evidence that, when Snarr entered Rhone's cell, Rhone was armed and attacked Garcia first. Rhone was killed as the men were fending off his attacks and once they were able to obtain his weapon. This is sufficient to negate the evidence of premeditation and establish second-degree murder. Therefore, it was error to deny this requested instruction.

**Issue No. Twelve**

The government alleged, as a statutory aggravatory factor, that the murder of Gabriel Rhone rose to the level of "especially heinous, cruel or depraved". The factor of "heinousness" was submitted to the jury during the eligibility phase (Phase II) of the trial. The jury returned affirmative findings on this issue.

There is insufficient evidence to support the jury's findings that the murder was committed in an "especially heinous, cruel, or depraved manner." Because the government did not propose that Rhone had been tortured, this aggravator focused on "serious physical abuse". There is insufficient evidence that Snarr or Garcia

27

inflicted "serious physical abuse" on Rhone within the meaning of 18 U.S.C. §3592(c)(6). The government's argument rested on the idea that, because Rhone was stabbed multiple times and his body was damaged, the fact of "heinousness" had been proven. This is the wrong focus. The key question is whether those actions taken by Snarr and Garcia to kill Gabriel Rhone were gratuitous and more than necessary to bring about death. Snarr's and Garcia's actions did not rise to this requisite level. Because a jury's sentencing decision under the FDPA requires a weighing process, the fact that the government did not sufficiently prove this aggravating factor requires reversal, as it impermissibly skewed the jury's weighing process. For these reasons, the §3592(c)(6) aggravating factor is based on insufficient evidence, and the jury's death sentences thus violated the Eighth Amendment.

**Issue No. Thirteen**

The government alleged, as a non-statutory aggravatory factor in the Selection Phase of the trial, that Snarr and Garcia posed a future danger. The jury agreed with this factor. Because the sentencing options for the defendants were the death penalty or life without the possibility of release, the "future danger" factor had to be viewed within the context of the future danger Snarr and Garcia represented within a prison, specifically the Control Unit of ADX.

28

The evidence is insufficient to sustain the jury's finding. The evidence was clear that the BOP had the unfettered discretion to house both Snarr andGarcia at the Control Unit at ADX for as long as necessary. The evidence and arguments presented by the government asked the jury to speculate that the BOP would somehow act irrationally and release Snarr and Garcia into the general population of ADX or another penitentiary. The government preyed upon this speculation. For instance, the government argued during closing that "as sure as the sun is going to shine again" the two men would be released into the general population of a prison and asked the jury if they wanted to take a chance that would happen. This type of argument made it difficult for the jury to properly consider Snarr's and Garcia's mitigating factors. The lack of evidence and the confusion produced by the government introduced an arbitrary factor into the sentencing hearing, in violation of the Eighth Amendment. Thus, Snarr's and Garcia's sentences should be vacated.

**Issue No. Fourteen**

The government alleged, as a statutory aggravatory factor, that the murder of Gabriel Rhone involved "substantial premeditation and planning." The government's questions to the jury during voir dire and the government's statements during closing arguments inaccurately stated the law by minimizing what this particular aggravator requires. There is insufficient evidence present throughout the trial that this was

anything more than a crime of convenience. It was committed rather spontaneously on a day when the staffing was low, when other incidents such as flooding and an inmate-attempted suicide occurred, which distracted the guards. Snarr and Garcia did not know that they would be left in the recreation cages for hours, or that there were not enough guards to sufficiently escort them back to their cells in the "three-man hold" as required. There is insufficient evidence to indicate that the murder of Rhone was anything but hatched upon a spur-of-the-moment whim. There is insufficient evidence that Snarr and Garcia committed this offense after "substantial premeditation and planning."

**Issue No. Fifteen**

The district court's refusal to sever each of the appellants' trials from that of the co-defendant resulted in a trial that created such prejudice and confusion in the minds of the jury that the jury could not reasonably segregate evidence against the two defendants. Instead, the jury most likely convicted Snarr and Garcia, and assessed the ultimate penalty of death, on the cumulative effect of all of the evidence against both defendants. Because of the prejudice, confusion and continued blurring of identities between these two defendants, the jury could not have reasonably separated the evidence and rendered an impartial verdict. Further, Snarr and Garcia were also denied the beneficial testimony that each would have provided had the two

defendants been tried separately. This is not a case where the two defendants sought to blame the other; rather, these defendants wanted to testify on behalf of the other. They could not do so when they were being tried together. The importance of Garcia's testimony to Snarr's case, and Snarr's testimony to Garcia's, is significant.

Finally, the denial of the motion to sever also precluded both Snarr and Garcia from receiving an individualized assessment for the penalty phase of the trial. As such, the cases should be reversed and remanded for separate trials.

**Issue No. Sixteen**

Although appellants recognize that the following issue is foreclosed by Fifth Circuit precedent, Snarr and Garcia contend (for purposes of preserving the issues for further appeal), that the Federal Death Penalty Act is unconstitutional.

**Issue No. Seventeen**

Appellant's death sentences were imposed by a jury with a constitutionally impaired understanding of the circumstances of the offense. This was so because they jury did not know the complaining witness, Gabriel Rhone. This prison death did not occur in a vacuum. What the prison knew about Rhone was important. What appellants knew was also important. What the jury never heard was the most important aspect of this issue. Rhone's record of violence and threats to other inmates and prison personnel would have permitted the jury to see appellants' conduct in an

entirely different light. While the failure of the trial court to provide a charge on self-defense or a lesser offense is discussed elsewhere, in this issue the critical fact of what the jury did not know about Rhone is addressed.

**Issue No. Eighteen**

A full picture of the mitigating evidence was denied to this jury because the court refused to admit testimony regarding the impact of the execution on the families of the appellants. Garcia attempted to offer information about what his death would mean to his children and loved ones. This testimony is separate and distinct from that offered about how appellant is involved in the lives of his family. The jury must consider what will happen when appellants are executed and they must be allowed to see who else will be the victim of such a decision. It was error to limit the mitigating testimony in this way. The error is reflected in the death sentence against Snarr because the two defendants were tried together over defendants' objections.

**Issue No. Nineteen**

Snarr and Garcia's death sentences must be reversed because this Honorable Court denied Garcia, tried simultaneously with Snarr, due process by overruling the district court and denying the funding necessary for Garcia to present a punishment

case. The error is reflected in the death sentence against Snarr because the two defendants were tried together over defendants' objections.

## ARGUMENTS AND AUTHORITIES

**ISSUE NO. ONE -** The trial court erred in excluding from the jury potential juror # 3 Lacy, who expressed reservations concerning the death penalty.

**ISSUE NO. TWO** - The trial court erred in excluding from the jury prospective juror # 66 Stephenson, who expressed reservations concerning the death penalty.

**ISSUE NO. THREE** - The trial court erred in excluding from the jury prospective juror # 130 Kimball, who expressed reservations concerning the death penalty.

**ISSUE NO. FOUR** - The trial court erred in excluding from the jury prospective juror # 140 Furby, who expressed reservations concerning the death penalty.

**ISSUE NO. FIVE** - The trial court erred in excluding from the jury prospective juror # 200 Blackmon, who expressed reservations concerning the death penalty.

**I.      Standard of Review and Reviewability**

The standard of review is found in *Witherspoon v. Illinois*, 391 U.S. 510 (1968), wherein the Supreme Court held that a trial court infringes a capital defendant's right under the Sixth Amendment when it excuses for cause members of the venire who express conscientious objections to capital punishment. A prospective juror may be excluded for cause from a capital jury only upon a showing that he or she is "irrevocably committed to… vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings." *id*. at 522 n.21, or that his or her views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath,'" *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)(quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)).    Jurors may not be excluded simply because they express some disagreement with the death penalty. *Gray v. Mississippi*, 481 U.S. 648, 658 (1987) (*citing Lockhart v. McCree*, 476 U.S. 162 (1986)).

**II.      Argument**

The above issues are discussed together in that they involve similar factual basis and similar authorities. Each issue arose from the trial court granting the government's challenges for cause against the above venirepersons based upon their reservations concerning the death penalty. Appellants Snarr and Garcia submit that

the potential jurors were in fact qualified and should not have been excluded simply because they expressed reservations concerning the death penalty. The removal of each of these potential jurors constituted reversible error. The improper exclusion of even a single potential juror requires reversal. The potential jurors excused here did not demonstrate that they were not qualified to serve. Voir dire is a process of education. A meaningful assessment of a juror's feelings can only be gained by a complete review of their answers, especially after they have been properly informed about the law. Each of these potential jurors was qualified but wrongfully excluded by the erroneous granting of the government's challenges based on their feelings about the death penalty.

During voir dire in Snarr's and Garcia's trial, the district court excluded these prospective jurors in the absence of the showing required under *Witherspoon* and *Witt.* Appellants Snarr and Garcia were thus improperly convicted and sentenced to death by "a jury uncommonly willing to condemn a man to die." *Witherspoon*, 391 U.S. at 521. This error cannot be deemed harmless. *Gray*, 481 U.S. at 648, 668.

**Venireperson # 3 Lacy**

Potential juror # 3 Lacy initially told the prosecutor that she did not like the death penalty and could not vote for it because she could not vote for the death penalty . Vol. 10 [Supp. 1], p. 655-657. Without explaining the applicable law in

36

detail, the prosecutor did note that she had answered her questionnaire by stating that she was generally opposed to the death penalty but believed that she could put aside her feelings and impose it if was called for by the facts and law in the case. Vol. 10 [Supp. 1], p. 655. When the law was explained to her in detail, she indicated that she would follow her oath after she had heard the evidence in the case and answer the questions posed to her truthfully. Vol. 10 [Supp. 1] , p. 660. She went on in detail concerning that if she heard the evidence and the government had proven the issues to her beyond reasonable doubt, she would answer the questions truthfully; she stated that she would answer the questions truthfully even if a death sentence was warranted under the law. Vol. 10 [Supp. 1], p. 661-663. In an attempt to rehabilitate Ms. Lacy, the prosecutor ignored the process of weighing the factors, over the objections of appellants, and persuaded the juror to answer affirmatively that her feeling would substantially impair her, despite her declarations to the contrary. Vol. 10 [Supp. 1], p. 666.When she was again allowed to express her opinion, she again stated "No, I'll follow the evidence. I'm not going to disregard it. I'll follow the evidence as it's given to me." Vol. 10 [Supp. 1], p. 667. When she was asked if the government had proven its case and the death penalty was what was required by evidence, she would follow her oath as a juror and do that, to which she responded " That's what I'm trying say, yes." Vol. 10 [Supp. 1], p. 667. Over the objections of appellants, the trial

court granted the government's challenge for cause and excluded the prospective juror. Vol. 10 [Supp. 1], p. 669-671.

**Venireperson # 66 Stephenson**

The trial court excluded potential juror # 66 Stephenson because of her concerns about the death penalty. Upon examination by the government, she initially said that if she felt that the Holy Spirit was to guide her or tell her what to do, she would do what her "gut feeling" lead her to do, even if it was the death penalty. Vol. 13 [Supp. 1], p. 1463. When she tried to explain her feeling regarding the guilt or innocence stage but was interrupted by the trial court, she indicated that it was not hard for her to "say guilty or not guilty." Vol. 13 [Supp. 1], p. 1465. The prosecutor even noted that her questionnaire indicated that if a person was convicted of a capital crime and the death penalty was requested, she would always vote to impose it regardless of the facts of the law, but perhaps she misunderstood the question. Vol. 13 [Supp. 1] , p. 1465. The sum of her testimony was that she did not know how she felt at that point in the trial because it was the first time she had ever done it; she was really not for the death penalty but did not know. Vol. 13 [Supp. 1], p. 1466. She stated that she did not know if she could live with it if the defendants were sentenced to death, again stating " I don't know." Vol. 13 [Supp. 1], p. 1469. Without any detailed explanation of the law or potential evidence, the juror simply stated that she

could not answer as to how she felt about putting someone to death, repeatedly stating " I don't know."  Vol. 13 [Supp. 1], p. 1469-1470. Appellants pointed out that *Witherspoon* [391 U.S. 510 (1968)] is not an exclusionary rule and did not warrant the exclusion of this juror. Appellants pointed out that the potential juror never said she could not impose the death penalty and even stated that she could do it if the Holy Spirit was guiding her. Vol. 13 [Supp. 1], p. 1473. Over the objections of appellants, the trial court granted the government challenge of cause and excluded this potential juror from the jury. Vol. 13 [Supp. 1], p. 1473-1474. In granting the challenge for cause, the trial court made curious comments concerning the "Holy Spirit" and failed to even understand the jurors explanation of the presumption of innocence, then made a generic statement concerning an inadequate demeanor to serve as a juror. Vol. 13 [Supp. 1], p. 1474.

**Venireperson # 130 Kimball**

The trial court granted the government's challenge for cause of potential juror # 130 Kimball, who had previously served on a jury and had in fact assessed a death penalty. Based on his prior experience, he indicated that the prior service and imposition of the death penalty weighed heavily on his mind. Vol. 16 [Supp. 1], p. 1932-1935. Regarding the effect of his prior service, he repeatedly expressed to the prosecutor that he simply could not say what the effect of his prior service would be.

Vol. 16 [Supp. 1], p. 1933-1937. He continually expressed his reservations in terms of "possibilities," but stated that he knew he did the right thing with the prior death sentence. Vol. 16 [Supp. 1], p. 1934. He could not say that his feeling would substantially impair his ability, because he had not done it " a second time." Vol. 16 [Supp. 1], p. 1936. In the absence of the evidence and a detailed explanation of the federal death penalty process, he stated that he could not tell the prosecutor that "right now" he would vote for the death penalty but added that most of his life, he believed in the death penalty if it was warranted. Vol. 16 [Supp. 1], p. 1937. The purpose of a peremptory challenge was clearly demonstrated by the record, when the prosecutor asked Mr. Kimball if the prosecutor should be concerned about him being on the jury, to which he replied "probably." Vol. 16 [Supp. 1], p. 1938. The court previously excused this juror based on a hearing disability of the juror but he had been recalled. Vol. [Supp. 1], p. 1938. He indicated that he did not know if he could choose whether or not a person died or lived a second time, but stated he would base his decision exactly on what he heard in the courtroom. Vol. 16 [Supp. 1], p. 1944-1445. He reiterated the information on his questionnaire, that he generally favored the death penalty but would base his decision on the facts and the law. Vol. 16 [Supp. 1], p. 1946. He even gave an example in his questionnaire as to what types of cases warranted the death penalty and agreed that they related to the aggravating factors.

Vol. 16 [Supp. 1], p. 1950-1951. He indicated that his feeling would not affect his ability but could affect his decision regarding the death penalty. Vol. 16 [Supp. 1], p. 1951-1952. He finally said that he could listen to the evidence and follow the law, but again could not state whether or not he could judge someone else's life. Vol. 16 [ Supp. 1], p. 1955. The court excluded him because of his feelings on the death penalty over the objections of appellants. Vol. 16 [Supp. 1], p. 1962-1965.

**Venireperson # 140 Furby**

Potential juror # 140 Furby indicated that she had reservations about the death penalty and did not think that she could ultimately vote for the death penalty. Vol. 16 [Supp. 1], p. 2039-2040. She made it clear that she simply did not know if she could do it, stating " I don't think so." Vol. 16 [Supp. 1], p. 2040-2041. Upon explanation of the process by the defense counsel, she indicated a greater understanding of her duties indicated that if she was in the situation where the evidence had shown her that the death sentence was appropriate, she would follow her oath, answer correctly and say yes. Vol. 16 [Supp. 1], p. 2045. She stated that she was not opposed to the death penalty but made it clear that she would never put down a false answer because she was opposed to the death penalty. Vol. 16 [Supp. 1], p. 2045-2046. While her feelings about the death penalty would have an impact and factor into her decision-making process, she testified that she would answer truthfully. Vol 16 [Supp. 1], p. 2047. She

again said that if she was put in the situation and the government satisfied her that this was a death penalty case, she would vote for it just like the other jurors. Vol. 16 [Supp. 1], p. 2048. In summary, she said that if she were satisfied that it had been proven to her, she would say "yes," but it would be hard. Vol. 16 [Supp. 1], p.2049. The prosecutor repeatedly relied on how she would feel when she was around her kids and family, excluding what she would do in following her oath as a juror. Vol. 16 [Supp. 1], p. 2052. Even the "rehabilitation" by the court was improper in that the court directed her that she was "in the position" of making the decision concerning the death penalty and "had to answer"; such was obviously not correct, since she was not even sworn in as a juror. Vol. 16 [Supp. 1], p. 2057. Over the objections of appellants, the trial court granted the government's challenge for cause and excused the potential juror. Vol. 16 [Supp. 1], p. 2060**.

### Venireperson # 200 Blackmon

Prospective juror #200 Blackmon repeatedly told the prosecutor that she believed the death penalty was appropriate for the killing of a child or a killing of a wife, referring to domestic violence. Vol. 18 [Supp. 1], p. 2558. The prosecutor then committed the juror to assessing the death penalty only in a specific set of circumstances. Vol. 18 [Supp. 1], p. 2568-2571. Upon examination by defense counsel, she agreed that she was limiting herself to a certain fact situation and agreed

there could be other fact situations that she had not contemplated. Vol. 18 [Supp. 1], p. 2573-2574. She even admitted that she had not thought about some other fact situations but defense counsel was then prevented from expounding on those fact situations that had been alluded to by the prosecutor; the prosecutor objected and did not want defense counsel to commit the juror to specific fact situations despite the fact that he had done exactly the same thing. Vol. 18 [Supp. 1], p. 2575. In the absence of the ability of defense counsel to expound on other situations, the potential juror indicated that she believed that there could be situations that she had not thought of that could warrant a death penalty. Vol. 18 [Supp. 1], p. 2576. Over the objections of appellants, the trial court sustained the government's challenge for cause; she additionally mentioned the potential juror would be distracted by her grandson for whom she babysat, despite the fact that the child had a custodial mother. Vol. 18 [Supp. 1], p. 2579.

In *Uttecht v. Brown*, 127 S.Ct. 2218 (2007) the Supreme Court, while paying respect to the trial court's judgment based on her ability to observe the demeanor of the prospective juror, reaffirmed the defendant's rights in jury selection. These include a defendant's right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause, citing *Witherspoon v. Illinois*, 391 U.S. 510,521 88 S.Ct. 1770, 20 L.Ed 2d 776. The

Court acknowledged that the prosecutor also is entitled to jurors who can apply capital punishment within the framework of the law and that to balance those interests, only those jurors whose ability to impose death is substantially impaired should be excused. *Uttecht* makes it clear that a trial court is in a superior position to observe a juror's demeanor and reviewing Court's should defer to that their judgment in this area of the decision. Snarr and Garcia submit, however, that the record itself shows the opinions of the prospective jurors and that the "demeanor" factor is not the central one here. As argued above, what was happening with each of these juror is clear. The government attempted to paint each potential juror as one who could not vote for death or only vote death in limited circumstances. Those attempts failed. After rehabilitation by defense counsel, these venirepersons were fit for service despite their reservations. *Uttecht* holds:

"The need to defer to the trial court's demeanor decision does not foreclose the possibility of reversal where the record discloses no basis for a substantial impairment finding…"

*Uttecht,* supra 2221

In *Uttecht* the trial court did not exceed its discretion. Here the court clearly did so.

This Court rejected a challenge to juror exclusion in *United States v. Fields*, 483 F.3d 313, 357 (5th Cir. 2007) that provides a strong contrast to Snarr and Garcia's arguments here and further support for their request for relief. In *Fields*, although the Court applied its standard of "considerable deference" to the trial court [see *United States v. Bernard*, 299 F.3d 467, 474 (5th Cir. 2002)], the Court found that the potential juror there challenged "resoundingly" indicated his refusal to ever apply the death penalty. *United States v. Flores*, 63 F.3d 1342, 1354 (5th Cir. 1995). No considerable deference is necessary when the potential juror's opinions are resoundingly clear and no amount of deference can provide support for an excusal when the record does not support such an excusal. An examination of the complete voir dire of these potential jurors fully illuminates their positions; persuading them to parrot "magic words" by the prosecutor does not change that record. Reference to "deference" cannot do so either.

If we are mindful of the protection from *Witherspoon* to *Uttecht,* we do not see the kind of clear statements in these jurors that would cause them to be excused. Concern for how one would deal with the emotion of assessing a death penalty did not reach disqualification here and no amount of deferral to demeanor can provide justification for the abuses of discretion. The Court committed error in excusing each of these potential jurors.

Regarding the inapplicability of a harm analysis to the exclusion of those with death penalty scruples, the U.S. Supreme Court stated in *Gray v.Mississippi*, 481 U.S. 648, 107 S.Ct. 2045, (1987), at page 2057:

> "Because the Witherspoon-Witt standard is rooted in the constitutional right to an impartial jury, Wainwright v. Witt, 469 U.S., at 416, 105 S.Ct., at 848, and because the impartiality of the adjudicator goes to the very integrity of the legal system, the *Chapman* harmless-error analysis cannot apply. We have recognized that 'some constitutional rights [are] so basic to a fair trial that their infraction can never be treated as harmless error.' Chapman v. California, 386 U.S., at 23, 87 S.Ct., at 827. The right to an impartial adjudicator, be it judge or jury, is such a right. *Id.,* at 23, n. 8, 87 S.Ct., at 828, n. 8, citing, among other cases, *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (impartial judge). As was stated in *Witherspoon,* a capital defendant's constitutional right not to be sentenced by a 'tribunal organized to return a verdict of death' surely equates with a criminal defendant's right not to have his culpability determined by a 'tribunal "organized to convict."' 391 U.S., at 521, 88 S.Ct., at 1776, quoting *Fay v. New York,* 332 U.S. 261, 294, 67 S.Ct. 1613, 1630, 91 L.Ed. 2043 (1947)."

Under *Gray*, *supra*, the wrongful exclusion of even a single potential juror on *Witherspoon-Witt* grounds requires reversal. This record demands a reversal because of the abuse of discretion in granting the government's challenges for cause respecting each of these venirepersons.

**ISSUE NO. SIX** - The trial court error in failing to grant appellants'

challenges for cause of potential juror # 17 Peveto.

**ISSUE NO. SEVEN** - The trial court error in failing to grant appellants'

challenges for cause of potential juror # 132 Himes.

**ISSUE NO. EIGHT** - The trial court error in failing to grant appellants'

challenges for cause of potential juror # 184 Zeigler.

## I.      Standard of Review and Reviewability

In *United States v. Webster*, 162 F.3d 308 (5th Cir. 1998), this Court

pronounced the standard of review for the wrongful denial of a challenge for cause

as an abuse of discretion standard, stating at page 342:

> "'While peremptory challenges, or the number provided by
> Fed.R.Crim.P. 24(b) may not be constitutionally required, it does not
> follow that a trial court's wrongful reduction of the number so provided
> is not reversible error on direct appeal.' *United States v. Munoz*, 15 F.3d
> 395, 398 n. 1 (5th Cir.1994).37 ' "The denial or impairment of the right
> to exercise peremptory challenges is reversible error without a showing
> of prejudice." ' *Hall*, 152 F.3d at 408 (quoting *United States v.
> Broussard*, 987 F.2d 215, 221 (5th Cir.1993)). Because the district
> court's predominant function is determining the credibility of the
> veniremen, however, 'deference must be paid to the trial judge who sees
> and hears the prospective juror.' Id. at 407 (quoting *Witt*, 469 U.S. at
> 426, 105 S.Ct. 844). 'We will only second-guess the court's decision that
> a juror is unbiased if there is an abuse of discretion.' Id. (quoting *Flores*,
> 63 F.3d at 1357).'"

In reviewing trial court rulings on the impartiality of a juror, this Court has also addressed the standard of review in *United States v. Munoz*, 15 F.3d 395 (5th Cir. 1994), at page 397:

"We review the district court's ruling as to juror impartiality only for manifest abuse of discretion. *United States v. Bryant*, 991 F.2d 171, 174 (5th Cir.1993)."

More recently, the United States Supreme Court refined this standard of review adding:

"In reviewing such claims, the deference due to district courts is at its pinnacle: ' "A trial court's findings of juror impartiality may be overturned only for manifest error."' *Mu'Min*, 500 U.S., at 428, 111 S.Ct. 1899." *Skilling v. United States*, 561 U.S. __, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010), at page 2903."

In order to preserve the error, it is necessary that all peremptory challenges were exhausted by the defense and an objectionable juror served on the jury. When an objectionable juror sits after all available peremptory challenges have been exhausted and the trial court erred in failing to grant a challenge for cause, reversible error is presented; "Had Huling sat on the jury that ultimately sentenced petitioner to death, and had petitioner properly preserved his right to challenge the trial court's

48

failure to remove Huling for cause, the sentence would have to be overturned." *Ross v. Oklahoma*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), at page 85. The error herein is properly presented for review and presents reversible error.

## II.    Argument

The above issues are discussed together in that they involve similar factual basis and similar authorities. Each issue arose from the trial court's failure to grant the appellants' challenges for cause against the above venirepersons based upon their expressed biases and issues of disqualification. Appellants Snarr and Garcia submit that the potential jurors were in fact disqualified and should have been excluded . The failure to remove each of these potential jurors constituted reversible error.  The error was preserved because: (1) an objectionable juror actually served as a result of the trial court's failure to grant the defense challenges, (2) the exhaustion of the peremptory challenges by the defense, and (3) the failure of the trial court to grant one or more additional peremptory challenges.

## Venireperson # 17 Peveto

Potential juror # 17 Peveto had a background in law enforcement and repeatedly stated that he presumed law enforcement officers would be telling the truth and that it would have to be demonstrated to him otherwise for him to disbelieve a police officer. Vol. 11 [Supp. 1], p. 931-933. He indicated that despite the court's

instructions to start each witness out with a clean slate, he would tend to give added credibility to a police officer unless someone refuted it. Vol. 11 [Supp. 1], p. 934. When asked if there was any reason why he could not be a fair juror, he stated, "I don't want to be here." Vol. 11 [Supp. 1], p. 936. When asked if that would be a distraction to him and that he needed to tell counsel, he replied " I just did. I don't want to be here". Vol. 11 [Supp. 1], p. 937. While he added that he would be fair and impartial he indicated that he was a fair person but did not want to be there. He stated that he could set aside his opinion that law enforcement officers were more credible and make up his mind whether or not he believed them, but never wavered in his belief that law enforcement officers were more credible. Vol. 11 [Supp. 1], p. 939. He reiterated that regardless of any instructions, he believed people in law enforcement were more credible and no instruction would change his mind. Vol. 11 [Supp. 1], p. 940. Appellant challenged potential juror # 17 on the basis of his bias in favor of law enforcement officers as witnesses and the fact that he stated that he could not be fair because he "did not want to be here," but the trial court denied the challenge. Vol. 11 [Supp. 1], p. 941-942.

**Venireperson # 132 Himes**

Potential juror # 132 Himes told the prosecutor that he still agreed with his written answer to the effect that he believed "strongly if objective evidence proved

guilt, death penalty should be implemented to protect and improve society;" he still felt that way at the time of the individual questioning. Vol 16 [Supp. 1], p. 1968. While he parroted the rote words that his mind would not be made up (Vol. 16 [Supp. 1], p. 1971), when he was allowed to explain his answers by the defense counsel, he reiterated that if the objective evidence proved guilt, then the death penalty should be implemented. Vol. 16 [Supp. 1], p. 1973. In the absence of any evidence, he could not even afford appellants the presumption of innocence. Vol. 16 [Supp. 1], p. 1974. Again, he stated that he would not have a problem making the choice to implement the death penalty if the evidence proved guilt. Vol. 16 [Supp. 1], p. 1975. He again stated that while it was not "automatic," once a person was found guilty, the death penalty should be implemented if the option was available. Vol. 16 [Supp. 1], p. 1976. When defense counsel explained the burden of proof and the fact that appellants had no duty to present evidence, the potential juror denigrated the presumption and stated that it would be frivolous to even ask a question concerning the defense presenting no evidence. Vol. 16 [Supp. 1], p. 1977. He stated that he knew he would be looking at evidence from both sides and if he was not, his reply was "Ouch....Well, then we have a problem." Vol. 16 [Supp. 1], p. 1978. He added that what that meant was he would have to "go with what the government says" if he heard no objective evidence from the defense, and nothing could change his mind

about that. He added that he would have to hear evidence from both sides. Vol. 16 [Supp. 1], p. 1978. Even when the government questioned him concerning if the government failed to meet its burden, he did not know what he would do. Vol. 16 [Supp. 1], p. 1980. Again when the prosecutor questioned him at length about if the government failed to meet its burden, he stated that he could not answer truthfully until he was in that situation; he stated that he would follow the law "but..." and then was interrupted by the prosecutor. Vol. 16 [Supp. 1], p. 1982-1983. In response to a question by the prosecutor, he indicated that he would make the decision as to whether it was going to be life in prison during the first phase of the trial. Vol. 16 [Supp. 1], p. 1985. While he finally stated that he would not make the decision until he heard the evidence in the third phase, it was apparent that that evidence would necessarily have to include evidence from the defense before a life sentence could be imposed. Vol. 16 [Supp. 1], p. 1987. Despite the clear statements of the potential juror that he felt that the death penalty was the appropriate sentence once guilt had been established and the fact that he would require objective evidence from the defense to consider a life sentence, the trial court denied the appellants' challenges for cause. Vol. 16 [Supp. 1], p. 1987-1992.

**Venireperson #184 Zeigler**

Potential juror # 184 Zeigler was adamant from the beginning of questioning that once the case of capital murder had been proven to her, the defendant would never have a chance for a life sentence. Vol. 19 [Supp. 1], p. 2721-2723. Again she reiterated that she placed herself at the far end of the spectrum such that if she found someone guilty of capital murder, he would not have the chance for a life sentence, replying "Yes, sir, I do." Vol. 19 [Supp. 1], p. 5724. Even if she took the oath to follow the evidence, she would find it difficult to assess a life sentence and would automatically vote in favor of the death sentence if she found someone guilty of capital murder. Vol. 19 [Supp. 1], p. 2724-2725. Upon questioning by the prosecutor, she misspoke "life," but added that she did not mean to say life, "It would be death," if the government proved a premeditated murder. She would agree with the prosecutor that she was not going to listen to any mitigating factor or require the government to follow the law. Vol. 19 [Supp. 1], p. 2727. While she again answered rotely that she would follow the law, her explanations to the prosecutor were simply curt replies. Vol. 19 [Supp. 1], p. 2730-2734. While she indicated that she was confused, upon requestioning by defense counsel she replied that she would place a burden of proving extenuating circumstances, such as appellants' childhood, in order to consider a life sentence. Vol. 19 [Supp. 1], p. 2737. She reiterated that if she did not hear any extenuating circumstances or mitigating evidence, if the government had

proven one or more aggravating factors, that would always satisfy her that it should be a death sentence. Vol. 19 [Supp. 1], p. 2738. She stated that she was "trying to say the same thing," and replied that if the government proved it, the defendant would get a death sentence "unless the lawyers show me that there should be something other than death," in her words. Vol. 19 [Supp. 1], p. 2738. Upon an objection by the government and instruction by the court, defense counsel again restated the question and she reiterated that if there were no extenuating circumstances or mitigating evidence, the proof of the capital murder was always sufficient for a death sentence and she was not confused about that part at all. Vol. 19 [Supp. 1], p. 2739. She stated that if the government proved the guilt and the eligibility for the death penalty, she would assess death unless the defendant proved it should be life. Vol. 19 [Supp. 1], p. 2739. She even stated that she believed the law said that proof of capital murder and one of the aggravating factors was enough to satisfy her that it should be a death sentence. Vol. 19 [Supp. 1], p. 2744. After lengthy questioning, defense counsel asked her to tell in her own words how she felt about the death penalty and she indicated that a person should receive the death penalty in a capital murder case when they have deliberately committed murder, it was not self-defense, and there were no extenuating circumstances that made them do it. Vol. 19 [Supp. 1], p. 2746. She concluded with her clear thought that if she was convinced beyond a reasonable doubt

of guilt and aggravating circumstances, she would vote for the death penalty. Vol. [Supp. 1], p. 2747. Ms. Zeigler repeatedly made it clear that she believed that persons found guilty of capital murder should be put to death, unless the defense was able to persuade her that it should be a life sentence. Despite this repeated statement of her beliefs, the trial court denied the challenges for cause. Vol. 19 [Supp. 1], p. 2751.

The record reflects that appellant Snarr and Garcia filed a written motion to reurge the challenges made against the above jurors and additionally requested one or more additional peremptory challenges. Vol. 3, p. 653. At the time the challenges had been tendered, the appellants could not have determined which jurors were to serve on the jury because the government strikes had not been tendered; nonetheless, appellants pointed out that the above potential jurors were lawfully challenged for cause. Vol. 3, p. 654. Appellants pointed out that the peremptory challenges were reduced by seven and they were unable to remove other objectionable jurors who were not necessarily disqualified as a matter of law but who were nonetheless unable to be fair and impartial jurors in the judgment of the appellants. As a result of the trial court's failure to grant the challenges for cause, appellants were required to exhaust their peremptory challenges and did not receive any additional peremptory challenges. Vol. 3, p. 654. The errors are properly preserved in that appellants pointed out objectionable potential jurors, including venireperson # 129 Dr. Jennie Godkin

who ultimately served on the jury. Vol. 3, p. 655. Juror Godkin indicated during the individual voir dire examination that she had a brother that was a security guard and a nephew as a security guard at a state prison. Vol. 15 [Supp. 1], p. 1857. She had also connections with victims and perpetrators of crimes, in that her friend's brother was killed in a drive-by shooting and her husband's cousin was convicted of rape. Vol. 15 [Supp. 1], p. 1858-1859. She indicated that on a scale of 1 to 10, with 10 being the strongest, she was a 7 in favor of the death penalty. Vol. 15 [Supp. 1], p. 1860. She also had specialized knowledge concerning the medical field, which was important to the defense since medical personnel testified during the course of the trial. Vol. 15 [Supp. 1], p. 1864. She testified that she was more in favor of the death penalty on the reference scale because she believed that "the person that takes that life is responsible and should be punished." Vol. 15 [Supp. 1], p. 1866. She also related that she had heard from her prison guard nephew that gang members kill other prisoners. Vol. 15 [Supp. 1], p. 1870. Defense counsel concluded with probing questions concerning the fact that she had indicated that she could choose a life sentence if the mitigating factors outweighed the aggravating factors. Vol. 15 [Supp. 1], p. 1873. Despite her answers, she was not subject to a challenge for cause but was obviously an objectionable juror because of her feeling about the death penalty, leanings in favor of the death penalty, initial thoughts about placing the burden to

prove the life sentence on the appellants, and her general prosecutorial demeanor. The combination of these factors made her an objectionable juror. Appellants would have chosen to exercise a peremptory challenge on her, but had no remaining peremptory challenge. Appellants Snarr and Garcia were required to use their peremptory challenges on the above potential jurors because of the trial court's failure to grant the lawful challenges for cause. The intuition and experience of defense counsel in assessing juror Godkin's suitability for jury service in this case was well-taken. Dr. Godkin in fact served on the jury and assessed death sentences as to both appellants, just as defense counsel had anticipated. Had the trial court granted one or more lawful challenges for cause set out above or granted an additional peremptory challenge, then Dr. Godkin would have been removed from the jury and appellants may have received a life sentence instead of death. The harm in failing to grant the above challenges for cause is therefore apparent.

"The standard for determining whether a proposed juror may be excluded for cause is whether the prospective "juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *United States v. Wharton*, 320 F.3d 526, 535 (5th Cir. 2003). This Court has recognized "that there is no generally accepted formula for determining the appropriate breadth and depth of the voir dire, except that the court's discretion is

'subject to the essential demands of fairness." *United States v. Dellinger*, 472 F.2d 340, 367 (5th Cir. 1972); see also *Aldridge v. United States*, 283 U.S. 308, 310 (1931). This Court, however, should examine "whether the procedure used for testing impartiality created a reasonable assurance that prejudice would be discovered if present." Id.; see also *United States v. Nell*, 526 F.2d 1223,1229 (5th Cir. 1976). The procedure used for testing the impartiality of the three prospective jurors did not create a reasonable assurance that these prospective jurors were impartial. The district court "ha[d] the duty to develop the facts fully enough so that it [could] make an informed judgment on the question of 'actual' bias. *Nell*, 526 F.2d at 1229. This duty could not be discharged, as it was in this case, simply by asking whether the prospective juror "understood" the broad legal concepts of presumption of innocence and burden of proof beyond a reasonable doubt. Id ("This duty cannot be discharged solely by broad, vague questions once some potential area of actual prejudice has emerged."). *Id*. at 1229-30. It is well-settled that "the juror is poorly placed to make a determination as to his own impartiality," and that courts are obligated to "make an independent determination whether the panel member can and will be impartial." *United States v. Davis*, 583 F.2d 190, 197 (5th Cir. 1978); Thus, a juror's assurance of fairness "cannot be dispositive"; to the contrary, "continual protestations of impartiality from prospective jurors are best met with a healthy skepticism from the

bench." *United States v. Murphy*, 421 U.S. at 800; *United States v.Williams*, 523 F.2d at 1209 n.10; *United States v. Hyde*, 448 F.2d 815, 848 n.38 (5th Cir. 1971) ("it is for the court, not the jurors themselves, to determine whether their impartiality has been destroyed"). In cases where this Court has found that a district court did not abuse its discretion by denying a challenge for cause on a juror who had expressed a bias against one of the court's instructions, the records reflected that the juror had been rehabilitated by stating that he could follow the instructions despite personal feelings to the contrary. See, e.g., *United States v. Duncan*, 191 F.3d 569, 573-75 (5th Cir. 1999) (challenged juror, who expressed bias in favor of law enforcement witnesses, unambiguously affirmed that she would be fair and could reject the testimony of a law enforcement witness found to be lacking in credibility); *United States v. Webster*, 162 F.3d 308, 342-43 (5th Cir. 1998) (in a death penalty case, challenged juror implied that, because of defendant's arrest for kidnapping that involved a death, he was predisposed to find defendant guilty, but agreed that the verdict must be based on the evidence presented in the courtroom, that he would hold the government to its burden of proof, and that he could give both parties a fair trial); *United States v. Munoz*, 15 F.3d 395,397-98 (5th Cir. 1994) (challenged juror stated he could follow instruction that indictment is not evidence and put aside his contrary feeling); *United States v. Bryant*, 991 F.2d 171,174 (5th Cir. 1993)(one challenged juror stated that she could

59

be fair and impartial despite her husband's position as chief of police, and another challenged juror stated that his experience in law enforcement would not affect his ability to be fair and impartial); *United States v. Mendoza-Burciaga*, 981 F.2d 192,197-98 (5th Cir. 1992) (challenged juror, who was an employee at the detention center where defendants were held, stated that she could be fair and could follow instructions); *United States v. Dozier*, 672 F.2d 531, 547-49 (5th Cir. 1982) (challenged juror, who expressed belief that indictment made defendant looked more guilty than innocent, agreed to put aside this impression, to accord the presumption of innocence, and to consider only the evidence presented at trial). The record reflects that the three prospective jurors were actually biased against the court's instructions and, therefore, biased against Snarr and Garcia. See *Nell*, 526 F.2d at 1230 (finding reversible error to deny challenge for cause where one of two challenged prospective jurors who made an express admission of bias). Although the district court asked general questions relating to this bias, the court did not adequately explore and remove the taint of the prospective juror's admission of bias. See *id* (finding reversible error in district court's procedure to explore adequately potential bias of one of two challenged prospective jurors). This Court in Nell found it telling that one of two challenged prospective jurors never once stated that he would be able to render a fair and impartial verdict. *Nell* 526 F.2d at 1230. "Not once, even ritualistically, did

the prospective jurors aver that they could be fair and impartial." *Id* at 1228. Because the district court did not remove the cloud of impartiality of the three prospective jurors, the district court erred by denyingSnarr and Garcia's challenges for cause.

The error was also not harmless. This Court, following the Supreme Court's decision in *United States v. Martinez-Salazar*, 528 U.S. 304, 313-18 (2000), has stated that "[a] district court's erroneous refusal to grant a defendant's challenge for cause is only grounds for reversal if the defendant establishes that the jury which actually sat to decide his guilt or innocence was not impartial." *Wharton*,320 F.3d at 536. The holding in Martinez-Salazar, however, was not this broad. In Martinez-Salazar, the Supreme Court focused on the following sequence of events: "the erroneous refusal of a trial judge to dismiss a potential juror for cause, followed by the defendant's exercise of a peremptory challenge to remove that juror." *Martinez-Salazar*, 528 U.S. at 307. The Supreme Court held that any error in a district court's refusal to strike a juror for cause is extinguished if the defendant uses a peremptory challenge to remove the objectionable juror. Id ("We hold... that if the defendant elects to cure such an error by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been deprived of any rule-based or constitutional right."); see also *id*. at 317 ("We... hold that a defendant's exercise of peremptory challenges pursuant to Rule 24(b) is not denied or impaired

61

when the defendant chooses to use a peremptory challenge to remove a juror who should have been excused for cause."). In so holding, the Supreme Court "reject[ed] the Government's contention that under federal law, a defendant is obliged to use a peremptory challenge to cure the judge's error." *Id* at 307; see also id at 314-15. The Supreme Court left open the possibility that reversal might be required where "the trial court deliberately misapplied the law in order to force the defendants to use a peremptory challenge to correct the court's error." *Id*. at 316. The Court also noted that reversal would be required if a juror who should have been dismissed for cause actually sat on the jury. See *id*. Pertinent to Snarr's and Garcia's case, the Supreme Court also left open the question of "whether it is reversible error to refuse to afford a defendant a peremptory challenge beyond the maximum otherwise allowed when he has used a peremptory challenge to cure an erroneous denial of a challenge for cause and when he shows that he would otherwise [have] use [d] his full complement of peremptory challenges for the noncurative purposes that are the focus of the peremptory right." See id at 317-18 (Souter, J. concurring). Justice Souter' s concurrence reveals that the Supreme Court has left open the possibility that it is reversible error when defendants, as did Snarr and Garcia, shows that: (1) he used his full complement of peremptory challenges permitted under Fed. R. Crim. P. 24(b); (2) he would have used the peremptory challenge that he used to cure the district

court's error of denying the challenge for cause on another juror; and (3) he requested a "make-up" peremptory challenge. *Id* at 318 (Souter, J., concurring). Long before *Martinez-Salazar,* this Court recognized, and granted relief on, this type of claim. See, e.g., *Munoz*, 15 F.3d at 396-98; *Bryant*, 991 F.2d at 174 & n.3; *Nell,* 526 F.2d at 1229. And, as noted by Justice Souter, Martinez-Salazar did not address this situation and thus could not have overruled Nell, Bryant, or Munoz. As this Court held in Nell, where, as in Snarr and Garcia's case, the district court erroneously denies a challenge for cause, the defense expends all of its peremptory challenges, and the court offers no more, the error cannot be harmless, and reversal is required. *Nell* 526 F.2d at 1230 & n.10. The Court reasoned as follows: To ensure that those who enter [the jury box] are purged of prejudice, both challenges for cause and the full complement of peremptory challenges are crucial. Therefore, as a general rule it is error for a court to force a party to exhaust his peremptory challenges on persons who should be excused for cause, for this has the effect of abridging the right to exercise peremptory challenges. *Id*. at 1229. The rule-based right to exercise peremptory challenges "is the product of a judgment that our jury system should be given a stable and constant structure, one that cannot be varied by a court with or without the consent of the parties." *United States v. Olano*, 507 U.S. 725, 1782 (1993) (Kennedy, J., concurring). Because the appellants used their full complement

of peremptory challenges, three of which were used on biased prospective jurors that the district court erroneously refused to remove, identified other seated jurors on whom they would have exercised his peremptory challenge, and requested make-up peremptory challenges for those reasons, the district court's error, in this case, was reversible error. See *Nell,* 526 F.2d at 1229-30 (reversing where two prospective jurors should have been removed for cause and defendant used all of his peremptory challenges, including two on the challenged prospective jurors, and was denied his request for make-up peremptory challenges). Accordingly, this Court should vacate the appellants' convictions and remand for a new trial.

**ISSUE NO. NINE** - The trial court erred in excluding from the jury potential juror # 130 Kimball  based on his disability.

**ISSUE NO. TEN** - The trial court erred in excluding from the jury potential juror # 232 Horton based on his disability.

## I.  Standard of Review and Appealability

The standard of review has been discussed in another circuit in *United States v. Dempsey*, 830 F.2d 1084, 1088-89 (10th Cir. 1987).  In that case, the appellate court discussed the qualification of a deaf juror, stating at page 1087:

"Because determinations of qualifications are committed to the sound discretion of the trial court, we will not reverse such determinations unless the court has clearly abused its discretion.  *See United States v. Mason*, 440 F.2d 1293, 1298 (10th Cir.), *cert denied*, 404 U.S. 883, 92 S.Ct. 219, 30 L.Ed.2d 165 (1971)."

Appellants submit that the proper standard is more akin to the evaluation in cases involving unconstitutional discrimination.  The standard for evaluation of a *prima facie* case of purposeful discrimination in violation of the U.S. Constitution was discussed in *Batson v. Kentucky*, 476 U.S. 79, 87 (1986), wherein the Supreme Court stated at page 100:

"If the trial court decides that the facts establish, prima facie, purposeful discrimination and the prosecutor does not come forward with a neutral explanation for his action, our precedents require that petitioner's conviction be reversed. *E.g., Whitus v. Georgia*, 385 U.S., at 549-550, 87 S.Ct., at 646-47; *Hernandez v. Texas,* 347 U.S., at 482, 74 S.Ct., at 672-673; *Patton v. Mississippi,* 332 U.S., at 469, 68 S.Ct., at 187."

In the case at bar, it was not the prosecutor's action of purposeful discrimination, but the stated actions of the trial court. The record clearly establishes a *prima facie* case of unconstitutional discrimination requiring a reversal.

## II. Argument

The trial court erred in dismissing potential jurors #130 Kimball and #232 Horton based on the court's perception of their disabilities. The above issues are discussed together in that they involve similar factual basis and similar authorities. Each issue arose from the trial court granting the government's challenges for cause and dismissing the veniremen on the court's own initiative based upon their disabilities. Appellants Snarr and Garcia submit that the potential jurors were in fact qualified and should not have been excluded simply because they were disabled. Each citizen could have served with reasonable accommodations. The removal of each of these potential jurors constituted reversible error. The trial judge rewarded these venirepersons who had appeared to fulfill their civic duty by unlawfully

discriminating against them and dismissing them from jury service because of circumstances completely out of their control, their physical infirmities.

**Venireperson # 232 Horton**

Prior to the individual voir dir, the trial court excused venireperson # 232 Horton on the basis of his disability, a potential urinary problem. The record reflects that this potential juror indicated that he was taking medication that caused him to use the restroom frequently. He also had hypertension, colon issues, and "things like that". Vol. 9 [Supp. 1], p. 536. He indicated that he would have no problem raising his hand and telling the judge he had "got to go", and that he did not have a problem with that whatsoever; the trial court told him that she "did not really do that." Vol. [Supp. 1], p. 536-537. The juror explained in detail that he would attempt to accommodate the court and serve on the jury, but might need accommodations for his condition. Vol. [Supp. 1], p. 539-540. He indicated his actual willingness to serve on the jury, stating that he would "love to serve." Vol 9 [Supp. 1], p. 541-542. He could not assure the court that he would not need a restroom break, whereupon the court stated "I can't have somebody who is going to be calling the shots on when we take breaks, bathroom problems;". Vol. 9 [Supp. 1], p. 542-543. Appellants objected to excusing No. 232 Mr.Horton. Vol. 9 [Supp. 1], p. 544. The court continued to document her complaints concerning his frequent use of the bathroom, and stated that

she was excusing him for "frequent urination problems." Vol. 9 [Supp. 1], p. 547-548. Appellants objected on the basis that he was not disqualified and that it violated the Americans With Disabilities Act, pointing out that he wanted to serve and that his claimed disability should not prevent him from serving on the jury. Vol. 9 [Supp. 1], p. 548. Potential juror # 232 Horton was called back for further individual voir dire examination, and his views on the death penalty indicated that he was qualified to serve. Vol. 9 [Supp. 1], p. 2956-2962. He recounted his condition requiring restroom breaks because of his medication, indicating "I don't deal in issues with it." Vol. 20 [Supp. 1], p. 2963-2964. Upon repeated questioning by the prosecution, and ultimately by the trial court, he stated that he was trying to be as honest as he possibly could, but would require restroom breaks. He finally relented and said that he was asking to be excused because of the problem, after badgering concerning the issue. Vol. 20 [Supp. 1], p. 2964-2966. He was never told that any accommodations could be made for his condition. The court again stated that she felt "that he's disqualified for service because of a physical infirmity." Vol. 20 [Supp. 1], p. 2968. Appellants objected on the same basis asserting that he was qualified but the trial court excused him based on the physical infirmity. Vol. 20 [Supp. 1], p. 2968.

**Venireperson # 130 Kimball**

Venireperson # 130 Kimball indicated that he took numerous medications, but none of them affected his ability to concentrate or understand the proceedings; he did have 40% hearing loss in both ears which would affect his ability. Vol. 8 [Supp. 1], p. 439. He indicated that he had trouble hearing the judge, and his hearing problem could possibly interfere with his hearing witnesses. Vol. 8 [Supp. 1], p. 440. The trial court summarily said she was going to excuse him because "the hearing is too bad. I can't deal with that. I mean, he's had it- - Since birth he's had a problem." Vol. 8 [Supp. 1], p. 443. Appellants objected, pointing out the acoustics were notoriously bad in the courtroom, and counsel could not even hear everything spoken. Vol. 8 [Supp. 1], p. 443-444. Upon further questioning by the court, he even indicated that if the court spoke a little louder, he could understand every word she was saying; he had previously served on a capital murder jury and did not recall having a problem hearing things in that case. Vol. 8 [Supp. 1], p. 446-447. Trial counsel even assumed the witness stand, and the juror could hear trial counsel speaking without a microphone; speaking in the microphone even assisted him. He further detailed his ability to hear when accommodations such as volume were offered. Vol.8 [Supp. 1], p. 450-452. Over the objection of appellants, the trial court excused him stating " I don't think his hearing is adequate." Vol. 8 [Supp. 1], p. 453. When trial counsel pointed out that the potential juror could raise his hand if he could not hear, the trial

court indicated "Well, it doesn't happen here... I just don't want to have somebody that is really handicapped at hearing everything that's going on; and if he has a problem hearing me, that's a big problem because that's... that's the court's instructions. I mean, that's just a big problem." Vol. 8 [Supp. 1], p. 454. The trial judge simply did want to be bothered by Mr. Kimball's limited disability. Over the repeated objections of appellants, the trial court told Mr. Kimball he was excused on April 6, 2010. Vol. 8 [Supp. 1], p. 455. On April 13, 2010, the trial court indicated that the court clerk had advised Mr. Kimball that he needed to return pursuant to the court's instructions, and he informed the court that he had conducted independent research based upon his excusal by the trial court including internet research, and reading articles in the Beaumont Enterprise. He had learned details concerning the alleged offense and appellants. Vol. 11 [Supp. 1], p. 863. The trial court indicated that he should not even be brought back because he had been excused and had now researched the case, whereupon appellants renewed their objections and pointed out the problem occasioned by the wrongful excuse of the juror and the harm inuring to appellants. Vol. 11 [Supp. 1], p. 860-861. The manifestation of the harm was recognized by the trial court which she stated "I mean, at this point he needs to stop research, stop talking, stop doing anything about it, and show back up, I guess." Vol. 11 [Supp. 1], p. 863. On April 20, 2010, potential juror # 130 Kimball returned for

further questioning. He discussed at length his previous service in a state death penalty case, in which he served on the jury that assessed death. Vol. 16 [Supp. 1], p. 1931-1933. The sum of his testimony was that he had reservations about serving a second time because the first experience bothered him. Vol. 16 [Supp. 1], p. 1934-1936. While he could not promise he could assess a death penalty, he testified that he believed in the death sentence if it was warranted. Vol. 16 [Supp. 1], p. 1937. While he did not know if he could again "take someone else's life", he did state that he could listen to the evidence and could follow the law. Vol. 16 [Supp. 1], p. 1955. Of more significance was his discussion of his hearing problem. He indicated that his research on the internet and other media sources was based entirely on the fact that he had been excused by the trial court; based on the prior excusal because of his disability, he learned a great deal about the facts alleged in the case and the defendants. Vol. 16 [Supp. 1], p. 1938-1941. The harm occurring from the wrongful excusal by the trial court was apparent when he stated " I don't think you ever forget what you've learned" concerning the information he had gained. Vol. 16 [Supp. 1], p. 1941. The court again questioned him concerning his hearing problem, and stated he did have a problem hearing the trial judge. Vol. 16 [Supp. 1], p. 1956. The prosecutor attempted to have him excluded once again, but this time upon the basis that he had scruples concerning the death sentence, having previously assessed a

71

death sentence.[1] Vol. 16 [Supp. 1], p. 1957-1958. Appellants pointed out that he should not be excluded under *Witherspoon*, since *Witherspoon* was not an exclusionary rule affording the government the opportunity to remove someone from the jury. Vol. 16 [Supp. 1], p. 1959. The trial judge had her clerks study the Americans with Disabilities Act and she concluded that it did not apply to federal courts. Vol. 16 [Supp. 1], p. 1962. (Obviously the sum of her logic was that if the ADA did not apply to federal courts, she was free to discriminate against the disabled jurors with impunity; she obviously leapt on this opportunity to exclude Mr. Kimball and Mr. Horton from jury service.) Based on the combination of factors, including his hearing problem, the courts excused him. Vol. 16 [Supp. 1], p. 1962. Appellants again objected to the exclusion of Mr. Kimball and moved for a mistrial based on the previous erroneous exclusion of him. Counsel pointed out that it violated the Americans with Disabilities Act and the principles espoused in that Act. The trial court denied the motion for mistrial and excused the juror, stating " you know, I think he should be denied because of the hearing problem. He doesn't hear me. He needs to hear the instructions of the court and the rulings of the court. He was having trouble today hearing people in a setting which is much quieter and there's

---

[1]It is certainly suspect that the government would use the fact that this juror had previously participated in the process and assessed a death sentence as an excuse to urge that he could not participate in the process and assess a death sentence.

microphones abounding. And I don't think the courts have definitely said that the ADA does apply to federal courts. So, that's just denied. He's gone." Vol. 16 [Supp. 1], p. 1963-1964.

Appellants pointed out that neither of the above potential jurors were offered any accommodations for their disabilities. Neither was consulted concerning what arrangements could be made by the trial court to facilitate their serving on the jury. The trial court simply summarily dismissed each of these potential jurors based upon their disabilities. Appellants submit that the dismissal of these jurors violated the spirit of the Americans with Disabilities Act, if not the Act itself as well as the principles set out therein. Additionally, the judge's actions violated the Equal Protection Clause of the United States Constitution and denied appellants due process of law. The actions of the trial court additionally impinged upon the constitutional right of each of these gentlemen to perform their civic duty and serve on the jury, in violation of the United States Constitution.

The district court refused to allow a minor-hearing-impaired juror and those with minor medical issues, such as those individuals identified above, including one who had a need for frequent bathroom breaks, to serve on the venire panel. There was no authority for the district court to dismiss Mr. Kimball and Mr. Horton from jury service and in doing so, the district court violated the Americans with Disabilities

Act (ADA), as well as appellants' Sixth Amendment right to a fair trial. This case also implicates the equal protection clause of the Fifth and Fourteenth Amendments. The district court therefore erred by summarily dismissing these two veniremen who were qualified to serve.

"Whether jury service be deemed a right, a privilege, or a duty, the State may no more extend it to some citizens and deny it to others … than it may discriminate in the offering of the elective franchise." *Carter v. Jury Commission*, 396 U.S. 320, 330 (1970). The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. *Batson v. Kentucky*, 476 U.S. 79, 87 (1986).

In federal courts, the Jury Selection and Service Act of 1968, §§ 1861-77 Title 28, U.S. Code states that any persons is qualified to serve on a federal jury unless, *inter alia*, he or she "is incapable, by reason of mental or physical infirmity, to render satisfactory jury service."d. § 1865(b)(4). In *United States v. Dempsey*, 830 F.2d 1084, 1088-89 (10th Cir. 1987), a pre-ADA case, the Tenth Circuit expressly held that a juror's deafness does not disqualify him or her from jury service. The court found that a deaf juror, with accommodations, was able to evaluate the evidence presented. Deafness of a venireman or minor medical issues, such as the need to use the

bathroom more frequently than a district judge would like to accommodate, do not render a venireman unqualified under federal statutes governing jury service.

Under the Jury Selection and Service Act of 1968, 28 U.S.C. §§18611-77, any person is qualified to serve on grand and petit juries in the district court unless, *inter alia,* that person "(2) is unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form; (3) is unable to speak the English language; [or] (4) is incapable, by reason of mental or physical infirmity, to render satisfactory jury service." *Id*.; §1865(b)(2)-(4).

There is no indication that the minor-hard-of-hearing venireman Kimball or Mr. Horton with the need for bathroom breaks had trouble competently completing their juror qualification forms or questionnaires. It is apparent from their educational and work experience, as well as their interviews, that these veniremen could read, write, and understand the English language with proficiency. The district court's limited questioning of the veniremen regarding their minor impairments before dismissing them from the panel was nothing more than a subterfuge to allow her to avoid making any accommodations whatsoever for their minor disabilities. The trial judge simply did not want to be bothered with their problems, as she made it clear on the record. There is no basis for concluding that they were unqualified under subsection (2) or any other subsection.

Further, the Americans with Disabilities Act of 1990 (ADA) supports the conclusion that the district court abused its discretion in systematically removing veniremen with any disability from the venire panel. The Americans with Disabilities Act of 1990 (ADA) prohibits the exclusion of deaf and hard of hearing individuals and those with other disabilities from jury service. The district court's actions in this case constitute a flagrant violation of the ADA.

The ADA was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title II of the ADA applies to "public entities,"including both state and local governments, and their agencies and instrumentalities, such as courts. 42 U.S.C. § 12131(1). It provides that "no qualified individual with a disability shall, by reason of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 USC § 12132. A person is a "qualified individual with a disability "if he or she can, with accommodations, meet the essential requirements to participate in the public entity's programs, services, or activities. 42 U.S.C. § 12131(2).

Congress passed Title II of the ADA in part because "many individuals, in many States across the country, were being excluded from courthouses and court proceedings by reason of their disabilities.... including exclusion of persons with... hearing impairments from jury service." *Tennessee v. Lane*, 541 U.S. 509, 527 (2004). As stated by the President when signing the ADA, the legislation "signals the end to the unjustified segregation and exclusion of persons with disabilities from the mainstream of American life." *People v. Green*, 561 N.Y.S.2d 130, 133 (1900); <u>see</u> also U.S. Code Cong, and Admin. News, No. 6, September 1990, at 602. The legislation signaled the end to such discrimination, that is, except in this trial court in the Eastern District of Texas.

The need for equality and full participation in society becomes even greater in the context of jury service. *Powers v. Ohio*, 499 U.S. 400, 407 (1991) ("Indeed, with the exception of voting, for most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process."). Additionally, a defendant has "the right to be tried by a jury whose members are selected by nondiscriminatory criteria." *Powers*, 499 U.S. at 404.

Title II of the ADA prohibits public entities from excluding persons with disabilities "from participation in... the services, programs, or activities of a public

entity" by reason of that person's disability.42 USC § 12132. [2] The hearing disability and minor medical issues were the only reason for which the district court questioned the qualifications for these veniremen to serve as jurors. The district court's conclusions were based solely on ignorant speculation, with no evidence to suggest that these veniremen were not qualified to serve as jurors.

Congress intended to eradicate this exact type of misconception and prejudice by enacting the ADA. Tellingly, the ADA begins with the finding that "physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination." 42 USC § 12101(a)(1). For the district court to speculate, or even conclude as this judge did, that these jurors on the venire panel who had a hearing disability or a need for bathroom breaks would render their service as jurors dissatisfactory would be a violation of both the letter and purpose of the ADA.

---

[2]Compliance with Title II of the ADA involves both a duty to refrain from direct or indirect exclusion of persons with disabilities and an affirmative obligation to modify exclusionary policies, practices, and procedures. §§35.130(b)(1)(i) and (b)(3)(i) (1998), Title 28, C.F.R. This includes the prohibition of "eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity..." 28 C.F.R. § 35.130(b)(8).

§ 504 of the Rehabilitation Act, Section 794, Title 29, U.S. Code (the pre-ADA federal law prohibiting discrimination by recipients of federal funds) was specifically enacted in response to historical segregation of persons with disabilities from society and the fact that "such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." § 12101(a)(2), Title 42, U.S. Code. § 504 sought to ensure that handicapped individuals are not denied jobs or other benefits because of the prejudiced attitudes or ignorance of others." *School Bd. of Nassau County v. Arline* , 480 U.S. 273, 284 (1987).

There is a "tendency on the part of officialdom to overgeneralize about the handicapped," and the law must accordingly afford protections against such stereotypes. *See Galloway v. The Superior Court of the District of Columbia* , 816 F. Supp. 12, 16 (D.D.C. 1993). Consequently, courts have held that "mere possession of a handicap is not a permissible ground for assuming an inability to function in a particular context." *Southeastern Community College v. Davis* (1979), 442 U.S. 397, 405. In *DeLong v. R. Bruce Brumbaugh*, the court "acknowledge[d] that deaf persons... can efficiently serve on juries, [and] also by permitting litigants to be judged by 'a body truly representative of the community.' " *DeLong v. R. Bruce Brumbaugh*, 703 F. Supp. 399, 406 (W.D.Pa. 1989)(holding that trial court violated the Rehabilitation Act by excluding deaf individual from jury).

Courts in other jurisdictions have affirmed convictions and held that deaf and hard of hearing individuals are qualified to serve as jurors. *See Ronning v. State*, 748 S.W.2d 633, 636 (Ark. 1988); *Carrillo v. People*, 974 P.2d 478, 492 n.10 (Colo. 1999); *Ford v. State*, 658 S.E.2d 428, 429 (Ga. Ct. App. 2008); *State v. Francis*, 403 So.2d 680, 682-83 (La. 1981); *State v. Dugar*, 643 So. 2d 870, 871 ((La. Ct. App. 1994); *Roberts v. State*, 241 A.2d 903, 905-06 (1968); *Commonwealth v. Best*, 63 N.E. 1073, 1073 (Mass. 1902); *Moore v. State*, 909 So.2d 77, 83 (Miss. Ct. App. 2005); *State v. O'Neal*, 718 S.W.2d 498, 502 (Mo. 1986); *Parish v. State*, 142 P.2d 642, 645-46 (Okla. Crim. App. 1943); *Safran v. Meyer*, 103 S.C. 356, 88 S.E. 3 (1916); *Skinner v. State*, 33 P.3d 758, 764 (Wyo. 2001).

One court has even gone so far as to hold that individuals with hearing disabilities should be afforded *Batson*-like protection, and thus disallowed peremptory challenges based on hearing disability. *People v. Green*, 561 N.Y.S.2d 130, 131 (County Ct. 1990); *Batson v. Kentucky*, 476 U.S. 79, 89 (1986) (forbidding litigants from using peremptory challenges to strike jurors based on race).

In cases where courts overturned convictions due to the presence of a deaf or hard of hearing juror, the trial court was either not aware of the juror's hearing disability or did not accommodate the juror. In *Commonwealth v. Brown*, 332 A.2d 828 (Pa. Super. Ct. 1974), a conviction was overturned where a juror did not advise

the court of his hearing disability and was not accommodated during the trial. In *Commonwealth v. Greiner*, 455 A.2d 164, 167 (Pa. Super. Ct. 1983), the court overturned a conviction where a juror's inability to hear was discovered after the parties had introduced testimony. Any accommodations made thereafter could not cure the lack of accommodations during the earlier testimony. In *State v. Miller*, 722 P.2d 1131 (Kan. Ct. App. 1986), the court found an abuse of discretion where the juror advised the trial judge that she was hard of hearing, but the trial judge did not accommodate the juror.

In *State v. Speer*, 124 Ohio St.3d 564, 925 N.E.2d 584, 2010-Ohio-649 (Ohio Mar 03, 2010), the court reversed Speer's conviction, and held that the accommodation made in the case was insufficient to enable the hearing-impaired juror to consider all of the relevant and material evidence presented to the jury. Both the state and the defense relied on the 9-1-1 tape as evidence relevant to whether Speer had committed the charged offenses. The state suggested that Speer's "calm tone" and his "demeanor on the 9-1-1 tape" provided evidence of his guilt. Speer's defense counsel pointed out that the 9-1-1 tape did not show Speer slurring his speech at the time of the call. The appellate court found that the juror's hearing impairment directly affected her ability to perceive and evaluate that evidence because she only read the colloquy from a real-time transcription. Further, the

accommodation made by the trial court of allowing the deaf juror to read the court reporter's transcript did not provide her any means to effectively discern the demeanor, speech patterns, voice inflections, or excitement or lack of it as reflected in the voice modulations or other audio clues on the 9-1-1 tape. The appellate court found that, because the deaf juror could not perceive whether there was urgency in Speer's voice, whether he slurred his speech, or whether he sounded deceptive or hesitant, this juror could not include such evaluations in rendering her verdict.

Unlike these cases, the district court was made aware of these potential jurors on the venire who had hearing difficulties or needed restroom breaks. It would not have presented any difficulty to provide adequate accommodation. Government agencies do it every day, in every federal office, to accommodate those with such disabilities. There is no reason to conclude that this district judge was incapable of providing the accommodations that a park ranger can provide. The same issues present in *Speer* were not present in this case.

Many jurisdictions have specifically protected jurors from discrimination based on speculation and prejudice because a hearing disability, when accommodated, does not hinder a person's ability to serve as a juror. Many states have enacted statutes that explicitly prohibit the exclusion of individuals with hearing disabilities from juries. *See* Alaska Stat. § 09.20.010(b) ("A person is not disqualified from serving as a juror

solely because of the loss of hearing or sight in any degree or a disability that substantially impairs or interferes with the person's mobility"); Ark. Code Ann. §16-31-102(a) ("no person shall be disqualified solely on the basis of loss of hearing or sight in any degree"); Cal. Code of Civ. Proc. § 203(6) ( "no person shall be deemed incompetent solely because of the loss of sight or hearing in any degree or other disability which impedes the person's ability to communicate or which impairs or interferes with the person's mobility"); Fla. Stat. § 40.013(5) ("no person shall be excused from service on a civil trial jury solely on the basis that the person is deaf or hearing impaired"); Iowa Code § 607 A.2 ("A person shall not be excluded from jury service or from consideration for jury service in this state on account of age if the person is eighteen years of age or older, race, creed, color, sex, national origin, religion, economic status, physical disability, or occupation"); Mo. Rev. Stat. § 494.425(5) ("any person unable to read, speak and understand the English language [shall be disqualified from serving as a juror], unless such person's inability is due to a vision or hearing impairment which can be adequately compensated for through the use of auxiliary aids or services"); N.M. Stat., State Court Rules, Uniform Jury Instructions - Civil 13-110A ("New Mexico law permits all citizens to serve on a jury whether or not... they are hearing-impaired"); Or. Rev. Stat. §10.030(4) ("a person who is blind, hard of hearing or speech impaired or who has a physical disability is

not ineligible to act as a juror and may not be excluded from a jury list or jury service on the basis of blindness, hearing or speech impairment or physical disability alone"); R.I. Gen. Laws § 9-9-1.1(d) ( "Notwithstanding subdivisions (a)(4) and (5), a person with a disability shall not be ineligible to serve as a juror solely on the basis of his or her disability, and if that person meets the above requirements, with reasonable accommodations if necessary, he or she shall be deemed a qualified juror"); S.D. Codified Laws § 16-13-10 ("No potential juror may be excluded from jury duty because of a visual or hearing impairment"); W. Va. Code § 52-1-8(b)(2) ("For the purposes of this section [regarding the qualifications of jurors], the requirement of speaking and understanding the English language is met by the ability to communicate in American sign language or signed English"); Wis. Stat. § 756.001(3) ("No person who is qualified and able to serve as a juror may be excluded from that service in any court of this state on the basis of... a physical condition").

Further, a number of states explicitly provide for transcriptions, assistive listening devices, interpreters, or other reasonable accommodations for deaf and hard of hearing jurors. See Cal. Civ. § 54.8(a); Colo. Rev. Stat.§13-71-137; Colo. Rev. Stat. §13-90-204; Conn. Gen. Stat. § 1-245; Fla. Stat. § 90.6063; Ill. Comp. Stat. 5/8-1402; Kan. Stat. § 75-4355a; Ky. Rev. Stat. § 30A.410(1)(a); La. Code Crim. Proc. art. 401.1; Md. Rules, Rule 4-462; Mass. Gen. Laws ch. 234A, § 69; Mo. Rev. Stat.

§ 476.753; N.J. Stat. Rules of Ct., Directive 3-04 (2004); N.M. Stat., State Ct. Rules, Uniform Jury Instructions - Civil 13-110A; N.Y. Crim. Proc. §190.25; Okla. Stat. § 2409(A); R.I. Gen. Laws § 9-9-1.2; Tex. Civ. Prac. & Rem. Code Ann. § 21.002; W. Va. Code § 57-5-7. Under the established law in all of these jurisdictions, the district court could not have summarily excluded members of the venire panel on the basis of a hearing disability, or by analogy, a need to use the restroom.

The district court's exclusion of the potential jurors also violated the fair cross-section requirement of the Sixth Amendment, as well as the Equal Protection Clause of the Fifth and Fourteenth Amendments. The district court's exclusion of potential jurors, based on either their hearing impairment or need for slight accommodations such as bathroom breaks was contrary to federal statutory law, and violated the fair cross-section requirement of the Sixth Amendment, as well as the Equal Protection and Due Process Clauses of the Fifth and Fourteenth Amendment. *See,* e.g., *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975); *Alexander v. Louisiana*, 405 U.S. 625, 630 (1972); *State v. Rogers*, 334 Or 633, 642-43 and n 8, 55 P3d 488 (2002) (criminal defendant can challenge systematic exclusion of identifiable groups from jury pool

as either Sixth Amendment fair cross-section violation, or as equal-protection violation under Fourteenth Amendment).[3]

The Sixth Amendment right to a jury trial "encompasses trial by a jury that is drawn from a fair cross-section of the community." *Taylor v. Louisiana*, 419 US 522, 530 (1975). It is this community of interests that defendant was entitled to have represented in the venire from which his petit jury was drawn, particularly in a capital case. *See McCleskey v. Kemp*, 481 US 279, 310 (1987) ("a capital sentencing jury representative of a criminal defendant's community assures a diffused impartiality...in the jury's task of ... expressing the conscience of the community on the ultimate question of life or death") ; *Gibson v. Zant*, 705 F.2d 1543, 1546 (11th Cir. 1983) ("The importance of non-discriminatory jury composition is magnified in capital cases, where juries are required to consider 'as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.") *see* also *Lockett v. Ohio*, 438 US 586, 604 (1978). *See* also *United States v. Grisham*, 63 F3d 1074, 1078 (11th Cir. 1995), *cert den* 516 US 1084 (1996)("The representativeness requirement serves the goal of impartiality because it prevents the government from

---

[3]The Fifth Amendment's Due Process Clause, as applied to the federal government, incorporates the Fourteenth Amendment's guarantees of equal protection. *Davis v. Passman*, 544 F.2d 865, 868 (5th Cir.1977).

drawing up 'jury lists in such manner as to produce a pool of prospective jurors disproportionately ill disposed towards one or all classes of defendants.'") (quoting *Duren*, 439 US at 480).

 "[O]ne aspect of the fair cross-section requirement is that any group that the law excludes from jury service not be a "distinctive group within the community.";　*Duren v. Missouri*, 439 US 357, 364 (1979).　The appellant,  however, does not to be a member of excluded group to raise a fair cross-section challenge. *Duren,* 439 US at 359-60 and n. 1 (allowing male defendant to challenge exclusion of women); *Taylor*, 419 US at 526 (same). [4]

Criminal defendants have a Sixth Amendment right to trial by an impartial jury drawn from a fair cross-section of the community. *See Taylor v. Louisiana*, *supra*.

To establish a *prima facie* violation of the fair-cross-section requirement, a defendant must prove that: (1) a group qualifying as "distinctive" (2) is not fairly and

---

[4]In *Powers v. Ohio*, 499 U.S. 400 (1991), the  Supreme  Court held that a white criminal defendant had standing to challenge his criminal conviction based upon alleged violations of the equal protection rights of black prospective jurors.  *Powers* broke new ground by holding for the first time that a criminal defendant may raise an equal protection challenge to the use of peremptory strikes to exclude jurors of a different race. *See id*., at 422 . Recognizing that the defendant could not claim that his own equal protection rights had been denied, the Court held that the defendant had standing to assert the equal protection rights of veniremen excluded from the jury. <u>Id</u>., at 410-416. The Court concluded that the defendant had such "third party standing" because three criteria had been met: he had suffered an "injury in fact"; he had a "close relation" to the excluded jurors; and there was "some hindrance" to the jurors' ability to protect their own interests. <u>Id</u>., at 410-411, 111 S.Ct., at 1370-1371.

reasonably represented in jury venires, and (3) "systematic exclusion" in the jury-selection process accounts for the underrepresentation. *Berghuis v. Smith*, ____ U.S. _____, 130 S.Ct. 1382 (U.S. Mar 30, 2010); *Duren v. Missouri*, 439 U.S. 357, 364 (1979).

Once a *prima facie* violation is established, the state "bears the burden of justifying this infringement by showing attainment of a fair cross-section to be incompatible with a significant state interest." *Id*. at 368. In other words, "the right to a proper jury cannot be overcome on merely rational grounds." *Taylor*, 419 US at 534. "Rather, it requires that a significant state interest be manifestly and primarily advanced by those aspects of the jury selection process ....that result in the disproportionate exclusion of a distinctive group." *Duren,* 439 US at 367-68. Also, "mere suggestions or assertions to that effect are insufficient." *Id.* at 369.

In proving an equal-protection violation in the selection of a jury panel:

"The first step is to establish that the [excluded] group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as ...jurors, over a significant period of time. Finally, "selection procedure that is susceptible of

abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing.'" *Castaneda v. Partida*, 430 US 482, 494 (1977).

As with a fair cross-section challenge under the Sixth Amendment, a defendant need not be a member of the excluded group to raise an equal-protection claim under the Fourteenth Amendment. *See Campbell v. Louisiana*, 523 US 392, 394 (1998) ("a white criminal defendant has standing to object to discrimination against black persons in the selection of grand jurors" and thus "has the requisite standing to raise equal protection and due process claims"). *See* also *Powers v. Ohio*, 499 US 400, 415 (1991) ("a defendant in a criminal case can raise the third-party equal protection claims of jurors excluded by the prosecution because of their race," and barring such a "claim because his race differs from that of the excluded jurors would be to condone the arbitrary exclusion of citizens from the duty, honor, and privilege of jury service"). As the Supreme Court explained in *Peters v. Kiff*, 407 US 493 (1972), "the exclusion from jury service of a substantial and identifiable class of citizens has a potential impact that is too subtle and too pervasive to admit of confinement to particular issues or particular cases.... When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room

qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable .... Accordingly, we hold that, whatever his race, a criminal defendant has standing to challenge the system used to select his grand or petit jury, on the ground that it arbitrarily excludes from service the members of any race, and thereby denies him due process of law. 407 US at 503-04, 505." (white defendant may raise due-process and equal-protection challenge to exclusion of blacks from grand jury that indicted him).

Some courts hold that "the equal protection analysis employs a *prima facie* case test virtually identical to the one used in the fair cross-section analysis." *Bowen v. Kemp*, 769 F2d 672, 683 (11th Cir 1985), *cert den* 478 U.S. 1021 (1986). One of the differences is that "[u]nder a Fourteenth Amendment equal protection challenge the exclusion of a cognizable group must be 'purposeful.' *Castaneda*, 430 US at 493). In other words, "[t]he two analyses differ ...in the way the *prima facie* case is rebutted," this is done in equal-protection cases by proving absence of discriminatory intent, and in fair cross-section cases by proving significant governmental interest justifying the imbalance of classes." *Gibson v. Zant*, 705 F2d 1543, 1546 n 4 (11th Cir 1983); *see* also *Castaneda*, 430 U.S. at 497-98, and *Duren*, 439 US at 367-68).

In this case, the exclusion from the venire panel of the minor hearing impaired individual and the one with the need to use the restroom established a *prima facie*

violation of both the fair cross-section requirement of the Sixth Amendment and the Equal Protection Clause of the Fourteenth Amendment. The minor hearing impaired individual and one with a minor medical issue concerning urination are "distinctive" under fair cross-section analysis, and "cognizable" for purposes of equal protection.

Including persons with disabilities as participants injuries serves the broader interest of preserving "the integrity of the judicial process and... the fairness of the criminal proceeding." *Powers,* 499 U.S. at 401. The Supreme Court has unambiguously held that "the American concept of the jury trial contemplates a jury drawn from a fair cross section of the community." *Taylor*, 419 U.S. at 527; *see* also *Smith v. Texas*, 311 U.S. 128, 130 (1940); *Glasser v. United States*, 315 U.S. 60, 85 (1942); *Thiel v. S. Pac. Co.* 328 U.S. 217, 220 (1946). The "important social policy" of adhering to the law throughout a trial "argues against automatically foreclosing members of an important segment of our society from jury duty" merely on the basis of their disabilities. *Dempsey*, 830 F.2d at 1091. The ADA operates to protect individuals against this type of discriminatory exclusion. Consequently, under the principles of the ADA, and the principles underlying it, the district court erred in dismissing Mr. Kimball and Mr. Horton.

Established case law and state statutes throughout the United States support the inclusion of deaf and hard of hearing individuals as jurors. *See People v. Guzman*,

478 N.Y.S.2d 455, 460 (N.Y. Sup. Ct. 1984), *aff'd*, 76 N.Y. 2d 1, 555 N.E.2d 259 (1990).  The ADA prohibits exclusion of deaf and hard of hearing individuals as jurors.   The unintended effect of the district court's actions  is to encourage other courts to exclude deaf or hard of hearing people, as well as those with minor medical issues,  from jury service at the outset, for cause, solely because they have a disability -- the very type of discrimination that the ADA is intended to prevent.

With accommodations, these members of the venire panel were qualified under federal law  to perform the essential duties of a juror at the appellants' trial. These venire panel members  could understand the evidence, evaluate it fairly, and carefully apply the law to the evidence.  The systematic exclusion of these members of the venire panel violated the ADA, the appellants' Sixth amendment rights, and the right to equal protection under the law.   Because of the district court's actions, this case should be reversed and remanded.

**ISSUE NO. ELEVEN -** Snarr and Garcia's convictions must be reversed because the district court denied appellants' request for a jury instruction on a lesser included offense, in violation of *Beck v. Alabama*, 447 U.S. 625 (1980), thereby violating each of their rights to due process.

## I.      Standard of Review and Reviewability

Snarr and Garcia requested an instruction during the "guilt/innocence phase" regarding lesser included offenses (Supp. 1, Vol. 2, USCA5 458; Supp. 2, Vol. 3, USCA5 5538). The district court denied this request on the record, outside the presence of the jury ( Supp. 1, Vol. 24, USCA5 4356; Supp. 2, Vol. 28, USCA5 5407).

The appellate court reviews the district court's decision to deny the request for a lesser-included-offense instruction for an abuse of discretion. *United States v. Colon*, 268 F.3d 367, 373 (6th Cir. 2001); *United States v. Ursery*, 109 F.3d 1129, 1136 (6th Cir. 1997). "To find an abuse of discretion we must have a definite and firm conviction that the trial court committed a clear error of judgment.*"Williams v. Eau Claire Pub. Sch.*, 397 F.3d 441, 445 (6th Cir. 2005).

**II.**  **Argument**

At  the close of evidence during the guilt innocence phase of the trial, the defendants urged the district court to include instructions on lesser included offenses which had been previously submitted to the district court.   These proposed written instructions were filed with the district court, and  counsel  took  the opportunity to urge the district court to submit these instructions  to the jury.

This was the proposed instruction submitted to the jury for the lesser included offense of second degree murder:

COUNT I

Murder (Second Degree)

Title 18 U.S.C. § 1111

Title 18, United States Code, Section 1111, makes it a crime for anyone to murder another human being with malice aforethought.  For you to find the defendant guilty of murder in the second degree, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

**First**: That the defendant unlawfully killed Gabriel Rhone;

**Second**: That the defendant killed Gabriel Rhone with malice aforethought;

94

**Third**: That the killing took place within the territorial jurisdiction of the United States; and

**Fourth**: That the defendant did not act in self defense.

**Fifth**: That the defendant did not act in defense of a third person.

**Sixth**: That the defendant's actions were not justified by coercion or duress.

To kill "with malice aforethought" means either to kill another person deliberately and intentionally, or to act with callous and wanton disregard for human life. To find malice aforethought, you need not be convinced that the defendant hated the person killed, or felt ill will toward the victim at the time. In determining whether the killing was with malice aforethought, you may consider the use of a weapon or instrument and the manner in which death was caused.

A killing is "premeditated" when it is the result of planning or deliberation. The amount of time needed for premeditation of a killing depends on the person and the circumstances. It must be long enough for the killer, after forming the intent to kill, to be fully conscious of that intent.

"Murder" is the unlawful killing of a person with malice aforethought.

You should consider all the facts and circumstances preceding , surrounding, and following the killing which tend to shed light upon the condition of mind of the defendant, before and at the time of the killing. No fact, no matter how small, no circumstance, no matter how trivial, which bears upon the questions of malice aforethought and premeditation, should escape your careful consideration.

Counsel made the following arguments in an effort to convince the Court to submit the proposed instructions:

**MR. MORROW**:

Judge, further, on behalf of both defendants we had filed Document 232, which was our requested instructions; and I know that you've looked over it closely. And for the reasons we've stated throughout this trial and just for the record here, beginning on page 17, we objected to the court's charge for its failure to include the requested instructions on justification, duress, and coercion, self-defense, defense of a third person and then the lesser included offenses as set out beginning on page 21 of our requested instructions having to do with murder in the first degree, murder in the second degree, voluntary

96

manslaughter and involuntary manslaughter. And we would ask that the court include all those in your charge to the jury. (Supp. 1, Vol. 24, USCA5 4354; Supp. 2. Vol. 28, USCA5 5404).

The district court denied the request on the record, stating:

THE COURT: -- And then as to the lesser included offenses, I feel that the evidence in this trial is not such that the jury could rationally find the defendants guilty only of the lesser offenses and acquit them of the greater offense. So, I think only the first-degree murder charge is appropriate. And I'm looking at a number of cases, one of which is *United States versus Finley*, which is 477 F.3rd 250, Fifth Circuit 2007, which also says (reading) although a defendant's request for a lesser included offense charge should be freely granted, there must be a rational basis for the lesser charge and it cannot serve merely as a device for the defendant to invoke the mercy-dispensing prerogative of the jury. And I find that there is no rational basis in this instance for anything other than first-degree murder. And the other cases upon which I rely are *United States versus Harrison*, 55 F.3rd 163, Fifth Circuit 1995; *United States versus Browner*, 889 F.2d 549, Fifth Circuit 1989; and *United*

97

*States versus Collins*, 690 F.2d 431, Fifth Circuit 1982. So, those requested instructions are denied.

Anything else?

Objections are overruled. (Supp. 1, Vol. 24, USCA5 4356; Supp. 2. Vol. 28, USCA5 5407).

The Supreme Court has long recognized that if the facts of a case in any way support a finding that a defendant committed a lesser offense than the charged offense, then the issue of whether the defendant should be convicted of that lesser offense is one for the jury to resolve. *Stevenson v. United States*, 162 U.S. 313, 314 (1896).

In *Beck v. Alabama*, 447 U.S. 625 (1980), the Supreme Court held that state criminal defendants in capital murder cases have a constitutional right to jury instructions on lesser-included offenses. The Supreme Court held that the failure to give a lesser-included-offense instruction in a capital murder case can violate due process. In *Beck*, the defendant and his accomplice broke into the house of an eighty-year-old man and tied him up. According to Beck's version of the events, the accomplice struck the man and killed him. Beck consistently maintained that he did not kill the victim and that he had never intended for the murder to occur. The state

charged him with "robbery-intentional killing," a capital crime. *id*. at 628. Pursuant to the applicable state statute, the trial judge was prohibited from instructing the jury on the lesser-included offense of "felony-murder," a non-capital crime. The jury convicted Beck of intentional murder, and he was sentenced to death.

The Supreme Court held that it is a denial of due process for a jury to be deprived of the opportunity to consider the lesser-included offense of felony-murder when "the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction." *id*. at 638.

In *Beck*, the Supreme Court squarely addressed the constitutionality of Alabama's capital sentencing scheme. At the guilt phase, the jury was given two options: It was to "either convict the defendant of the capital crime, in which case it [was] required to impose the death penalty," or it could "acquitted him, thus allowing him to escape all penalties for his alleged participation in the crime." 447 U.S. at 629. The jury did not have a middle "option of convicting the defendant of a lesser included offense," thereby avoiding a death sentence. Id. at 628.

The *Beck* Court held this guilt-phase procedure unconstitutional because it injected "uncertainty and unreliability into the factfinding process that cannot be tolerated in a capital case." *id*. at 643. Alabama's all-or-nothing choice between death and acquittal "may encourage the jury to convict [the defendant of capital murder] for

an impermissible reason - its belief that the defendant is guilty of some serious crime and should be punished." Id. at 642. In light of these concerns, the Court held that the jury in a capital case must be given an option of convicting the defendant of a "non-capital offense … when the evidence would … support[] such a verdict." Id. at 627.

In *Beck*, the United States Supreme Court overturned a portion of Alabama's death penalty law that had prohibited lesser included offense instructions from being given in capital cases, holding that such provision violated the defendant's Fourteenth Amendment right to due process. "'The goal of the *Beck* rule ... is to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence.' " *Schad v. Arizona*, 501 U.S. 624, 646-647 (1991). Subsequently, courts have held that *Beck'*s rationale applies not only to the actual imposition of the death penalty, but also to a first degree murder verdict that renders a defendant eligible for death. *Vickers v. Ricketts* (9th Cir.1986) 798 F.2d 369, 370-374.)

The Supreme Court resolved conflicts within the Courts of Appeals concerning how to define a lesser included offense in *Schmuck v. United States*, 489 U.S. 705 (1989). In order to be a lesser included offense, "one offense is not 'necessarily included' in another unless the elements of the lesser offense are a subset of the elements of the charged offense. Where the lesser offense requires an element not

required for the greater offense, no instruction is to be given under Rule 31(c)." *Schmuck*, 489 U.S. at 716.

Under the elements only test, an offense is a lesser included one if all of its statutory elements can be demonstrated without proof of any fact or element in addition to those which must be provided for the greater offense. An offense is not a lesser-included one if it contains an additional statutory element. *United States v. Boyles*, 57 F.3d 535, 544 (7th Cir. 1995).

Second, an instruction for a lesser included offense is proper "if the evidence would permit a rational jury to find guilt under the lesser charge and acquit on the charge alleged." *United States v. Windsor*, 981 F.2d 943, 946 (7th Cir. 1992).Third, an instruction for a lesser included offense is proper when conviction of the greater offense requires that the jury find a disputed fact which is not an element of the lesser offense. "A lesser-offense charge is not proper where, on the evidence presented, the factual issues to be resolved by the jury are the same as to both the lesser and greater offenses .... In other words, the lesser offense must be included within but not, on the facts of the case, be completely encompassed by the greater." *Sansone v. United States*, 380 U.S. 343, 349-50 (1965).

An offense is a "lesser-included offense"if it meets the standard set forth in *Schmuck v. United States*, 489 U.S. 705, 716 (1989). Under that test, a defendant is

entitled to an instruction on a lesser-included offense if: "(1) the elements of the lesser offense are a subset of the elements of the charged offense; and (2) the evidence would allow a rational jury to find the defendant guilty of the lesser offense but not guilty of the charged offense." *United States v. Waldon*, 206 F.3d 597, 604-05 (6th Cir. 2000); *Schmuck*, 489 U.S. at 716); *accord United States v. Colon*, 268 F.3d 367, 373 (6th Cir. 2001).

A court should give a lesser-included-offense instruction when: "(1) a proper request is made; (2) the elements of the lesser offense are identical to part of the elements of the greater offense; (3) the evidence would support a conviction on the lesser offense; and (4) the proof on the element or elements differentiating the two crimes is sufficiently disputed so that a jury could consistently acquit on the greater offense and convict on the lesser." *Colon*, 268 F.3d at 373. It is generally reversible error to deny the request if all the requirements are satisfied. *United States v. Waldon*, 206 F.3d 597, 604 (6th Cir. 2000).

In denying the appellants' request for a lesser-included offense of second-degree murder, the district court listed four cases that it claimed supported its position in rejecting the appellants' request for the instruction (Supp. 1, Vol. 24, USCA5 4356; Supp. 2. Vol. 28, USCA5 5407). First, the district court cited *United States*

*v. Finley*, 477 F.3d 250 (5th Cir. 2007) as authority to deny the request. This reliance was misplaced.

In *Finley*, the defendant asserted that simple possession of a controlled substance is a lesser included offense of possession with intent to distribute. Finley's argument assumed that simple possession of the methamphetamine found in a pill bottle was a lesser included offense of possession with intent to distribute the methamphetamine in the cigarette package. The Court found that they were two separate, independent offenses.[5] Applying *United States v. Johnson* to the facts of the case, the Court found that the methamphetamine in the cigarette package and the methamphetamine in the pill bottle were two separate caches of drugs; one was intended for distribution at a truck stop, and the other was intended for some other

---

[5]It is well established that, in the abstract, simple possession of a controlled substance under 21 U.S.C. § 844(a) is a lesser included offense of possession with intent to distribute under 21 U.S.C. 841(a)(1). *United States v. Lucien*, 61 F.3d 366, 372–74 (5th Cir.1995). Under the *Blockburger* rule, possession with intent to distribute and simple possession constitute only one offense only where "the *same act or transaction* constitutes a violation" of both §841(a)(1) and § 844(a). *Rutledge*, 517 U.S. at 297, 116 S.Ct. 1241 (emphasis added); see also *Blockburger v. United States*, 284 U.S. 299, 304 [1932]). If, however, the greater offense of possession with intent to distribute and the lesser offense of simple possession arise out of two separate acts, and not "the same act or transaction," then the lesser offense is not included in the greater. See *Blockburger,* 284 U.S. at 301–03, 52 S.Ct. 180 (holding that two unlawful sales of narcotics to the same purchaser on consecutive days constituted two offenses, punishable separately).

purpose[6]. Each stash therefore constituted a separate violation of the narcotics laws and a lesser-included instruction was not warranted under the facts of the case.

*Finley* does not support the district court's decision in this case to deny the appellants an instruction on second-degree murder. Second-degree murder has been held to be a lesser-included offense of capital murder. *See Beck v. Alabama*, 447 U.S. 625 (1980) The issues in Snarr's and Garcia's case regarding the instructions involve the appropriate mental state, as well as premeditation, not whether second-degree murder is a lesser-included offense of capital murder.

The district court also relied on *United States v. Harrison*, 55 F.3d 163, 166-68 (5th Cir. 1995) to justify the decision to deny the requested jury instruction. Again, this case was a controlled substance case and the district court's reliance was misplaced. The defendant in *Harrison* was convicted of possession with intent to distribute cocaine base and using or carrying firearm during commission of drug

---

[6]In *United States v. Johnson*, the defendant was convicted of one count of possession of amphetamine in violation of § 844(a) and a separate count of possession with intent to distribute amphetamine in violation of §841(a)(1) and 18 U.S.C. § 2. *United States v. Johnson*, 977 F.2d 1360, 1373 (10th Cir.1992). Johnson argued that his multiple convictions for amphetamine possession violated the Double Jeopardy Clause because they arose out of a single course of conduct. Id. at 1371. The court disagreed. The court acknowledged that "as to a single cache of drugs, simple possession under § 844(a) is a lesser included offense of possession with intent to distribute under § 841(a)(1)." *id.* at 1373 (emphasis added); *Brown v. Ohio*, 432 U.S. 161, 169, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977); *United States v. Burns*, 624 F.2d 95 (10th Cir.1980). It reasoned that the situation in that case differed because the amphetamine was found in two separate stashes and each stash was intended for a different purpose or transaction; one stash was intended for personal use and the other for distribution. *See id*. at 1373–74. Each stash therefore constituted a different criminal transaction. *id*. at 1374.

trafficking offense. The defendant requested a lesser included offense charge on simple possession. Although Harrison did not introduce any evidence at trial, he relied on the cross-examination of the narcotics officer and DEA agent; both testified that approximately 49 grams of crack cocaine, the amount seized from Harrison's residence, *could* be used by a single individual in approximately two weeks, and that the marijuana found in Harrison's bedroom *could* have been intended for personal use rather than for distribution.[7]

This Court held in *Harrison* that the defendant was not entitled to charge on the lesser-included offense of simple possession since there was no rational basis for giving it. This Court held that evidence viewed in context of the entire record did not warrant a lesser-included offense. In short, it is not enough that an item of evidence when viewed alone and presented out of context from all evidence presented at trial supports a requested instruction. *See* also *United States v. Branch*, 91 F.3d

---

[7]Harrison's primary defense at trial was that he did not possess the cocaine. As noted, Harrison did not testify or otherwise present any evidence, and defense counsel did not argue to the jury that Harrison possessed the cocaine for his personal use rather than for distribution. In his opening statement, defense counsel stated that he intended to show that the cocaine was placed in Harrison's room by the confidential informant; likewise, in his closing argument, counsel stated that the informant placed the cocaine in Harrison's home. Nevertheless, "it is well established that a criminal defendant may raise inconsistent defenses, and is entitled to an instruction on any defense or lesser-included offense whenever there is evidence sufficient for a reasonable jury to find in [his] favor, even when the defense and lesser-included offense are inconsistent with each other". *Browner I*, 889 F.2d at 555. In *Browner I* and the case of Snarr and Garcia, **unlike** *Harrison*, denial of the element present in the greater but not in the lesser offense (in *Browner I*, the intent to inflict bodily injury) "was the primary thrust of her [Mrs. Browner's] defense and of her testimony. *id*.

699, 713 (5th Cir. 1996).  The critical distinction is that a single item of evidence can be overwhelmed by other evidence in the record. *id.*

Snarr and Garcia did not rely on any single piece of evidence, nor take any evidence out of context, in their argument for an instruction on second-degree murder.  There was various testimony at trial from different sources about Gabriel Rhone's aberrant and threatening behavior towards Snarr and Garcia.  Rhone was facing imminent release, and made horrific threats against Snarr's and Garcia's families. Snarr and Garcia faced lengthy sentences. Rhone's constant taunting threats, as well as the testimony about the abundance of weapons in the SHU, lack of supervision, and chaos in the institution reveal an atmosphere rife with the potential for spontaneous violence without premeditation.  The evidence as a whole supported the request for an instruction on second-degree murder.

In *United States v. Browner*, 889 F.2d 549 (5th Cir. 1989)(referred to as *Browner I*), also cited by the district court, this Court reversed Browner's conviction and remanded the case for a new trial based on instructional error.  Browner with indicted for voluntary manslaughter committed in the special maritime and territorial jurisdiction of the United States in violation of 18 U.S.C. § 1112.[8]  At the close of the

---

[8]The indictment also charged Mrs. Browner with murder and aggravated assault under state law, Tex.Penal Code §§ 19.02 & 22.02(a)(4), and the Assimilative Crimes Act, 18 U.S.C. § 13. The district court dismissed those counts before trial because both types of conduct could have

evidence after a three-day trial, the defense counsel requested the district court to

instruct the jury on involuntary manslaughter as a lesser included offense, but without

explanation the court refused.[9] Mrs. Browner was convicted. On appeal, she

challenged the district court's denial of her request for an involuntary manslaughter

instruction. This Court agreed with Mrs. Browner, reversed and remanded the case

for a new trial.

At her second trial, Mrs. Browner was acquitted on the charge of voluntary

manslaughter but convicted of assault with a dangerous weapon, in accordance with

an instruction that assault with a dangerous weapon is a lesser included offense of

voluntary manslaughter. This Court concluded that assault with a dangerous weapon

is not a lesser included offense of voluntary manslaughter and it reversed. *See United

States v. Browner*, 937 F.3d 165 (5th Cir. 1991) (*Browner II*).

The district court's reliance on the *Browner* case was completely misplaced.

This Court reversed Browner's convictions **twice** for instructional error. The factual

---

been indicted under federal law. *See* 18 U.S.C. §113(c) (assault with a dangerous weapon); 18
U.S.C. § 1111 (murder).

[9]This Court noted in *Browning I* that conviction for voluntary manslaughter as a lesser
included offense on an indictment for murder is not uncommon. *See* e.g., *United States v.
Comosona*, 848 F.2d 1110 (10th Cir.1988); *United States v. Lincoln*, 630 F.2d 1313 (8th
Cir.1980); *United States v. Lopez*, 575 F.2d 681 (9th Cir.1978); *United States v. Reagan*, 453 F.2d
165 (6th Cir.1971). The Court also noted that Involuntary manslaughter is also a lesser included
offense of murder. E.g., *Lincoln*, 630 F.2d at 1320.

evidence in *Browner* warranted an instruction on the lesser-included offense. Similarly, in the case *sub judice* the evidence established that a jury could have rationally concluded that appellants were guilty only of second-degree murder, rather than first-degree murder. The facts before the jury would have supported such a conclusion. Just as in *Browner*, the trial court was required to submit this instruction based on the evidence adduced. The *Browner* case therefore actually supports the appellants' claim that the district court erred for not properly charging the jury on the lesser-included offense of second-degree murder.

The district court also mistakenly relied on *United States v. Collins*, 690 F.2d 431 (5th Cir. 1982). Curtis Collins appealed his jury conviction for first degree murder and assault. **It should be noted that the jury in Collins was charged on second-degree murder.** The jury was not charged on manslaughter. This Court discussed the requirements for a manslaughter charge, so this case is somewhat inapplicable to the appellants' situation.

Collins claimed on appeal that the jury should have been charged on manslaughter as a lesser included offense[10]. Collins requested the charge on the

---

[10] The facts of *Collins* were undisputed. On November 24, 1980, Collins entered the main post office in New Orleans, Louisiana and shot and killed Adrienne Wharton, a supervisor of the Postal Service, with a .30 caliber carbine. Collins, a probationary employee of the Post Office, believed that Wharton lowered his rating for an unexcused absence from work. He was afraid that he would lose his job. A jury convicted Collins of first degree murder and assault. Collins was sentenced to life imprisonment on Count I and a 5 years on Count II.

grounds that he killed his victim out of a sense of "rage over the loss of his livelihood at the hands of Ms. Wharton." Witnesses testified that Collins was angry about Wharton's causing his immediate supervisor to give him an unsatisfactory rating. There was testimony that Collins believed that Wharton was harassing him and that Collins had the misguided notion that Wharton was sexually attracted to him.

The case involved a lengthy discussion of the existence of manslaughter requirements; to that extent, it is not supportive of the district court's decision to deny the second-degree murder instruction. The *Collins* court stated that the fact that distinguishes manslaughter from murder is the existence of malice. *Stevenson v. United States*, 162 U.S. 313, 16 S.Ct. 839, 40 L.Ed. 980 (1896). In the case of voluntary manslaughter, the onset of a "sudden passion" is deemed to demonstrate the absence of malice. *United States v. Elk*, 658 F.2d 644 (8th Cir. 1981). The Court affirmed the district court's decision to deny the manslaughter charge stating that

---

At trial, the government introduced two witnesses who saw Collins enter the building, but neither observed Collins with a firearm. Persons who met Collins inside the post office observed that he seemed to be concealing an automatic rifle. Collins questioned a number of people concerning Wharton's whereabouts. He then argued with his immediate supervisor about the unsatisfactory rating. Shortly thereafter, witnesses saw Collins shoot Wharton repeatedly, emptying the clip of his carbine into her body after she was already obviously dead.

As he was fleeing the scene of the shooting, Collins confronted Robert L. Jones, a security guard employed by the Post Office. When Jones ordered Collins to stop, Collins fired his weapon at Jones, wounding him above his right eye.

"none of this evidence amounts to provocation adequate to reduce a charge of murder to voluntary manslaughter."

This Court determined that the incidents described by Collins as the cause of his rage are not of the sort that would cause an ordinary, reasonable person to act rashly, without deliberation and from passion.

Further, the evidence and the jury verdict indicate that the defendant calmly and deliberately killed his victim, rather than acting in the heat of passion. The evidence also revealed that Wharton changed the evaluation four days before she was murdered, allowing Collins ample time for his blood to cool and for reflection.

The Court noted in *Finley* that a lesser-included offense charge is not "a device for [the] defendant to invoke the mercy-dispensing prerogative of the jury." *Finley* at 256. The district court quoted this passage at trial herein and was apparently of the opinion that the charge on second-degree murder would be tantamount to some kind of undeserved gift to the appellants. The idea that the request for a second-degree murder instruction was not based on the evidence presented at trial is erroneous. The evidence presented directly and through cross-examination fully justified the instruction on second-degree murder.

Murder is defined as "the unlawful killing of a human being with malice aforethought." 18 U.S.C. §1111. First degree murder is defined as any murder"

perpetrated by poison, lying in wait, or any kind of wilful, deliberate, malicious, and premeditated killing." 18 U.S.C. § 1111(a). Second degree murder is defined as any other murder. *id*. "Second degree murder, therefore, requires a finding of malice aforethought." *United States v. Milton*, 27 F.3d 203, 206 (6th Cir. 1994). Thus, the elements for second-degree murder are: "(1) the unlawful killing of a human being; (2) with malice aforethought; and (3) within the special maritime or territorial jurisdiction of the United States." *United States v. Sheffey*, 57 F.3d 1419, 1431 (6th Cir. 1995).

Under the federal murder statute, any murder that results from a premeditated plan to kill is first-degree murder, regardless of whether the victim was the intended target of the killer's premeditated plan. 18 U.S.C. §1111(a).

Snarr and Garcia requested a charge on second-degree murder, the essential elements of which are an unlawful killing, malice aforethought, and intent. *See United States v. Quintero*, 21 F.3d 885, 890 n.3 (9th Cir.1994); 18 U.S.C. § 1111(a). Premeditation is the essential element that distinguishes first- and second-degree murder. *See Quintero*, 21 F.3d at 890 n.3.[11] Intent and premeditation are separate and

---

[11]The government must introduce evidence, circumstantial or otherwise, supporting the conclusion that the defendant " *did, in fact,* reflect" upon the decision to commit murder and then committed that act with a cool mind. *United States v. Shaw*, 701 F.2d 367, 393 (5th Cir.1983); *see also* LaFave, *supra,* § 14.7(a) ("It is not enough that the defendant is shown to have had time to premeditate and deliberate. One must actually premeditate and deliberate...."). *See*, e.g., *Hemphill v. United States*, 402 F.2d 187, 189 (D.C.Cir.1968)("But the jury may not find

distinct elements of first-degree murder. *Both* are required. Intent alone will not suffice. *See Quintero*, 21 F.3d at 890 n.3; *United States v. Free*, 841 F.2d 321, 325 (9th Cir.1988) (distinguishing between "malice aforethought" and premeditation as essential elements of first-degree murder); *see also* LaFave, *supra,* § 14.7(a) ("[T]he defendant must not only intend to kill but in addition he must premeditate the killing and deliberate about it.").

The jury should have been instructed on second-degree murder because the evidence of premeditation was insufficient and hotly disputed. Snarr and Garcia believe that the Government's theory of the case regarding premeditation was largely based on conjecture and speculation. A charge of second-degree murder would have allowed the jury to winnow out this speculation and would have allowed them to return a verdict more in line with the facts of the case, absent the government's conjecture. The district court's stated reasons for denying the appellants' request were inadequate and erroneous.

---

premeditation solely from the fact that defendant had time to premeditate.); *State v. Garcia*, 837 P.2d 862, 868 (N.M.1992) ("We do not dispute the State's contention that Garcia had sufficient time to form a deliberate intention to kill.... Garcia certainly could have formed a deliberate intent during the ten to fifteen minutes while going from the back yard to the front yard, but nothing in the evidence enabled the jury to infer that this is when he formed the requisite deliberate intent, or that he ever formed such an intent."); *see* also *United States v. Catalan-Roman*, 585 F.3d 453, 467 (1st Cir.2009) ("With respect to premeditation, 'it is the fact of deliberation, of second thought[,] that is important.' ").

A defendant is entitled to an instruction on his theory of defense if the record contains evidentiary support for the theory and the theory is supported by law. *United States v. Lesina*. 833 F.2d 156, 160-160 (9th Cir. 1987). This includes lesser-included offense instructions.

Rule 31 (c) of the Federal Rules of Criminal Procedure provides that "[t]he defendant may be found guilty of an offense necessarily included in the offense charged ...." The rule restates prior law, *see Berra v. United States*, 351 U.S. 131 (1956), and permits the jury to find the defendant guilty of a lesser included offense even though it was not explicitly set forth in the indictment.

Lt. Randal Calhoun testified that Rhone was not viewed as a peaceful, law-abiding inmate (Supp. 1, Vol. 21, USCA5 3489; Supp. 2. Vol. 25, USCA5 4540). The evidence in this case demonstrated that Gabriel Rhone was a troubled, disliked and mentally disturbed inmate who "flew off the rack a lot," according to government witness and fellow inmate Keenan Hurt (Supp. 1, Vol. 23, USCA5 3966; Supp. 2. Vol. 27, USCA5 5717). Hurt further explained that Rhone was "unpredictable." He offered further examples:

> Like he unpredictable. Any minute he'll just do -- he'll just -- you never know what he going to do or what he going to say out his mouth. It's certain things that you don't say in prison. Three things you don't do --

mainly that you don't do. You don't call a man that's not a homosexual a "bitch," you do not offer a man that's not a homosexual off to your private parts, and you do not call a man that's not a snitch "hot." Three things you don't do. (Vol. 23[Supp. 1], USCA5 3966; Supp. 2. Vol. 27, USCA5 5717).

Hurt testified in particular about one strange incident involving Rhone:

"One day he was walking down the range; and he say, "'Whoever ain't Muslim on this tier can suck my dick; and if you want to see me outside, we can see each other.'" (Supp. 1, Vol. 23, USCA5 3966; Supp. 2. Vol. 27, USCA5 5717).

Dawn Gallagher was a corrections officer at the Beaumont BOP. She also testified that Rhone did not have a reputation as a peaceful and law-abiding inmate (Supp. 1, Vol. 23, USCA5 4125; Supp. 2. Vol. 27, USCA5 5176). She testified that, on November 12, 2007, she was working on the same range where Rhone was housed. She described an incident in which an inmate, possibly Rhone, had requested to use a telephone. When she returned with the telephone, Rhone "stuck

his erect penis through the food slot." (Supp. 1, Vol. 23, USCA5 4116; Supp. 2. Vol. 27, USCA5 5167). Officer Gallagher ordered him to put it away and he responded by ejaculating on her shoe (Supp. 1, Vol. 23, USCA5 4117; Supp. 2. Vol. 27, USCA5 5168). Gallagher further testified that while masturbating was common, ejaculating on a guard was not common (Supp. 1, Vol. 23, USCA5 4159; Supp. 2. Vol. 27, USCA5 5210).

The testimony at trial also revealed that Rhone had made several threats to Snarr and Garcia while they were housed in the SHU together. Rhone was facing imminent parole. He taunted Snarr and Garcia. Inmate Ricardo Pallaret testified about the threats and Rhone's behavior. Pallaret was Rhone's cell-mate on the SHU. Pallaret testified that Rhone was a "very controlling guy" and a "manipulator" (Supp. 1, Vol. 23, USCA5 4196; Supp. 2. Vol. 27, USCA5 5247). Pallaret testified that, when Rhone was bored, he would stand at the door of the cell and shout insults at the other inmates (Supp. 1, Vol. 23, USCA5 4196; Supp. 2. Vol. 27, USCA5 5247).

On the evening of November 27, 2007, the night before Rhone was killed, Rhone was particuarly angry and restless. He shouted to Garcia and Snarr that, if he ever got into the cell with him, he would kill him (Supp. 1, Vol. 23, USCA5 4197; Supp. 2. Vol. 27, USCA5 5248). He called Garcia "rice and beans" which is very

insulting to Hispanic inmates. (Supp. 1, Vol. 23, USCA5 4198; Supp. 2. Vol. 27, USCA5 5249). He called them "devils." He shouted insults and threats to Snarr and Garcia all night long (Supp. 1, Vol. 23, USCA5 4199; Supp. 2. Vol. 27, USCA5 5250). He only stopped when the guards walked by.

Officer Calhoun testified that homemade knives, referred to as "shanks" are common in the prison and in the Special Housing Unit where Rhone, Garcia, and Snarr were housed. Calhoun testified that he did not think Snarr and Garcia were the only ones who were equipped with shanks on the day of Rhone's murder. (Supp. 1, Vol. 21, USCA5 3523; Supp. 2. Vol. 25, USCA5 4574). Calhoun testified that there are numerous hiding places throughout a cell where the inmates secret their weapons (Supp. 1, Vol. 21, USCA5 3524; Supp. 2. Vol. 25, USCA5 4575).

The government alleged, and the jury found, that Snarr and Garcia, on November 28, 2007, were able to overcome the guards escorting them from recreation, take the keys, and enter Rhone's cell. An attack ensued and Rhone was killed. It is less clear what happened inside the cell and whether Rhone was armed.

The videotape shows that Snarr reached Rhone's cell first and unlocked it. Snarr did not appear to have a weapon as he unlocked Rhone's cell with the keys he had obtained from the guards. When Garcia reached Rhone's door, Rhone appeared to attack Garcia as evident by the downward slashing motion his hand made. Snarr

116

punched Rhone with his fist while Garcia and Rhone appeared to engage in a knife fight. Rhone leapt at Snarr and knocked Snarr's glasses off. In doing so, it is likely that Rhone dropped his shank. When Snarr bent down to retrieve his glasses, it is possible that is when he obtained Rhone's shank. This was a form of mutual combat where Rhone used his weapon first.

Appellants established that they were entitled to an instruction on second-degree murder. Therefore, in addition to violating Rule 31 (c), the district court's failure to give the lesser-included offense instruction violated Snarr's and Garcia's due process rights. This is because failure to instruct on the less-included offense can result in a distortion of the fact-finding process. If the jury is convinced of a defendant's guilt of some lesser crime but is given only the choice between acquittal and a greater crime, the jury may convict on the more serious charge in order to avoid letting the defendant go free. For this very reason, the Supreme Court has made clear that the right exists for capital defendants. *Beck , supra.*

In this case, counsel requested that the court give a lesser-included offense instruction relative to the lesser included offenses of capital murder. The facts surrounding the events relative to the incident  supported the giving of the additional instructions.  Snarr and Garcia were thus entitled to a lesser-included offense instruction in this case. Denial of the request for the lesser-included offense

117

instruction violated appellants' due process rights leaving the jury no choice but to convict of the capital offense.

This Court in *Cordova v. Lynaugh*, 838 F.2d 764, 767 (5th Cir. 1988), *overruled in part on other ground*, *Vanderbilt v. Collins*, 994 F.2d 189, 195 (5th Cir. 1993), wrote that " *Beck* stands for the proposition that the jury in a capital case must be permitted to consider a verdict of guilt of a noncapital offense in every case in which the evidence would have supported such a verdict ..... [D]ue process and the Eighth Amendment require that, in a capital case, the jury must be allowed to consider a lesser included noncapital offense if the jury could rationally acquit on the capital crime and convict for the noncapital crime."

The application of *Beck* pivots only on that the instruction was not given and not on why the instruction was not given ( E.g., in the case of *Beck*, a statutory preclusion; in *Cordova*, because the trial judge refused to give the instruction). The application of *Beck* to appellants' case does not require that his facts be identical. *See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007)(the AEDPA does not "require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied.")

The district court  court violated Snarr's and Garcia's rights to due process under *Mathews v. United States*, because "a defendant is entitled to an instruction as

to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." 485 U.S. 58, 63 (1988). It is clearly established federal law that, in a capital case, the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment require the trial court to instruct the jury on lesser included offenses supported by the evidence. *Beck*, 447 U.S. at 627. Because the district court refused to follow the law of *Beck* and give the instruction on second-degree murder, Snarr and Garcia should be afforded a new trial.

**ISSUE NO. TWELVE** - There is insufficient evidence to support the jury's findings that the murder was committed in an "especially heinous, cruel, or depraved manner."

## I.     Standard of Review and Reviewability

The evidence is insufficient to support the jury's finding that Snarr and Garcia committed the murder in an " especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim." 18 U.S.C. §3592(c)(6) (2000) (listing this as a statutory aggravator).   An appellate court is to consider, *de novo*, challenges to aggravating factors and their impact  upon a sentencing proceeding.  *United States v. Allen*, 247 F.3d741, 786 (8th Cir. 2001) *vacated and remanded on other grounds*, 536 U.S. 584 (2002); 18 U.S.C. 3595(c)(2)(B).

As with any criminal verdict, an appellate court  reviews jury findings of aggravating factors by asking whether, after viewing the evidence in a light most favorable to the government, any rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt. *United States v. Bernard*, 299 F.3d 467, 481 (5th Cir.2002).   This Court must engage in a review of the record in order to determine "whether the evidence supports the special finding of the

existence of an aggravating factor required to be considered under section 3592." 18 U.S.C. § 3595(c)(1).

As indicated by the statute, a murder may be especially heinous, cruel, or depraved if it involves either torture or serious physical abuse. In this case, the government argued serious physical abuse and did not propose torture as an aggravating factor. Therefore, the question for a reviewing court is reduced to whether there was sufficient evidence of heinousness, cruelty, or depravity in the context of serious physical abuse.

## II.   Argument

The Murder of   Gabriel Rhone   Was Not Committed in an "Especially Heinous. Cruel, or Depraved Manner.

Because Snarr and Garcia were convicted for an offense that authorizes capital punishment and because the government sought the death penalty in this case, the Federal   Death Penalty Act required a separate "penalty phase" after the jury convicted them  on the underlying offenses. 18 U.S.C. §3591, 3593; *see* also *United States v. Jones*, 132 F.3d 232, 240 (5th Cir. 1998).

The death penalty phase's initial sentencing step requires a jury to find beyond a reasonable doubt whether a defendant:

(A) intentionally killed the victim;

(B) intentionally inflicted serious bodily injury that resulted in the death of the victim;

(C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or

(D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act. 18 U.S.C. §§3591(a)(2)(A-D), 3593(b).

If a jury finds beyond a reasonable doubt that one or more of these threshold elements is satisfied, then it may proceed to consider whether one or more statutory aggravating factors exists; otherwise, the jury's sentencing role ends. *See* 18 U.S.C. §3592(c) (stating that the jury should proceed to consider the statutory aggravators only if the jury first finds that the crime satisfies one of the four standards described in §3591[a][2]).

One of the statutory aggravating factors set forth in the Federal Death Penalty Act is that a capital murder was committed "in an especially heinous, cruel, or

depraved manner in that it involved torture or serious physical abuse to the victim."

18 U.S.C. § 3592(c)(6). In the indictment and in the government's notice of intent

to seek the death penalty, the statutory aggravating factor was alleged, pursuant to 18

U.S.C. 3592(c)(6,) that the offense was committed in an especially heinous, cruel and

depraved manner (Vol. 1, USCA5 26; Supp. 2. Vol. 1, USCA5 41)(Vol. 1, USCA5

35; Supp. 2. Vol. 1, USCA5 50). The jury in Snarr's and Garcia's case found that

this statutory aggravating factor existed. (Doc. # 321, p.3)(Sealed); (Doc. # 322,

USCA5 42) The jury then used that factor in its weighing process (Doc. 349, p.

11)(Sealed); (Doc. # 350, USCA5, p.44).

The aggravating factor is met if "[t]he defendant committed the offense in an

especially heinous, cruel, or depraved manner in that it involved torture or serious

physical abuse to the victim." 18 U.S.C. §3592(c)(6). Most federal offenses that carry

the death-penalty punishment could be fairly characterized as heinous, cruel, or

depraved. *See Godfrey v. Georgia*, 446 U.S. 420, 428–29 (1980)("A person of

ordinary sensibility could fairly characterize almost every murder as "outrageously

or wantonly vile, horrible and inhuman.' ").

Accordingly, the statute limits the application of the aggravating factor to

offenses that involve "torture or serious physical abuse to the victim." § 3592(c)(6).

The limiting construction, along with the jury instructions defining the statute's terms,

provides "a meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." *Godfrey*, 446 U.S. at 428, 100 S.Ct. 1759; *Furman v. Georgia*, 408 U.S. 238, 313 (1972) (White, J. concurring).

18 U.S.C. 3592(c)(6) has been upheld as a constitutional aggravating factor only because it has been interpreted to require that something more be shown in support of its finding beyond the mere means of causing the death; that something must be the showing that the violence inflicted was gratuitous, more than the violence necessary to complete the crime charged, thereby justifying its description as torture or serious physical abuse. *United States v. Agofsky*, 458 F.3d369, 374 (5th Cir. 2006); *United States v. Taveras*, 488 F.Supp.2d 246, 252-253 (E.D.N.Y. 2007).

This Court in *United States v. Hall*, 152 F.3d 381 (5th Cir. 1998), *rev'd on other grounds, United States v. Martinez-Salazar,* 528 U.S. 304, 310 (2000) observed that this aggravating factor could be satisfied by a showing of the infliction of "torture" or "serious physical abuse." Id. at 414-15. The Court held that "torture" requires evidence that the defendant physically or mentally abused the victim while he was still conscious, while "serious physical abuse" could be inflicted on an unconscious defendant. Id. at 414-15. The court further observed that " serious physical abuse... contemplates something more than the amount of injury necessary

to cause death" *and* that "the defendant must have specifically intended the abuse *apart from* the killing," *i.e.,* that the defendant *intentionally* caused "needless mutilation of the victim's body ... *above and beyond that necessary to commit the killing." Hall,* 152 F.3d at 415 (emphasis in original; internal quotation marks omitted).

Submission to a jury of the aggravating factor of heinousness in a murder case penalty phase has always been an exercise fraught with the danger that a jury would impermissibly find in favor of the aggravating factor, and then the death penalty, simply because of the fact of the murder itself, making imposition of the death penalty in such case infirm as unconstitutionally overbroad. *Godfrey v.Georgia*, 446 U.S. 420, 428-432 (1980); *Maynard v. Cartwright*, 486 U.S. 356, 363-364 (1988). The Supreme Court has "…plainly rejected the submission that a particular set of facts surrounding a murder, however shocking they might be, were enough in themselves, and without some narrowing principle to apply to those facts, to warrant the imposition of the death penalty." *Maynard v. Cartwright*, 363.

"Something more than a horrible murder is necessary to make that murder especially heinous, cruel, or depraved as required by the Constitution and the terms of the FDPA." *United States v. Sampson*, 335 F.Supp.2d 166, 203 (D. Mass. 2004); *see* also *United States v. Agofsky*, 458 F.3d 369 (5th Cir. 2006) (defendant must inflict

suffering or mutilation above and beyond that necessary to cause death and must intend gratuitous violence); *United States v. Taveras,* 488 F.Supp.2d 246 (E.D. NY 2007)(properly instructed jury is asked to consider whether there was infliction of gratuitous violence above and beyond that necessary to commit the killing or needless mutilation of the victim's body). Even the Committee Comments associated with the instruction given to the jury expressly reiterate that "the defendant must have specifically intended the abuse apart from the killing." Instruction No. 12.07F, cmt.

Properly analyzed then, the question is not whether stabbing another inmate is shocking or whether the crime scene was especially bloody. Rather, the key question is whether those actions taken by Snarr and Garcia to kill Gabriel Rhone were gratuitous and more than necessary to bring about death.

Appellants' actions did not rise to this requisite level, so that the prosecution's evidence in this case clearly failed to prove beyond a reasonable doubt that Snarr and Garcia killed Gabriel Rhone in an "especially heinous, cruel, or depraved manner" in that he neither "tortured" nor caused "serious physical abuse" of Rhone within the meaning of § 3592(c)(6).[12]

---

[12]The government stated in closing argument that "I'm not going to ask you to consider the issue of torture, but I will ask you to decide whether or not you think they caused serious physical abuse to Gabriel Rhone" (1 Supp. Vol. 27, USCA5 4907; Supp. 2. Vol. 31, USCA5 5958).

The government's evidence at trial failed to prove such serious physical abuse. Dr. Tommy Brown, a contract forensic pathologist, testified for the government regarding Gabriel Rhone's manner of death. He testified that Mr. Rhone had been stabbed fifty times (1 Supp. Vol. 22, USCA5 3724; Supp. 2. Vol. 26, USCA5 4775). The total of 50 stab wounds, however, included numerous superficial wounds (1 Supp. Vol. 22, USCA5 3743; Supp. 2. Vol. 26, USCA5 4794). Dr. Brown identified one stab wound to the heart (1 Supp. Vol. 22, USCA5 3726; Supp. 2. Vol. 26, USCA5 4777). Dr. Brown also identified three stab wounds to the liver and two to the lungs that would have been fatal if not treated in time (1 Supp. Vol. 22, USCA5 3727; Supp. 2. Vol. 26, USCA5 4778). The wounds to Gabriel Rhone, although severe, cannot be said to be the work of gratuitous violence that rises to the level of heinousness.

Officer Randall Calhoun, the investigative technician at the federal penitentiary testified on behalf of the Government. Through his testimony, the government introduced the videotape of the assault on Gabriel Rhone as government's Exhibit 3A. (1 Supp. Vol. 21, USCA5 3402; Supp. 2. Vol. 25, USCA5 4453). It is evident from the videotaped footage that the entire assault on Gabriel Rhone occurred in a period of minutes. Thus, the government's own evidence shows that Snarr and Garcia inflicted the fatal blows in a surprise assault, which occurred quite rapidly--

hardly the actions of someone who was "specifically intend[ing] [physical] abuse *apart from* the killing." Hall, 152 F.3d at 415 (emphasis in original; internal quotation marks omitted).

Although Gabriel Rhone's body was unquestionably violated during the fatal assault, such violence is not sufficient to support application of the §3592(c)(6) aggravating factor based on "serious physical abuse." Cf. *Godfrey v. Georgia*, 446 U.S. 420, 433 n.16 (1980) (opinion of four Justice plurality) ("An interpretation of [Georgia's equivalent aggravating factor] so as to include all murders resulting in gruesome scenes would be totally irrational."); *see also id.* at 435 (Marshall, J., concurring in judgment, joined by Brennan, J.) (specifically agreeing with the plurality opinion regarding its holding that "extensive damage to the victim's body is constitutionally irrelevant" when the victims' deaths were instantaneous).

The fact that Rhone was stabbed multiple times was the essential act in his killing. The facts, "however shocking they might be", were only enough to effect the crime itself, and demonstrated nothing more than the effort necessary to complete the charged crime. *United States v. Agofsky*, 458 F.3d 369, 374 (5th Cir. 2006); *United States v. Taveras, supra. See* also *United States v. Montgomery*, 635 F.3d 1074 (8th Cir. 2011)(heinousness as an aggravating factor upheld where defendant murdered pregnant woman by strangling her until she was unconscious, using a knife to remove

128

her unborn child, and then strangling her again until she died when she regained consciousness during the act of removing the unborn baby).

Because a jury's sentencing decision under the FDPA requires a weighing process, the fact that the government did not sufficiently prove this aggravating factor, requires reversal as it impermissibly skewed the jury's weighing process by, in effect, placing a thumb on death's side of the scale. *Jones v. United States*, 527 U.S. 373, 398, 119 S.Ct. 2090 (1999); *Stringer v. Black*, 503 U.S. 222, 232 (1992); *United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005); *United States v. McCullah*, 76 F.3d 1087, 1111-1112 (10th Cir. 1996). For these reasons, the § 3592(c)(6) aggravating factor is based on insufficient evidence, and the jury's death sentences thus violated the Eighth Amendment. Consequently, this Court must reverse the death sentences imposed in this case and remand for further proceedings.

**ISSUE NO. THIRTEEN** - There is insufficient evidence to support the jury's findings regarding the non-statutory aggravating factor of future dangerousness.

## I.    Standard of Review and Reviewability

The evidence is insufficient to support the jury's affirmative finding regarding Snarr's and Garcia's "future dangerousness."   An appellate court is to consider, *de novo*, challenges to aggravating factors and their impact  upon a sentencing proceeding.  *United States v. Allen*, 247 F.3d741, 786 (8th Cir. 2001) *vacated and remanded on other grounds*, 536 U.S. 584 (2002); 18 U.S.C. 3595(c)(2)(B).

As with any criminal verdict, an appellate court reviews jury findings of aggravating factors by asking whether, after viewing the evidence in a light most favorable to the government, any rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt. *United States v. Bernard*, 299 F.3d 467, 481 (5th Cir.2002).   This Court must engage in a review of the record in order to determine "whether the evidence supports the special finding of the existence of an aggravating factor required to be considered under section 3592." 18 U.S.C. § 3595(c)(1).

## II.     Argument

**A.     The government relied on, and the jury found, the aggravating factor that Snarr and Garcia represented a future danger.**

Upon conviction for a homicide, the FDPA provides for a separate, post-conviction penalty proceeding. 18 U.S.C. § 3593(b); *see* also *Jones v. United States*, 527 U.S. 373, 407-08, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999).

In the first, or "eligibility," phase of the proceeding, a jury must unanimously find beyond a reasonable doubt that: (1) the victim's death resulted from the defendant's intentional engagement in life-threatening activity; and (2) one or more of the aggravating factors proposed by the government is present. *See* 18 U.S.C. §3591(a)(2), 3592(c); *Jones*, 527 U.S. at 407-08, 119 S.Ct. 2090.

If the jury returns both findings, the proceeding moves to the second or "selection" phase. *See* 18 U.S.C. § 3593(e).  Here, the jury must decide  whether the aggravating factors sufficiently outweigh statutory or non-statutory mitigating factors to warrant a death sentence or, absent mitigating factors, whether the aggravators alone warrant that sentence. *id*.; *see* also *id.*§ 3592(a); *Jones*, 527 U.S. at 408, 119 S.Ct. 2090. "The weighing is not numeric; the perceived significance, not the number, of aggravating and mitigating factors determines the decision." *Jones*, 527 U.S. at 408, 119 S.Ct. 2090.  While the jury determines aggravating factors unanimously and

beyond a reasonable doubt, it determines mitigating factors individually and by "a preponderance of the information." 18 U.S.C. § 3593(c), (d). In other words, "a mitigating factor may be considered in the jury's weighing process if any one juror finds the factor proved by a preponderance." *Jones*, 527 U.S. at 408, 119 S.Ct. 2090.

Based on its consideration of the aggravating and mitigating factors, the jury decides unanimously whether the defendant shall be sentenced to death, to life imprisonment without possibility of release, or some other lesser sentence. 18 U.S.C. § 3593(e).

The FDPA requires consideration of specific aggravating factors ("statutory aggravating factors") but also allows the government to allege other aggravating factors ("non-statutory aggravating factors").

The FDPA provides that a defendant convicted of any offense listed in §3591 "shall be sentenced to death" if the sentencing body determines that "imposition of a sentence of death is justified" after considering the factors listed in §3592. *See* 18 U.S.C. § 3591. Specifically, the sentencing body must consider "whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death." 18 U.S.C. § 3593(e).

Regarding the sentencing factors, § 3592(a) lists eight mitigating factors that must be considered, including a catch-all factor covering any relevant mitigating circumstance. Conversely, §3592(c) lists sixteen aggravating factors that must be considered for a homicide offense, assuming notice has been given, and adds that "any other aggravating factor for which notice has been given" may be considered. 18 U.S.C. § 3592(c).

Because a death sentence cannot be imposed unless at least one statutory aggravating factor has been proved, statutory aggravating factors are determined before any alleged mitigating or non-statutory aggravating factors are considered. At the selection stage, the government proffered two additional non-statutory aggravating factors. One of these was "future dangerousness."

During the defense case at the selection phase, Snarr and Garcia introduced the testimony of former BOP warden Mark Bezy, who retired after many years managing various institutions within the BOP. Mr. Bezy helped open the ADX prison in Florence, Colorado.[13] Mr. Bezy testified that the ADX is the "most secure facility

___

[13]The Control Unit at Florence ADMAX is one of six units at that facility. Control units, which also exist at other BOP facilities, are isolation units where BOP may place an inmate unable to function in a less restrictive environment without posing a threat to others. BOP, Policy Statement 5212.07. Causing injury to another person is a factor that may warrant placement in a Control Unit. *Id.* The other isolation units at Florence ADMAX are the Special Housing Unit and General Population Unit. The Intermediate and Transitional Units, which are part of the "Step-Down Unit Program"

the Bureau has" (1 Supp. Vol. 34, USCA5 6161; Supp. 2. Vol. 38, USCA5 7212).[14]

Within ADX is a unit termed the "Control Unit".

Mr. Bezy explained the functioning of the Control Unit:

The control unit, inmates are only allowed out of their cell -- I believe

it's seven hours a week. To come out of their cell -- the cells are -- they

have a doubledoor on them. It's a sliding door, and then it's got a grille

door which allows -- the inmate has to be in leg irons, Martin chain, and

handcuffs. All the officers at the ADX for -- unless they're in the

transition or the step-down units, carry batons. There would be I believe

three officers -- three officers on the inmate at a time. Everything is

single celled, single recreation. They're fed in the cells. They have a

small -- I think it's a – it's either a black-and-white or color  T.V. All

their programming is given to them over the T.V. -- education, religious

-- and information from the facility can be put over the T.V., too.

---

permit interaction among a small number of inmates.. Inmates in the Control Unit move from their cells under shackles and with three officers escorting them.

[14]Later testimony indicated that some of the nation's most notorious criminals are housed in this facility, in both the control unit and in general population.  These include "Unabomber" Ted Kaczynski, Oklahoma City co-defendant Terry Nichols, and Thomas Silverstein.

Q. So, when you say they're single celled, does that mean that the inmates don't have contact with each other?

A. No, there's no contact. (1 Supp. Vol. 34, USCA5 6122; Supp. 2. Vol. 38, USCA5 7174).

Mr. Bezy explained how inmates at ADX are moved within the facility:

The inmates, anytime they're out of the cells, they're in handcuffs and leg irons. They're escorted by the staff with batons. And, again, they're single celled, single recreation.

Mr. Bezy further explained that, although the goal of the BOP is to allow inmates to transition into the general population, this is not an automatic promotion:

And it's a program where the inmate can stay up into that general population for three years. It's designed -- there's a possibility they can be put into a general population penitentiary in three years, but there's no guarantee. The behavior and then the Bureau has a say whether they're going to move an inmate out of the ADX into general population.

Q. Okay. In fact, does the Bureau of Prisons have unfettered discretion to decide what security level to keep an inmate at?

A. Yes, basic -- yes, they do.

Q. Okay. If the Bureau of Prisons decides that Mr. Snarr needs to be kept single celled and kept at ADX for an unlimited period of time, can the Bureau of Prisons do that?

A. Yes.

Q. And, in fact, are there inmates that have been there for a long time?

A. There are inmates that I transferred there in 1995 that are still there, from Marion. (1 Supp. Vol. 22, USCA5 3724; Supp. 2. Vol. 26, USCA5 4775)

In order to rebut the testimony of Warden Bezy, the government offered the testimony of retired regional director of the BOP, Greg Hershberger. He echoed Mr. Bezy's assessment of the ADX control group unit:

The control unit is a national program that's housed at the ADX. Previously it had been housed at the United States Penitentiary in Marion, Illinois; and when the ADX opened, the control unit was moved

to the ADX. Essentially the control unit is the most restrictive form of housing and confinement that is possible within the federal prison system. And an inmate -- the requirement for admission to that program, the control unit program, is much more stringent than the referrals to the ADX general population part. (1 Supp. Vol. 35, USCA5 6317; Supp. 2. Vol. 39, USCA5 7368).

Mr. Hershberger, however, testified that he saw nothing in appellants' records that would indicate that they would not be able to "program out" of the ADX control group and be returned to the general population at any BOP facility.

The government then made the following argument in summation: There was no remorse. There was no remorse for the guards. They were just in the way. They were acceptable casualties. They were in the way of the mission. Every one of you knows they'd do this again, and they wouldn't even think twice about it. You know, as far as Mark Snarr's remorse saying that he was sorry, you heard Swain say, "I didn't believe him."

******

You know, Hershberger and Chris Rivers, who actually works at the ADX and the former warden of the ADX, both told you that they had no doubt that these two men would program out of the ADX and be back on a regular prison yard within the next ten years, probably less than that. So, all this talk about they can put them away, they can lock them up, da-da da-da da-da da, it's not going to happen. They are going to get to another prison if you give them a life sentence. That is as sure as the sun is going to shine again. That's going to happen. If you give them a life sentence, they're going to get back out there..... And when you think about a death penalty case and what is the most important thing to consider, it's whether a person is going to be a future danger again. (1 Supp. Vol. 36, USCA5 6576-6577; Supp. 2. Vol. 40, USCA5 7627-7629).

The government, not Snarr and Garcia, bore the burden of proof on the issue of future dangerouness and the other aggravating factors. *See* 18 U.S.C. § 3593(c). Thus, the issue was whether the government demonstrated that Snarr and Garcia remained a future danger--not --whether the defense demonstrated that any danger in a general population institution had dissipated. The government did not meet its

burden of proof that Snarr and Garcia would pose a risk of violence *in prison*, in the control unit of the ADX in Florence, Colorado.

Nevertheless, the jury unanimously found that each "poses a continuing and serious threat to the lives and safety of others because it is likely that he will commit criminal acts of violence in the future" and sentenced them to die. (Doc. #349, p.11)(Sealed); (Doc. # 350, USCA5. p.44).

**B.    The government's evidence in support of Snarr's and Garcia's future dangerousness in a prison setting was legally insufficient.**

In appellants' case, the statutory aggravating factor of future dangerousness is necessarily limited to how the defendant will function in an institutionalized prison setting. *See Simmons v. South Carolina*, 512 U.S. 154, 165 n.5 (1994); *United States v. Bernard*, 299 F.3d 467, 482 (5th Cir. 2002). This narrowed examination of dangerousness is warranted because the jury has the option of choosing life imprisonment without the possibility of parole as an alternative to death.[15] This is in

---

[15]In a system where the alternative to death is imprisonment for a minimum term of years, jurors have been asked to consider the threat the defendant may pose to "society,"which includes not only prison staff and other inmates but also the larger community if and when he is released. *See Berry v. State*, 233 S.W.3d 847, 863 (Tex.Cr.App. 2007)("Our precedent states clearly that 'society'... includes both prison

contrast to states who have the future-danger factor employed under capital statutes like that formerly found in Texas, where the alternative to death was imprisonment for a minimum term of years.

It is that assessment of dangerousness in the larger society that the Supreme Court approved in two Texas cases involving this aggravating factor, *Barefoot v. Estelle*, 463 U.S. 880, 897 (1983), and *Jurek v. Texas*, 428 U.S. 262, 274-76 (1976). While acknowledging that it is "not easy to predict future behavior," the Court observed that such predictions are "an essential element in many of the decisions rendered throughout our criminal justice system," such as bail determinations, noncapital sentencing choices, and parole decisions. *Barefoot*, 463 U.S. at 897; *Jurek*, 428 U.S. at 274-76. Of course, all of those involve assessing whether a defendant would pose a danger to the safety of others in the community at large.

The issue for appellants' jury, by contrast, was whether they would pose a danger to the safety of others in a maximum-security federal penitentiary. This type of institution is a setting specifically designed, organized, and staffed to handle

<hr />

and the 'free world,' and that the jury must consider dangerousness in that context"). *Accord Berget v. State*, 824 P.2d 364, 374 ( *Okl.Cr.App*. 1992) (same, as to Oklahoma aggravating factor of "continuing threat to society"). It should be noted that the state of Texas amended its statute to make life imprisonment without parole the alternative to death, for crimes committed after September 1, 2005. *See* Tex. Code Crim. Pro. 37.071.

inmates who have been convicted of violent crimes. The Supreme Court has never

considered the reliability of such judgments under the Constitution or the Federal

Death Penalty Act ("FDPA"). There is growing reason to question whether even

experienced government prosecutors, let alone lay jurors who see only a single case,

are equipped to make such a judgment. For example, an empirical study of 145 death-

noticed federal defendants sentenced to life imprisonment from 1991 to 2005 found

no statistically significant difference in the rates of serious disciplinary infractions

between those against whom the government had alleged future danger as an

aggravating factor and those against whom it had not. Cunningham, M.D., Reidy, T.J.

and Sorensen, J.R., *Assertions of "Future Dangerousness" at Federal Capital*

*Sentencing: Rates and Correlates of Subsequent Prison Misconduct and Violence*, 32

Law and Hum. Behav. 46, 55-57, 59, 61 (2008). [16.] *See also Flores v. Johnson*, 210

---

[16]Moreover, to the extent this and other studies reveal attributes tending to predict which capital offenders might engage in assaultive conduct in prison, those attributes were conspicuously absent from Mr. Snarr's and Mr. Garcia's case. *See id*. at 49 (other studies show that factors impacting on rates of assaultive misconduct include age (inversely), high school diploma or GED (lower risk), sentence length (inversely), prior prison sentence, robbery in the offense of conviction, and prison gang membership."); *id*. at 57-58, 60 & Table 4 (study of death-noticed federal defendants sentenced to LWOR finds that higher "age at entry," possession of high school diploma or GED, and capital crime "against the government"such as "killing of [a] witness []" are negative predictors of disruptive prison behavior, while treatment for psychological disorder and capital crime involving accompanying violent felony (e.g., robbery) are positive predictors).

F.3d 456 (5th Cir. 2000) (Garza, J., concurring) (even expert psychiatric testimony on future dangerousness has been shown to be "unreliable").

Against this backdrop, this Court must review the jury's finding that each appellant "poses a continuous and serious threat to the lives and safety of others because it is likely that he will commit criminal acts of violence in the future and this factor is aggravating" (Doc. #349, p.1)(Sealed); (Doc. # 350, USCA5. p.44). Viewing "the evidence in the light most favorable to the government," it is evident that here "no rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt." *Bernard*, 299 F.3d at 481.

The government presented evidence that appellants assaulted other inmates during his incarceration in general population unit of federal penitentiaries. This evidence, however, does not directly address the question of how appellants would fare in the Control Unit of the ADX in Florence, Colorado. *See*, e.g., *United States v. Pepin*, 514 F.3d 193, 206 (2nd Cir. 2008) (evidence about defendant's sexual abuse of a child properly excluded because he would not pose a danger to children if incarcerated for life); *United States v. Gilbert*, 120 F.Supp.2d 147, 154-55 (D. Mass. 2000) (defendant's effort, as nurse, to obtain medications to use as poison "lacks any substantial relevance to [her] dangerousness in a prison setting,"since she would have no access to such items in prison).

Regarding appellants' prior prison violence, these incidents did not involve anything they might be able to repeat in the Control Unit of the ADX prison setting. *See Gilbert*, 120 F.Supp.2d at 155 (government did not show why defendant's effort to break into home of her boyfriend "has any bearing on [her] dangerousness in prison, where she would be under lock and key," or that such conduct was "of sufficient gravity"); *United States v. Peoples*, 74 F.Supp.2d 930, 932-33 (W.D. Mo. 1999) (excluding evidence of burglaries to support future-danger aggravator). *See also Beltran v. State*, 728 S.W.2d 382, 390 (Tex.Cr.App. 1987) (future-danger finding not supported by prior crimes "not shown to involve criminal acts of violence or assaultive offenses").

Because the jury's finding that appellants presented a future danger in prison was based on legally insufficient evidence, *its reliance on this factor introduced an arbitrary element into its sentencing decision, in violation of the Eighth Amendment.*

**C.** **The government cannot show that jurors' unsupported finding that Snarr and Garcia would likely threaten the lives and safety of others in prison did not influence their decision to impose a death sentence.**

The FDPA prescribes the review of a death sentence imposed pursuant to its procedures. A reviewing court may not reverse or vacate a sentence of death "on

account of any error which can be harmless, including any erroneous special finding of an aggravating factor, where the Government establishes beyond a reasonable doubt that the error was harmless." *id*. § 3595(c)(2).

It should not surprise that the government sought to emphasize future dangerousness into this case, and then argued this aggravating factor in summation: Empirical studies of actual capital jurors consistently show that it drives death verdicts more than almost any other aggravating factor. *See*, e.g., John H. Blume, Stephen P. Garvey & Sheri Lynn Johnson, *Future Dangerousness in Capital Cases: Always "At Issue,"* 86 Cornell L.R. 397, 398 (2001); Sally Constanzo & Mark Constanzo, *Jury Decision Making in the Capital Penalty Phase*, 16 Law & Hum. Behav. 185, 188-89 (1992). Indeed, of the federal capital prosecutions in this Circuit that have resulted in death sentences (including appellants'), the jury has found future danger in all but one of them.[17]

In this case, the government made the following argument in summation:

---

[17]*See United States v. Fields*, 483 F.3d 313, 324-25 (5th Cir. 2007); *United States v. Bourgeois*, 423 F.3d 501, 511-12 (5th Cir. 2005); *United States v. Robinson*, 367 F.3d 278, 293 n.22 (5th Cir. 2004); *Bernard*, 299 F.3d at 482; *United States v. Webster*, 162 F.3d 308, 338 (5th Cir. 1999); *United States v. Hall*, 152 F.3d 381, 397, 418 (5th Cir. 1998); *United States v. Jones*, 132 F.3d 232, 238 & n.2 (5th Cir. 1998); *United States v. Flores*, 63 F.3d 1342, 1367 (5th Cir. 1995); *see* also *Special Verdict Form*, *United States v. Jackson*, E.D.Tex. No. 1:06-CR-51 (Nov. 13, 2006).

You know, Hershberger and Chris Rivers, who actually works at the ADX and the former warden of the ADX, both told you that they had no doubt that these two men would program out of the ADX and be back on a regular prison yard within the next ten years, probably less than that. So, all this talk about they can put them away, they can lock them up, da-da da-da da-da da, it's not going to happen. They are going to get to another prison if you give them a life sentence. That is as sure as the sun is going to shine again. That's going to happen. If you give them a life sentence, they're going to get back out there..... And when you think about a death penalty case and what is the most important thing to consider, it's whether a person is going to be a future danger again. (1 Supp. Vol. 36, USCA5 6576-6577; Supp. 2. Vol. 40, USCA5 7627-7629).

Here, the court's constitutional error, *see Lewis v. Jeffers*, 497 U.S. 764, 781 (1990), in submitting this unsupported yet generally influential aggravating factor cannot be deemed harmless beyond a reasonable doubt. That is the standard for this constitutional claim. *See Satterwhite v. Texas*, 486 U.S. 249, 257 (1988) (applying constitutional harmless-error rule of *Chapman v. California*, 386 U.S. 18 (1967), to

state capital sentencing proceedings, but agreeing that "the evaluation of the consequences of an error in the sentencing phase of a capital case may be more difficult because of the discretion that is given to the sentencer"); *see* also 18 U.S.C. § 3595(c)(2) (requiring reversal of death sentence unless government proves on appeal that jury's "erroneous special finding of an aggravating factor" was harmless "beyond a reasonable doubt").

Since, as to a death sentence, potential impact on one juror's vote establishes harm, the issue is whether the erroneous consideration of appellants' future dangerousness may have influenced even a single juror in favor of death. *See*, e.g., *Wiggins v. Smith*, 539 U.S. 510, 537 (2003); *Neal v. Puckett*, 286 F.3d 230, 241 (5th Cir. 2002).

The government argued future dangerousness in its sentencing summation, which is highly probative of prejudice. *See Johnson v. Mississippi*, 486 U.S. 578, 590 & n.8 (1988) (agreeing with lower court that improper reliance on aggravating evidence of prior conviction was not harmless, "since the district attorney argued this particular aggravating circumstance as a reason to impose the death penalty"). Although the government alleged other aggravating factors, it is reasonable to think that, for one or more jurors, none was as galvanizing as the fear that Snarr and Garcia would threaten the lives and safety of other persons in prison.

146

The jurors' refusal to find any mitigating factors does not demonstrate that this error was harmless beyond a reasonable doubt. Subtracting the influential future-danger aggravator from the mix, it is reasonable to assume that one or more jurors would have voted against death based solely on the relatively modest weight of the remaining aggravators. As the FDPA requires, the court explicitly instructed jurors that, "in the absence of any mitigating factors," they could impose death only upon finding "that the aggravating factors are themselves sufficient to justify a sentence of death." Even absent mitigating factors, they were free to find "that the aggravating factors proved do not, standing alone, justify imposition of a sentence of death, but instead justify a sentence of life imprisonment without possibility of release." *See Barclay v. Florida*, 463 U.S. 939, 955 (1983) (noting with approval that "[t]he Florida Supreme Court has not always found that consideration of improper aggravating factors is harmless, even when no mitigating circumstances exist."); *cf. Bernard*, 299 F.3d at 484-85 & n.15 (faulty finding that defendant killed for pecuniary gain was harmless where not only did jury fail to find any mitigators for Bernard, but it found five other aggravators including two especially weighty ones, future dangerousness and special heinousness).

Further, the effects of this error were not limited to the aggravation side of the sentencing scale. The jurors' unsupported finding of this *aggravating* factor led to

147

their equally unwarranted refusal to find the converse *mitigating* factor that appellants did not pose a threat of future dangerousness in prison. *See Pizzuto v. Arave*, 385 F.3d 1247, 1267 (9th Cir. 2004) (because error "affected both sides of the balance, once cannot be sure that the valid aggravating factors would have outweighed all the mitigating evidence").

Thus, the real question for harmless-error review is whether the Court can be certain, beyond a reasonable doubt, that no juror would have voted for life even had the mix of factors been altered by the removal of a significant aggravating one and its replacement by an equally significant mitigating one. The answer is "no." *See Skipper v. South Carolina*, 476 U.S. 1, 8 (1986) (exclusion of jailer's testimony that defendant had been well-behaved inmate for seven months was prejudicial where it was relevant both as mitigation and to rebut prosecutor's future-danger argument).

In this case, there is a prospect, and not merely an abstract legal one, that one or more jurors might have opted against a death sentence for appellants had they not been misled into a faulty finding of future dangerousness -- in other words, had the perceived aggravation been significantly lessened.

There have been some extremely aggravated FDPA cases in this circuit in which sentencing juries have declined to vote for death. *See*, e.g., *United States v. Frye*, 489 F.3d 201, 205 (5th Cir. 2007) (defendant and accomplice carjacked and

fatally shot two robbery victims after driving one around in the trunk of their car for an hour before the killings, then attempted to dismember their bodies afterwards); *United States v. Britt*, 112 Fed. Appx. 352, 355 (5th Cir. 2004) (defendant committed two murders for monetary gain as part of drug ring); *United States v. Davis*, 124 Fed. Appx. 838, 839, 843-44 (5th Cir. 2005) (defendant murdered three people in his role as enforcer for gang); *United States v. Tatum*, 31 Fed. Appx. 156 (5th Cir. 2001) (defendant killed two victims in two separate robbery-kidnappings). *See* also *Gardner v. Johnson*, 247 F.3d 551, 563 (5th Cir. 2001) (rejecting government claim that sentencing error involving future dangerousness was harmless because crime was egregious and heinous). A death verdict is not a foregone conclusion, even for crimes arguably more serious than that committed by appellants, and it is impossible to speculate that it was inevitable in this case without this error.

Accordingly, the Court should reverse Snarr's and Garcia's death sentences and remand the cases for new capital sentencing proceeding.

**ISSUE NO. FOURTEEN** - There is insufficient evidence to support the jury's findings regarding the statutory aggravating factor of substantial premeditation and planning.

## I.    Standard of Review and Reviewability

The evidence is insufficient to support the jury's finding that appellants killed Gabriel Rhone after "substantial planning and premeditation". This statutory aggravating factor was submitted to the jury during the eligibility phase of the trial. The jury found made an affirmative finding regarding this factor. Sufficiency challenges are reviewed *de novo*, and this Court must determine whether a rational juror could have found the disputed facts beyond a reasonable doubt. See *United States v. Soler*, 275 F.3d 146, 153 (1st Cir.2002). In making this determination, this Court must consider the evidence in the light most favorable to the verdict, giving the prevailing party (here, the government) the benefit of all reasonable inferences and resolving credibility questions in its favor. *See United States v. Lara*, 181 F.3d 183, 200 (1st Cir.1999); see also *United States v. Bernard*, 299 F.3d 467, 481 (5th Cir. 2002)(the Court reviews this query by asking whether, after viewing the evidence in a light most favorable to the government, any rational trier of fact could have found the existence of the aggravating fact or circumstance beyond a reasonable doubt).

150

This Court must engage in a review of the record in order to determine "whether the evidence supports the special finding of the existence of an aggravating factor required to be considered under section 3592." 18 U.S.C. § 3595(c)(1).

## II.     Argument

The unique structure of the FDPA has been discussed at length in several published opinions.  As has been noted, if the government decides to seek the death penalty, the FDPA bifurcates the trial into two phases: a guilt phase and a penalty phase. The penalty phase occurs only if the defendant is found guilty of a capital offense. In the context of this case, since the jury found that the government proved the capital charge, a penalty phase of the jury trial was required.

There are two distinct issues before the jury during the penalty phase. The first is whether the defendant is eligible for the death penalty. If so, the second is whether the death penalty is justified.  In order to establish eligibility for a death sentence for a homicide, the government must prove, beyond a reasonable doubt, that: the defendant was at least 18 years old at the time of the offense, 18 U.S.C. 3591(a); he acted with one of the four mental states set forth in 18 U.S.C. §3591(a)(2); and at least one of the sixteen statutory aggravating factors set forth in 18 U.S.C. § 592(c) exists.

If the government fails to establish eligibility, a death sentence cannot be imposed. If the jury finds that the defendant is eligible for the death penalty, it must decide whether a sentence of death is justified. In reaching this decision, the jury must weigh any aggravating factors against any mitigating factors. In order to recommend that the defendant be sentenced to death, the jury must unanimously conclude that "all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, the aggravating factor or factors alone are sufficient to justify a sentence of death." 18 U.S.C. 3593(e). The jury can also recommend a sentence of life imprisonment or, in some cases, some lesser punishment. A jury's "recommendation" of a sentence of death or life imprisonment is binding on the court. 18 U.S.C. §3594.

Aggravating factors may include statutory aggravating factors and non-statutory aggravating factors identified by the government in its notice of intent to seek the death penalty. *See* 18 U.S.C. § 3593. Mitigating factors may include any "relevant circumstance that could cause [a jury] to decline to impose the [death] penalty." *McCleskey v. Kemp*, 481 U.S. 279, 305-06, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

Different standards govern the proof of aggravating factors and mitigating factors. "The burden of establishing the existence of any aggravating factor is on the government, and is not satisfied unless the existence of such a factor is established beyond a reasonable doubt. The burden of establishing the existence of any mitigating factor is on the defendant, and is not satisfied unless the existence of such a factor is established by a preponderance of the information." 18 U.S.C. § 3593(c).

A jury must unanimously agree that an aggravating factor has been proven in order to consider it in deciding if the death penalty is justified. 18 U.S.C. § 3593(d). Any juror who finds that the defendant has established a mitigating factor may take it into account in considering whether a death sentence is justified even if no other juror finds that mitigating factor has been proven. *Id*. The FDPA refers to "information" rather than "evidence" because the penalty phase of a capital case is not governed by the Federal Rules of Evidence. *See* 18 U.S.C. § 3593(c). Rather, any relevant information may be presented to the jury unless "its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." *id*.

Within this framework of aggravating factors and mitigating factors, Snarr and Garcia contend that there was insufficient evidence that they killed Gabriel Rhone

after "substantial premeditation and planning." (1 Supp. Vol. 2, USCA5 722; Supp. 2. Vol. 4, USCA5 939).

Both the statute and the jury's instructions required the government to prove, beyond a reasonable doubt, that appellants engaged in both substantial premeditation and substantial planning. (1 Supp. Vol. 2, USCA5 5722; Supp. 2. Vol. 4, USCA5 939); 18 U.S.C. § 3592(c)(9); *see United States v. Davis*, 609 F.3d 663, 689 (5th Cir. 2010).

The Supreme Court has recognized that the word "substantial" is ambiguous, and can carry either of two distinct definitions: It can refer to the "existence" of something and thus "not mean seeming or imaginary," or it can refer to the "magnitude" of something, and thus mean "to a large degree." *Victor v. Nebraska*, 511 U.S. 1, 19; *see* also *Pierce v. Underwood*, 487 U.S. 552, 565 (discussing ambiguity of word "substantially"). In *United States v. Flores*, 63 F.3d 1342, 1373 (5th Cir. 1995), this Court construed the word "substantial" as used in the "substantial planning and premeditation" aggravator "to denote a thing of high magnitude."

Planning is not the same as premeditation. "Premeditation" refers to the time, before the act, that the defendant had to think or deliberate upon what he was about to do. (1 Supp. Vol. 2, USCA5 5722; Supp. 2. Vol. 4, USCA5 939). "Planning," according to the jury's instructions, "means the act or process of making or carrying

out plans." A "plan," in turn, is "a method of achieving something or a way of carrying out a design." (1 Supp. Vol. 2, USCA5 5722; Supp. 2. Vol. 4, USCA5 939).

To be found eligible for death under this factor, appellants must have engaged in "substantial"—"considerable" or "significant"— amount of planning and premeditation. (1 Supp. Vol. 2, USCA5 5722; Supp. 2. Vol. 4, USCA5 939). The statute, the instructions to the jury, and the government's argument made clear that the relevant actor for the purposes of this aggravator is the defendant. *See* 18 U.S.C. § 3592(c)(9) ("the defendant committed the offense after substantial planning and premeditation").

> The government made the following arguments in the eligibility phase: The next factor for you to consider is the issue of substantial planning and premeditation. The jury charges you -- as far as premeditation, the judge tells you that premeditation means a considerable or significant amount of planning and premeditation and leaves for you to define what that means. But it does tell you that the planning and premeditation has to be more than the minimum amount necessary. So, the bar is whatever you think above the minimum amount. Well, I'd submit to you that while they're trying to open up Gabriel Rhone's cell, they know that they're

going to kill him. They've already premeditated it. They're doing it right there. They're deliberating on it, they're forming the intent to kill him, and they're going ahead to do it. So, anything after that is -- that's the minimum. Anything after that is more premeditation.

The chaos that went on that morning you know was orchestrated as part of this. The way they knew what guards were going to be there and how they manipulated the fact that they got back from rec; Mr. Snarr saying that he wanted to go to the bathroom so that they could be assured that they would be going back together; getting the shanks that George Sarro told you he brought to Snarr the morning of the incident; Delacruz, the other Texas Syndicate member on the range, trying to get that pen clip and you saw something identical that was obviously used to get out of those handcuffs. They knew exactly what they were doing in this case. They planned it. They knew how the guards were going to react to everything that they did. They took those knives with them to the rec cage and had them with them the entire time that they were there. They planned to get the keys from the guards. They took the keys from them. That's all premeditation, ladies and gentlemen; and that is substantial

premeditation. And you should find that the government has proven that. (1 Supp. Vol. 27, USCA5 4908; Supp. 2. Vol. 31, USCA5 5959).

The evidence did not show that appellants had engaged in "substantial planning" premeditation that rose to the level that supported an affirmative finding on this aggravating factor. This appeared to be a crime of coincidence and convenience, rather than a masterplan incubated and hatched over lengthy secretive planning sessions and machinations.

The testimony at trial indicated there were many unusual things that happened the day of Rhone's murder, none of which Snarr and Garcia were able to orchestrate (despite the government's suggestion that they somehow arranged the series of events). One inmate tried to commit suicide. Another area on the range had a water overflow that resulting in flooding. Alarms were being pulled by various inmates. The staff, which was typically undermanned and even more than usual that day, had to deal with these incidents. The inattention by staff to policy and procedures they were required to follow, along with the kailedescope of varying events such as the flooding, alarms, and attempted suicide, created a "perfect storm" situation that enabled Snarr and Garcia to assault Rhone.

The evidence further indicated that Snarr and Garcia had been left in the recreation cages for hours, well beyond the length of time they usually spent there. Snarr and Garcia had no control over this snafu. They were forced to wait in the cages until the staff decided to take them back to their cells. Further, the staffing at the Beaumont facility was lower than usual the day Rhone was killed. Again, Snarr and Garcia had no control over the staffing numbers within the BOP. This resulted in each defendant being escorted by only one guard, in contravention of the "Three Man Hold" policy which required them to be escorted by three officers. Although the government argued that the defendants took their shanks to the recreation cages, there was testimony that inmates always carried their shanks with them. If the defendants had shanks, it was the result of an everyday common practice of all the inmates, not the result of planning or premeditation for this particular crime.

When there is insufficient evidence to support an aggravating factor, this Court must "remand the case for reconsideration" or for "imposition of a sentence other than death" unless the government can show, beyond a reasonable doubt, that the error was harmless. 18 U.S.C. § 3595(c)(2); *Webster*, 162 F.3d at 325. The Government cannot prove the error was harmless. *See United States v. Causey*, 185 F.3d 407, 412, 423 (5th Cir. 1999) (when jury was permitted to consider unproved fact

158

in determining penalty, court could not say its "penalty phase recommendations of the death penalty were not influenced").

At the selection phase of trial, the jury was instructed that it could consider all the evidence submitted throughout the entire trial and the statutory aggravating factors when it decided whether appellants were eligible for the death penalty. *See* Doc. # 364, p. 2; 10-11: 18 U.S.C. § 3593(c).

The consideration of the invalid "substantial premeditation and planning" factors certainly skewed the jury's deliberations. *See Brown v. Sanders*, 546 U.S. 212, 220–21 (2006). Had this factor been excluded, the jury "could not have given aggravating weight to the same facts and circumstances." *id*. at 221. The non-statutory factors presented at the selection phase were the government's assertion s that Gabriel Rhone was a vulnerable victim and that appellants presented a future danger. Without the erroneous aggravating factor regarding the "substantial premeditation and planning" before it, the jury would likely have weighed the mitigating factors differently.

The jury's refusal to find the mitigating factors was almost certainly the result of the erroneous finding on the aggravating factor. *See Pizzuto v. Arave*, 385 F.3d 1247, 1267 (9th Cir. 2004). Consideration of those factors—which included Snarr's and Garcia's upbringing, their relationships with their respective families, their

efforts to protect them—was likely colored by the erroneous determination that they had planned and carried out a "cruel," "heinous," or "depraved" crime. Defense counsel offered the jury a picture of Snarr as a young boy who grew up in a lawless, violent family and who, at age 8, tried to obtain a job from a neighborhood store in order to support his family. Without the guidance of stable, law-abiding parents, Snarr developed physical and emotional survival techniques that ultimately resulted in the altercation with Rhone. Garcia presented similar testimony concerning his home life and childhood, with the same results.

The jury's determination that appellants engaged in heinous conduct and "substantially planned" a murder improperly pulled the jury away from the facts jurors otherwise would have believed to be mitigating, to allegations it should not have considered because the evidence did not support them. This resulted in an unreliable sentencing determination, in violation of the Eighth Amendment. Thus, the erroneous findings were not harmless and reversal is required.

**ISSUE NO. FIFTEEN** - The district court abused its discretion in denying appellant Snarr's and appellant Garcia's motion to sever.

## I.  Standard of Review and Reviewability

Before trial,  the defendants filed a Motion to Sever (Vol. 1, USCA5 102; Supp. 2, Vol. 1, USCA5 121).  This motion was denied in a written order. (Vol. 1, USCA5 252-368; Supp. 2, Vol. 2, USCA5 288).

This Court reviews a grant or denial of severance for abuse of discretion. *United States v. Lewis*, 476 F.3d 369, 383 (5th Cir. 2007); *United States v.Sudeen*, 434 F.3d 384, 387 (5th Cir. 2005). A severance is reversible only on a showing of specific compelling prejudice. *id*.  "There is a preference in the federal system for joint trials of defendants who are indicted together...." *Lewis*, 476 at 384;  *Zafiro v. United States*, 506 U.S. 534, 537 (1993); *United States v. Scott*, 795 F.2d 1245,1250 (5th Cir. 1986).

"Historically, this Court has been reluctant to vacate a conviction because the district court  refused to sever a trial." *id*.; *United States v. Bieganowski*, 313 F.3d 264, 287 (5th Cir. 2002) ("A spillover effect by itself is an insufficient predicate for a motion to sever."); *United States v. Peterson*, 244 F.3d 385, 393 (5th Cir. 2001) (concluding that a limiting instruction cured risk of prejudice of evidence used

against a co-defendant); *United States v. Rocha*, 916 F.2d 219, 228-29 (5th Cir. 1990) ("[S]everance is required on the basis of a disparity in the evidence only in the most extreme cases.").

In order to be entitled to reversal, a defendant must isolate events occurring in the course of the trial and then demonstrate that these events caused substantial prejudice." *Lewis*, 476 at 384;  *United States v. Booker*, 334 F.3d 406, 415 (5th Cir. 2003).  To prevail, a defendant must show that "(1) the joint trial prejudiced him to such an extent that the district court could  not provide adequate protection and (2) the prejudice outweighed the government' s interest in economy of judicial administration." *United States v. Peterson*, 244 F.3d  385, 393 (5th  Cir. 2001); *United States v. Richards*, 204 F.3d 177, 206 (5th Cir. 2000). The court should also  consider whether some defendants may be unduly prejudiced by harmful " spillover of evidence against other defendants. *United States v. Erwin* , 793 F.2d  656, 665 (5th Cir. 1986);   *United States v. Johnson*, 713 F.2d 633, 639 (11th Cir. 1983). Nevertheless, compelling prejudice is not shown if it appears that through use of cautionary instructions, the jury could reasonably separate the evidence and render impartial verdicts as to each defendant." *id; United States v. Bolts*, 558 F.2d 316, 322-23 (5th Cir. 1997).

## II. Argument

Snarr and his co-defendant and fellow inmate, Garcia, were indicted for the capital murder of another inmate, Gabriel Rhone. Snarr and Garcia moved for relief from prejudicial joinder, but the court denied the motion. (Vol. 1, USCA5 252-368; Supp. 2, Vol. 2, USCA5 288). Based upon the evidence presented, it is likely that Snarr and Garcia would have been acquitted or not received the death penalty had each been tried separately from his co-defendant. Each suffered prejudice by being tried with the co-defendant and that prejudice far outweighed any interest in judicial economy. The resulting prejudice was such that it made it impossible for a jury to reasonably separate the evidence and render an impartial verdict as to appellants for guilt or punishment. Further, joint trial deprived each appellants of the beneficial testimony of his co-defendant.

It is noted that there is a preference in the federal system for joint trials of defendants who are indicted together, for reasons of efficiency and consistency. *See* Federal Rule of Criminal Procedure 8. That preference, however is tempered by the need to avoid undue prejudice. Federal Rule of Criminal Procedure 14 recognizes that joinder of some offenses and defendants can create prejudice to the level of unfair prejudice to the United States or the defendant. Rule 14 provides:

(a) Relief. If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the  defendants' trials, or provide any other relief that justice requires.

Severance should be granted defendant is able to show that "there is a serious risk that a joint trial would compromise a special trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993).  A trial court  faced with a motion to sever is required must balance potential prejudice to the defendant against the  public interest in joint trials where the case against each defendant arises from the same general transaction."  *United States v. Kane*, 887 F.2d 568, 571 (5th Cir. 1989); *United States v. Simmons*, 374 F.3d 313 at 317, (5th Cir. 2004).

In *Zafiro v. United States*, 506 U.S. 534 (1993), the Supreme Court discussed various issues involved in charging multiple conspiracies within a single indictment for trial purposes, noting:

When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened. Evidence that is probative of a defendant's guilt but

164

technically admissible only against a co-defendant also might present a risk of  prejudice. Conversely, a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial. The risk of prejudice will vary with the facts in each case, and district courts may find prejudice in situations not discussed here. When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but, as we indicated in *Richardson v. Marsh*, less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice. *Zafiro*, at 539.

Relief from this type of prejudicial joinder becomes necessary  when a jury could not be expected to compartmentalize the evidence as it relates to separate defendants. *United States v. Williams* , 809 F.2d  1072, 1084 (5th Cir. 1987);  *United States v. Lemm*, 680 F.2d 1193, 1205 (8th  Cir. 1982).

Severance of defendants in capital cases however , presents entirely different issues than those which courts regularly confront in ordinary criminal trials.  The weight of authority in non-capital cases is against  requiring guilt phase severance of properly-joined defendants and offenses.  *Zafiro v. United States*, 506 U.S. 534, 537

(1993); *United States v. Odom*, 13 F.3d 949 (6th Cir. 1994).[18]  This is so despite the existence of substantial non-capital authority tending to support severance, *see*, e.g., *United States v. Breinig*, 70 F.3d 850 (6th Cir. 1995); *United States v. Odom*, 888 F.2d 1024, 1018 (4th Cir. 1989), *United States v. Peveto*, 881 F.2d 844, 856-858 (10th Cir. 1989), and National Conference of Commissioner of Uniform State Laws, *Uniform Rules of Criminal Procedure* Rule 472(a) (1974) (recommending rule to create right to severance of defendants on defense or prosecution motion, except where severance would cause loss of material evidence and defeat ends  of justice).

No such weight of authority against severance exists with respect to capital cases, however.  In fact, in the majority of federal death penalty cases, some type of severance has been granted.  According to information from the Federal Resource Counsel, in the 34 cases where there was more than one capital defendant, some type of severance has been granted 23 times or in 60% of the cases. Overall, in the 52 cases where there were multiple capital or non-capital defendants, some form of severance has been granted 31 times or in 68% of the cases.  When the government seeks to have a convicted offender condemned to death, the Eighth Amendment requires "precise and individualized sentencing," *Stringer v. Black*, 503 U.S. 222, 232

---

[18]Motions for severance of federal criminal defendants are routinely made and just as routinely denied. *See generally*, 1 Charles Alan Wright, *Federal Practice and Procedure 2d* § 223 (1982).

(1992) to ensure that "each defendant in a capital case [is treated] with that degree of respect due the uniqueness of the individual." *Lockett v. Ohio*, 438 U.S. 586, 605 (1978).

The constitutional necessity of individualized treatment has led the Supreme Court to strike down death sentences imposed without full consideration of "any relevant circumstance that could cause [the sentencer] to decline to impose the [death] penalty," *McCleskey v. Kemp*, 481 U.S. 279, 306 (1987), *see* e.g., *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Skipper v. South Carolina*, 476 U.S. 1 (1986); *Hitchcock v. Dugger*, 481 U.S. 393 (1987); *Mills v. Maryland*, 486 U.S. 367 (1988); *Penry v. Lynaugh*, 492 U.S. 302 (1989), as well as whenever the procedures employed created an unnecessary risk of factual error in the decision to inflict death as punishment. *See Lankford v. Idaho*, 500 U.S. 110 (1991); *Ford v. Wainwright*, 477 U.S. 399 (1986); *Beck v. Alabama*, 447 U.S. 625 (1980) and *Gardner v. Florida*, 430 U.S. 349 (1977).

The requirement of individualized treatment in capital sentencing means, among other things, that the legally relevant facts to be litigated and decided in a capital sentencing hearing are potentially countless. As summarized by Justice Powell, writing for the Court in *McCleskey v. Kemp*, 481 U.S. 279, 294 (1987), "the Constitution requires that [the jury's capital sentencing] decision rest on innumerable

factors that vary according to the characteristics of the individual defendant and the facts of the particular capital offense." *accord California v. Ramos*, 463 U.S. 992, 1008 (1983) (referring to the "myriad of factors" which determine sentencer's choice between life and death); *Zant v. Stephens*, 462 U.S. 862, 900 (1983) (Rehnquist, J., concurring) (citing "the countless considerations" weighed by capital sentencing authorities).

It is harm enough that both Snarr and Garcia were denied a fair determination of guilt or innocence by the denial of the testimony of his co-defendant. In the punishment phase, the issues before the sentencer are much more complex than those confronted at the preceding phase of the trial in which the jury decides guilt or innocence. When a sentencing jury confronts this array of complexities for multiple capital defendants, with two defendants who are on trial, a number of difficult and potentially insoluble conflicts between constitutional rights can develop.

*Prejudice to Snarr*

One of the most prejudicial items in the selection phase of the trial was the evidence presented against Garcia for an unadjudicated murder. Before this trial, Snarr was never been convicted of murder. Evidence was presented that Garcia was responsible for an execution-style murder of a fellow drug trafficker whose body remained unfound for years.

During the selection phase, the government introduced the testimony of L.C. Dodson, formerly a narcotics agent with the Taylor County Sheriff's Office in Abilene, Texas. (1 Supp. Vol. 31, USCA5 5472; Supp. 2. Vol. 35, USCA5 6523) Officer Dodson testified that Garcia was a methamphetamine drug dealer in the Abilene area (1 Supp. Vol. 31, USCA5 5475; Supp. 2. Vol. 35, USCA5 6526). His work in investigating Garcia led to a major conspiracy indictment in the Northern District of Texas. (1 Supp. Vol. 31, USCA5 5488; Supp. 2. Vol. 35, USCA5 6539)

The government also introduced the testimony of Daniel Jose Cisneros, who was acquainted with Edgar Garcia and Eusabio Perez when both men lived in Abilene in the middle and later 1990's. (1 Supp. Vol. 31, USCA5 5492; Supp. 2. Vol. 35 USCA5 6544). Cisneros also testified to Garcia's involvement with the illegal drug trafficking in the area. Government witness Eusabio Perez testified that Jacob Ponce worked in the illegal drug trafficking industry. Perez and Garcia disliked Ponce. Perez testified that Ponce was "cocky, rude and disrespectful." (1 Supp. Vol. 2, USCA5 426-428; Supp. 2. Vol. 35, USCA5 6574).

Cisneros testified that, on the evening of March 3, 1998, he witnessed Garcia brutally murder Jacob Ponce in a field behind the Motel 6 in Abilene, Texas. Cisneros drove the men in his car to the field, which was served as an illegal dump

169

ground, with the understanding that Ponce was interested in purchasing a firearm from Garcia. (1 Supp. Vol. 31, USCA5 5497; Supp. 2. Vol. 35, USCA5 6548).

Cisneros waited by the car while Garcia, Ponce, and another man named Eusabio Perez wandered out to the field ostensibly to test the firearm. (1 Supp. Vol. 31, USCA5 5497; Supp. 2. Vol. 35, USCA5 6550). Cisneros heard gunshots and saw Jacob Ponce on the ground. (1 Supp. Vol. 31, USCA5 5499, 5501; Supp. 2. Vol. 35 USCA5 6552). Cisneros also observed Perez dragging an old couch over the body. (1 Supp. Vol. 31, USCA5 5501; Supp. 2. Vol. 35, USCA5 6552). Perez and Garcia returned to the car, and Garcia ordered Cisneros to drive away. (1 Supp. Vol. 31, USCA5 5504; Supp. 2. Vol. 35, USCA5 6555). Garcia made a comment that no one should say anything about what happened in the field, which Cisneros interpreted to be a threat. (1 Supp. Vol. 31, USCA5 5504; Supp. 2. Vol. 35, USCA5 6555).

Indeed, Cisneros never spoke of the murder until 2002. (1 Supp. Vol. 31, USCA5 5509; Supp. 2. Vol. 35, USCA5 6560) Garcia also made a statement to Cisneros to the effect of "I got him." (1 Supp. Vol. 31, USCA5 5509; Supp. 2. Vol. 35, USCA5 6556). Cisneros testified that he sensed no remorse from Garcia and felt like Garcia seemed proud of murdering Ponce. (1 Supp. Vol. 31, USCA5 5505; Supp. 2. Vol. 35, USCA5 6556).

After driving around Abilene, Garcia directed Cisneros to stop at a city park. (1 Supp. Vol. 31, USCA5 5505; Supp. 2. Vol. 35 USCA5 6556). Garcia got out of the vehicle and threw the weapon into a pond within the park.(1 Supp. Vol. 31, USCA5 5506; Supp. 2. Vol. 35, USCA5 6557) Despite using federal divers and fire department divers, law enforcement has never recovered the firearm used to murder Jacob Ponce. (1 Supp. Vol. 32, USCA5 5596; Supp. 2. Vol. 36, USCA5 6647)

Ponce's remains were not recovered by law enforcement until 2002. Only a few skeletal remains were located. Garcia was never charged with this murder, although law enforcement believed that he was responsible for Ponce's death. (1 Supp. Vol. 32, USCA5 5594; Supp. 2. Vol. 36, USCA5 6646). Despite its irrelevance, this evidence was introduced and considered in the determination of whether Snarr should receive a life or a death sentence.

*Prejudice to Garcia*

Although at first glance, it appears that Garcia has a significant criminal history, on reflection in light of his mitigating evidence it makes sense considering his upbringing. His prior bad acts were of the type that Dr. Brams explained based upon Garcia's troubled and very tragic background.

Snarr had a history dating back to his days as a youth which included 44 convictions - 15 felonies, 21 misdemeanors, and 8 other cases including two life

171

endangering felonies. (USCA5 6024-39). A member of the Aryan Brotherhood, he was also a skinhead who liked the skinhead lifestyle who had to kill or seriously injure people who disrespected him. (USCA5 6078-6105, 6304-6343). Snarr carried shanks and also once stomped another inmate repeatedly despite the fact the inmate was unconscious and appeared to already be dead. (USCA5 6039-63; 6413-6426).

This severely prejudiced Garcia's right to a fair trial and to be sentenced to death based upon his own history rather than intermingling it with Snarr. In *Bernard*, 299 F.3d at 475, this Court acknowledged that the "Federal Death Penalty Act contains no special rules regarding joinder of co-defendants." Because the issue of failure to sever was not preserved in Bernard's case with a request for severance, this Court held that the court's failure to *sua sponte* order a severance was not "plain error." However, in so holding, this Court opined:

> we share [co-defendant's] concern over the inherent tension between joinder and each defendant's constitutional entitlement to an individualized capital sentencing decision. A trial court must be especially sensitive to the existence of such tension in capital cases, which demand a heightened degree of reliability.

*Id.*

*Prejudice and Confusion to Both Appellants*

The untenable "tension" this Court expressed concern over in *Bernard* is manifest in the instant case and served to deny both Snarr and Garcia their "...

172

constitutional entitlement to an individualized capital sentencing decision." *See Id.*

The unfiltered unstructured barrage of the jury with irrelevant and prejudicial information regarding each co-defendant resulted in the "wanton" and "freakish" imposition of the death penalty -- as is prohibited by the 8th Amendment to the United States Constitution. *Jurek v. Texas*, 428 U.S. 262 (1976). This issue was preserved and reversible error is presented.

In *United States v. McVeigh*, 169 F.R.D. 362 (D. CO 1996), Chief Judge Matsch engaged in analysis of the delicate balancing between judicial economy and the risk of prejudice, candidly discussing the acceptable level of risk of a mistrial or reversible error. Of special significance is the *McVeigh* court's belief that the sheer magnitude of a case can "compel caution and restraint ..." in ruling on a severance motion. *id*. at 364.

The jury was given the following instruction at the guilt/innocence phase of the joint trial:

MULTIPLE DEFENDANTS-SINGLE COUNT

The case of each defendant and the evidence pertaining to that defendant should be considered separately and individually. The fact that you may find one of the defendants guilty or not guilty should not

control your verdict as to the other defendant. (1 Supp. Vol.3 USCA5 706; Supp. 2. Vol. 4, USCA5 923)

Here, the jury was instructed in the eligibility phase of the trial:

MULTIPLE DEFENDANTS

The case of each defendant and the evidence pertaining to that defendant should be considered separately and individually. The fact that you may find one of the defendants eligible for the death penalty should not control your verdict as to the other defendant. (1 Supp. Vol. 4, USCA5 728; Supp. 2. Vol. 4, USCA5 945)

Finally, the jury was given the following instruction for the selection phase of the trial:

MULTIPLE DEFENDANTS

The case of each defendant and the evidence pertaining to that defendant should be considered separately and individually. The fact that you may find one of the defendants should be sentenced to death

should not control your verdict as to the other defendant.(1 Supp. Vol. 4, USCA5 791; Supp. 2. Vol. 4, USCA5 1024)

These instructions did not overcome the prejudice that resulted from the introduction of evidence relating to separate defendants, the blurring of identities, the spillover of evidence, the fact that Snarr could not call Garcia to testify, the fact that Garcia could not call Snarr to testify and the prejudicial testimony introduced throughout the trial such as the unadjudicated murder committed by Garcia and the history of Snarr, and the prejudice resulting from same.

The district court denied the appellants' motion in a lengthy written order which did not adequately address the specific issues of prejudice and the loss of certain constitutional rights facing these particular defendants in a joint trial in which the death penalty was sought.

The court addressed the appellants' argument regarding their mutual need for the other's testimony. Addressing appellants' concern regarding the need for co-defendant testimony, the court wrote:

Defendants argue that a joint trial will create an unfair prejudice by depriving each defendant of beneficial testimony and evidence potentially provided by his co-defendant. Snarr proffers that if afforded

175

a separate trial, he anticipates that Garcia will testify and provide evidence beneficial to Snarr during the guilt/innocence phase and, if convicted, during the punishment phase. At Garcia's trial, Snarr intends to do the same. Defendants assert that, if tried jointly, "because each defendant is in jeopardy at that time, each defendant intends to exercise his right to remain silent, thereby denying the codefendant the benefit of his testimony." The Government contends that the assertion that both defendants would testify on behalf of the other is mere speculation and that neither defendant has sufficiently demonstrated that he would be prejudiced by his co-defendant declining to testify. The court agrees.(Vol. 1, USCA5 252-368; Supp. 2, Vol. 2, USCA5 288)

In rejecting this claim, the district court specifically relied on *United States v. Nguyen*, 493 F.3d 613 (5th Cir. 2007). *Nguyen* involved brothers who participated in various financial scams and conspiracies. Although the Nguyen twins were indicted jointly and requested a severance, which was denied, there the similarities end. The *Nguyen* case is not dispositive of the claims in the present case.

The Nguyens were indicted for numerous counts of financial fraud and conspiracy. Twin brothers James and Thomas Nguyen worked at the American Title

Company. They acted as the notary, escrow, and closing agents for several real estate transactions initiated by Frank Mei and his family in their residential real estate mortgage scheme. The Mei family and their associates were subject to numerous prosecutions in the district court for the Southern District of Texas resulting in several trials and guilty pleas.

The *Nguyen* case does not involve a capital murder prosecution where the death penalty was sought and obtained. *Nguyen* is a conspiracy fraud case with numerous financial documents. There was no evidence introduced of an unadjudicated, previously unsolved murder or any other prior conviction. The *Nguyen* court asked the jury to distinguish the brothers' involvement in the various financial schemes. Although the district court cited to *Nguyen* repreatedly, the factual differences between the *Nguyen* case and appellants' case render this case of little assistance in determining whether reversible error was committed in this case. The district court used *Nguyen,* as well as other similar non-death penalty cases, to address the issue of the deprivation of co-defendants' beneficial testimony. In the Snarr and Garcia case, each defendant was unable to call his co-defendant at trial because of Fifth Amendment protections; if the trial was severed, Snarr would have been able to benefit from his co-defendant's testimony. Garcia would have been able to benefit from Snarr's testimony. Under these circumstances, severance might be granted to

protect the Sixth Amendment right to compulsory process, which is considered a special trial right. *United States v. Barnett*, 197 F.3d 138, 145 (5th Cir.1999).

The district court also cited in its order to *United States v. Davis*, No. 94-381, 1995 WL 602881 (E.D. La. October 11, 1995), for the same proposition regarding exculpatory evidence. This is an unpublished decision of a district court in the Eastern District of Louisiana. This case was cited by the district court in the present case for the purported holding that "whether a defendant chooses to testify and whether the statements would be admissible are speculative". (Order, Vol. 1, USCA5 252-368; Supp. 2, Vol. 2, USCA5 288).

Davis and his co-defendant Hardy were initially tried together for capital murder. They were convicted and received the death penalty. On their first appeal, this Court reversed one of their three convictions and vacated their death sentences. See United States v. Causey, 185 F.3d 407 (5th Cir. 1999). **It should be noted that, upon re-sentencing, the district court severed Davis and Hardy's sentencing hearings.**

The unpublished decision by a Louisiana District Court in 1995 to initially deny a motion to sever should have limited or no precedential value to this Court. In light of the subsequent events, e.g., the reversal of the conviction, the vacatur of

the death penalty, and the severance of the sentencing hearing, the *Davis* case ultimately supports Snarr's and Garcia's arguments for severance.

The Supreme Court has recognized that a defendant may suffer prejudice if "essential exculpatory evidence that would be available to the defendant tried alone were unavailable in a joint trial." *Zafiro v. United States*, 506 U.S. at 539. Recognizing the same principal, this Court has not hesitated to reverse when a defendant, by denial of severance, has been deprived of the right to call favorable witnesses. *United States v. Neil*, 27 F.3d 1035, 1047 (5th Cir. 1994)(reversing where a denial of severance deprived defendant of exculpatory testimony); *United States v. Dennis*, 645 F.2d 517, 521 (5th Cir. Unit B May 1981)(reversing, in part, for loss of corroborating evidence due to denial of severance).

The district court should grant a severance if there is a serious risk that a joint trial would compromise a specific trial right of one of the Defendants. *Zafiro v.United States*, 506 U.S. 534, 539 (1993); *United States v. Broussard*, 80 F.3d 1025, 1037 (5th Cir.), *cert. denied sub. nom.*, *Merritt v. United States,* 117 S.Ct. 264 (1996). Reversal is warranted when the defendant demonstrates that the denial of the severance resulted in compelling prejudice against which the trial court was unable to afford protection. *United States v. Thomas*, 12 F.3d 1350, 1363 (5th Cir. 1994). The appellants have shown that a  specific trial was compromised because of the district

179

court's decision to deny the motion for severance. The trial itself amply demonstrated that the joint trial resulted in compelling prejudice, and that the instructions provided by the court were unable to overcome this prejudice.

Not only would the testimony of Garcia increased Snarr's chances of acquittal, or a life sentence, and *vice versa*, Snarr and Garcia were each prejudiced by the denial of the evidence. This is not a case in which one defendant intended to cast blame upon the other one. Instead, it is a case in which each defendant had beneficial testimony for the co-defendant if the jury had only been able to hear the testimony. In this case, the lack of testimony by each defendant is not a minor or peripheral matter; the testimony would have addressed, among other things, the relative *mens rea* of the defendants, and who actually did what. Due to the nature of the denial of the otherwise available evidence, each defendant was prejudiced by the joint trial.

Had each appellant been able to call the co-defendant, the testimony of his co-defendant would have exculpated each appellant at least to the issue of culpability regarding the death of Gabriel Rhone. Because of the joint trial and the decision of each defendant to invoke his constitutional right not to testify guaranteed by the Fifth Amendment of the United States Constitution, the defendants were unable to call each other as a witness. This resulted in a denial of each appellant's Sixth Amendment right to compulsory process. The violation of this Sixth Amendment right prevented

the jury from making a reliable determination of guilt. *United States v. Barnett*, 197 F.3d 138 (5th Cir. 1999).

The court also addressed the argument that each defendant was entitled to an individualized determination of his respective sentence. The appellants argued that a joint trial would deny each defendant the right to an individualized sentencing determination as provided by the Eighth Amendment. Each appellant had a separate theory of mitigation based on their different backgrounds and circumstances. The defendants argued that a joint penalty phase would invite the jury to make comparisons of relative culpability, denying each defendant the right to individual consideration. In fact, as set out in other issues herein, the evidence adduced on behalf of each appellant did effect the verdict of the other.

The Court did not find these arguments to be persuasive, and wrote:

> Again, Defendants provide merely hypothetical scenarios and raise unfounded speculations of prejudice. They fail to demonstrate that the other defendant's mitigating evidence is so overwhelming as to cause an incurable prejudice. Any potential prejudice created by a joint sentencing hearing may be cured by a proper instruction from the court reminding the jury to consider each defendant individually.(Vol. 1, USCA5 252-368; Supp. 2, Vol. 2, USCA5 288)

The Eighth Amendment requires that "[a] sentencer [must] be allowed to give *full* consideration and *full* effect to mitigating circumstances." *Penry v. Johnson*, 532 U.S. 782, 797 (2001)(Penry II). The *Penry II* Court clarified that, *"Penry I* did not hold that the mere mention of 'mitigating circumstances' to a capital sentencing jury satisfies the Eighth Amendment. Nor does it stand for the proposition that it is constitutionally sufficient to inform the jury that it may 'consider' mitigating circumstances in deciding the appropriate sentence. Rather, the key under *Penry I* is that the jury be able to consider and *give effect* to [a defendant's mitigating] evidence in imposing sentence. [A] sentencer [must] be allowed to give *full* consideration and *full* effect to mitigating circumstances" *Penry II*, 532 U.S. at 797(emphasis in original).

Accordingly, any process that dilutes the appellants' mitigating evidence hampers a jury's ability to "give *full* consideration and *full* effect" to mitigating circumstances. *Id*. At the penalty phase, a capital defendant relies heavily on his social history, which includes evidence of his environment, for mitigation. Thus, the practical effect of jointly trying the appellants is that it dilutes each individual's mitigation evidence. The district court's written opinion simply minimized the difficulties each defendant faced in preparing mitigation for their defense against the imposition of the death penalty and did not fully address the issue.

The district court also reached to the idea of instructions as the answer to any possible problems regarding the ethnicity of the defendants and the victim:

Defendants further argue that a joint sentencing phase will be prejudicial because Snarr is a white male, Garcia is a Hispanic male, and the victim is an African-American male. Specifically, they contend that "a joint sentencing greatly exacerbates the risk that the defendants' minority status will have a substantial adverse effect on the jury's determination of the relative position of those involved." Appropriate jury instructions, however, will effectively safeguard against Defendants' concerns. (Vol. 1, USCA5 252-368; Supp. 2, Vol. 2, USCA5 288).

The United States Supreme Court in *Cafico v. United States*, 506 U.S. 534 (1993) indicated that a severance should be granted only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. This Court in *United States v. Rocha*, 916 F.2d 219, (5th Cir. 1990), *cert. denied*, 500 U.S. 936 (1991) stated,

"to demonstrate an abuse of discretion, a defendant must show that he suffered specific and compelling prejudice against which the district court could not provide adequate protection, and that this prejudice resulted in an unfair trial."

The district court stated in its written order:

In the instant case, neither Snarr nor Garcia has articulated any compelling instance of prejudice; rather, Defendants merely raise a variety of general, unsupported, and speculative grounds for severance.

The district court then concluded:

...the court finds that Defendants have failed to demonstrate that they will suffer compelling prejudice or that there is a serious risk that a specific trial right will be compromised by the continued joinder of the defendants. *See Mitchell*, 484 F.3d at 775; *Zicree*, 605 F.2d at 1388-89. Defendants' arguments are merely "speculation heaped upon speculation" and do not amount to the strong showing of prejudice required. *See McGuire*, 608 F.2d at 1032. Indeed, the court is of the opinion that several of Defendants' concerns can be addressed by

providing appropriate cautionary instructions to the jury. (Vol. 1, USCA5 252-368; Supp. 2, Vol. 2, USCA5 288).

The district court, thus, thought it could rely on jury instructions to remedy any problems occasioned by a joint trial. This panacea proved to be illusory. There is an excellent general review of some of the literature of the effectiveness of judicial instructions, plus a review of the findings of the curative powers of such instructions in joinder of charges cases, in Note, "Rethinking Criminal Joinder: An Analysis of the Empirical Research and Its Implications for Justice," 52 Law & Contemporary Problems 325, 333-36 (1989). The author concluded that based on empirical studies, "curative instructions, as used by the courts today, are insufficient to counter the prejudicial effects of joinder." *Id*., at 336. As the Supreme Court wrote many years ago in *Bruton v. United States*: "'The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction. . . .'" The *Bruton* opinion dealt with the problem of co-defendant confessions arising from the joinder of criminal defendants. The Court added in a footnote, "It has been suggested that the limiting instruction actually compounds the jury's difficulty in disregarding the inadmissible hearsay. *See Broeder*, The University of Chicago Jury Project, 38 Neb. L. Rev. 744, 753-755 (1959)."

Cautionary instructions might work in a variety of other cases, possibly where the stakes were not so high and death was not on the line as the ultimate sentence. Cautionary instructions might suffice in routine drug conspiracy or financial fraud conspiracy cases. Cautionary instructions might work in a case where evidence of an unadjudicated, previously unsolved murder ostensibly committed by one of the defendants was not introduced. Cautionary instructions might work where evidence of involvement in prison gangs – gangs with terrible reputations renown by society at large (not merely prison culture) for violence – was not introduced. Cautionary instructions might work where evidence of previous brutal altercations in and out of prison were not introduced. Cautionary instructions might work in a case where extensive evidence of extensive drug trafficking allegedly committed by one defendant was not admitted. Cautionary instructions, however, were not sufficient in this case. The appellants' made the required showing of prejudice. The arguments offered by the defense, which were derided by the district court as "speculation heaped upon speculation", all proved to be valid as the trial developed.

In light of the nature and lack of evidence justifying a death sentence against each defendant if tried separately, any confusion would have been material. Therefore, the jury easily could have attributed any evidence against Garcia as evidence against Snarr, and vice versa, and it is likely that happened. This confusion

most likely affected the jury's decision in this case with respect to each defendant. As a result of the continued confusion of the two defendants, the jury could not reasonably separate the evidence and render impartial verdicts as to each defendant.

Further, Snarr was likely to be found guilty by association simply because of the fact the attack on Gabriel Rhone appeared to be coordinated with Garcia. Garcia was likely to be found guilty by association simply because of the fact the attack on Gabriel Rhone appeared to be coordinated with Snarr. It is more likely than not that the jury convicted each defendant based, not on any evidence against him individually, but on the entire evidence presented in this case as a whole against both defendants and on the fact that each was a co-defendant to the other. If the evidence against Snarr is isolated from that against Garcia, it is less likely that he would have been convicted or received the death penalty if tried alone. If the evidence against Garcia is isolated from that against Snarr, it is less likely that he would have been convicted or received the death penalty if tried alone. Because of the risk of prejudice to these appellants, borne out by the evidence at trial, the district court erred in denying the motion to sever. For these reasons, the Court is asked to reverse Snarr's and Garcia's convictions and death sentences and remand for separate trials.

**ISSUE NO. SIXTEEN** - The Federal Death Penalty Act is unconstitutional.

## I.      Standard of Review and Reviewability

Snarr and Garcia filed a written pre-trial motion requesting that the District Court declare that the Federal Death Penalty Act is unconstitutional (1 Supp. Vol. 2, USCA5 360-379; Supp. 2. Vol. 2, USCA5 396-414). The district court denied the motion in a written order (1 Supp. Vol. 2, USCA5 426-428; Supp. 2. Vol. 2, USCA5 456-458). Because Snarr and Garcia preserved this issue for appeal by raising it in the court below, this Court engages in *de novo* review. See *United States v. Vontsteen*, 950 F.2d at 1091-92.

## Ii.      Argument

Snarr and Garcia filed a motion to have the district court declare the Federal Death Penalty Act to be unconstitutional. In this motion, they argued that the Federal Death Penalty Act (FDPA) violates due process in all federal capital trials by providing less protection to proof of elements of a capital crime than to other elements of a crime. This is because the aggravated findings required by the FDPA are the equivalent of elements. They are entitled to the same constitutional protections as any other element of a crime.

Under the FDPA, capital elements are considered at a hearing where the defendant's character, future dangerousness, victim impact, and hearsay are admitted. The rules of evidence prohibit the admission of such evidence in all criminal trials. Introduction of that evidence to prove elements of a crime violates due process of law. There is no method to separate proof of elements and punishment when they are presented in a single hearing. There is no portion of the FDPA that can be severed to accomplish that goal. The statute, therefore, is unconstitutional on its face. The Federal Death Penalty Act provides:

> The government may present any information relevant to an aggravating factor for which notice has been provided under subsection (a). Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury. The government and the defendant shall be permitted to rebut any information received at the hearing, and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any aggravating or mitigating factor, and as to the appropriateness in the case of imposing a sentence of death.

The district court denied the motion in a written order. The district court wrote in its order:

> The court declines to reject long-standing jurisprudence supporting the constitutionality behind allowing the submission of more evidence to the jury at the sentencing phase so that the jurors may have full and complete information about the defendant before making a sentencing recommendation. The court will exercise its ability, as explicitly allowed by the FDPA, to exclude evidence if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury. (1 Supp. Vol. 2, USCA5 426-428; Supp. 2. Vol. 2, USCA5 456-458).

Appellants acknowledge that this Court repeatedly has upheld the constitutionality of the death penalty in general and the Federal Death Penalty Act in particular. *See United States v. Robinson*, 367 F.3d 278,290-91 (5th Cir. 2004); *United States v. Jones*, 132 F.3d at 239-43. The argument that the FDPA's relaxed evidentiary standard is unconstitutional has been rejected by this Court. *United States v. Weber*, 162 F.3d 308, 354 (5th Cir. 1998), *cert. denied*, 528 U.S. 829 (1999); *Jones*,

132 F.3d at 241. This Court in *Jones* stated that "the relevancy standard enunciated in § 3593(c) actually excludes a greater amount of prejudicial information where the 'probative value is outweighed by the danger of creating unfair prejudice' rather than 'substantially outweighed.'" 132 F.3d at 241 n.7.

Conceding that this Court must reject this claim based on binding Fifth Circuit precedent, appellants raise this claim here solely to preserve it for a further appeal to the Supreme Court in the event that this Court were to affirm their convictions and death sentences.

**ISSUE NO. SEVENTEEN** - Snarr and Garcia's death sentences must be reversed because the district court reversibly erred in keeping out the prior bad acts of the complainant at sentencing depriving the jury of making an informed vote.

## I. Standard of Review and Reviewability

The standard of review for the trial court's determination of admissibility of evidence is abuse of discretion. *See United States v. Chavez*, 119 F.3d 342, 346 (5th Cir. 1997); *Fed.R.Evid. 103.*

## II. Argument

Appellants' death sentences were imposed by a jury with a constitutionally impaired understanding of the circumstances of the offense. This was so because they jury did not know the complaining witness, Gabriel Rhone. This prison death did not occur in a vacuum. What the prison knew about Rhone was important. What appellants knew was also important. What the jury never heard was the most important aspect of this issue. Rhone's record of violence and threats to other inmates and prison personnel would have permitted the jury to see appellants' conduct in an entirely different light. While the failure of the trial court to provide a charge on self

defense or a lesser offense is discussed elsewhere, in this issue the critical fact of what the jury did not know about Rhone is addressed.

Snarr's and Garcia's death sentences must be reversed because the district court reversibly erred in keeping out the prior bad acts of the complainant at sentencing depriving the jury of making an informed vote. What the jury did not hear about Rhone was more compelling than what they did hear. Although a few witnesses testified as to some minor bad acts such as exposing himself to a guard - the true character of Rhone was never presented to the jury. On April 5, 2010, the day before voir dire was to begin, the defense filed a motion for continuance based upon the contents of the government's file on the actions of Rhone. (USCA5 611) As the motion detailed, Rhone had numerous prison infractions at various correctional facilities from May 2011 to November 2007. These incidents at the prisons included assault with serious bodily injury, fighting with another person, threatening bodily harm, possession of a dangerous weapon, setting a fire, possession of intoxicants, indecent exposure, refusing an order, destruction of government property, being in an unauthorized area, engaging in a sex act, making sexual proposals, being insolent to a staff member and engaging in a group demonstration. (USCA5 611-12). The motion was denied. (USCA5 621-22). The Court was well aware of the nature of the character of Rhone and when the defense attempted to introduce the acts of Rhone to

193

the jury, the court refused.  (USCA5 7475).  In a brief to the court, a portion of

Rhone's behaviors were detailed:

> The behaviors known by Edgar Garcia and Mark Snarr, which led to the
> murder of Rhone, were just the tip of the iceberg. The BOP knew about
> all these behaviors, yet failed to find a way to manage Rhone in such a
> way that he did not frighten and threaten the safety of other inmates
> whose lives were in BOP's hands. Rhone's long history of dangerous
> and provocative behavior makes it clear that Snarr and Garcia did not
> misperceive the profound threat they felt from Rhone. For ten years,
> Gabriel Rhone was a train wreck waiting to happen, building up speed
> as he careened from one provocation to another. The killing of a person
> who, for ten years, threatened the well-being of his fellow inmates and
> correctional staff is seen in a different light when this person's history
> is known. His demise at the hands of inmates he threatened was
> predictable and virtually inevitable.

(DOC. 329)

Again, through a lengthy bill, the defense attempted to explain to the court why

Rhone's aggressive and violent behavior throughout his incarceration history was

admissible.  (USCA5 7471-77).   This information was relevant, admissible, and

absolutely necessary.  What is especially compelling is that on the Verdict of the Jury - Phase Three, when the jury was asked whether the defendant had proved by a preponderance of the evidence the existence of a factor (and whether it was mitigating) zero jurors found true that Rhone was a behavior management problem in the Bureau of Prisons or that he had engaged in defiant behavior.  (Vol. Supp.2, USCA5 p. 50-52; Document 350-1, pages 7-9; Document 349-1, pages 2-3).  The jury was left with a false impression regarding Rhone and this denied the defense   The trial court erred in denying the same.

The trial court denied both defendants the right to present a self-defense case; however, that did not obviate the necessity for the evidence regarding the bad acts of Rhone.  He was more than a pesty inmate.  He was diabolical and threatening and regardless of the introduction of a self defense instructions, both Snarr and Garcia were protecting themselves from Rhone.  The district court erred in denying the men the right to present the bad acts of Rhone.

*The evidence was admissible under the Federal Rules of Evidence*

Evidence of the character of the victim is admissible:

(a) Character evidence generally.--Evidence of a person's character or

a trait of character is not admissible for the purpose of proving action in

conformity therewith on a particular occasion, except:

(2) Character of alleged victim.--In a criminal case, and subject to the limitations imposed by Rule 412, evidence of a pertinent trait of character of the alleged victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the alleged victim offered by the prosecution in a homicide case to rebut evidence that the alleged victim was the first aggressor

*Federal Rules of Evidence Rule 404.* In a case with a marked similarity, the conviction was reversed for an assault in a prison when the jury was precluded from hearing about the victim's propensity for violence:

First, the defendant attempted to present evidence that Logan previously had stabbed another inmate. The government objected on grounds of relevancy. The trial court upheld the objection.

To determine whether the proffered line of inquiry was relevant to the defendant's case, we begin by reviewing *Fed.R.Evid. 401*, which provides as follows:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

As the Advisory Committee's Note indicates, the standard of probability is not stringent. The standard for relevancy is only that the evidence would make the existence of the fact "more probable." As Professor McCormick has stated, "(a) brick is not a wall." Advisory Comm.'s Note, quoting McCormick on Evidence, s 152 at 317.

In this case, the question becomes whether the victim's participation in a previous stabbing has "any tendency" to make the existence of the fact in issue that he had a violent character more probable. We conclude that such evidence does make the existence of that fact more probable. Also, the "violent character" line of proof is relevant to the defendant's theory of self-defense in that it makes his version that the victim attacked him "more probable." Therefore, the character evidence proffered was relevant.

*United States v. Greschner*, 647 F.2d 740, 741 (7th Cir. 1981). In the case *sub judice*, the jury never heard about who the real Rhone was and what his character traits were. This deprived the jury of relevant evidence to consider.

In a civil case, the First Circuit held that prior aggressive acts of a plaintiff were admissible under the less exacting standard of relevancy. *See Bowden v. McKenna*, 600 F.2d 282, 284 (1st Cir.1979) (evidence relevant to show both general violent character and specific motive to attack police officers). And the D.C. Circuit, with an opinion by Judge Skelly Wright, also reversed a conviction when the evidence of the bad acts of the victim were excluded. *See United States v. Burks*, 470 F.2d 432, 434–38 (D.C.Cir.1972) (reversal due to erroneous exclusion from evidence of deceased's plea of guilty to crime of violence and of testimony by deceased's spouse concerning details of deceased's violent acts,). This evidence was relevant, admissible, and necessary for the defense.

*Reverse "victim impact"*

In *United States v. Whitten*, 610 F.3d 168 (2nd Cir. 2010), a capital case, the Court of Appeals held that it was admissible for a jury to hear ten victim impact witnesses, including three police officers who testified that "the murders caused them anguish and had a profound influence on other officers who worked with Detectives Andrews and Nemorin, and who admired them personally and professionally."

*Whitten*, 610 F.3d at 187. In determining the admissibility of that evidence, the Court of Appeals explained:

> Wilson characterizes as utilitarian in character the testimony describing Detectives Andrews and Nemorin as heroic individuals who loved their work and inspired other policemen. Such testimony is permissible to show a "victim's uniqueness as an individual human being." *See Payne*, 501 U.S. at 823, 111 S.Ct. 2597 (internal quotation marks omitted). As the Payne concurrence explains, the prosecution may, consistent with the Constitution, show "all that is special and unique about" the victim, including their "hopes, dreams, and fears." Id. at 832, 111 S.Ct. 2597 (O'Connor, J., concurring).

*Whitten*, 610 F.3d at 189. If that is true that a jury can hear about a "victim's uniqueness," then certainly Rhone's extraordinary criminal background was part of his uniqueness. Due process requires "accurate sentencing information [as] an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die." *Gregg v. Georgia*, 428 U.S. 153, 190, 96 S.Ct. 2909, 2933, 49 L.Ed.2d 859 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). The Supreme Court has long held that the death penalty is different:

This conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991 (1976). To preclude evidence of the negative and paint a slanted picture of the positive was constitutionally impermissible. The evidence was admissible to understand the entirety of the offense. The district court abused its discretion is refusing to admit this evidence warranting a reversal of the convictions and death sentences herein.

**ISSUE NO. EIGHTEEN** -Snarr and Garcia's death sentences must be reversed because the district court reversibly erred in keeping out execution impact evidence.

## I.     Standard of Review and Reviewability

The standard of review for the trial court's determination of admissibility of evidence is abuse of discretion. *See United States v. Chavez*, 119 F.3d 342, 346 (5th Cir. 1997); *Fed.R.Evid. 103.*

## II.    Argument

In attempting to present a complete picture of Garcia to the jury, the defense sought to introduce evidence of Garcia's family.  In a pretrial motion, denied by the court, the defense sought to introduce two inquiries of the family: whether the defendant's family and friends want defendant to live or die; and also what the impact would be on such persons if the defendant were, in fact, sentenced to death and ultimately executed.  (Document 186; Document 226).

In re-urging the motion to the court, the defense presented a compelling offer of proof:

Your Honor, the – Rachel, the mother of Isaiah and Audri feels that the biggest impact on losing Edgar would be felt by her son Isaiah.  She has not allowed herself to think about their future without him and she has

not told them that he faces the death penalty, but she feels Isaiah would miss having his father to talk to and share his interests and concerns.

Audri, age 11, would also miss him and be terribly sad. She would never again be her daddy's little girl. No one could ever take his place. He makes her feel special; and when he talks to her, she lights up.

Rachel feels that Isaiah – and she would testify – that Isaiah would be both angry and sad. She worries that he will feel he didn't do enough to try to save his father's life. She's afraid his whole attitude and personality will change. She worries that he will be angry and rebellious towards the law. She fears he will choose the wrong friends and do risky things that might get him in trouble if his father is killed. Isaiah is already showing signs of frustration and depression, she would testify, notably since coming to Houston to prepare for the trial. He spends a lot of time alone in his room and does not want to go out and do things like he used to do. He gets lost in his video games and doesn't talk to anyone. He keeps his feelings inside and won't say what is wrong.

He's more protective of his little sister, she would testify, than he ever has been before. His mom fears – she fears he will feel a heavy

burden to grow up and to be the man of the family long before he's old enough to shoulder such responsibility. She wishes he could stay a boy a bit longer with fewer worries.

Garcia's brother Oswaldo would testify that he will not only feel the loss of his only brother but the responsibility to keep his mom through her – help her get through her grief if Edgar is killed. He realizes the majority of the family responsibility will fall to him to take care of not only his own children but Edgar's as well. He worries how the grief will affect them since their father is such a big part of their young lives. Even though he's been in prison a long time, his loss would leave a tremendous hole in their lives that they would never really overcome.

(USCA5 7458-59).

The district court denied the admission of the evidence. In a written order, the district court concluded that "precedent in this Circuit precludes execution impact testimony by a defendant's family and friends." (Document 226).

In denying this relevant, necessary evidence, the district court determined the evidence was inadmissible based upon three cases from this court. The court's interpretation of those cases was flawed and appellants' case is distinguished. First,

*Kelly v. Lynaugh,* 862 F.2d 1126, 1133 n. 12 (5th Cir. 1988) was relied upon for the proposition that "the defendant's stepfather's request that the jury spare the defendant's life was not mitigating evidence required to be admitted under the Eighth Amendment." (USCA5 514, Document 226). What this Court said, *in a footnote*, was:

> During the sentencing phase of the trial, Kelly's counsel attacked the death penalty on moral and pragmatic grounds, as well as putting his step-father on the stand to ask the jury to spare Kelly's life. Though these matters may well impact a jury's decision, they are not mitigating evidence within the meaning of Justice O'Connor's opinion in Franklin, since they do not reflect on Kelly's personal culpability.

*Kelly v. Lynaugh*, 862 F.2d at 1133, n. 12. The district court cherry-picked one portion of that section and failed to recognize the broader information the defendant was attempting to introduce. The district court also relied upon *United States v. Jackson*, 549 F.3d 963, 970 n. 3 (5th Cir. 2008) for the proposition that "the trial court properly ruled that general pleas for mercy are not permitted." (USCA5 514, Document 226). Again, *in a footnote*, this Court relied upon the same footnote from *Kelly v. Lynaugh* that pleas for mercy were not permitted. Yet, that was not what this

Court had previously held. And finally relied upon was *Jackson v. Dretke*, 450 F.3d 614, 617-18 (5th Cir.2006) (holding that state court's decision to exclude execution impact testimony by defendant's family and friends did not contradict Supreme Court governing law and was not unreasonable application of Supreme Court precedent). Yet, a thorough reading of *Jackson v. Dretke*, establishes that was an AEDPA case and the standard in reviewing the *state* court decision was based upon §2254, "Our role is to determine not whether Jackson is entitled to relief, but whether the district court's conclusion that the state court adjudication was not contrary to or an unreasonable application of clearly established federal law is one about which jurists of reason could disagree or as to which jurists could conclude that the issues presented are adequate to deserve encouragement to proceed further." *Jackson v. Dretke*, 450 F.3d at 616. Simply put, reliance upon any of these cases was misplaced.

The Supreme Court has held that an individualized determination of death-worthiness requires that the jury be allowed to consider any evidence if "the sentencer could reasonably find that it warrants a sentence less than death." *McKoy v. North Carolina*, 494 U.S. 433, 441, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). In *Payne v. Tennessee*, 501 U.S. 808, 111 S. Ct. 2597 (1991), the U.S. Supreme Court removed the prior *per se* bar on the introduction of "victim impact statements" by the prosecution as part of aggravating evidence during a capital sentencing hearing. *Id*.

at 2616. Chief Justice Rehnquist's opinion for the Court in *Payne* noted that in the context of mitigating evidence, the Court's decisions have allowed the sentencer to consider "'any relevant mitigating evidence' that the defendant proffers in support of a sentence less than death," *Payne*, 111 S. Ct. at 2606 (*citing Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982)), and that a capital defendant should be "treated as a `uniquely individual human being'" during capital sentencing, *Id*. at 2606-07 *(quoting Woodson v. North Carolina*, 428 U.S. 280, 304 (1976). The Chief Justice then concluded, comparing aggravation and mitigation evidence, that what is good for the goose is good for the gander: that a sentencing jury should be permitted to know about the individual characteristics of the murder victim – as well as of the convicted capital defendant – which necessarily includes evidence about the victim's family and their reaction to the murder. *See, Payne*, 501 U.S. 808, 111 S. Ct. at 2607-09. He held that it was not a bar to introducing such aggravating evidence that it "was [not] related to the circumstances of Payne's brutal crimes." *id*. at 2609. As the Chief Justice noted:

> Human nature being what it is, capable lawyers trying cases to juries try
> to convey to the jurors that the people involved in the underlying events
> [i.e., including the victim's survivors] are . . . living human beings who
> have something to be gained or lost from the jury's verdict. Under the

aegis of the Eighth Amendment, we have given the broadest latitude to the defendant to introduce relevant mitigating evidence reflecting his own individual personality. ...[W]e now reject the view . . . that a State may not permit the prosecutor to similarly argue to the jury the human cost of the crime of which the defendant stands convicted. ..."[J]ustice, though due to the accused, is due to the accuser also. ...We are to keep the balance true." (*citing Snyder v. Massachusetts*, 291 U.S. 97 (1934). Id. (emphasis added).

Justice O'Connor's concurrence in *Payne* also sheds some light on the Court's reasoning. She noted at the outset of her opinion that "[a] State may decide that the jury, before determining whether a convicted murder should receive the death penalty, should know the full extent of the harm caused by the crime, including its impact on the victim's family. . . ." *Id*. at 2611. She later noted, like the Chief Justice, that a victim should be portrayed to the jury as a "unique human being" -- which includes knowledge of the victim's family's reaction to the murder. See, *id*. at 2612. Justice Scalia's concurring opinion echoed Chief Justice Rehnquist's reciprocity arguments:

"The Court correctly observes the injustice of requiring the exclusion of relevant aggravating evidence during the capital sentencing, while

requiring the admission of all relevant mitigating evidence. ". . [T]he Eighth Amendment permits parity between mitigating and aggravating factors."

*Id*. at 2613. Justice Souter's concurring opinion noted, like the Court's opinion did, *id*. at 2605, that "traditionally" criminal conduct has been punished in view of the degree of harm, if any, caused. Hence, he argued, a victim impact statement was relevant because it allowed the jury to better know this "traditional" factor in assessing punishment. *Id.* at 2614. Such aggravating evidence was considered "morally relevant" and allowed for a "reasoned moral response" from the jury. It also permitted the jury to better know the victim as a "uniquely individual human being," whose unique personality was in part a product of his family. *Id*. at 2614-15. As Justice Souter stated:

> Just as defendants know that they are not faceless human ciphers, they know that their victims are not faceless fungibles, and just as defendants appreciate the web of relationship and dependencies in which they live, they know that their victims are not human islands, but individuals with parents or children, spouses or friends, or dependents. Thus, when a defendant chooses to kill . . . this choice necessarily relates to a whole

human being and threatens the association of others, who may be distinctly hurt. *Id.* at 2616 (emphasis added).

The collective reasoning of the Court and the concurring opinions in *Payne* applies equally to testimony from a capital defendant's family and friends about their feelings regarding the possible execution of their loved one and the impact that an execution would have on them. Such testimony is relevant to mitigation in at least three ways: first, it goes directly to the question of mercy, a quintessential element of mitigation. *See, e.g., Gregg v. Georgia*, 428 U.S. 153, 199 (1976) (plurality) ("Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution."); *People v. Sanchez*, 503 N.E.2d 277, (Ill. 1986) ("mercy" recognized as important part of mitigation); *State v. Petary*, 781 S.W.2d 534, 541 (Mo. 1989) (same).

Any objective standard of human decency permits close relatives and friends to ask the jury not to impose death on their loved one. Allowing the jury to consider such testimony surely aids in eliciting a "reasoned moral response," *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring).

In *Saffle v. Parks*, 494 U.S. 484, 500, 110 S. Ct. 1257, 1266 (1990) (Brennan, J., dissenting), Justice Brennan quoted the Tenth Circuit's en banc opinion below,

which recognized that, "mercy, humane treatment, compassion, and consideration of the unique humanity of the defendant . . . have all been affirmed as relevant considerations in the penalty phase of a capital case." *Id.* (*quoting Parks v. Brown*, 860 F.2d 1545, 1556 (10th Cir. 1988) (en banc). Such factors, of course, were of the very type relied upon by the *Payne* Court in holding that the prosecution's use of victim impact statements was proper during a capital sentencing hearing, see discussion supra, albeit with reference to the victims' family.

To not apply the same considerations to the testimony of a capital defendant's relatives regarding their feelings about the possible execution of their loved one would be as "unfair" and "imbalanced" an approach during sentencing as the Court's prior approach in *Booth v. Maryland*, which Chief Justice Rehnquist so condemned in *Payne*. See, 111 S. Ct. at 2609. If *Payne* permits testimony from the victim's relatives regarding their feelings about the crime as part of the prosecution's presentation of aggravating circumstances, testimony of the capital defendant's relatives regarding their feelings about the proposed punishment as part of the defense's presentation of mitigating circumstances was admissible.

A second way that such testimony is relevant as mitigating evidence is that it evinces that a particular defendant may still possess enough redeeming qualities as a human being to warrant his life being spared. The clear message sent to jury by such

testimony is that the defendant's life until the murder had enough positive elements to lead his family members to express their love by pleading that a life sentence be imposed. *People v. Mickle*, 814 P.2d 290, 321 (Cal. 1991) (Such testimony "exemplifie[s] the feelings held toward the defendant by a person with whom he [has] had a significant relationship" and "bears on his overall character and humanity" (citation omitted)); *cf. Martin v. Dugger*, 686 F. Supp. 1523, 1538-41 (S.D. Fla. 1988) (quoting extensive testimony from capital defendant's relative in which numerous pleas for mercy interspersed with discussions of defendant's character and background).

Third, as was extensively discussed in *Payne* with respect to the testimony of the victim's survivors used as aggravation evidence, but equally applicable to testimony of the defendant's relatives used as mitigation evidence, testimony from the defendant's family aids the sentencing jury in seeing the defendant as a "uniquely individual human being." He is part of a family who still loves him, notwithstanding his crime, and that family, just like the victim's family, has a vested interest in the jury's verdict.

Just as Chief Justice Rehnquist argued the need to convey to a jury that "the people involved in the underlying events [i.e., the victim's survivors] are . . . living human beings, with something to be gained or lost from the jury's verdict," *id*. at

2609, a capital sentencing jury should likewise know that a capital defendant also has a family of "living human beings," who care deeply about what verdict the jury reaches. Just as Justice Souter noted of a murder victim, a capital defendant such as Garcia is not a "human island." He has "a web of relationships and dependencies." He is "an individual[] with parents or children, [a] spouse[] or friends, or dependents." The jury's choice of a death sentence "necessarily relates to [the] whole human being and threatens [the] association of others, who may be distinctly hurt." *Payne*, 111 S. Ct. at 2615. And just as Justice O'Connor noted that a jury cannot fully know a murder victim as a "unique human being" without knowing of the impact of the crime on the victim's family, *see Id.* at 2611, neither can a jury know of the capital defendant as a "uniquely individual human being[]," *see, Woodson v. North Carolina*, 428 U.S. 280, 304, (1976), without hearing the defendant's family's feelings about the possible execution of their loved one.

In non-capital cases, countless courts in various ways have taken into consideration a criminal defendant's family in imposing a particular sentence. *See, e.g., State v. Laird*, 547 So. 2d 1, 3 (La.App. 3 Cir. 1989); *United States v. Denardi*, 892 F.2d 269, 271 (3rd Cir. Pa. 1989); *United States v. Risco*, No. 89-0052-01, 1989 U.S. Dist. LEXIS 16493 at *2 (E.D. Pa. Mar. 16, 1989); *United States v. Moran*, 601 F. Supp. 205 (D. Me. 1985); *United States v. Ramos*, 605 F. Supp. 277, 279 (S.D.N.Y.

1985); *Irizzary v. United States*, 58 F.R.D. 65 (D. Mass. 1973); *United States v. Orlando*, 206 F. Supp. 419, 420-21 (E.D.N.Y. 1962). As the First Circuit noted in *United States v. Villarin Gerena*, 553 F.2d 723, 727 (1st Cir. 1977), "[t]hat any sentence may be a hardship to [a criminal defendant's] family is undeniable, the consequences of any crime are rarely visited only upon the actor and the immediate victim." Since "traditionally," *cf. Payne*, 501 U.S. 808, 111 S. Ct. at 2614 (Souter, J. concurring), a criminal defendant's family has not been irrelevant to non-capital sentencing, a fortiori it should not be excluded from capital sentencing.

Almost every argument made by the majority and concurring members in *Payne* regarding the propriety of victim impact statements applies with equal force to a capital defendant's right to offer testimony by his family regarding their feelings about the prospect of losing their loved one. Appellants made a compelling case for the admission of the testimony regarding the impact of execution. By precluding the jury from hearing that evidence, the jury was unable to fairly consider all the evidence in determining the appropriate sentence.

As detailed in the complaints herein concerning the failure to grant a severance, Snarr was also denied a fair trial by the actions of the trial court in this issue. Garcia was not afforded a fair trial, and it is reasonable to conclude that the jury was likely eased into a death sentence for Snarr by the joint death sentence of Garcia. As a

result both appellants were denied their rights to due process and a fair trial, and the

convictions and death sentences should be reversed.

**ISSUE NO. NINETEEN** - Garcia's and Snarr's death sentences must be reversed because this Honorable Court denied Garcia due process by overruling the district court and denying the funding necessary for Garcia to present a punishment case, which additionally impinged upon the due process rights of Snarr in the joint trial.

## I.      Standard of Review and Reviewability

The Criminal Justice Act, 18 U.S.C. § 3006A(e), provides that a "person who is financially unable to obtain investigative, expert, or other services necessary for adequate representation" may obtain such services after demonstrating in an *ex parte* proceeding that the services are necessary. *See 18 U.S.C. § 3006A(e)* (West Supp.1993). *United States v. Castro*, 15 F.3d 417, 421 (5th Cir. 1994). The denial of experts are reviewed for an abuse of discretion. *Id*.

## II.      Argument

This issue was heavily litigated - and in fact, it was this very Honorable Court that committed the error despite the findings by the trial court. Sealed before this Court is Defendant's Exhibit 7, an exhibit presented in a pretrial *ex parte* hearing for funding to properly defend this case. The total requested budget, including attorneys fees, was $470,000. The district judge, contemplatively reviewed the budget, and

made cuts of 14.36% to $402,500.00. Those cuts never eliminated any category of expert - just the amount of funding. Then Chief Judge Jones of this Court reviewed the budget and reduced the budget by $195,000, over 41%, to an amount of $275,000. (See Exhibit 7). Garcia was denied the right to present expert Richard Cervantes and Craig Haney, Ph.D., along with a neurological expert, and further precluded from requesting additional funding absent extraordinary circumstances. (USCA5 815-16).

The district court's Memorandum to Chief Judge Jones explicitly laid out the necessity for three requested experts and the recommendation to the Fifth Circuit:

> Proper investigation and presentation to the jury of both the underlying facts and mitigating evidence will in large part determine whether Mr. Garcia is convicted of the charges against him and, if so, the sentence he will receive. Therefore, the court is of the opinion that the requested services are reasonably necessary for an adequate defense. It is requested that advance authorization be granted to obtain additional services in the amount in excess of the maximum allowed for capital cases, as follows:
>
> | | |
> |---|---|
> | Mental health Neurological Expert | $15,000 |
> | Criminologist/Prison Culture Expert and | |
> |     Prison Administration Expert | $35,000 |
> | Cultural Mitigation Expert | $15,000 |
> | TOTAL | $65,000. |
>
> I certify that the estimated expenses appear necessary to provide fair compensation for services of an unusual character or duration for an adequate defense in this capital case. Therefore, I recommend approval of this advance authorization in the amount of $65,000.

(USCA5 812-13). Judge Crone signed this order on November 24, 2009, after a lengthy hearing on this issue. Chief Judge Jones allowed for an additional $20,000

but specifically excluded any of the money to be spent on a Mexican cultural expert. (USCA5 815). Judge Jones wrote that " ...no funding is authorized for a Mexican cultural expert, as it would be (sic) in appropriate for testimony to be adduced by either party characterizing the defendant according to national origin." (USCA5 815). She denied the request and overruled the trial court. (USCA5 816).[19]

As the record of the *ex parte* hearing demonstrated - these experts were necessary to present a full picture of Mr. Garcia to the jury. Dr. Jolie Brams, a clinical psychologist, did testify at trial. (USCA5 7239-1305). During the hearing on whether there would be sufficient funds to pay for her expertise at trial, Dr. Brams made it quite clear that she had investigated the background of Garcia and found the need for a cultural expert was very important. (USCA5 763-64). Dr. Brams testified that Garcia's background was atypical and that he was raised in "a cartel family." (USCA5 764). She explained that the cultural expert was necessary because of the unique background of Garcia:

> From almost preschool years, he was very well aware of the criminal nature of his family. He was part and parcel of witnessing and being exposed to a variety of problematic and atypical situations; and he was

---

[19]   The district court was probably not surprised at Chief Judges Jones' denial of funding; in an earlier hearing for Snarr, Judge Crone specifically told the defense they needed to prepare a summary because "I don't think Judge Jones is going to read all those pages of testimony." (Sealed Transcript 11/9/09. Page 49). Judge Crone informed the defense that the summary needed to be prepared to try and "pique" the interest of Judge Jones if they had any hope to receive necessary funding. (Sealed Transcript 11/9/09 at 49).

very indoctrinated into a lifestyle, from really preschool years, in which one lives a life of criminal behavior.

* * *

But we need to understand that this is a history of his family which is generational in its criminality, and this is not just commonplace criminality. This is Mexican mafia. Mr. Garcia was raised almost as an alien in this world, even as compared to other individuals whose family may be criminal in nature to some degree.

(USCA5 764).

Dr. Brams then also noted there was another type of expert absolutely necessary for the defense of Garcia, regarding neurological issues:

Okay. Well, I think that's a very important question: and, as you know, in any case we will look at the neurological and intellectual capacities of the defendant. The history that I have received, it correlates absolutely with my clinical impressions of Mr. Garcia in that his early childhood history is marked by, first of all, insult – physical insults. His mother was beaten while she was pregnant with him, and he was also poisoned as an infant by his grandmother.

All during his childhood, he was extremely impulsive, hyperactive, and had no fear of danger. When I met with Mr. Garcia now, his impulsivity and intentional difficulties are noted not just in the clinical interview but also in the history that he provides.

He appears to be, at least clinically, of normal intelligence; and he's quite verbal. But when we look at his ability to conform his behavior in a voluntary nature, especially when it dovetails with the history in his family and his experiences, it's extremely important that a neuropsychological expert look at his history, his prison capacities, and formulate hypotheses and conclusions as to why, in addition to his very dysfunctional and criminal family background, how he decided to take the path that he took in light of his possible neurological defect.

* * * *

218

Well, what I'm pointing out to you is that it I would be remiss and I believe, from my perspective as a consulting psychologist, inappropriate not to explore this. All of us obviously have strengths and weaknesses intellectually: but in terms of Mr. Garcia, his history is very suggestive of lifelong neurological difficulties in terms of frontal lobe functioning, his ability to control his behavior, issues that are neurological and beyond his control. And understanding these issues alone are significant; but understanding them in light of this incredible family history is, I believe, central to providing mitigation for this individual. And, thus, it's my strongest opinion we need a neuropsychological expert to assist in this case.

(USCA5 765-66).

The district court understood after the testimony of Dr. Brams that three more experts were necessary: a prison expert, a cultural consideration person, and a neurological expert. (USCA5 770).

During the *ex parte* hearing, Dr. Richard Cervantes explained his expertise as a cultural expert. (USCA5 773-74). He explained the necessity for a cultural expert:

First, we can talk about the importance of Mr. Garcia being the product of an unwanted pregnancy and how that runs counter to traditional Mexican culture. In Mexican culture there's very strong value placed on the integrity of the nuclear family. Several studies have related to family stress and destruction in the nuclear family among Mexican Americans as having a much more negative mental health impact than it has in other cultural groups. So, the fact that he is from an unwanted pregnancy and, in essence, was early on rejected by his family is a – runs counter to cultural standards, cultural practices, and cultural norms that I believe are really really important and that need to be fleshed out and investigated throughly and presented to the court.

(USCA5 774-75).  Dr. Cervantes did a preliminary evaluation of Garcia, but explained that his preparation was "absolutely not" completed.  (USCA5 775).  He also explained a portion of the significance of why a cultural expert was so necessary:

> All individuals experience life stress events.  However, there are some stress events or traumatic events that are unique to Mexican or Mexican American culture: and that's what we refer to as non-normative stressors.  And those are stressors, for example, related to discrimination, language problems, stress related to legal status issues, family conflicts about parenting and child rearing practices.  All of these things have been studied and researched, including some of my own published research on these topics.
>
> * * * *
>
> We know that Mexican Americans have some of the highest rates of alcohol abuse and dependence in American particularly Mexican American men, much higher, for example, than even in other Hispanic groups.  Puerto Ricans have much lower rates.  Cuban Americans have lower rates.  Mexican American men have higher rates of alcohol abuse and dependency even than you would find in African-American communities.
>
> What we know is that patterns of high-quantity binge drinking that are found in many traditional Mexican-American households – excuse me – have ben combined with high-frequency drinking patterns that are more common to the U.S. population; and these have produced elevated rates of alcohol abuse, alcoholism, and dependence among Mexican Americans.
>
> * * * *
>
> For Edgar, I have evidence that he began drinking at a very early age, started using marijuana at about age 11 but began drinking alcohol also at about age 11.  He reported to me that his early life pretty much revolved around alcohol at a very early age, where he reported drinking approximately a case of beer at his heaviest point of use; and that was still in his late teen years.  So, his life really revolved around alcohol abuse, alcohol addiction that was untreated.

> I believe that we can best understand his alcoholism and alcohol addiction by understanding Mexican culture and some of the cultural values and norms around alcohol abuse and alcohol dependence and that those things are really really important as part of the mitigation presentation.

(USCA5 778-80). The crux of Dr. Cervantes' testimony was that he, as a cultural expert, could provide a comprehensive framework to understand how Garcia grew up. (USCA5 781). One striking example that Dr. Cervantes gave about the Mexican example cultural experience was an example of asking non-Hispanic parents how their children came to be drug-users. (USCA5 783). Dr. Cervantes stated the answer was typically that all of the child's friends were drug users. (USCA5 783). But if you asked a Mexican parent how their child became a drug user or had a mental health problem, the answer would be:

> "It's because of the *bruja* that live next door to us. Our child was bewitched. The witch that lived next door to us, because she didn't like us, put a spell on him: and all of my children have turned out to be substance abusers or have emotional problems." So, culture and the way culture defines problems are very very important.
> The practice of *Brujeria, Santeria*, very important in the Hispanic culture; and, in fact, some of the that is evidence and is present in this case. And I will be talking about the role of *Brujeria* and that practice in the Mexican culture, if allowed to testify in terms of Mr. Garcia.

(USCA5 783).

The Fifth Circuit also denied funding for Dr. Craig Haney, a lawyer and Ph.D. from Stanford University. (USCA5 789). His expertise was in mitigation and

explaining the role an institution can have on a person's social history. (USCA5

791). He explained that it would be difficult for a juror to understand a defendant's

social history without understanding the portion of the defendant's life that was lived

in an institutional setting, explaining:

> Institutions are powerful environments and they can shape and influence and affect people in very significant ways and that then becomes part of the story of who the defendant is and why his life has taken that court that it has. So, that would be true in any case in which a defendant had been institutionalized in the past.
>
> In this particular case it's even more important for two reasons. One os that the defendant in this case has not only been institutionalized and spent a considerable amount of time in institutional settings ut also has engaged in conflict, had violent physical encounters in the past in institutional settings, which will need to be understood and analyzed and explained to the jury in terms of, at least in part, the nature of the environment in which the defendant was housed, so that there is potential aggravation in this case which will have to be addressed by the defense in addition to the institutional aspects of the defendant's social history.
>
> And then finally and obviously in this case, the crime in which is at issue in this case is a crime which is alleged to have taken place in prison. So, the nature of the prison environment, the immediate nature of that environment, is important but also the defendant's institutional history, how he reacts in institutional settings, what he leaned in institutional settings, how his development was shaped and affected by virtue of his prior incarceration. All of these things are acutely important in a case where the crime at issue is one that's taken place inside a prison.

(USCA5 792-93).

Only funding for the administrative prison expert Dr. Bezy, was ultimately received by Garcia - no expertise was allowed on prison society, like Dr. Haney, or on scientific neurological testing for Garcia. While Dr. Brams did testify at trial - she lacked the appropriate expertise Garcia's defense needed; she conceded during her testimony that she was not an expert in Spanish culture. (USCA5 7248). Garcia had a tragic past which was unique based upon his culture. His own father's family rejected him even before he was born and beat and abused his pregnant mother. (USCA5 7083). She was dropped off in front of the hospital when she was in labor, having her baby alone and isolated from anyone but herself. (USCA5 7088). When Garcia was two months old, his paternal grandmother, a known witch and abortionist in Mexico, tried to kill him with a fire and he ended up in the hospital. (USCA5 7090). From that incident, Garcia was injured, had a code blue, and spent an extensive time in intensive care. (USCA5 7091).

Growing up, Garcia's father was a very negative influence on him, dealing in drugs and committing numerous crimes. (USCA5 7100, 7109-12). His father introduced him to a life of crime that unfortunately escalated to Garcia serving time in prison and then ultimately committing a capital offense.

This issue is incredibly unique because there is no allegation the district court erred. In fact, it was the district court that recognized the importance of the issues

and requested this Court to provide adequate funding. This was an error by the Fifth Circuit. In asking this Court to review its own error, objectivity is requested.

Indigent defendants are entitled to expert assistance beyond the original psychiatric scope of *Ake*. *Yohey v. Collins*, 985 F.2d 222, 227 (5th Cir.1993). Under this standard, a defendant possesses a due process right to the assistance of a non-psychiatric expert when the testimony to be obtained is "both critical to the conviction and subject to varying expert opinion." *Yohey v. Collins*, 985 at 227 (citation and internal quotation marks omitted). In *Yohey*, the defendant was seeking forensic and ballistic experts. In upholding the trial court's denial of those requests, the Circuit held that he had failed to establish a "reasonable probability that the requested experts would have been of assistance to the defense and that denial of such expert assistance resulted in a fundamentally unfair trial." *Id.*

This Court determined in *Yohey* that an indigent defendant requesting non-psychiatric experts "must demonstrate something more than a mere possibility of assistance," 985 F.2d at 227. Garcia presented the compelling testimony of Dr. Cervantes and Craig Haney to the district court who recognized the value and necessity of their testimony. Further, upon Dr. Brams testimony in the *ex parte* hearing that a neurologist was absolutely necessary, the district court agreed. Typically, findings by the trial court are afforded great deference under a clear error

standard, and the district court's "[f]indings based on the credibility of witnesses demand even greater deference." *See Tokio Marine & Fire Ins. Co. v. FLORA M/V*, 235 F.3d 963, 970 (5th Cir. 2001). The district court was in the best position to judge the credibility of the witnesses and determine whether additional funding was needed.

A Sixth Circuit case upheld the granting of relief in a habeas case, in part, because the defense had failed to "to adequately investigate [Morales's] cultural background and the effect it had on [his] life"; and "to investigate the possibility of a neurological cause of [Morales's] mental and emotional deficiencies due to his lifelong alcohol consumption." *Morales v. Mitchell* 507 F.3d 916, 931 (6th Cir. 2007). The importance of both these experts was enough to remand for a new trial. Garcia was denied both of these experts, as well.

In *Barraza v. Cockrell*, 330 F.3d 349 (5th Cir. 2003), the court upheld the denial of funds, but grounded its opinion in the notion that what the defendant sought was gratuitous because he had already had *two* experts test the defendant for possible brain damage:

> Petitioner is now attempting to develop more evidence to supplement, if not contradict the expert testimony rejected by the jury. The state habeas judge and the federal district judge were uncertain of just where all this was headed beyond its relevance to a Ford inquiry into competence to be executed. We can imagine that it has some relevance to a claim that trial counsel was ineffective for not digging deeper. **But now having done so**, the effort has not produced the evidence that

Barraza says his counsel ought to have earlier located. (Footnote omitted)(Emphasis supplied).

*Barraza v. Cockrell* 330 F.3d at 352. Garcia was denied the right to even one neurological test resulting in the jury failing to have a full picture of why Garcia might be the person he was.

In *Griffith v. Quarterman*, 196 F. App'x. 237, 243 (5th Cir. 2006), this Court upheld the denial of an expert with a "law enforcement background." In doing so, it pointed out that the expert's area of expertise was not at issue in the case, and further, defendant's three other experts were capable of rebutting the state's witness. Similarly, it denied a defendant the services of experts on jury selection and mitigation in *Moore v. Johnson*, 225 F.3d 495 (5th Cir. 2000). Drawing on *Ake*'s statement that a defendant is entitled only to "access to the raw materials integral to the building of an effective defense," 470 U.S. at 77, the *Moore* court held that a competent lawyer is equipped to select a jury and thus defendant already possessed the raw materials to mount his defense. Likewise, the court was not convinced that a mitigation specialist would provide "critical" assistance to a defense team that already included a lawyer and psychiatrist cognizant of the importance of mitigation evidence in avoiding a death sentence. *Moore*, 225 F.3d at 503.

The Supreme Court recognized in *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 256 (2007), that "possible neurological damage" is relevant mitigating evidence. Interestingly, this Court upheld a state court in *Woods v. Thaler*, 399 F. App'x. 884 (5th Cir. 2010), determining that trial counsel was not deficient for failing to seek neurological testing because  there was no indication defendant's psychologist had recommended further investigation into defendant's mental condition. *Id.* at 889. That was not the case herein - Dr. Brams specifically told the court that it was her "strongest opinion" that neurological testing was warranted. (USCA5 765-66).

A case out of the Oklahoma Court of Criminal Appeals is illustrative.  In *Fitzgerald v. State*, 972 P.2d 1157 (Okla. Crim. App. 1998), the criminal appeals court found that the trial court had abused its discretion when it denied defendant funds for a neuropsychologist and a juvenile diabetes expert and that the error was not harmless at the penalty stage. With respect to the neuropsychologist, the defendant had made a sufficient factual showing to support the request – namely, a psychologist's report discussing a head wound that might have caused organic brain damage. *Id.* at 1167. Further, the psychologist who had evaluated defendant strongly recommended neurological testing. *Id.* at 1166. The court rejected the state's argument that a combination of lay witnesses and the defendant's psychologist were adequate to present these issues as mitigation. "These witnesses certainly could

neither conduct neuropsychological tests nor present the result of those tests to the jury. As other witnesses could not present this mitigating evidence, [defendant] has shown he was prejudiced by the trial court's decision." *Id.* at 1168.

In *Wright v. Angelone*, 151 F.3d 151 (4th Cir. 1998), the defendant contended on appeal that the district court abused its discretion when it denied his motion for funds to hire a neurologist to determine the existence of an organic brain disorder. In the Fourth Circuit, the state is obligated to provide expert assistance to an indigent defendant when "a substantial question exists over an issue requiring expert testimony for its resolution and the defendant's position cannot be fully developed without professional assistance." *Williams v. Martin*, 618 F.2d 1021, 1026 (4th Cir. 1980). Wright fell short of this standard because he had previously been examined by *three* mental health experts, none of whom found evidence of brain damage the court determined that a fourth expert opinion was not "reasonably necessary" to Wright's defense. *Wright*, 151 F.3d at 163.

In *Loyd v. Smith*, 899 F.2d 1416 (5th Cir. 1990), this Court remanded the case back to the district court for failing to give sufficient deference to the state court's finding that defendant had received ineffective assistance of counsel due to a failure to investigate mitigating mental health evidence. The Circuit reviewed the state court's factual findings in the context of the *Strickland* deficiency prong and wrote:

> [A]lthough the indicators of organic brain dysfunction, a mental defect admissible as a mitigating circumstance under the Louisiana statutory scheme, were present, the original team of psychiatrists did not perform tests to determine the extent of the defect, and limited their analysis to the issue of whether [defendant] was sane or not.

*Id.* at 1423. On remand, the district court again found that counsel was not deficient, and that any hypothetical deficiency did not prejudice defendant. The case went back up to this Court, which rejected the district court's opinion and found a clear *Strickland* violation determining counsel had been aware of a host of factors pointing to brain damage but did not pursue that avenue for mitigation. "The marked disparity in testimony [between the initial sentencing trial and the postconviction hearing] establishes that reasonable professional standards require that counsel should have *used readily available funds* to hire an independent psychiatrist to put [defendant's] mental condition in proper focus." *Loyd v. Whitley*, 977 F.2d 149, 158 (5th Cir. 1992). Though both the state and district courts had concluded that defendant was not prejudiced, the Circuit disagreed. The evidence of mental dysfunction was strong enough to mandate a reweighing of aggravating and mitigating factors. *Id.* at 160.

In *Powell v. Collins*, 332 F.3d 376 (6th Cir. 2003), the Sixth Circuit vacated the defendant's death sentence because the state court's failure to appoint an independent psychiatric expert to assist the defendant during the sentencing phase rendered sentencing fundamentally unfair. *Id.*, 332 F.3d at 392. One month prior to trial,

defendant's attorneys provided the court with juvenile court records and psychological evaluations, alleging that these documents revealed mental deficiencies that should lead to the appointment of a psychiatric expert. *Id*., 332 F.3d at 392. The motion was denied but the court appointed a psychiatrist to examine defendant. The psychiatrist concluded that defendant was not legally insane but acknowledged that he likely suffered from some organic brain dysfunction. *Id*., 332 F.3d at 392. However, she had not conducted the test that would detect such a dysfunction. In fact, she stated that she was "'definitely not equipped'" to conduct the necessary neuropsychological testing relevant to mitigation. *Id.* at 384.

The Sixth Circuit analyzed this denial in the context of *Ake*, noting that "*Ake* also held that when appropriate, the right to expert assistance extends to the sentencing phase of capital proceedings." *Id.* at 390. It concluded that the defendant had provided the trial court with the necessary particularized facts sufficient to trigger *Ake*'s requirement of psychiatric assistance. Moreover, the error was not harmless at the penalty stage because, by her own admission, the court appointed psychiatrist was not equipped to perform the tests necessary to present the jury with a full mitigation picture. *Id.* at 395.

The Sixth Circuit resolved a similar issue in *Glenn v. Tate*, 71 F.3d 1204 (6th Cir. 1995). Counsel was found deficient for woefully inadequate mitigation

investigation. The court wrote: "the jury, unfortunately for [defendant] . . . did not hear that he had a neurological impairment which probably stemmed from the general anesthesia administered to his mother months before he was born." *Id.* at 1209. This was in spite of the fact that expert testimony to that effect would have been readily available if counsel had sought it. *Id.* at 1205.

The Supreme Court of Utah has found deficient performance under *Strickland* where counsel did not consult with a neurologist to determine if defendant was brain damaged. In *Taylor v. State*, 156 P.3d 739 (Utah 2007), the court found counsel deficient for failing to conduct further investigation after a court appointed psychologist determined that, although defendant was not insane, his behavior was consistent with that "sometimes seen with head injured or otherwise brain damaged people." *Id.* at 748. Despite this error, the court concluded that defendant was not prejudiced.

Finally, *Porter v. McCollum*, 130 S. Ct. 447 (2009) lends additional support to the Supreme Court's statement in *Abdul-Kabir* that "possible neurological damage" is relevant mitigating evidence. 550 U.S. at 256. In *Porter*, the Supreme Court found that Florida's highest court unreasonably applied *Strickland* when it found that defendant was not prejudiced by his counsel's failure to present mitigating evidence. The Court focused on counsel's failure to investigate defendant's mental health,

noting that the neuropsychology expert who testified at the postconviction evidentiary hearing had concluded that defendant was brain damaged. *Porter*, 130 S. Ct. at 451.

There is no doubt the district court found compelling the need for a cultural expert and neurological testing. This Court's rejection of the district court's findings was clear error and denied Garcia a fair trial, and impinged upon the due process rights of Snarr since he was tried simultaneously. As detailed in the complaints herein concerning the failure to grant a severance, Snarr was also denied a fair trial by the actions of the trial court in this issue. If Garcia was not afforded a fair trial, then it is reasonable to conclude that the jury was likely eased into a death sentence for Snarr by the joint death sentence of Garcia.

As a result both appellants were denied their rights to due process and a fair trial, and the convictions and death sentences should be reversed.

## CONCLUSION

For these reasons, appellant Snarr's and appellant Garcia's convictions should be reversed and the case remanded to the district court for proceedings consistent with this Court's opinion. In the alternative, appellant Snarr's and appellant Garcia's death sentences should be vacated and the cases remanded to the district court for resentencing or proceedings otherwise consistent with this Court's opinion.

Respectfully submitted,

/s/Douglas M. Barlow
DOUGLAS M. BARLOW
Attorney at Law
485 Milam
Beaumont, TX 77701
(409) 838-4259
FAX: (409) 832-5611
TBL #01753700

/s/ G. Patrick Black
G. PATRICK BLACK
Federal Public Defender
Eastern District of Texas
110 N. College, Suite 1122
Tyler, TX 75702
Tel:  (903) 531-9233
Fax: (903) 531-9625
TBL #02371200

*Attorneys for Appellant Snarr*

/s/ Gerald E. Bourque
GERALD E. BOURQUE
Attorney at Law
24 Waterway Ave., Suite 6600
The Woodlands, TX 77380
(281) 379-6901
FAX: (832) 813-0321
TBL #02716500

/s/ Robert A. Morrow, III
ROBERT A. MORROW, III
Attorney at Law
24 Waterway Ave., Suite 660
The Woodlands, TX 77380
Tel: (281) 379-6901
Fax: (832) 813-0321
TBL #14542600

/s/ Jani J. Maselli
Attorney at Law
808 Travis St., 24th Floor
Houston, TX 77002
Tel: (713) 256-7726
TBL #00791195

*Attorneys for Appellant Garcia*

# CERTIFICATE OF SERVICE

I certify that on the 8th day of August, 2011, I did not serve the foregoing Brief of Appellant, on the following individuals pursuant to Fed. R. App. P. Rule 25, because the Brief contains attorney/client privileged information and *ex parte* matters sealed by the trial court and has been filed under seal:

| | |
|---|---|
| Mr. Joseph Batte | Ms. Traci Kenner |
| Assistant U.S. Attorney | Assistant U.S. Attorney |
| US Attorney's Office | U.S. Attorney's Office |
| 350 Magnolia, Suite 150 | 110 North College, Suite 700 |
| Beaumont, TX 77701 | Tyler, TX 75702 |

/s/Douglas M. Barlow                    /s/ Gerald E. Bourque
DOUGLAS M. BARLOW                  GERALD E. BOURQUE

/s/G. Patrick Black                          /s/ Robert A. Morrow, III
G. PATRICK BLACK                        ROBERT A. MORROW, III
*Attorneys for Appellant Snarr*        *Attorneys for Appellant Garcia*

234

<h1 style="text-align:center">CERTIFICATE OF NONCOMPLIANCE</h1>

Pursuant to 5th Cir. R. 32.2.7(c), the undersigned certifies this brief does not comply with the type-volume limitations of 5th Cir. R. 32.2.7(b), but counsel has filed a motion to file an oversized brief and record excerpts, based on the fact that this is a death penalty case with an extraordinarily length record.

1. EXCLUSIVE OF THE EXEMPTED PORTIONS IN 5th Cir. R. 32.2.7(b)(3), THE BRIEF CONTAINS:

A.  54,260  words.

2. THE BRIEF HAS BEEN PREPARED:

A. In proportionally spaced typeface using:
WordPerfect 12 in 14 point Times New Roman Font.

3. THE UNDERSIGNED UNDERSTANDS THAT A MATERIAL MISREPRESENTATION IN COMPLETING THIS CERTIFICATE, OR A CIRCUMVENTION OF THE TYPE- VOLUME LIMITS IN 5th Cir. R. 32.2.7, MAY RESULT IN THE COURT''S STRIKING THE BRIEF AND IMPOSING SANCTIONS AGAINST THE PERSON SIGNING THE BRIEF.

| | |
|---|---|
| /s/Douglas M. Barlow | /s/ Gerald E. Bourque |
| DOUGLAS M. BARLOW | GERALD E. BOURQUE |
| Attorney at Law | Attorney at Law |
| 485 Milam | 24 Waterway Ave., Suite 6600 |
| Beaumont, TX 77701 | The Woodlands, TX 77380 |
| (409) 838-4259 | (281) 379-6901 |
| FAX: (409) 832-5611 | FAX: (832) 813-0321 |
| TBL #01753700 | TBL #02716500 |
| | |
| /s/ G. Patrick Black | /s/ Robert A. Morrow, III |
| G. PATRICK BLACK | ROBERT A. MORROW, III |

Federal Public Defender
Eastern District of Texas
110 N. College, Suite 1122
Tyler, TX 75702
Tel:  (903) 531-9233
Fax: (903) 531-9625
TBL #02371200

*Attorneys for Appellant Snarr*

Attorney at Law
24 Waterway Ave., Suite 660
The Woodlands, TX 77380
Tel: (281) 379-6901
Fax: (832) 813-0321
TBL #14542600

/s/ Jani J. Maselli
Attorney at Law
808 Travis St., 24th Floor
Houston, TX 77002
Tel: (713) 256-7726
TBL #00791195

*Attorneys for Appellant Garcia*