**No. 10-40525**
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
_____

**UNITED STATES OF AMERICA**,
Plaintiff-Appellee,

v.

**MARK ISAAC SNARR AND
EDGAR BALTAZAR GARCIA**,
Defendants-Appellants.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION, NO. 1:09CR15

_____

**BRIEF FOR THE UNITED STATES**

_____

John M. Bales
United States Attorney
Eastern District of Texas

Traci L. Kenner
Assistant United States Attorney
110 North College, Suite 700
Tyler, Texas 75702
(903) 590-1400

**CERTIFICATE OF INTERESTED PERSONS**

Because Plaintiff-Appellee is the government, a certificate of interested persons is not required.  5th Cir. R. 28.2.1.

**STATEMENT REGARDING ORAL ARGUMENT**

The United States does not request oral argument because (1) the facts and legal arguments are adequately presented in the briefs and record and (2) oral argument would not assist the Court in its consideration of the issues presented as they relate to the record in this case.  Fed. R. App. P. 34(a)(2)(C).  Nevertheless, because this is a capital case in which the defendants received death sentences, the United States does not oppose Appellants' request for oral argument.

# TABLE OF CONTENTS

Certificate of Interested Persons. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Statement Regarding Oral Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

Statement of Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    I.  Facts proved during the guilt/innocence phase of the trial. . . . . . . . . . . 9

    II.  Evidence presented by Snarr and Garcia. . . . . . . . . . . . . . . . . . . . 17

    III.  Evidence presented during the eligibility phase. . . . . . . . . . . . . . . . 19

    IV.  Evidence presented by the government during the selection phase. . 31

    V.  Evidence presented by Snarr during the selection phase. . . . . . . . . . . 51

    VI.  Evidence presented by Garcia during the selection phase. . . . . . . . . . 53

    VII.  Government's rebuttal evidence. . . . . . . . . . . . . . . . . . . . . . . . 55

Summary of the Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

    Issues I-X:  Issues Related to Jury Selection. . . . . . . . . . . . . . . . . . . . 62

Issues I-V:  A district court may excuse a prospective juror from a capital case if his views on the death penalty would prevent or substantially impair his performance as a juror in accordance with the court's instructions and the juror's oath.  Here, after evaluating their demeanor, the district court excused five prospective jurors who would not impose the death penalty or who vacillated so much that the court could not discern their views.  Did the court abuse its discretion?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Issues VI-VIII:  In addressing a district court's failure to remove a prospective juror for cause, the Supreme Court focuses on the impartiality of the jurors actually seated.  Here, after receiving ten additional peremptory challenges, the defendants exercised three challenges on prospective jurors that they had challenged for cause, but another juror the defendants desired to strike— who was not challenged for cause— was selected.  Were the district court's rulings a manifest abuse of discretion?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Issues IX-X:  A district court may, in its discretion, excuse a prospective juror who has a physical infirmity that impairs his capacity to serve on a jury.  Here, the district court excused two veniremen— at their request— after determining that they had physical impairments to service.  Did the court abuse its discretion?. . . . . 90

Issue XI:  Lesser Included Offense Issue. . . . . . . . . . . . . . . . . . . . . . . . . . . 105

Issue XI:  Courts must give a lesser-included-offense instruction only if a jury could rationally find a defendant guilty of the lesser offense while acquitting on the greater.  The evidence overwhelmingly proved premeditation, which distinguishes first and second degree murder:  Snarr and Garcia obtained weapons, tricked the guards into bringing them in together, attacked the guards for their keys, and taunted the victim while opening his cell.  Did the district court correctly hold that no rational juror could have acquitted on first degree murder but convicted on second?. . . . . . . . . . . . . . . . . . . . . . . . . . 105

Issues XII-XVIII:  Sentencing Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

Issue XII:  Evidence showing that a murder involved suffering or
mutilation beyond that necessary to cause death is sufficient to
support a finding that the crime was committed in an especially
heinous, cruel, or depraved manner.  Here, Snarr and Garcia stabbed
the victim more than 50 times in a frenzied manner.  Did the district
court err in submitting the "especially heinous, cruel, or depraved"
statutory aggravating factor to the jury?. . . . . . . . . . . . . . . . . . . . . . . . 112

Issue XIII:  When life imprisonment without parole is an alternative
to the death penalty, proof of the non-statutory aggravating factor of
future dangerousness may include evidence that a defendant poses a
safety threat in prison.  Along with substantial evidence of the
defendants' violent acts in prison and out, the government rebutted
their expert testimony that Snarr and Garcia might be held in the
ADX indefinitely.  Did the district court err in submitting the non-
statutory aggravating factor of future danger to the jury?. . . . . . . . . . . . 117

Issue XIV:  The statutory aggravating factor of "substantial planning
and premeditation" contemplates a considerable or significant amount
of both.  Here, Snarr and Garcia obtained shanks, carried them to
recreation, manipulated the guards into bringing them back to the
range at the same time, stabbed two guards to get keys, and struggled
to open the victim's cell for nearly a minute before murdering him.
Did the district court err in submitting "substantial planning and
premeditation" to the jury?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

Issue XV:  A district court should grant a severance only if a joint
trial poses a serious risk of compromise to a specific trial right or
prevents the jury from making a reliable judgment about guilt.  Here,
the defendants fail to demonstrate specific, compelling prejudice
occasioned by their joint trial.  Given the district court's careful
instructions regarding separate consideration of the evidence for each
defendant, did the court abuse its discretion by denying their motions
to sever?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

Issue XVI: As the defendants acknowledge, this Court has determined that the relaxed evidentiary standards applied during a capital sentencing hearing do not render the Federal Death Penalty Act unconstitutional. Although conceding that this issue is foreclosed, defendants raise it to preserve the claim. Did the district court err in declining to declare the FDPA unconstitutional?. . . . . . . . . . 145

Issue XVII: During a capital sentencing, the defendant may offer relevant mitigating evidence— without regard to the Federal Rules of Evidence— unless its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury. Here, the district court excluded as irrelevant and unduly prejudicial character evidence of the victim of which the defendants were unaware when they murdered him, but allowed reputation evidence and prior acts they knew about. Did the court abuse its discretion?. . . . . 146

Issue XVIII: Evidence about the effect a defendant's execution might have on his family and friends is not mitigating because it does not reflect on his background, character, or the circumstances of his crime. After the government submitted no victim-impact evidence and Garcia offered substantial mitigating evidence, the district court declined to permit a speculative statement regarding the effect Garcia's execution might have on his family. Did the court err?. . . . . . . 156

Issue XIX: Expert Funding Issue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

Issue XIX: If the costs for reasonably necessary experts and investigators assisting indigent capital defendants exceed $7,500, they must by certified by the lower court and approved by the chief judge of the circuit. After careful review, the Chief Judge of this Court reduced expert funds approved for Garcia and denied funding for a cultural expert; nevertheless, Garcia presented an adequate case in mitigation. If this Court's orders reducing or denying funding are appealable, did the Court err?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

Certificate Related to Fifth Circuit Rule 25.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

Certificate of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

Certificate of Compliance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

**TABLE OF AUTHORITIES**

**Cases:**

*Adams v. Texas*, 448 U.S. 38 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Ake v. Oklahoma*, 470 U.S. 68 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . 170, 173

*Barraza v. Cockrell*, 330 F.3d 349 (5th Cir. 2003). . . . . . . . . . . . . . . . . . . . . 171

*Beck v. Alabama*, 447 U.S. 625 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

*Berghuis v. Smith*, 130 S.Ct. 1382 (2010). . . . . . . . . . . . . . . . . . . . . . 102, 103

*Bowden v. McKenna*, 600 F.2d 282 (1st Cir. 1979). . . . . . . . . . . . . . . . . . . . 149

*Bruton v. United States*, 391 U.S. 123 (1968). . . . . . . . . . . . . . . . . . . . . . . . 144

*Calero-Cerezo v. United States Dept. of Justice*,
        355 F.3d 6 (1st Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

*Cordova v. Lynaugh*, 838 F.2d 764 (5th Cir. 1988). . . . . . . . . . . . . . . . . 111, 112

*Duren v. Missouri*, 439 U.S. 357 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . 102

*Fautenberry v. Mitchell*, 572 F.3d 267 (6th Cir. 2009). . . . . . . . . . . . . . . . . . 169

*Fendrick v. PPL Services Corp.*, 193 F. App'x 138 (3rd Cir. 2006). . . . . . . . . . . 95

*Griffith v. Quarterman*, 196 F. App'x 237 (5th Cir. 2006). . . . . . . . . . . . . . . . 171

*Isle Royale Boaters Ass'n v. Norton*,
        154 F. Supp. 2d 1098 (W.D. Mich. 2001). . . . . . . . . . . . . . . . . . . . . . 100

*Jackson v. Dretke*, 450 F.3d 614 (5th Cir. 2006). . . . . . . . . . . . . . . . . . 157, 160

*Johnson v. United States*, 520 U.S. 461 (1997). . . . . . . . . . . . . . . . . . . . . . . 91

*Jones v. United States*, 527 U.S. 373 (1999).. . . . . . . . . . . . . . . . . . . . . 92

*Jurek v. Texas*, 428 U.S. 262 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . 119

*Keeble v. United States*, 412 U.S. 205 (1973).. . . . . . . . . . . . . . . . . . . . . 106

*Kelly v. Lynaugh*, 862 F.2d 1126 (5th Cir. 1988). . . . . . . . . . . . . . . . . . 157

*Landano v. Rafferty*, 859 F.2d 301 (3rd Cir. 1988). . . . . . . . . . . . . . . 168

*Moore v. Johnson*, 225 F.3d 495 (5th Cir. 2000). . . . . . . . . . . . . . . . . . 171

*Mu'Min v. Virginia*, 500 U.S. 415 (1991). . . . . . . . . . . . . . . . . . . . . . . . 78

*Ortiz v. Quarterman*, 504 F.3d 492 (5th Cir. 2007). . . . . . . . . . . . . 65, 66, 73, 75

*Payne v. Tennessee*, 501 U.S. 808 (1991).. . . . . . . . . . . . . . . . 147, 148, 160, 161

*Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51 (1937). . . . . . . . . . . . . . . . 147

*Pointer v. United States*, 151 U.S. 396 (1894). . . . . . . . . . . . . . . . . . . . . . . 82

*Reyes v. Bridgwater*, 362 F. App'x 403 (5th Cir. 2010). . . . . . . . . . . . . . . . . 92

*Richardson v. Marsh*, 481 U.S. 200 (1987). . . . . . . . . . . . . . . . . . . . . . . . 144

*Ross v. Oklahoma*, 487 U.S. 81 (1988). . . . . . . . . . . . . . . . . . . . . 78, 81, 82, 83

*Schad v. Arizona*, 501 U.S. 624 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . 111

*Schmuck v. United States*, 489 U.S. 705 (1989). . . . . . . . . . . . . . . . . . . . . 111

*Scott v. Louisiana*, 934 F.2d 631 (5th Cir. 1991). . . . . . . . . . . . . . . . . . . 171

*Shearin v. United States*, 992 F.2d 1195 (Fed. Cir. 1993). . . . . . . . . . . . . . . . 168

*Simmons v. South Carolina*, 512 U.S. 154 (1994). . . . . . . . . . . . . . . . . . . . . 119

*Sinisterra v. United States*, 600 F.3d 900 (8th Cir. 2010). . . . . . . . . . . . . . . . . . 157

*Skilling v. United States*, 130 S.Ct. 2896 (2010). . . . . . . . . . . . . . . . . . . . . . 77, 78

*Smith v. Dretke*, 422 F.3d 269 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . 169

*State v. Gaskins*, 326 S.E.2d 132 (S.C. 1985). . . . . . . . . . . . . . . . . . . . . . . . . 149

*Stenson v. Lambert*, 504 F.3d 873 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . 157

*Swain v. Alabama*, 380 U.S. 202 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Taylor v. Louisiana*, 419 U.S. 522 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . 104

*United States v. Agofsky*, 516 F.3d 280 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . 128

*United States v. Agofsky*, 458 F.3d 369 (5th Cir. 2006). . . . . . . . . . . . . . . . . . . 113

*United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002)
. . . . . 62, 66, 77, 113, 114, 118, 119, 127, 136, 137, 138, 141, 144, 147, 156

*United States v. Bieganowski*, 313 F.3d 264 (5th Cir. 2002). . . . . . . . . . . . . . . . 138

*United States v. Bloomer*, 150 F.3d 146 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . 168

*United States v. Bourgeois*, 423 F.3d 501 (5th Cir. 2005). . . . . . . . . . . . . . . . . 118

*United States v. Branch*, 91 F.3d 699 (5th Cir. 1996). . . . . . . . . . . . . . . . . . . . 107

*United States v. Browner,* 889 F.2d 549 (5th Cir. 1989) . . . . . . . . . . . . . . 106, 108

*United States v. Bryant*, 991 F.2d 171 (5th Cir. 1993). . . . . . . . . . . . . . . . . . . . 81

*United States v. Burks*, 470 F.2d 432 (7th Cir. 1972). . . . . . . . . . . . . . . . . . . . 149

*United States v. Castro-Guevarra*, 575 F.3d 550 (5th Cir. 2009). . . . . . . . . . . . 146

*United States v. Causey*, 185 F.3d 407 (5th Cir. 1999). . . . . . . . . . . . . . . . . . . . 136

*United States v. Collins*, 690 F.2d 431 (5th Cir. 1982). . . . . . . . . . . . . . . . . . . . 108

*United States v. Davis*, 609 F.3d 663 (5th Cir. 2010). . . . . . . . . . . . . . . . . . 128, 147

*United States v. Dominguez Benitez*, 542 U.S. 74 (2004). . . . . . . . . . . . . . . . . . 92

*United States v. Dozier*, 672 F.2d 531 (5th Cir. 1982). . . . . . . . . . . . . . . . . . 85, 86

*United States v. Duncan*, 191 F. 3d 569 (5th Cir. 1999). . . . . . . . . . . . . . . . . . . 85

*United States v. Fields*, 483 F.3d 313 (5th Cir. 2007). . . . . . . . . . . . . . . 62, 64, 118

*United States v. Finley*, 477 F.3d 250 (5th Cir. 2007). . . . . . . . . . . . . 105, 106, 107

*United States v. Flores*, 63 F.3d 1342 (5th Cir. 1995). . . . . . . . . . . . 65, 73, 81, 128

*United States v. Flores*, 572 F.3d 1254 (11th Cir. 2009). . . . . . . . . . . . . . . . . . . 98

*United States v. Greschner*, 647 F.2d 740 (7th Cir. 1981). . . . . . . . . . . . . . . . . 149

*United States v. Gulley*, 526 F.3d 809 (5th Cir. 2008). . . . . . . . . . . . . 147, 148, 149

*United States v. Hall*, 152 F.3d 381 (5th Cir. 1998). . . . . . . . . . . . 89, 113, 146, 156

*United States v. Harrison*, 55 F.3d 163 (5th Cir. 1995). . . . . . . . . . . . 105, 106, 107

*United States v. Jackson*, 549 F.3d 963 (5th Cir. 2008)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66, 69, 71, 73, 75, 77, 91, 146, 157

*United States v. Jones*, 132 F.3d 232 (5th Cir. 1998)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113, 117, 126, 127, 133, 145, 146

*United States v. Ketchem*, 420 F.2d 901 (4th Cir. 1969). . . . . . . . . . . . . . . . . . 168

*United States v. Leahy*, 82 F.3d 624 (5th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . 95

*United States v. Lewis*, 476 F.3d 369 (5th Cir. 2007)................ 134, 135

*United States v. Mares*, 402 F.3d 511 (5th Cir. 2005). ..................... 91

*United States v. Martinez-Salazar*, 528 U.S. 304 (2000)............. 82, 83, 89

*United States v. McCord*, 695 F.2d 823 (5th Cir. 1983)..................... 90

*United States v. McVeigh*, 944 F. Supp. 1478 (D. Colo. 1996). ............. 147

*United States v. Mikos*, 539 F.3d 706 (7th Cir. 2008). .................... 172

*United States v. Miller*, 406 F.3d 323 (5th Cir. 2005). ..................... 91

*United States v. Munoz*, 15 F.3d 395 (5th Cir. 1994)................ 77, 85, 89

*United States v. Nguyen*, 493 F.3d 613 (5th Cir. 2007). ........... 139, 140, 141

*United States v. Olano*, 507 U.S. 725 (1993). ........................... 91

*United States v. Owens*, 2012 WL 1941836
    (5th Cir. May 30, 2012)................ 134, 135, 138, 139, 140, 141, 144

*United States v. Peltier*, 505 F.3d 389 (5th Cir. 2007)...................... 91

*United States v. Peterson*, 244 F.3d 385 (5th Cir. 2001). .................. 135

*United States v. Posada-Rios*, 158 F.3d 832 (5th Cir. 1998). ............... 135

*United States v. Powell*, 444 F. App'x 517 (3rd Cir. 2011). .................. 95

*United States v. Quiroz-Cortez*, 960 F.2d 418 (5th Cir. 1992)................ 95

*United States v. Rodriguez*, 833 F.2d 1536 (11th Cir. 1987)................ 168

*United States v. Smith*, 633 F.2d 739 (7th Cir. 1980)...................... 168

*United States v. Solomon*, 273 F.3d 1108 (5th Cir. 2001). . . . . . . . . . . . . . . . . . . 92

*United States v. Stone*, 53 F.3d 141 (6th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . 168

*United States v. Stotts*, 397 F. App'x 68 (5th Cir. 2010).. . . . . . . . . . . . . . . . . . . 92

*United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996). . . . . . . . . . . . . . . . . . . . . 136

*United States v. Turner*, 584 F.2d 1389 (8th Cir. 1978).. . . . . . . . . . . . . . . 168, 169

*United States v. Walton (In re Baker)*, 693 F.2d 925 (9th Cir. 1982). . . . . . . . . 168

*United States v. Webster*, 162 F.3d 308 (5th Cir. 1998)
. . . . . . . . . . . . . . . . . . . . . . . . 62, 66, 77, 81, 86, 87, 89, 126, 128, 133, 146

*United States v. Wharton*, 320 F.3d 526 (5th Cir. 2003). . . . . . . . . . . . . . . . . . . 81

*United States v. Whitfield*, 590 F.3d 325 (5th Cir. 2009). . . . . . . . . . . . . . . . . . . 90

*United States v. Williams*, 809 F.2d 1072 (5th Cir. 1987). . . . . . . . . . . . . . . . . 138

*Uttecht v. Brown*, 551 U.S. 1 (2007).. . . . . . . . . . . . . . . . . . . . . . . 63, 66, 67, 71

*Vanderbilt v. Collins*, 994 F.2d 189 (5th Cir. 1993). . . . . . . . . . . . . . . . . . . . . 111

*Wainwright v. Witt*, 469 U.S. 412 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . 63, 64

*Williams v. Meese*, 926 F.2d 994 (10th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . 101

*Witherspoon v. Illinois*, 391 U.S. 510 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Woodson v. North Carolina*, 428 U.S. 280 (1976). . . . . . . . . . . . . . . 147, 156, 161

*Wright v. Bell*, 619 F.3d 586 (6th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . 157

*Yohey v. Collins*, 985 F.2d 222 (5th Cir. 1993). . . . . . . . . . . . . . . . . . . . 171, 173

*Zafiro v. United States*, 506 U.S. 534 (1993). . . . . . . . . . . . . . . . . . . . . . . . 134, 135

*Zingher v. Yacavone*, 30 F. Supp. 2d 446 (D. Vt. 1997). . . . . . . . . . . . . . . . . 100

**Statutes and Rules:**

18 U.S.C. § 113(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

18 U.S.C. § 924(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

18 U.S.C. § 1111. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

18  U.S.C. § 1791(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

18 U.S.C. § 1956(h). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

18 U.S.C. § 1959. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

18 U.S.C. § 1962(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

18 U.S.C. § 3231. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3591(a)(2)(A), (B), (C), (D). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

18 U.S.C. § 3592 (c)(4), (5), (6), (9), (10), (12), (16). . . . . . . . . . . . . 5, 6, 114, 127

18 U.S.C. § 3593(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

18 U.S.C. § 3593(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146, 148

18 U.S.C. § 3595. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 113

18 U.S.C. § 3599(g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

18 U.S.C. § 3599(g)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61, 162

21 U.S.C. § 841(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

21 U.S.C. § 846. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

21 U.S.C. § 848(q)(10)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. 1865(b)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92, 101, 103

28 U.S.C. § 2244 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

29 U.S.C. § 794. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

29 U.S.C. § 794(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

29 U.S.C. § 794(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

42 U.S.C. § 12101(b)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

42 U.S.C. § 12131. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

42 U.S.C. § 12132. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

Fed. R. Crim. P. 14(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

Fed. R. Crim. P. 24(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Fed. R. Crim. P. 31(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

Fed. R. Crim. P. 52(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

Fed. R. Evid. 404(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

**Other:**

FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS, CRIMINAL, § 2.55 (2001). . . . . . 128

FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS, CRIMINAL, § 1.22 (2001). . . . . . 141

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

**UNITED STATES OF AMERICA**,

Plaintiff-Appellee,

v.

**MARK ISAAC SNARR AND
EDGAR BALTAZAR GARCIA**,

Defendants-Appellants.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION, NO. 1:09CR15

**BRIEF FOR THE UNITED STATES**

**STATEMENT OF JURISDICTION**

A jury convicted Defendant-Appellants Mark Isaac Snarr and Edgar

Baltazar Garcia of murder and determined that both should receive the death

penalty.  The district court (Crone, J.), who had jurisdiction under 18 U.S.C. §

3231, entered judgment on May 27, 2010.  Both Snarr and Garcia filed timely

notices of appeal on June 3, 2010.  This Court has jurisdiction over the

consolidated appeal under 18 U.S.C. §§ 3595 and 3742(a) and 28 U.S.C. § 1291.

# STATEMENT OF ISSUES

## ISSUES I-X: ISSUES RELATED TO JURY SELECTION

Issues I-V: A district court may excuse a prospective juror from a capital case if his views on the death penalty would prevent or substantially impair his performance as a juror in accordance with the court's instructions and the juror's oath. Here, after evaluating their demeanor, the district court excused five prospective jurors who would not impose the death penalty or who vacillated so much that the court could not discern their views. Did the court abuse its discretion?

Issues VI-VIII: In addressing a district court's failure to remove a prospective juror for cause, the Supreme Court focuses on the impartiality of the jurors actually seated. Here, after receiving ten additional peremptory challenges, the defendants exercised three challenges on prospective jurors that they had challenged for cause, but another juror the defendants desired to strike— who was not challenged for cause— was selected. Were the district court's rulings a manifest abuse of discretion?

Issues IX-X: A district court may, in its discretion, excuse a prospective juror who has a physical infirmity that impairs his capacity to serve on a jury. Here, the district court excused two veniremen— at their request— after determining that they had physical impairments to service. Did the court abuse its discretion?

## ISSUE XI: LESSER INCLUDED OFFENSE ISSUE

Issue XI: Courts must give a lesser-included-offense instruction only if a jury could rationally find a defendant guilty of the lesser offense while acquitting on the greater. The evidence overwhelmingly proved premeditation, which distinguishes first and second degree murder: Snarr and Garcia obtained weapons, tricked the guards into bringing them in together, attacked the guards for their keys, and taunted the victim while opening his cell. Did the district court correctly hold that no rational juror could have acquitted on first degree murder but convicted on second?

**ISSUES XII-XVIII:  SENTENCING ISSUES**

Issue XII:  Evidence showing that a murder involved suffering or mutilation beyond that necessary to cause death is sufficient to support a finding that the crime was committed in an especially heinous, cruel, or depraved manner.  Here, Snarr and Garcia stabbed the victim more than 50 times in a frenzied manner.  Did the district court err in submitting the "especially heinous, cruel, or depraved" statutory aggravating factor to the jury?

Issue XIII:  When life imprisonment without parole is an alternative to the death penalty, proof of the non-statutory aggravating factor of future dangerousness may include evidence that a defendant poses a safety threat in prison.  Along with substantial evidence of the defendants' violent acts in prison and out, the government rebutted their expert testimony that Snarr and Garcia might be held in the ADX indefinitely.  Did the district court err in submitting the non-statutory aggravating factor of future danger to the jury?

Issue XIV:  The statutory aggravating factor of "substantial planning and premeditation" contemplates a considerable or significant amount of both.  Here, Snarr and Garcia obtained shanks, carried them to recreation, manipulated the guards into bringing them back to the range at the same time, stabbed two guards to get keys, and struggled to open the victim's cell for nearly a minute before murdering him.  Did the district court err in submitting "substantial planning and premeditation" to the jury?

Issue XV:  A district court should grant a severance only if a joint trial poses a serious risk of compromise to a specific trial right or prevents the jury from making a reliable judgment about guilt.  Here, the defendants fail to demonstrate specific, compelling prejudice occasioned by their joint trial.  Given the district court's careful instructions regarding separate consideration of the evidence for each defendant, did the court abuse its discretion by denying their motions to sever?

Issue XVI:  As the defendants acknowledge, this Court has determined that the relaxed evidentiary standards applied during a capital sentencing hearing do not render the Federal Death Penalty Act unconstitutional.  Although

conceding that this issue is foreclosed, defendants raise it to preserve the claim.  Did the district court err in declining to declare the FDPA unconstitutional?

Issue XVII:  During a capital sentencing, the defendant may offer relevant mitigating evidence— without regard to the Federal Rules of Evidence— unless its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.  Here, the district court excluded as irrelevant and unduly prejudicial character evidence of the victim of which the defendants were unaware when they murdered him, but allowed reputation evidence and prior acts they knew about.  Did the court abuse its discretion?

Issue XVIII:  Evidence about the effect a defendant's execution might have on his family and friends is not mitigating because it does not reflect on his background, character, or the circumstances of his crime.  After the government submitted no victim-impact evidence and Garcia offered substantial mitigating evidence, the district court declined to permit a speculative statement regarding the effect Garcia's execution might have on his family.  Did the court err?

## ISSUE XIX:  EXPERT FUNDING ISSUE

Issue XIX:  If the costs for reasonably necessary experts and investigators assisting indigent capital defendants exceed $7,500, they must by certified by the lower court and approved by the chief judge of the circuit.  After careful review, the Chief Judge of this Court reduced expert funds approved for Garcia and denied funding for a cultural expert; nevertheless, Garcia presented an adequate case in mitigation.  If this Court's orders reducing or denying funding are appealable, did the Court err?

## STATEMENT OF THE CASE

On January 21, 2009, a federal grand jury in the Eastern District of Texas

returned a one-count indictment against Snarr and Garcia, charging them with the

murder of Gabriel Rhone, in violation of 18 U.S.C. §§ 1111 and 2.  Snarr USCA5

26-29; Garcia USCA5 41-44.[1]  The indictment provided notice of special findings

for both defendants.  Snarr USCA5 26-26; Garcia USCA5 42-43.  In addition to

alleging that both defendants were 18 years or older at the time of the offense, the

indictment alleged the four statutory intent elements required for imposition of the

death penalty.[2]  Snarr USCA5 26-27; Garcia USCA5 43.  The indictment also

alleged five statutory aggravating factors for the death penalty against Snarr [3] and

---

[1]  The record on appeal consists of the three volumes of pleadings for Snarr and two sealed transcripts.  It will be referred to by "Snarr USCA5" followed by the USCA5 page numbers.  The first supplemental record on appeal contains the trial transcripts for Snarr.  It is used as the primary source for trial citations in this brief and will be referred to as "USCA5" followed by the page number.  The pleadings and trial transcripts for Garcia are contained in the second supplemental record on appeal and are referred to by "Garcia USCA5."  Government exhibits are referred to by "G Ex."  Defense exhibits are referred to by "D Ex."

[2]  The indictment alleged that both defendants (1) intentionally killed the victim; (2) intentionally inflicted serious bodily injury that resulted in the death of the victim; (3) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and the victim died as a direct result of the act; and (3) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than a participant in the offense, such that participation in the act constituted a reckless disregard for human life, and the victim died as a direct result of the act.  Snarr USCA5 26-27; Garcia USCA5 43; *see* 18 U.S.C. § 3591(a)(2)(A)-(D).

[3]  The indictment alleged that Snarr committed the offense (1) after having previously been convicted of two or more federal or state offenses, punishable by a term of imprisonment of more than one year, committed on different occasions, involving the infliction of, or attempted infliction of, serious bodily injury or death of another person; (2) during which he knowingly created a grave risk of death to one or more persons in addition to the victim; (3) in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim; (4) after substantial planning and premeditation to cause the death of another person; and (5) intentionally killing or intending to kill more than one person in the single criminal episode.  Snarr USCA5 27; *see* 18 U.S.C. § 3592 (c)(4), (5), (6), (9), (16).

5

seven statutory aggravating factors for Garcia.[4]  Snarr USCA5 27; Garcia USCA5

43.

On February 4, 2009, the United States filed a notice of intent to seek the

death penalty against Snarr.  Snarr USCA5 35.  The notice alleged the same

statutory intent elements and aggravating factors found in the indictment.[5]  Snarr

USCA5 35-37.  It also alleged seven non-statutory aggravating factors.[6]  Snarr

USCA5 37-38.  The government filed a notice of intent to seek the death penalty

---

[4]  The indictment alleged that Garcia committed the offense (1) after having previously
been convicted of two or more federal or state offenses, punishable by a term of imprisonment of
more than one year, committed on different occasions, involving the infliction of, or attempted
infliction of, serious bodily injury or death of another person; (2) during which he knowingly
created a grave risk of death to one or more persons in addition to the victim; (3) in an especially
heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the
victim; (4) after substantial planning and premeditation to cause the death of another person; (5)
after having previously been convicted of two or more federal or state offenses, punishable by a
term of imprisonment of more than one year, committed on different occasions, involving the
distribution of a controlled substance; (6) having previously been convicted of either (i) a
violation of Title II or III of the Comprehensive Drug Abuse and Control Act of 1970 for which a
sentence of five years or more could be imposed or (ii) for engaging in a continuing criminal
enterprise; and (7) intentionally killing or intending to kill more than one person in the single
criminal episode.  Garcia USCA5 43; *see* 18 U.S.C. § 3592 (c)(4), (5), (6), (9), (10), (12), (16).

[5]  For the first statutory aggravating factor, alleging prior felony convictions involving
serious bodily injury or death of another person, the notice specified that Snarr was convicted of
the following:  aggravated assault by a prisoner, Second District Court, Farmington-Davis
County, Utah, June 10, 2004; a federal Racketeer Influenced and Corrupt Organization (RICO)
conspiracy, District of Utah, August 12, 2005; possession of a weapon by a federal inmate,
Eastern District of Texas, October 15, 2007.  Snarr USCA5 36.

[6]  The first five non-statutory aggravating factors related to future dangerousness based on
Snarr's continuing pattern of violence, institutional misconduct, lack of remorse, low likelihood
of rehabilitation, and membership in racist gangs.  Snarr USCA5 37-38.  The two other non-
statutory aggravating factors focused on victim impact and the vulnerable nature of the victim.
Snarr USCA5 38.

against Garcia the same day.  Garcia USCA5 50-55.  The notice alleged the same statutory intent elements and aggravating factors found in the indictment.[7]  Garcia USCA5 50-53.  It also alleged seven non-statutory aggravating factors.[8]  Garcia USCA5 53-55.

The defendants filed numerous pre-trial motions.  Those relevant to this appeal will be addressed within the argument.  Before trial, the district court raised the issue of whether Snarr and Garcia would require extra peremptory challenges.  USCA5 81-95, 100-103.  The court ultimately gave the defendants ten additional peremptory challenges that they could divide or exercise jointly, resulting in a total of 30 peremptory challenges for Snarr and Garcia.  USCA5 231-34.

---

[7]  For the first statutory aggravating factor, the notice specified that Garcia was convicted of deadly conduct in the 350th District Court, Taylor County, Texas, on December 8, 1998; that he was convicted of possession of contraband in prison in federal court in the Western District of Virginia on April 9, 2004; and that he was convicted of assault with a dangerous weapon in federal court in the Eastern District of Texas on October 23, 2007.  Garcia USCA5 51.  For the fifth factor, the notice specified that, on June 28, 2002, Garcia was convicted of the following crimes in federal court in the Northern District of Texas:  conspiracy to distribute and possess with intent to distribute in excess of five kilograms of cocaine, in excess of 500 grams of methamphetamine, and in excess of 100 kilograms of marijuana; possession with intent to distribute methamphetamine; distribution of methamphetamine; distribution of cocaine; possession with intent to distribute cocaine; and possession with intent to distribute cocaine base.  Garcia USCA5 52-53.

[8]  The non-statutory aggravating factors were basically identical to those alleged against Snarr, except that two of Garcia's referred to an uncharged murder of Jacob Ponce in 1998.  Garcia USCA5 53-55.

Jury selection began on April 6, 2010, with initial juror qualification and the panel's completion of an extensive questionnaire. USCA5 289-579. Individual voir dire occurred over 11 days between April 12-26. USCA5 606-3120. Before exercising their peremptory challenges, Snarr and Garcia moved for "one or more" additional challenges. USCA5 653-55. The district court denied their motions. USCA5 660.

The court divided the trial into three phases: guilt/innocence, eligibility for the death penalty, and selection of sentence. The guilt/innocence phase of the trial began on May 3, 2010. USCA5 3358. The jury heard evidence for four days and retired to deliberate on May 7. USCA5 3380-4341, 4426. It took the jury slightly more than one hour to return guilty verdicts against both defendants. USCA5 4430.

The eligibility phase began on May 10. USCA5 4435. Two days later, the jury found both defendants eligible for the death penalty. USCA5 4944-47.

The selection phase commenced on May 12. USCA5 4950. On May 21, the unanimous jury selected the death penalty for both Snarr and Garcia. USCA5 6593, 6606-07. The district court sentenced the defendants to death immediately after the verdict and entered its written judgment on May 25. USCA5 6613-16; Snarr USCA5 832; Garcia USCA5 1067. The court entered amended judgments

for both defendants two days later. Snarr USCA5 838; Garcia USCA5 1073.

Snarr and Garcia each filed a timely notice of appeal on June 3. Snarr USCA5

843; Garcia USCA5 1078.

**STATEMENT OF FACTS**

## I. Facts proved during the guilt/innocence phase of the trial

On November 28, 2007, Snarr and Garcia were inmates at the United States

Penitentiary in Beaumont, Texas (USP-Beaumont).[9] USCA5 4310. Both were

classified as "single-cell" inmates, housed in USP-Beaumont's special housing

unit, or SHU,[10] while they awaited transfer to the federal administrative maximum

security prison (the ADX) in Florence, Colorado.[11] USCA5 3393, 3482, 3495-96.

As such, they had no cell mates and spent their allotted recreation time— one hour

---

[9] USP-Beaumont is in the Eastern District of Texas. USCA5 3386. The parties stipulated that USP-Beaumont is within the special maritime and territorial jurisdiction of the United States. USCA5 3394; G Ex. 2A, 2B.

[10] The SHU housed inmates who needed extra security or who were being punished. Unlike inmates in a penitentiary's general population, SHU inmates were confined to their cells most of the time, generally spending 23 hours locked in their cells with one hour of recreation each day. USCA5 3605-06, 3761, 3764. The SHU at USP-Beaumont was a two-story unit containing four hallways with cells, referred to as the A, B, C, and D ranges. USCA5 3390; G Ex. 21. Entry to the SHU was controlled by a sally port and each range within the SHU had only one entrance. USCA5 3398-3401; G Ex. 21. The SHU had a separate recreation area consisting of six outdoor cages built along an outdoor hallway. USCA5 3391; G Ex. 21. Inmates were restrained when being escorted from their cells to the recreation cages. USCA5 3392.

[11] The ADX offers the highest level of security in the federal prison system. USCA5 3552-53.

9

per day— alone in one of the SHU's recreation cages.  USCA5 3393.  Snarr and Garcia were each classified as "three man holds," which meant that they were to be escorted by three correctional officers when out of their cells and were not to be moved while other inmates were in the range hallway.  USCA5 3506-07, 3511-12.

Both Snarr and Garcia were housed on the SHU's "D" range, with Snarr in cell D-8 and Garcia in cell D-10.  USCA5 3493.  Inmate Gabriel Rhone and his cell mate, Ricardo Pallaret, shared cell D-11.  USCA5 3402-03, 3493, 3526.

The morning of November 28, 2007, was not normal in the SHU at USP-Beaumont.  USCA5 3610-11, 3613, 3772-73, 3813-16.  Fire alarms were sounding, a guard had been injured by an inmate, one of the ranges had flooded, and the SHU was short staffed.  USCA5 3613, 3657-60, 3669, 3772.  When correctional officers Dewight Baloney, William Bertrand, and Josh McQueen arrived around 1:30 p.m. for the afternoon shift, several inmates had been left outside for recreation longer than one hour because the morning-shift staff had been dealing with these other issues.  USCA5 3610-11, 3613-14, 3664, 3772-73, 3816.

At approximately 2:30 p.m., Baloney, Bertrand, McQueen, and probationary officer Edwin Lavine began escorting the inmates in the recreation cages back to their cells.  USCA5 3505-06, 3615-16, 3776, 3816; D Ex. 51 at 9 and n.4.  All of

the inmates at recreation were "three man holds."  USCA5 3776, 3817-18.  Two

inmates, both of whom were housed on the D range with Snarr and Garcia, refused

to leave the recreation cages, so the officers decided to remove the others before

forcibly extracting them.[12]  USCA5 3819-20, 3826.  Snarr and Garcia, whom

Baloney did not know, were in the two cages nearest to the exit.  USCA5 3609,

3615.  Baloney and Bertrand handcuffed Garcia for escort back to his cell.

USCA5 3615-16, 3820.  Snarr began to shout that he needed to go to the restroom.

USCA5 3615-16, 3618, 3820.  Baloney, who was not aware that Garcia was on

three-man-hold status, then began moving Garcia without assistance.  USCA5

3616, 3618, 3674.  Because of Snarr's claim that he needed to use the restroom

and in the interest of clearing the recreation yard before dealing with the problem

inmates, the other officers decided to remove Snarr, too.  USCA5 3820-21.

Bertrand placed handcuffs on Snarr, and McQueen and Lavine escorted him to the

D range.[13]  USCA5 3776-80, 3822-23, 3825.

When Baloney and Garcia entered the D range, Baloney began checking the

photo identification on the cell doors to locate Garcia's cell.  USCA5 3619-20;

---

[12]  One of the inmates, Frankie Delacruz, was a member of the same prison gang as
Garcia, the Texas Syndicate.  USCA5 3941-42; *see* n.29 and section IV.B.(3). below.

[13]  McQueen knew it was against policy to move an inmate on three-man-hold status with
less than three staff members, but he was more concerned about moving two inmates on that
status at the same time.  USCA5 3778-79.

GX 3A at 14:34:38-14:35:04.  Unbeknownst to Baloney, McQueen and Lavine

brought Snarr into the range approximately twelve seconds behind him and

Garcia.  USCA5 3637-38; G Ex. 3A at 14:34:50.  Someone had left an envelope

leaning against Garcia's cell door, so Baloney bent over to retrieve it.  USCA5

3620-21, 3639-40; G Ex. 3A at 14:35:04-14:35:09.  At the same time, McQueen

started to unlock Snarr's cell, but stopped when he saw that Snarr had slipped out

of his handcuffs [14] and was holding a shank.[15]  USCA5 3780; G Ex. 3A at

14:35:06-14:35:12; *see also* USCA5 3430-31.  McQueen immediately activated

his body alarm.[16]  USCA5 3783.  As Baloney stood up, Snarr moved toward him.

USCA5 3622; G Ex. 3A at 14:35:10-14:35:12.  Thinking that Snarr was going to

attack Garcia, Baloney turned his back to Garcia, positioning himself between the

two.  USCA5 3622, 3643-45; G Ex. 3A at 14:35:12.  Garcia, who had also

"slipped his cuffs," then stabbed Baloney in the back as Snarr attacked him from

the front.  USCA5 3433, 3622-23; G Ex. 3A at 14:35:13-14:35:15.  Both inmates

had shanks.  USCA5 3785.  The pair continued attacking Baloney as he struggled

---

[14]  Aware that Snarr was proficient at slipping out of his handcuffs, McQueen had reported prior incidents to supervisors and had written an incident report about it.  USCA5 3791. But he had never seen Snarr "slip his cuffs" outside of his cell.  USCA5 3793.

[15]  Homemade knives are referred to as "shanks" by inmates.  USCA5 3412-13.

[16]  For safety, correctional officers are not armed.  USCA5 3418-19.  Instead, they wear body alarms.

to get to the range door at the end of the hall, stabbing him 23 times in approximately 15 seconds.[17] USCA5 3434, 3623-25, 3649; G Ex. 3A at 14:35:15-14:35:31.

When Baloney and, then, Lavine escaped from the D range through the glass entry door, Snarr and Garcia turned on McQueen, who had fallen behind. USCA5 3435, 3625-26, 3784; G Ex. 3A at 14:35:31-14:35:45. Snarr stabbed McQueen while demanding the cell door keys. USCA5 3625-26, 3786-87; G Ex. 3A at 14:35:31-14:35:45. During the struggle, McQueen was kneed in the stomach, he fell down, and Garcia stabbed him in the rib cage. USCA5 3436, 3787; G Ex. 3A at 14:35:46-14:35:52. Snarr grabbed McQueen's keys, and he and Garcia ran back down the hall to Rhone's cell. USCA5 3787-88; G Ex. 3A at 14:35:52-14:35:56. Bertrand, who had remained on the recreation range until he heard the body alarms, assisted McQueen from the range.[18] USCA5 3437, 3788-89, 3825-27; G Ex. 3A at 14:35:57-14:36:53. The entry door to the range was then locked.[19] USCA5 3437, 3828-29, 3411.

---

[17] Hospitalized for three days due to his injuries, Baloney did not return to work after the attack. USCA5 3627, 3654.

[18] After the incident, McQueen spent some time on leave and was eventually given the option of returning to work or being fired. USCA5 3795. He chose the latter. USCA5 3795.

[19] When an incident occurs on a range, officers lock the door to contain the situation in the smallest area possible while more staff and munitions are brought to the site. USCA5 3415-

As Snarr struggled for nearly one full minute to unlock Rhone's cell, Garcia yelled, "We're going to kill you," and kicked the cell door. USCA5 3439-40, 3926-27, 3939; G Ex. 3A at 14:35:57-14:36:53. When the door opened, Rhone burst from the cell and Snarr and Garcia began attacking him. USCA5 3410; G Ex. 3A at 14:36:54-14:36:57. While officers watched from behind the glass entry door, Snarr and Garcia stabbed Rhone repeatedly as all three moved toward the range door. USCA5 3410-11, 3412, 3443, 3927-29; G Ex. 3A 14:36:58-14:37:25. At one point, Rhone broke away and ran for the door, pursued by Garcia and Snarr. USCA5 3411, 3443-45, 3929-31, 3940; G Ex. 3A at 14:37:15-14:37:21. Keenan Hurt, the inmate locked in cell D-7, heard either Snarr or Garcia say, "You want us to suck your dick."[20] USCA5 3910, 3931. At the door, Snarr and Garcia continued stabbing Rhone, despite officers commands that they stop. USCA5 3416, 3420, 3445-46, 3491-92, 3862-63, 3871-72; G Ex. 3A at 14:37:21-14:37:56. In a "frenzy," the pair kept attacking Rhone even when an officer sprayed pepper

---

16. Officers do not intervene in an attack by an armed inmate until appropriate staff and equipment are in place. USCA5 3417.

[20] Hurt recalled that, "[o]ne day [Rhone] was walking down the range; and he say, 'Whoever ain't Muslim on this tier can suck my dick; and if you want to see me outside, we can see each other.'" USCA5 3967-68; Appellants' Br. at 114.

gas on them through the food slot[21] in the range door. USCA5 3421-23, 3863. Snarr and Garcia backed away slightly when the officer emptied the can of pepper gas, but did not fully retreat until officers positioned a 37-millimeter gas gun in the slot. USCA5 3421-22, 3446-47, 3864; G Ex. 3A at 14:37:56-14:38:54. Officers were then able to open the door and retrieve Rhone. USCA5 3449-52; G Ex. 3A at 14:38:54-14:39:08.

As Snarr and Garcia retreated, Garcia yelled, "That's how you get your enemy." USCA5 3932; G Ex. 3A at 14:38:40-14:38:51. Hurt asked why they had attacked Rhone, and Snarr replied: "On my skin, bro. On my skin, bro. This ain't got nothing to do with race. This don't got nothing to do with race. Dude disrespected us, and that's what he got." USCA5 3932-33, 3940; G Ex. 3A at 14:38:51-14:39:10. Garcia then gestured, indicating that Rhone talked too much. USCA5 3933, 3941; G Ex. 3A at 14:38:51-14:39:10.

After the officers removed Rhone from the range to begin resuscitation attempts, Snarr and Garcia surrendered their shanks and permitted the officers to handcuff and remove them, too. USCA5 3452-53; G Ex. 3A at 14:39:24-14:41:57. Both were covered in blood, as were portions of the range. USCA5

---

[21] "Food slots" are small doors built into cell and range doors that are used, among other things, to put on or remove handcuffs. USCA5 3427.

15

3457-58, 3461-62, 3468-73; G Ex. 4H, 4I, 4J, 5A-5V, 9A-9L, 10A-10O.  Later

that day, Snarr told an officer that he had given them 18 months to transfer him to

the ADX and that, if he was going to remain "stuck" in USP-Beaumont, this is

what they would get.[22]  USCA5 3484.  Snarr said, "You're going to have to move

me now, aren't you?"  USCA5 3484.  Garcia also told the officer, "Yeah, well,

you're going to ship me now."  USCA5 3484-85.

When officers removed Rhone from the range, he appeared to be dead.

USCA5 3478-80; G Ex. 13A-13G.  Despite resuscitation attempts, Rhone was

officially pronounced dead at a local hospital in Beaumont.  USCA5 3712-13,

3866.  He suffered 50 stab wounds, 18 on the front and 32 on the back.  USCA5

3724, 3728-40; G Ex. 15, 15A-15Y.  Caused by two different instruments, most of

the wounds were to Rhone's upper body.  USCA5 3724-25, 3754.  One of the

wounds was to Rhone's heart; three were to his liver; and two were to his left

lung.  USCA5 3725-28.  The cause of death was listed as "multiple stab wounds of

the heart, lung, and liver," and the injury to Rhone's heart was the fatal wound.

USCA5 3741, 3748.

---

[22]  Although both Snarr and Garcia were designated for the ADX, their transfers had been
delayed by additional charges in the Eastern District of Texas.  USCA5 3564-65.  Garcia had
entered a guilty plea and was sentenced on October 31, 2007.  USCA5 4318-19.  Snarr also had
entered a guilty plea and was still awaiting sentencing.  USCA5 4319.

## II. Evidence presented by Snarr and Garcia

Snarr and Garcia called USP-Beaumont Correctional Officer Dawn Gallagher, who testified that Rhone ejaculated on her foot through the food slot in his cell door on November 12, 2007. USCA5 4115-18. Gallagher stated that Snarr and Garcia were offended by Rhone's conduct and that Snarr had asked if she wanted him to "get" Rhone for her. USCA5 4119-20; *but see* USCA5 4135-36. Gallagher responded that there would be no "getting" anyone. USCA5 4120. Gallagher also testified about a confrontation she had with an inmate after another inmate tried to hang himself, all of which contributed to the tension and disorder in the SHU on the morning of the murder. USCA5 4120-23.

The defendants also called inmate Ricardo Pallaret, Rhone's cell mate at the time of the murder. USCA5 4194. Pallaret claimed that Rhone was angry when he returned from the recreation cages on the day before the murder. USCA5 4195. Pallaret stated that Rhone shouted, paced, and kicked the bathroom in his cell, USCA5 4196, and that Rhone later stood near the cell door and yelled threats and insults at Garcia, calling him "rice and beans." USCA5 4196-98. Pallaret claimed that Rhone called both Snarr and Garcia "devils," threatened both, and made other racial slurs. USCA5 4198-4200. Pallaret stated that the alleged rant continued from 6:00-7:00 p.m. until 2:00 or 3:00 a.m. on the morning Snarr and Garcia

17

murdered Rhone, stopping only when the guards went by.  USCA5 4196, 4199.

Pallaret had failed to mention the specific threats, however, when questioned

shortly after the murder.[23]  USCA5 4201-06.

Finally, Snarr and Garcia called retired Bureau of Prisons administrator

Mark Bezy, who was a prison consultant.  USCA5 4245-48.  Bezy described

various BOP policy violations at USP-Beaumont.  USCA5 4251-93.  He

concluded that the defendants would not have been able to murder Rhone in the

manner they did on November 28, 2007, if the guards had followed BOP

procedures.  USCA5 4299-4300, 4324-25.  Bezy admitted that inmates study

guards, watching for opportunities to exploit weaknesses, and that Snarr and

Garcia used their knowledge of guard behavior to murder Rhone.  USCA5 4328-

30.  Bezy testified that USP-Beaumont could have expedited the defendants'

transfers to the ADX unit in Colorado, but acknowledged that court permission is

required to transfer inmates with cases pending in the district where they are

imprisoned.  USCA5 4294-97, 4314-18.

---

[23]  On rebuttal, the government called FBI Special Agent Steve Hanley, who remembered questioning Pallaret specifically about why the defendants might want to hurt Rhone.  USCA5 4333-35.  Pallaret stated that Rhone was a racist who "ran his mouth a lot," but did not mention any of the threats that became the crux of Pallaret's trial testimony.  USCA5 4334-45; G. Ex. 59.

### III. Evidence presented during the eligibility phase

The government offered all evidence from the guilt/innocence phase of the trial during the eligibility segment. USCA5 4474-75.

**A. Additional evidence relevant to Snarr**

The parties stipulated that Snarr was older than 18 years of age on the date of Rhone's murder. USCA5 4475; G Ex. 25. The government then presented the following evidence:

**(1). Utah state conviction:** On January 8, 2004, Snarr stabbed another inmate with a sharpened toothbrush while incarcerated in Davis County, Utah, for a parole violation. USCA5 4484, 4487; G Ex. 26A. A state jury convicted Snarr of aggravated assault by a prisoner, in violation of Section 103.5, Part 1, Title 76, Chapter 5 of the Utah Code, a second degree felony, which required a finding that the offense involved serious bodily injury or use of a dangerous weapon or some other means of force likely to produce death or serious bodily injury. USCA5 4481, 4488, 4489; G Ex. 26A. On June 10, 2004, Snarr was sentenced to not less than one year or more than fifteen years. USCA5 4486-87; G Ex. 26B.

**(2). Federal RICO conviction:** On December 4, 2003, a federal grand jury indicted Snarr and eleven others for participating in a Racketeer Influenced and Corrupt Organizations (RICO) conspiracy, in violation of 18 U.S.C. § 1962(d).

USCA5 4500-03; G Ex. 27A at 1-16.  Snarr was also indicted for two specific violent acts in aid of racketeering, in violation of 18 U.S.C. § 1959.  USCA5 4503; G. Ex 27A at 20-21.  The indictment was based on crimes committed by the "Soldiers of Aryan Culture" (SAC), an organized white-supremacy gang that began in the Utah state prison system and engaged in violent crime both within and outside of prison.  USCA5 4495-98; G Ex 27A at 1-16.  Snarr was an SAC lieutenant.  USCA5 4505; G Ex. 27B at 1.

Snarr pleaded guilty to the RICO conspiracy in June 2005.  USCA5 4504.  He signed a factual basis concerning his involvement with the SAC.  USCA5 4503-11; G Ex. 27B.  Snarr admitted that he committed, or assisted others in committing, violent crimes for the SAC, including assault and attempted murder.  USCA5 4507-08; G Ex. 27B at 3.  Specifically, Snarr admitted that, while in an Utah state prison, he aided in attacking another inmate on January 22, 1998, because the victim refused to assault or kill a rival gang member.  USCA5 4511-12; G Ex. 27B at 3.  The victim, Clinton Alls, testified that Snarr and two other inmates came into the cell he shared with Snarr.  USCA5 4533-34.  One of the other inmates began beating Alls, and Snarr cut Alls with a razor blade in an effort to remove Alls's SAC tattoo.  USCA5 4533-35.  Alls required medical treatment

for the cuts.  USCA5 4536.  On August 11, 2005, Snarr was sentenced to 188 months' imprisonment for the RICO conspiracy.  USCA5 4513; G Ex. 27C.

(3).  **Federal prison conviction:**  On February 19, 2007, Snarr stabbed his cell mate, Canyon Mason, USCA5 5333, with a shank while they were in their cell in the USP-Beaumont SHU, USCA5 4544-46, 4553-54.  Snarr tried to dispose of the weapon by flushing it down the toilet, but officers were able to retrieve it.  USCA5 4547, 4555-58; G Ex. 28A-28D.  When asked why he attacked Mason, Snarr replied, "You guys know why it happened."  USCA5 4558-59.  Snarr also asked why his transfer to the ADX was taking so long.  USCA5 4559.  Mason suffered seven puncture wounds to his upper chest and abdomen, none of which were life threatening.  USCA5 4561, 4571-72 4577-78; G Ex. 28E.  Mason refused to fully cooperate, USCA5 4592, so Snarr was indicted in the Eastern District of Texas for possession of a prohibited object, the shank, USCA5 4581.  Snarr plead guilty to the charge on October 15, 2007, USCA5 4581,4584; G. Ex. 28G, but sentencing was delayed because of Rhone's murder, USCA5 4586-88.  On March 19, 2009, Snarr was sentenced to 46 months' imprisonment for possessing the shank.  USCA5 4588-89; G Ex. 28H.  The court ordered the sentence to run consecutively to Snarr's prior RICO sentence.  USCA5 4589.

21

**(4). Additional Information:** In addition to the crimes listed above, the government called inmate John L. Franklin, who was in the Federal Detention Center in Houston, Texas, when Snarr was housed there in 2009. USCA5 4713-22, 4728-33; G Ex. 34A, 34B. At recreation one day, Snarr told Franklin that he had "put in some work at Beaumont," meaning that he had stabbed someone. USCA5 4602-04. When Snarr found out that Franklin— like Rhone— was from Washington D.C., Snarr told Franklin that he had gotten into it with one of Franklin's "homeys," explaining that the homey was "making a lot of noise, banging on the door, singing, hollering, whatever." USCA5 4605. When Snarr complained, "the homey" cursed at him. USCA5 4605. Franklin testified that Snarr claimed that this conduct continued for several days, so "he waited till some— till some guards that he really didn't care for, guards that's kind of more relaxed on security was coming and he was able to break out his cuffs when they was coming back from rec, stabbed the guards to get the keys from them, go in the cell, and put in work on my homey." USCA5 4605. Snarr said a member of the Texas Syndicate helped him. USCA5 4605. Snarr referred to the victim as a "cell

warrior,"[24] who was disrespectful.  USCA5 4606-09.  Snarr also bragged that

USP-Beaumont had closed down because of the attack.  USCA5 4609-10.

**B.  Additional evidence relevant to Garcia**

The parties stipulated that Garcia was older than 18 years of age on the date

of Rhone's murder.  USCA5 4632; G Ex. 29.  The government then presented the

following evidence:

**(1).  Federal Drug Convictions:**  A grand jury in the Northern District of

Texas indicted Garcia and approximately thirty co-defendants for conspiring to

distribute and possess with the intent to distribute cocaine, methamphetamine, and

marijuana from 1996 until January 8, 2002, in violation of 21 U.S.C. § 846.

USCA5 4634-35, 4638; G Ex. 31.  The multiple-count indictment also charged

Garcia with other offenses, including conspiracy to launder money, in violation of

18 U.S.C. § 1956(h); possession with intent to distribute and distribution of

methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) and (C);

possession of a firearm in furtherance of a drug trafficking crime, in violation of

18 U.S.C. § 924(c); and possession with intent to distribute and distribution of

cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(iii) and (C) and

---

[24]  In prison vernacular, a "cell warrior" is an inmate who speaks disrespectfully to other inmates from the safety of his cell.  USCA5 4606-07.

(b)(1)(B)(ii). USCA5 4639-48; G Ex. 31. Garcia pleaded guilty to the conspiracy (Count 1),[25] which involved more than five kilograms of cocaine, more than 500 grams of methamphetamine, and more than 100 kilograms of marijuana. USCA5 4638-39; G Ex. 31. He also pleaded guilty to one count of possession with intent to distribute methamphetamine (Count 10); one count of distribution of methamphetamine (Count 13); two counts of distribution of cocaine (Counts 15 and 16); one count of possession with intent to distribute cocaine (Counts 24); and one count of possession with intent to distribute cocaine base, or "crack" (Count 26). USCA5 4639-48; G Ex. 31. Finally, Garcia pleaded guilty to one money laundering count (Count 8) and the Section 924(c) violation (Count 11). USCA5 4639-40; G Ex. 31.

The conspiracy count, the possession with intent to distribute methamphetamine count, the distribution of methamphetamine count, the two distribution of cocaine counts, the possession with intent to distribute cocaine count, and the possession with intent to distribute cocaine base count all constituted violations of Title II or III of the Comprehensive Drug Abuse Prevention and Control Act of 1970 and carried possible sentences of five or more

---

[25] Count references are to the superseding indictment returned on January 12, 2002, in *United States v. Edgar Baltazar Garcia*, No. 1:02-CR-0003-01-C, United States District Court, Northern District of Texas, Abilene Division.

years' imprisonment.  USCA5 4638-39.  On June 28, 2002, Garcia was sentenced to 420 months in prison for four of the drug counts (Counts 1, 10, 24, 26).  USCA5 4648-49; G Ex. 31.  He was sentenced to 240 months for the money laundering count (Count 8) and the other three drug counts (Counts 13 15, 16), all to be served concurrently with the 420 months for the other drug counts.  USCA5 4648-49; G Ex. 31.  Garcia received a sentence of 60 months for the Section 924(c) count (Count 11), which was to be served consecutively to the 420 months, yielding a total sentence of 480 months.  USCA5 4649-50; G Ex. 31.

**(2).  Deadly Conduct Conviction:**  On May 26, 1998, Garcia and others shot at a residence in Abilene, Texas.  USCA5 4653-55, 4670-79, 4681-83, 4700-03.  He was charged in Texas state court with deadly conduct, in violation of Tex. Penal Code § 22.05(b)(2), a third degree felony that carried a possible sentence of not more than ten or less than two years' imprisonment or up to one year in a community correctional facility and a fine of up to $10,000.  USCA5 4664-68; G Ex. 30B.  Garcia pleaded guilty to the charge on December 8, 1998, and was sentenced to six years' probation and a $1,000 fine.  USCA5 4664-65; G Ex. 30A.

**(3).  Possession of Contraband at USP-Lee County:**  On July 15, 2003, Garcia possessed a shank while imprisoned at the United States Penitentiary in Lee County, Virginia.  USCA5 4685-90.  He was charged with a violation of 18

U.S.C. § 1791(a)(2), possession of contraband in prison, a federal felony that carried a possible term of imprisonment for more than one year. USCA5 4690; G Ex. 32B. Garcia was convicted of the offense. USCA5 4686-89. He was sentenced to 30 months' imprisonment, to be served consecutively to the 480 month sentence he was already serving. USCA5 4690-91; G Ex. 32B.

(4). **Assault on Ruiz at USP-Beaumont:** On August 26, 2006, Garcia and Frank Delacruz attacked inmate Jose Ruiz at USP-Beaumont. USCA5 4739; G Ex. 32B. In addition to hitting and punching Ruiz, Garcia stabbed Ruiz approximately 21 times in the head and body with a shank. USCA5 4742-43; G Ex. 32B. A federal grand jury in the Eastern District of Texas charged Garcia with assault with a dangerous weapon, in violation of 18 U.S.C. § 113(a)(3), and possession of a prohibited object, in violation of 18 U.S.C. § 1791(a)(2). USCA5 4739-40; G Ex. 33C. He entered a plea of guilty to the assault charge and, on October 23, 2007, was sentenced to imprisonment for 96 months, to be served consecutively to his two prior federal sentences. USCA5 4744-45; G Ex. 33A.

## C. Additional evidence of premeditation and planning

Robert Swain, who was a special investigative agent at USP-Beaumont in November 2007, knew both Snarr and Garcia before the murder. USCA5 4747-50. Swain met Garcia upon his transfer into USP-Beaumont and had investigated

the attack on Ruiz, which occurred three days after Garcia arrived.  USCA5 4748-50.  While making weekly rounds in the SHU, Swain spoke with Snarr, who was angry about being in Beaumont and repeatedly asked why he had not yet been transferred to the ADX.  USCA5 4750-51.

After Rhone's murder, Swain spoke with both defendants.  USCA5 4751.  Garcia told Swain:  "It wasn't supposed to happen that way with the staff.  Sorry about the staff.  Check the video.  You'll see why it had to happen that way."  USCA5 4752.  Snarr said basically the same thing, although Swain saw nothing on the video that demonstrated why the defendants "had" to attack the guards.  USCA5 4752-53.  Swain's investigation, however, indicated that the murder required deliberation and planning, including that necessary to obtain the weapons.  USCA5 4753-54.  The defendants mentioned no threats, USCA5 4752, but Rhone had been saying things that they did not like, USCA5 4754.  Swain believed the murder occurred because Snarr and Garcia felt like Rhone had "disrespected them."  USCA5 4768.

Inmate George Sarro was an orderly[26] in the SHU at the time of Rhone's murder. USCA5 4778-83. Snarr and another inmate named Joe Mosher had been communicating through the ventilation system in their cells. USCA5 4784-85. Before Snarr went to recreation on the day of the murder, he instructed Sarro to go see Mosher. USCA5 4785, 4790. Sarro complied, and Mosher gave Sarro a shank to take to Snarr. USCA5 4786-87. Sarro did, sliding the shank— in an envelope— under Snarr's cell door.[27] USCA5 4787-89, 4796-97. Earlier that day or, perhaps, the day before, Sarro had delivered another object in an envelope to Snarr from a third inmate, but Sarro did not see the contents. USCA5 4790-92. Sarro also recalled that, before the murder, Delacruz had tried to get a mechanical pencil, parts of which could be used to open handcuffs. USCA5 4809-10.

Sarro saw Rhone's body as officers carried him off of the range and was horrified by its condition. USCA5 4800-02. He also saw the defendants being escorted from the unit and recalled that they were celebrating "almost like . . . a

---

[26] Orderlies were inmates housed in units who were in charge of janitorial tasks, such as sweeping and mopping the floors, taking out the trash, folding laundry, and washing sheets. USCA5 4780. Unfortunately, the often-unsupervised orderlies acted as "gophers" for the other inmates taking contraband and other items, messages, and notes, called "kites," from cell to cell. USCA5 4781-83; D Ex. 51 at 4, 11, 13.

[27] A BOP Board of Inquiry Report notes that video footage from the D range at USP-Beaumont on the date of Rhone's murder showed an inmate orderly sliding something under Snarr's cell door at approximately 8:30 a.m. D Ex. 51 at 4. The report does not identify the orderly, but states that the orderly then walked to Garcia's cell and either passed something to, or received something from, Garcia. D Ex. 51 at 4.

bunch of guys that just won a softball game." USCA5 4803. Sarro believed that the chaos in the SHU on the morning of the murder was planned. USCA5 4807-09. He noted that inmates observe how guards react to certain situations and can manipulate events based on the officers' predictable behavior. USCA5 4808-09.

In conversations before the murder, Snarr had told Sarro that Snarr "had no intention of getting out [of prison], that this was his life, this is what he did, this is what he lives for, this whole jail, convict kind of lifestyle." USCA5 4805. According to Sarro, Snarr existed for respect and was obsessed with the ADX, a sort of status symbol for inmates. USCA5 4805-07.

## D. The jury's verdict on eligibility

The jury found that Snarr was 18 years or older at the time he murdered Rhone and that the government had proved that Snarr intentionally killed Rhone. USCA5 4944. The jury also found four statutory aggravating factors: (1) that Snarr had previously been convicted of two or more federal or state offenses, punishable by a term of imprisonment of more than one year, committed on different occasions, involving the infliction of, or attempted infliction of, serious bodily injury or death upon another person; (2) that in the commission of the offense, Snarr knowingly created a grave risk of death to one or more persons in addition to Rhone; (3) that Snarr committed the offense in an especially heinous,

29

cruel, or depraved manner in that it involved torture or serious physical abuse to Rhone; and (4) that Snarr murdered Rhone after substantial planning and premeditation to cause his death of another person. USCA5 4944-45.

As to Garcia, the jury found that he was 18 years or older at the time he murdered Rhone and that he intentionally killed Rhone. USCA5 4945-46. The panel found six statutory aggravating factors for Garcia: (1) that he committed the offense after having previously been convicted of two or more federal or state offenses, punishable by a term of imprisonment of more than one year, committed on different occasions, involving the infliction of, or attempted infliction of, serious bodily injury or death upon another person; (2) that, during the offense, Garcia knowingly created a grave risk of death to one or more persons in addition to Rhone; (3) that Garcia murdered Rhone in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim; (4) that Garcia murdered Rhone after substantial planning and premeditation to cause his death; (5) that Garcia had previously been convicted of two or more federal or state offenses, punishable by a term of imprisonment of more than one year, committed on different occasions, involving the distribution of a controlled substance; and (6) that Garcia had previously been convicted of violating Title II or III of the Comprehensive Drug Abuse Prevention and Control Act of 1970, for

30

which a sentence of five years or more could be imposed or had previously been convicted of engaging in a continuing criminal enterprise.  USCA5 4946-47.

## IV.  Evidence presented by the government during the selection phase

As the selection segment of the trial began, the United States offered all evidence from the guilt/innocence and eligibility phases for consideration during the sentencing.  USCA5 4972-73.

## A.  Evidence relevant to Snarr

**(1).  Snarr's juvenile record:**  Snarr amassed 44 juvenile convictions. USCA5 4983; G Ex. 34.  Of the 44 convictions, 15 were felonies, — two "life endangering"— and the remaining 29 were misdemeanors or "other."  USCA5 4983; G Ex. 34.  Randy Gangwer, who supervised the secure facility for Utah's Division of Youth Corrections in 1994, testified that Snarr committed an offense while at home on a trial visit, which resulted in his prosecution as an adult. USCA5 4980-81.  The judge intended to release Snarr on his own recognizance, but the Youth Division intervened and placed a hold on Snarr because "we felt, and continue to feel, he is a danger and threat to the community."  USCA5 4980-82; G Ex. 34.

**(2).  Attack underlying Snarr's Utah state conviction:**  One of the officers who responded when Snarr stabbed another inmate in the Davis County,

31

Utah, jail in January 2004 observed Snarr fighting with the other inmate and noticed that Snarr appeared to have a weapon.  USCA5 4993-99.  The shank, a sharpened toothbrush, was recovered from the room where the fight took place after Snarr was restrained.  USCA5 5000-01.  Although the victim suffered a puncture wound to the back, he refused medical care.  USCA5 5007-10.

**(3).  Snarr's SAC membership and RICO conviction:**  Formed in the Utah state prison system in 1997, the Soldiers of Aryan Culture initially wanted to become the strongest prison gang in Utah— thereby controlling the drug trade in prison— which required the group to commit violent assaults.  USCA5 5014-15.  The SAC was a white supremacy gang with a manual of conduct, bylaws, and a military-style hierarchy.  USCA5 5014-16.  The group began to recruit the most violent white inmates and, within a couple of years, had more than 100 members in the Utah prison system.  USCA5 5014.  The group eventually grew to around 300 members.  USCA5 5018.  Members were supposed to read white supremacy materials and prepare themselves for battle against other races.  USCA5 5015-16.  To achieve the ultimate goal of a white-only world, the SAC was prepared for racial warfare.  USCA5 5015-16.

SAC recruits, referred to as "probationers," served a six-month probationary term.  USCA5 5017.  The probationers were requited to live by the SAC manual

and commit an assault or beating.  USCA5 5017.  Like other prison gangs, the SAC was "blood in and blood out," which meant the probationer had to draw blood by attacking another person to get in and would have his own blood spilled if he wanted out.  USCA5 5017.  Once the probationary period was completed, the new SAC member would receive his "SAC patch," a distinctive tattoo on the stomach, which had a swastika draped with the letters S-A-C.[28]  USCA5 5018.

As SAC members left prison, the gang became active in the "free world" and began committing crimes— attempting to take over the methamphetamine trade in Utah and committing violent crimes, such as home invasions and car-jackings, as well as white-collar crimes, such as identity theft.  USCA5 5016, 5018.  Members who had left prison committed the crimes to fund the SAC's general cause and to support their brothers in prison.  USCA5 5017.  They also recruited females and men who had not been to prison.  USCA5 5019-20.  The

---

[28]  In addition to his SAC patch, G Ex. 36E, Snarr had the letters R-A-H-O-W-A, which stands for "racial holy war," tattooed on his upper lip.  USCA5 5047-48; G Ex. 9F.  "Wotan's Finest" was tattooed above his eyebrows.  USCA5 5045-46; G Ex. 9F.  This tattoo referred to the Germanic religion of Wotanism, a version of the Nordic religion of Odinism, practiced by some white supremacy believers.  USCA5 5017-18, 5045-46.  Snarr also had the number 14 tattooed on his face, which referred to a white-supremacy slogan, and the word "wood" tattooed on his chest, a common term used by Skinheads, Neo-Nazis, and other white supremacy groups.  USCA5 5046-47; G Ex. 9F, G Ex. 36D.  Snarr had tattoos depicting Nordic battle paraphernalia on his arm and had the letters S-K-I-N and H-E-A-D on his fingers.  USCA5 5049-50; G Ex. 36F, 36H, 36N.  Snarr also had other tattoos indicating his affinity for the white supremacy movement.  USCA5 5050-52; G Ex. 36I, 36J, 36K, 36N, 36O.  Although it was against BOP rules to be tattooed while in prison, USCA5 5052, Snarr acquired some of these while at USP-Beaumont, USCA5 5041-42, 5043; G Ex. 9F, 36C.

FBI began investigating the gang when it received information that the SAC

wanted to make a name for itself by bombing the 2002 Winter Olympics in Salt

Lake City and had discussed killing a federal judge. USCA5 5018-19. As

members were arrested, many were armed, which resulted in their federal

prosecutions for being felons in possession of firearms. USCA5 5019. Once in

federal prisons, SAC members began to recruit federal inmates from other states.[29]

USCA5 5019.

The SAC recruited Snarr while he was in a Utah state prison because of his

violent history, and he quickly rose to the level of lieutenant. USCA5 5014, 5022,

5023. When the United States Attorney's Office in Salt Lake City decided to

prosecute the SAC's leaders under the RICO statute in an effort to stop the gang's

violent criminal activities, Snarr was one of the defendants. USCA5 5020. Snarr

had the reputation of being one of the SAC's more violent members; in addition to

his attack on Alls, Snarr assisted one recruit in an attack that blinded another

---

[29] The BOP uses two categories for prison gangs: "Disruptive Group" and "Security Threat Group," or "STG." USCA5 5030. Disruptive Groups have a large presence in BOP, are well-organized, and have a long history of violence. USCA5 5030. Five gangs are classified as Disruptive Groups: the Mexican Mafia from California, the Aryan Brotherhood of California, the Texas Syndicate, the Mexikanemi (the Texas Mexican Mafia), and the Black Guerilla Family. USCA5 5031. The BOP classifies other prison gangs as STGs. USCA5 5030. These gangs are present and active, but do not meet the stringent criteria of the Disruptive Groups. USCA5 5030. The SAC was classified as an STG. USCA5 4552.

inmate.[30]  USCA5 5021-22.  When Snarr and nine other SAC leaders were convicted in the RICO prosecution, BOP intentionally separated them in an effort to stop the gang's criminal activity.  USCA5 5020-23.  Snarr was the only SAC member assigned to USP-Beaumont, so he aligned himself with the Nazi Lowriders, a white-supremacy gang from California.  USCA5 5058.

**(4).  Attack on Fortner at USP-Beaumont:**  On January 28, 2006, Snarr and two other inmates attacked a 50-year-old inmate named Dan Fortner.  USCA5 5056-65, 5085-91; G Ex. 38B.  Initially, Snarr shaved Fortner's head, ostensibly for playing chess with an African-American inmate.  USCA5 5064-67, 5087-88.  Later that day, Snarr and the others came to Fortner's cell and beat him, hitting him on the chest and in the face.  USCA5 5064-67, 5088-89.  The group demanded the items from Fortner's locker and the value from his commissary account.  USCA5 5089-91.  Although the guards took Fortner for medical attention when they saw his injuries, he did not tell them what happened for fear of retribution.  USCA5 5092-93, 5097.  When the incident was later reported, Snarr claimed that Fortner fell, but stated that he would "take the shot," which was construed as an admission.  USCA5 5128; G Ex. 38B.  Snarr lost 27 days of good

---

[30]  As described below, Snarr continued his violent behavior in federal prison.  One officer, who had worked for BOP for 17 years, described Snarr as "one of the most dangerous inmates I've ever been around."  USCA5 5075.

time[31]; was placed in disciplinary segregation[32] for 30 days; and lost his commissary, visiting, and telephone privileges for 180 days.  G Ex. 38B at 2.

**(5).  Possession of weapons at USP-Beaumont:**  On May 9, 2006, guards searched Snarr's cell after noticing that he was behaving suspiciously and discovered one weapon and a piece of metal being made into a weapon hidden in the plumbing.  USCA5 5140-51; G Ex. 39A.  Snarr later admitted that the incident report from the guard who found the weapons was true.  USCA5 5157; G Ex. 39A.  As a sanction, Snarr lost 41 days of good time and lost commissary and telephone privileges for 180 days.  USCA5 5162; G Ex. 39A at 2.

Later, on July 31, 2006, guards found two weapons hidden in Snarr's mattress in the USP-Beaumont SHU.  USCA5 5339-47; G Ex. 41A.  Snarr later admitted that the incident report from the guard who found the weapons was true.  USCA5 5352-53; G Ex. 41A.  As a sanction, Snarr lost 41 days of good time, was placed in disciplinary segregation for 30 days, was to be transferred to another institution, and lost visiting privileges.  G Ex. 41A at 2.

---

[31]  Federal inmates who are sentenced to terms of imprisonment greater than 24 months automatically accrue 54 days of "nonvested" good conduct time each year.  USCA5 5651.

[32]  Inmates placed in disciplinary segregation have even fewer privileges than the inmates in the SHU.  USCA5 5652.

**(6). Attack on Wengler at USP-Beaumont:** On June 21, 2006, Snarr and another inmate attacked inmate David Wengler, an SAC member who transferred to USP-Beaumont in 2005. USCA5 5069, 5207-46, 5255-57; G Ex. 40Z. Before the attack, Snarr had criticized Wengler for his lack of dedication to the SAC. USCA5 5263. Ultimately, Snarr decided to kill Wengler because Wengler had refused to stab an inmate who had taken a swing at him.[33] USCA5 5273-74, 5295-98, 5310-11, 5313. On the day of the attack, Snarr lured Wengler to his cell to look at a book and magazine. USCA5 5265-67, 5299-5300. When Wengler squatted down to look for the book, Snarr jumped on Wengler's back and began stabbing him. USCA5 5268, 5300-01. Another inmate blocked the door. USCA5 5269. A struggle ensued, with Snarr stabbing Wengler as he tried to get away. USCA5 5183-87, 5269; G Ex. 40C-40H. When Wengler asked him to stop, Snarr said: "You're a disgrace to the SAC. You never deserved to wear that patch." USCA5 5269. Snarr then attempted to stab Wengler on his SAC tattoo. USCA5 5269. Wengler finally got away; he ran to the unit's guard station, where he

---

[33] Wengler had been in a holding cell after the confrontation, but Snarr and another inmate sought out one of the special investigative services lieutenants who was investigating the incident and assured him that Wengler would be safe if he returned to USP-Beaumont's general population. USCA5 5067-69.

collapsed. USCA5 5166-67, 5269-71. Snarr threw the shank into a trash can in the common area. USCA5 5171-72, 5175, 5177-78; G Ex. 40A-B,

Severely injured, Wengler was stabbed 33 times and spent more than two weeks in the hospital. USCA5 5187-90, 5272, 5321-30; G Ex. 40O-P, 40CC. Although he believed Snarr intended to kill him, Wengler refused to cooperate in the subsequent investigation because he was afraid of retribution. USCA5 5275-78, 5279. Wengler's refusal to cooperate rendered prosecution for the assault impractical. USCA5 5331-36. As a sanction, Snarr lost 41 days of good time and the disciplinary hearing officer recommended that he be transferred to another institution. USCA5 5338, 5355-59. His other sanctions were suspended because prosecution was anticipated. USCA5 5359.

**(7). Attack on Hammonds at USP-Beaumont:** On March 11, 2007, Snarr and another inmate attacked inmate Michael Hammonds in one of the SHU recreation cages. USCA5 5363-73, 5384-86. While other inmates engaged in a "decoy" fight in another cage, USCA5 5367-68, Snarr and the other inmate beat Hammonds so severely that the officer who responded believed Hammonds was dead. USCA5 5368-70; G Ex. 42A-B. Snarr kicked Hammonds in the head while he was on the ground, unconscious and bleeding. USCA5 5369-70, 5381-82, 5386, 5392. As the inmates were being removed from the cages, one of the

inmates involved in the decoy fight asked Snarr if it was "okay" and Snarr replied, "That was good." USCA5 5367-68, 5372. Snarr told an officer that Hammonds was a snitch. USCA5 5387. Later that day, however, Snarr told another officer that he was not sure whether Hammonds was the "right" inmate. USCA5 5393. Snarr showed no remorse. USCA5 5393-94.

Hammonds was severely injured, suffering broken bones and head trauma, and he required hospitalization. USCA5 5414-19; G Ex. 42C-E, 42G. Ultimately, however, Hammonds refused to cooperate with the resulting investigation. USCA5 5387, Snarr later admitted that the incident report related to the beating was true. USCA5 5398; G Ex. 42F. As a sanction, Snarr lost 27 days of good time, received 60 days of disciplinary segregation, and lost commissary privileges for 90 days. USCA5 5400; G Ex. 42F at 2.

(8). **Behavior after Rhone's murder:** After they murdered Rhone, Snarr and Garcia were taken to the holding cells in the receiving and discharge area of USP-Beaumont. USCA5 5423. Guards were assigned to watch and videotape them until they were removed from the institution. USCA5 5423. Before the video cameras were turned on, Snarr and Garcia were jubilant, jumping up and down and yelling "like they had won the Super Bowl or the lottery . . . ." USCA5

39

5425.  When the cameras arrived and Snarr and Garcia saw that they were being filmed, they became reserved, and the screaming stopped.  USCA5 5425-26.

## B.  Evidence relevant to Garcia

**(1).  Additional information about Garcia's drug dealing:**  On January 22, 1998, officers with the Taylor County, Texas, Sheriff's Office executed a search warrant at a residence in Abilene, Texas, where they believed a suspect named Jason Middleton was selling drugs.  USCA5 5473-75.  When officers arrived, Garcia, Rachel Rodriguez, their infant son, and Middleton were present.  USCA5 5475.  Garcia and Rodriguez lived there.  USCA5 5475.  Officers found evidence of drug trafficking, including approximately 15.5 grams of methamphetamine, packaging materials, drug ledgers, and devices used to smoke narcotics.  USCA5 5476.  Officers also discovered 17 or 18 wire transfer orders, transferring around $35,000 to points of origin for illegal drugs in roughly a two-month period.  USCA5 5477-79; G Ex. 45D-45J.  One of the transfers was from Garcia to Jacob Ponce, who was the primary distributor in Abilene for a drug organization based in Del Rio, Texas.  USCA5 5479-80; G Ex. 45D.  Guns were also found in the house.  USCA5 5482-83; G Ex. 53TT.  A cooperating witness later taped Garcia while he discussed selling large quantities of methamphetamine.  USCA5 5484-88; G Ex. 45A.

**(2). Murder of Jacob Ponce:** In 1998, Garcia and Eusabio Perez were dealing drugs in Abilene for a man named Gilberto "El Diablo" Morales, who was based in Del Rio. USCA5 5521. Ponce was El Diablo's representative in Abilene, and Garcia and Perez grew to dislike him. USCA5 5522-25. Garcia eventually told Perez that Ponce asked him to kill Perez's brother, but Garcia declined because they were friends. USCA5 5525-26.

On March 3, 1998, Garcia and Ponce contacted Perez because Ponce was interested in purchasing some guns from Perez. USCA5 5526. A friend of Perez's, Daniel Jose Cisneros, drove Garcia, Perez, and Ponce to a field on the outskirts of Abilene that was used for illegal dumping. USCA5 5491, 5494-98, 5526-27. Cisneros opened the trunk and then walked to the front of the car to turn on some lights while Perez got a rifle from the trunk to show Ponce. USCA5 5498, 5527. Perez overheard Ponce pressuring Garcia to give him some drug money, and then, Ponce walked to Perez to look at the rifle. USCA5 5528. Hearing the click of a gun, Perez and Ponce turned around, and Garcia shot Ponce in the face at point-blank range. USCA5 5528-29. Perez placed a discarded couch over Ponce's body, but Garcia insisted that Perez shoot Ponce, too. USCA5 5529. Perez shot around the side of the couch, without knowing whether he hit the body. USCA5 5529. The terrified Cisneros then drove Garcia and Ponce back to

41

Abilene.  USCA5 5501-04, 5530-31.  As they drove back to town, Garcia threw bullets and clips out of the car windows and laughed.  USCA5 5531.  He also said, "I got him."  USCA5 5505.  After Ponce disappeared, Garcia assumed his role in the drug organization.  USCA5 5544-45, 5597.

When Ponce's family discovered that he was missing, his sister came to Abilene and tried to persuade Garcia to go to the police to help find Ponce.  USCA5 5578-79.  Garcia refused, telling her that he did "not want to come up missing like Jacob."  USCA5 5579.  Ponce's family contacted the police and placed posters around Abilene with a picture of Ponce wearing a crucifix.  USCA5 5534-35, 5580; G Ex. 53OO.  Garcia later told Perez that he had moved the body and buried it.  USCA5 5539-40.  In 2002, investigators learned about the murder while investigating the drug organization.  USCA5 5547-49.  Perez and Cisneros eventually provided the details of the murder, and officers recovered some of Ponce's bones and belongings— including the crucifix he wore around his neck, G Ex. 53V— from the field.  USCA5 5549-57, 5583-93; G Ex. 53A-53II.  The Taylor County District Attorney declined prosecution for the murder because Garcia had just been sentenced to 40 years for the federal drug conspiracy.  USCA5 5593-95.

Years later, Garcia told his cell mate in the Beaumont SHU that it would not matter if he were released from federal prison, explaining: "I still got a body in Texas.  If I go home, Texas going to pick me up."  USCA5 5606.  And while awaiting trial for murdering Rhone, Garcia told another inmate that he was in prison for murder and showed him pictures of bones, claiming, "That's what was left of the dude I killed."  USCA5 5844.  Garcia explained that he had buried the body, but dug up what he could of it after the person who was with him was questioned by the police.  USCA5 5845.  Garcia also mentioned that a "chain"—presumably Ponce's crucifix, G Ex. 53V — messed him up.  USCA5 5845.

**(3).  Affiliation with the Texas Syndicate prison gang:**

The Texas Syndicate was formed in the 1970's by Hispanic inmates from Texas who were imprisoned at Folsom State Prison in California.  USCA5 5625.  As those inmates came home and were later incarcerated in Texas, the Texas Syndicate spread throughout the Texas state prison system and, eventually, the federal prison system.  USCA5 5625.  It grew into a large, violent prison gang and was even featured on the History Channel's series "Gang Land."  USCA5 5625, 5628-29.  Within prisons, the gang was involved in murders, extortion, drug trafficking, and other crimes.  USCA5 5627.  In the "free world," the gang expanded its criminal activity to include crimes such as contract murders, weapons

trafficking, and alien smuggling.  USCA5 5627.  The gang had a quasi-military

structure, with a "chairman" or "sillón" in each institution as well as a sergeant

and non-ranked foot soldiers.  USCA5 5627-28.  Like the SAC, the Texas

Syndicate was a "blood in and blood out" gang.  USCA5 5629-30.  To join the

gang, a recruit had to be recommended by a full member, or "carnal," and had to

perform certain tasks, called "trabajos."  USCA5 5629.

At the time of trial, there were more than 1400 Texas Syndicate members in

Texas prisons and approximately 400 members and associates in federal prisons.

USCA5 5625.  The BOP classified the Texas Syndicate as a Disruptive Group,

which meant that extra security measures were taken for inmates who were

validated as members.  USCA5 5625-27.  In 2007, USP-Beaumont housed 35-40

members of the Texas Syndicate and was recognized throughout the federal prison

system as the gang's "home base."  USCA5 5628.

Garcia joined the Texas Syndicate while in prison at USP-Lee County.

USCA5 5617-18.  He had the distinctive Texas Syndicate tattoo, or patch, on his

chest.[34]  USCA5 5631; G Ex. 44E, 44F.

---

[34]  Garcia also had E-S-E and T-E tattooed on his neck, the phonetic spelling of the
Spanish letters "S" and "T."  USCA5 5631.  This represented "Sindicato Tejano," which is Texas
Syndicate in Spanish.  USCA5 5631; G Ex. 44D.  On his arms, Garcia bore tattoos with "TS"
and "ESE TE."  USCA5 5632; G Ex. 44J, 44M.

**(4). Possession of weapon at USP-Lee County:** On February 16, 2004, guards discovered two disposable razor blades and tinfoil, which inmates used to conceal the removal of blades from disposable razors, in Garcia's pillowcase. USCA5 5636-38, 5644-45, 5650; G Ex. 46B. As a sanction, Garcia lost 41 days of good time, was placed in disciplinary segregation for 30 days, and lost commissary privileges for 60 days. USCA5 5650-52; G Ex. 46A at 2.

**(5). Attacks on other inmates at USP-Lee County and USP-Atlanta:** On June 6, 2004, Garcia was housed in the SHU at USP-Lee County. USCA5 5654, 5656. While being escorted back to his cell from recreation, Garcia and his cell mate slipped out of their handcuffs and, eluding the guards, ran into the cell occupied by Antonio Peregrino-Lujan as the cell's automatic door was closing. USCA5 5654-56, 5659-64, 5667-69, 5683. Garcia then used his handcuffs to beat Peregrino, who was still restrained. USCA5 5656; G Ex. 47A-47C. A guard sustained minor injuries to his arm from the incident, and Peregrino had severe facial injuries. USCA5 5665-66, 5677-78, 5682-83; G Ex. 47D. Peregrino was a member of Pisa, a Mexican Nationalist gang that was embroiled in a conflict with the Texas Syndicate. USCA5 5678.

During his disciplinary hearing, Garcia admitted the conduct, but blamed the guards: "[S]taff made an error. We should not have been together. We are

separatees." USCA5 5690-91; G Ex. 47J.  As a sanction, Garcia lost 27 days of good time, forfeited 27 days of good time, was placed in disciplinary segregation for 30 days, and was ordered transferred to another institution.  G Ex. 47J at 3.

Six months later, on December 20, 2004, Garcia joined two other inmates in beating inmate Luis Saucedo in one of the SHU recreation cages.  USCA5 5695-5700; G Ex. 48 at 2.  Garcia lost 27 days of good time as a sanction.  USCA5 5710; G Ex. 48 at 3.

Slightly more than one month later, on January 26, 2005, Garcia— who had been moved to the SHU at the USP in Atlanta, Georgia— and his cell mate attacked another inmate, Harvey, who had just been placed in their cell.  USCA5 5711-13.  The "nasty" and "brutal" nature of the attack shocked the guard who responded.  USCA5 5713.  Garcia lost another 27 days of good time as a sanction.[35]  USCA5 5720; G Ex. 49 at 3.

**(6)  Assault on Ruiz at USP-Beaumont:**  The jury learned more details about Garcia's stabbing of Jose Ruiz at USP-Beaumont on August 26, 2006— the crime for which Garcia was sentenced shortly before he murdered Rhone— and

---

[35]  The disciplinary hearings for the attack on Saucedo at USP-Lee County and the attack on Harvey at USP-Atlanta were conducted after Garcia had been transferred to the USP in Marion, Illinois.  USCA5 5705-06, 5719.  In 2005, USP-Marion received many disciplinary transfers because it was the second-most secure facility in the BOP.  USCA5 5706-07.

saw a surveillance video of the attack.  USCA5 5724-31; G Ex. 50AA; *see also* USCA5 4744-45; G Ex. 33A.  Garcia had arrived at USP-Beaumont three days earlier.  USCA5 5770.  Both he and Delacruz, another member of the Texas Syndicate, were transferred from USP-Marion when it changed from a "lockdown" institution to a medium-level facility.  USCA5 5771, 5773-75.  Garcia was placed in USP-Beaumont's general population.  USCA5 5776.

Although a member of the Texas Syndicate, Ruiz was distancing himself from the gang, apparently because of a conflict he had with an influential member and a religious transformation.  USCA5 5769-70, 5777.  As a "blood in and blood out" gang, Texas Syndicate members could not leave the gang without being assaulted.  USCA5 5770.  On August 26, 2006, Garcia, Delacruz, and Ruiz were in the recreation area for the general population.  USCA5 5727; G Ex. 50A.  Delacruz grabbed Ruiz, and both Garcia and Delacruz began attacking Ruiz, stabbing him with shanks.  USCA5 5728-29, 5737; G Ex. 50A.  Garcia continued assaulting Ruiz even after Delacruz walked away.  USCA5 5729; G Ex. 50A.  Delacruz returned and pulled Garcia off Ruiz's motionless, bleeding body.  USCA5 5729-31, 5740; G Ex. 50A-B.  Delacruz later explained that he believed Ruiz was dead at that point, so Garcia was "wasting his energy."  USCA5 5778-79.  Although stabbed 21 times, USCA5 4742-43; G Ex. 32B, Ruiz survived the

attack.  But the stabbing stood out to one of the correctional officers because of the number of wounds near vital organs.  USCA5 5754.  As noted above, Garcia was charged with assault, entered a plea of guilty, and was sentenced to imprisonment for 96 months, to be served consecutively to his two other federal sentences.  USCA5 4744-45; G Ex. 33A.

(7).  **Assault on rival gang member at USP-Beaumont:**  On November 15, 2006, while being escorted to his cell in the SHU after recreation, Garcia kicked another inmate in the back.  USCA5 5780-84.  The other inmate, Barraza-Lopez, was a member of the Pisa prison gang.  USCA5 5784.  As a sanction, Garcia lost 27 days of good time and was placed in administrative segregation for 30 days. USCA5 5790; G Ex. 51 at 2.

(8).  **Possession of weapon at USP-Beaumont:**  On April 27, 2007, guards discovered a shank wrapped in cloth and concealed in an envelope while conducting a random search of Garcia's cell in the SHU.  USCA5 5791-95; G Ex. 52B.  As a sanction, Garcia lost 40 days of good time and was placed in disciplinary segregation for 30 days.  USCA5 5805; G Ex. 52A at 2.

(9).  **Additional information:**  For their safety, Snarr and Garcia were transported to the federal detention center in Houston, Texas, on November 28, 2007, the day Rhone was murdered.  USCA5 5808-09.  When asked why they

went after the staff, Garcia said that the attack "wasn't personal." USCA5 5809-10. He explained that the guards involved were victims of circumstance and that he and Snarr just wanted the keys to the cell. USCA5 5810.

In September 2009, an inmate named Shaquan Smith occupied the cell next to Garcia's at the detention center. USCA5 5820-21. The two talked, and Garcia eventually told Smith about Rhone's murder. USCA5 5827-41. Garcia described how Rhone "talked trash" to Garcia and an inmate in a nearby cell and how Rhone made racial comments. USCA5 5828-30. Garcia claimed that he did not respond to Rhone's disrespectful behavior. USCA5 5829. Instead, Garcia recalled:

> Day after day, he would just talk and talk and talk; and while he was talking, I was just sharpening my knife. I was just sharpening my knife, like "Come on. Keep on talking. Keep on talking." . . . I was sharpening my knife.

USCA5 5829.

Garcia said that he and his co-defendant, whom he did not identify, began talking about murdering Rhone in the recreation cages and that, on the day of the murder, they "jacked the rec cage" to assure that they would be brought in last. USCA5 5831-32. The co-defendant was supposed to be brought in ahead of Garcia, but Garcia said that he ended up in front. USCA5 5832-33. Garcia described how the attack began, with the co-defendant slipping his handcuffs and

49

charging the guard, who tried to protect Garcia under the mistaken belief that he was the intended victim. USCA5 5833. Garcia bragged about how he stabbed the guard from behind and "started banging him from back." USCA5 5833. When that guard refused to give the pair his keys, Garcia described how they attacked a second guard, stabbing him "a few times" before taking his keys. USCA5 5834.

Garcia showed Smith photos taken from the surveillance video and a picture of the bloody shank, referring to it as "pretty." USCA5 5835-37. Garcia recalled threatening another inmate— "You next, motherfucker. I'm going to kill you next"— while his co-defendant opened Rhone's cell. USCA5 5834, 5837-38. Garcia noted that "they" thought he was showing the knife, but he was actually threatening the other inmate. USCA5 5838. Garcia claimed that Rhone had a knife in his cell, but was too shocked to use it. USCA5 5838. He said that they had a difficult time opening the cell door because Rhone was holding it from within, so Garcia kicked the door. USCA5 5838-39. Rhone was still holding the door when it opened, and he fell into Garcia and his co-defendant. USCA5 5839. The pair began stabbing Rhone, "pulling" him down the range. USCA5 5839-41. When Smith asked Garcia what went through his mind as he stabbed Rhone, Garcia replied: "Man, I be in my zone. When I get in my zone, I'm in my zone."

USCA5 5842.  He further explained that "[o]nce I'm in my zone, I got to get my man."  USCA5 5842.

Smith testified that Garcia showed no remorse for murdering Rhone.  USCA5 5843.  Rather, Garcia stated that, although he might "change a few things," he would do it again.  USCA5 5842-43.

## V.  Evidence presented by Snarr during the selection phase

Dr. Oney Fitzpatrick, the interim dean of graduate studies at Lamarr University in Beaumont, Texas, who had a doctorate in developmental psychology, prepared a social work-up on Snarr based on a family history prepared by a mitigation specialist, interviews with Snarr and some of his family members, and selected items from discovery.  USCA5 5867-71, 5895-5902.  According to Fitzpatrick, Snarr's childhood was marked by instability and parental drug use, neglect, and abuse, which impaired his socialization.  USCA5 5873-95.  Fitzpatrick admitted that Snarr's violent behavior exceeded the level he was purportedly exposed to as a youth.  USCA5 5902.

One of Snarr's ex-girlfriends and her daughter testified that he was kind to them, serving as a soul mate and father figure.  USCA5 5921-25, 5940-43.  On cross-examination, the ex-girlfriend identified Snarr's handwriting on a letter he sent to a fellow SAC member that included the lines:

We even got some rec on them dudes that got you. I've beat dude so bad he's now retarded. He was knocked out for a week. It was fun. We got some get-back, little brother.

USCA5 5937-38. Snarr's paternal aunt testified that Snarr was taught hatred and violence and that his mother was neglectful and abusive. USCA5 5945-49. Snarr's mother asked the jury to spare her son's life. USCA5 6002.

Dr. Elizabeth Pelz, a professor of criminal justice who studied "inmate subcultures," testified about the value of respect to inmates. USCA5 5950-54. Based upon her interview with the mitigation specialist and Snarr, USCA5 5958, Pelz concluded that Snarr's childhood affected his survival instincts in prison. USCA5 5958-65. Pelz believed that Snarr had to react to perceived disrespect in order to maintain his status and security. USCA5 5967-68. Pelz agreed that Snarr would react violently if he treated with disrespect. USCA5 5978. She further agreed that he was a "convict to be feared." USCA5 5983. And she acknowledged that Snarr and Garcia planned the murder, although she did not believe that they intended to attack the guards. USCA5 5990-91.

Finally, prison consultant Mark Bezy testified about how the BOP would house Snarr and Garcia[36] if they were sentenced to life without parole, claiming that they could be kept in single cells in the highest level of security— the ADX—

---

[36] Garcia adopted Bezy's testimony. USCA5 6126.

for an unlimited period of time.  USCA5 6120-26.  He admitted, however, that if Snarr and Garcia behaved while in the ADX control unit, they could be moved to its general population unit in less than 60 months.  USCA5 6127-28.  And he noted that the ADX general population unit was designed to move inmates back into a United States penitentiary in three years.  USCA5 6130, 6134.

## VI.  Evidence presented by Garcia during the selection phase

Ricardo Pallaret testified that, about five days before the murder, Snarr and Rhone were both in recreation cages when Rhone told Snarr that he intended to "fuck you mother" and "find your sister and ... make sure that she got a black baby."  USCA5 6008.  He also claimed that Rhone exposed himself in front of Snarr on the day before the murder, calling Snarr a "bitch."  USCA5 6009-10. With respect to Garcia, Pallaret claimed that Rhone would drag a shank along the cell wall, asking Garcia if he could hear it.  USCA5 6010-11.

Garcia's mother and maternal uncle testified about Garcia's childhood, claiming that his father was a drug dealer and his paternal grandmother practiced witchcraft.  USCA5 6030-36, 6038-44, 6046-48, 6050, 6052-61, 6083-86.  His brother told the jury that Garcia's father taught the boys, as children, to remove gas tanks from cars for drug trafficking, USCA5 6065-66, and that Garcia chose his father's lifestyle, USCA5 6067-68.  Garcia's seventh-grade English teacher

relayed a story about teaching him the meaning of the word "melancholy" and told the jury how he later acknowledged her. USCA5 6089-91. Rachel Rodriguez, the mother of two of Garcia's three children, testified about their relationship and Garcia's parenting skills. USCA5 6163-67. Rodriguez was one of Garcia's co-defendants in the drug conspiracy case that sent him to federal prison, and she served a sentence of 63 months. USCA5 6167. She admitted that guns and illegal drugs were found in the home she and the children shared with Garcia. USCA5 6176.

Dr. Jolie Brams, a clinical psychologist, interviewed Garcia and some of his family members, including Rodriguez and her children, and reviewed information gathered by a mitigation specialist. USCA5 6192-93. Brams testified that Garcia's relationship with his father— who she did not meet or interview, USCA5 6225— was "the pivotal point of where his difficulties began" and that the father's actions were, "to a large part, why we're here in this courtroom today." USCA5 6200, 6204. Brams claimed that meeting Rodriguez and the birth of their children were "life changing" for Garcia. USCA5 6220, 6236. Yet, she admitted that Garcia continued his involvement in drug trafficking after meeting Rodriguez, that he murdered Ponce the year after his son was born, and that he kept drugs and

weapons in the house he shared with Rodriguez and their children. USCA5 6237, 6239, 6242.

## VII. Government's rebuttal evidence

In rebuttal, the government showed that Snarr circumvented prison restrictions regarding correspondence with other inmates when he sent a letter to one of his SAC "brothers" through a third party. USCA5 6266-71; G Ex. 60. With respect to Garcia, the government presented evidence, including a videotape, showing that, on the day Garcia arrived in Beaumont for the trial, he refused to comply with an order from a guard and, ultimately, had to be forcibly extracted from his cell. USCA5 6278-6300; G Ex. 55. Garcia warned the guards that this would be a daily occurrence, but it was not. USCA5 6289, 6298.

The government presented evidence about the ADX through two witnesses. Greg Hershberger, a retired BOP official who had once served as the warden at the ADX, explained how the facility differed from other federal penitentiaries. USCA5 6310-11, 6313-22. The goal of the ADX program is to prepare inmates to function in a general population at another prison facility. USCA5 6526. Based on their histories, Hershberger believed that Snarr and Garcia could successfully complete the program at the ADX control unit and ultimately be placed in the ADX general population or in the general population at another federal

penitentiary.  USCA5 6323.  The government also called Christopher Rivers, who

at one time supervised operations at the ADX.  USCA5 6379.  Rivers described

the facility and the three-year program used in the ADX general population, which

is designed to prepare inmates for placement at another USP.  USCA5 6378-6402.

Rivers knew Snarr and Garcia and believed that, if sentenced to life imprisonment,

they could successfully complete the program at the ADX and return to the general

population at a USP.  USCA5 6403-04.

## SUMMARY OF THE ARGUMENT

The jury convicted Snarr and Garcia after a fair trial and selected the death

penalty in individualized sentencing proceedings conducted in accordance with

the Federal Death Penalty Act.  Both defendants raise numerous issues in this

consolidated appeal.  None warrant reversal.

### Issues I-X:  Issues Related to Jury Selection

In their first five issues, Snarr and Garcia complain that the district court

erroneously excused five prospective jurors for cause.  These issues fail because

each of the jurors either stated that they would not be able to follow the court's

instructions or their oaths or they vacillated so much during questioning that it was

impossible to ascertain their bias with unmistakable clarity.  The district court did

not abuse its broad discretion in excusing these prospective jurors.

In their sixth, seventh, and eighth issues, Snarr and Garcia claim that the district court erred by declining their challenges for cause to three prospective jurors. These claims fail for two reasons. First, Snarr and Garcia fail to show that the jury actually seated was not impartial. Second, the record does not support their contention that the three veniremen were not impartial. The district court did not commit a manifest abuse of discretion in declining to excuse these prospective jurors.

In their ninth and tenth issues, Snarr and Garcia claim that the district court erred in excusing two prospective jurors who requested to be excused based on their physical infirmities. The record supports the district court's decision to excuse the prospective jurors, one whose medical condition required frequent restroom breaks and the other who had a significant hearing loss. The district court did not abuse its discretion in evaluating the prospective jurors' qualifications. Nor did it violate any rights of the defendants in excusing the jurors, one of whom was also properly excused for cause.

### Issues XI: Lesser Included Offense Issue

In their eleventh issue, Snarr and Garcia argue that the district court erred in declining to give an instruction on the lesser included offense of second degree murder, claiming that the evidence of premeditation— the distinguishing element

between first and second degree murder— was merely speculative.  In fact, the evidence of premeditation was overwhelming, and the district court did not abuse her discretion in holding that a jury could not have rationally convicted on second degree murder but acquitted on first degree murder.

### Issues XII-XVIII:  Sentencing Issues

In their twelfth issue, Snarr and Garcia contend that there was insufficient evidence that they murdered Rhone in an especially heinous, cruel, or depraved manner, claiming that stabbing Rhone fifty times was a necessary part of the killing.  Viewing the evidence in the light most favorable to the government, however, the jury's finding that the murder was committed in an especially heinous, cruel, or depraved manner must stand.  Moreover, even assuming that it could not, the error would be harmless beyond a reasonable doubt because the jury found three other statutory aggravating factors against Snarr and five others against Garcia.

In their thirteenth issue, Snarr and Garcia argue that the evidence was insufficient to prove that they present a future danger.  The argument focuses solely on the government's evidence describing how the ADX's control unit functions.  That evidence, offered to rebut the impression that the defendants were apt to be held in that unit for an indefinite period, showed that Snarr and Garcia

might be returned to the general population at a USP. Considering the other evidence of their violent propensities and viewed in the light most favorable to the government, the jury's findings that both defendants posed a future danger must stand. And, even assuming that the findings were unsupported, any error would be harmless beyond a reasonable doubt because other factors weighed heavily in favor of the death penalty.

In their fourteenth issue, Snarr and Garcia argue that the evidence was insufficient to submit the "substantial planning and premeditation" statutory aggravating factor to the jury, claiming that the crime was one of "coincidence and convenience." Viewing the evidence in the light most favorable to the government, however, the jury's finding that each defendant engaged in substantial planning and premeditation is amply supported by the evidence. Moreover, even if it were not, the error would be harmless given the jury's findings on the other statutory aggravating factors.

In their fifteenth issue, Snarr and Garcia argue that the district court abused its discretion by denying their motions for severance. A district court should grant a severance, however, only if a joint trial poses a serious risk of compromise to a specific trial right or prevents the jury from making a reliable judgment about guilt. Here, the defendants fail to demonstrate specific compelling prejudice

occasioned by their joint trial.  The district court carefully protected their rights and repeatedly instructed the jury to consider each man separately.  The court did not abuse its discretion in denying the motions to sever.

In their sixteenth issue, Snarr and Garcia argue that the Federal Death Penalty Act is unconstitutional because it permits proof of the statutory aggravating factors— which defendants claim are elements of the crime— under the relaxed evidentiary standards applicable to sentencing hearings.  As the defendants acknowledge, this issue is foreclosed to review.

In their seventeenth issue, Snarr and Garcia challenge the district court's decision to exclude evidence about Rhone's bad character that neither defendant knew about when they murdered him.  During a capital sentencing, the defendant may offer relevant mitigating evidence— without regard to the Federal Rules of Evidence— unless its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.  Here, the district court excluded as irrelevant and unduly prejudicial character evidence about Rhone that Snarr and Garcia did not know when they murdered him, but allowed evidence of reputation and prior acts they were aware of.  The court did not abuse its discretion.  Any bad conduct by Rhone that was unknown to the defendants had nothing to do with their personal culpability and was not mitigating.

The eighteenth issue relates only to Garcia. He complains about the district court's exclusion of "execution impact" evidence speculating on the effect a death sentence for Garcia might have on his family. This type of evidence is not mitigating because it does not reflect on the defendant's background or character or the circumstances of his crime. Here, the government did not submit victim-impact evidence, and Garcia offered substantial mitigating evidence. The district court did not abuse her broad discretion in declining to permit the mother of two of Garcia's children to relate her fears about how they would react to his execution.

## Issue XIX: Expert Funding Issue

Like the previous issue, the final issue applies only to Garcia. He argues that the Chief Judge of this Court erred in reducing the approved funding for experts and investigators and in denying funds for an expert in Mexican culture. Under 18 U.S.C. § 3599(g)(2), payments to reasonably necessary experts and investigators assisting indigent capital defendants must by certified by the lower court and approved by the chief judge of the circuit if the costs exceed $7,500. Although not previously addressed by this Court, most circuits to consider the issue have determined that district court orders reducing Criminal Justice Act funding are not appealable. The reasoning of those courts should apply to

decisions made by the reviewing court. Nevertheless, even if reviewable, the

Court's decision to reduce the funding for some experts and to deny funds for a

cultural expert meets the standards set out by the Supreme Court. Garcia received

the funds necessary to mount an adequate case in mitigation.

## ARGUMENT

### ISSUES I-X: ISSUES RELATED TO JURY SELECTION

**Issues I-V: A district court may excuse a prospective juror from a capital case if his views on the death penalty would prevent or substantially impair his performance as a juror in accordance with the court's instructions and the juror's oath. Here, after evaluating their demeanor, the district court excused five prospective jurors who would not impose the death penalty or who vacillated so much that the court could not discern their views. Did the court abuse its discretion?**

## A. Standard of Review

This Court reviews the trial court's decision to exclude a juror for cause in a

death penalty case for abuse of discretion. *United States v. Fields*, 483 F.3d 313,

357 (5th Cir. 2007). The lower court's determination is viewed with "considerable

deference [ ] because such decisions are based on face-to-face credibility

assessments." *United States v. Bernard*, 299 F.3d 467, 474 (5th Cir. 2002)

(*quoting United States v. Webster*, 162 F.3d 308, 340 (5th Cir. 1998).

**B.  The *Wainwright v. Witt* standard applies to evaluation of prospective jurors in a death-penalty case.**

When examining potential jurors regarding their views on the death penalty, the district court must determine "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."[37]  *Uttecht v. Brown*, 551 U.S. 1, 7 (2007) (*quoting Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *citing Adams v. Texas*, 448 U.S. 38, 45 (1980)).

Four principles underpin this standard.  First, "a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause."  *Id.* at 9.  Second, the government has a strong interest in having jurors who are able to apply capital punishment within the framework of the law.  *Id.*  Third, to balance the first two interests, a juror who is substantially impaired in his or her ability to impose the death penalty can be excused for cause, but "if the juror is not substantially impaired, removal for cause is impermissible."  *Id.*  Fourth, in determining whether the removal of a potential juror would vindicate the

---

[37]  Snarr and Garcia urge the Court, in part, to apply a stricter standard found in the dicta of *Witherspoon v. Illinois*, 391 U.S. 510 (1968).  Appellants' Br. at 35, 36, 43.  The *Witherspoon* dicta was rejected by the Supreme Court in *Brown,* 551 U.S. at 6-7.

government's interest without violating the defendant's right, the trial judge makes a judgment "based in part on the demeanor of the juror, a judgment owed deference by reviewing courts." *Id.*

The trial court's determination regarding whether to exclude a particular juror under this standard "is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province." *Id.* at 9 (quoting *Witt*, 469 U.S. at 428). Moreover, the decision receives deferential review "regardless of whether the trial court engages in explicit analysis regarding substantial impairment" because "even the granting of a motion to excuse for cause constitutes an implicit finding of bias," and

> the finding may be upheld even in the absence of clear statements from the juror that he or she is impaired because "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings."

*Id.* at 7.

This Court found no abuse of discretion when the district court excluded a prospective juror whose statements "'resoundingly' indicated his refusal to ever apply the death penalty." *Fields*, 483 F.3d at 357. Likewise, the Court has affirmed exclusion of prospective jurors who believe in the death penalty, but

could not vote to impose it for personal reasons.  For example, the Court held that trial court did not abuse its discretion when it excused a member of the venire who was not opposed to the death penalty, but refused to consider it if the victim was a drug dealer.  *United States v. Flores*, 63 F.3d 1342, 1356 (5th Cir. 1995).  The Court explained that

> [w]hile the process of qualifying jurors to sit in a capital case is of particular importance, "[h]ere, as elsewhere, the quest is for jurors who will conscientiously apply the law and find the facts."  ...  **The district court is not limited to disqualifying only those jurors who would never vote for the death penalty**, ... **but can excuse those who cannot set aside their own predilections in deference to the rule of law**.

*Flores*, 63 F.3d at 1356 (emphasis added) (internal citations omitted).

Similarly, in *Ortiz v. Quarterman*, 504 F.3d 492, 501-02 (5th Cir. 2007), a federal habeas proceeding following a state conviction, the trial court excused a member of the venire who expressed approval of the death penalty but stated that she could not personally impose it.  This Court affirmed the district court's conclusion that the state court did not err, observing that

> [e]ven though [the prospective juror] gave conflicting signals of her ability to serve on the jury given her opposition to capital punishment— she seemed to both "agree[ ] with the death penalty" in some cases but did not "feel" that she could impose it herself— ambiguity alone does not undermine the trial court's decision to exclude her.  Rather, "the trial court, aided as it undoubtedly [is] by

its assessment of [the veniremember's] demeanor, [is] entitled to resolve [ambiguity] in favor of the State."

*Id.* at 502-03 (*quoting Brown*, 551 U.S. at 7).

This Court has also affirmed the dismissal of prospective jurors who waver during voir dire. The Court found no abuse of discretion in dismissing a prospective juror who stated in her questionnaire that she could not sentence another person to death, allowed in voir dire that she might impose the death penalty under limited circumstances, and then wavered on that assertion. *Bernard*, 299 F.3d at 474-75. The Court also found no abuse of discretion where the trial court granted the government's challenge to a prospective juror who stated that she could envision cases in which she could impose the death penalty, but vacillated when asked if she could impose it if life imprisonment without parol was an option. *Webster*, 162 F.3d at 340. Significantly, the Court has noted that "inconsistent" answers regarding the death penalty "alone might have been ground[s]" for excusing a prospective juror. *United States v. Jackson*, 549 F.3d 963, 973 (5th Cir. 2008) (no abuse where juror vacillated, but ultimately stated that she would not vote to impose the death penalty).

**C. The district court did not abuse her discretion in dismissing the five prospective jurors.**

Snarr and Garcia argue that the district court improperly excluded five prospective jurors. The record demonstrates, however, that the trial court did not abuse her discretion in excluding any of the potential jurors for cause.

As an initial matter, the transcripts of the voir dire demonstrate that the court conducted a thorough and thoughtful evaluation of the entire panel. *See, e.g., Brown*, 551 U.S. at 10-13 (reviewing entire voir dire for context). The process included a written questionnaire followed by individual questioning by the government and the defense. Before each juror was individually questioned, the trial court addressed the panel with the following general instructions:

> The law requires that the jurors approach this entire task with open minds and be guided by what they see and hear in court. They must not allow themselves to be controlled by any preconceived notions or ideas that they might have about the facts or the law. Any personal disagreement with the controlling law must be set aside by the juror.
>
> . . .
>
> A potential juror is not qualified for or disqualified from service on this jury merely because he or she has some personal views or opinions for or against the death penalty as a punishment. On the contrary, persons who personally oppose the death penalty may serve as jurors so long as they clearly and honestly state their willingness and ability to put aside their own beliefs and follow the law given by the court. Stated another way, your personal views for or against the death penalty will not disqualify you from being a juror unless they will prevent or substantially impair your ability to decide all of the

issues in the case based solely on the evidence and the law which I tell you applies, whether or not you may personally agree with that law. That is the essence of what it means to be a judge of the facts.

*See* USCA5 611-12, 633-34, 1413, 1419, 1890, 1915-16, 2393, 2420-21.

### (1). Issue I: Prospective Juror No. 3

On her written questionnaire, Juror No. 3's answers generally indicated opposition to the death penalty, but in response to one question, she stated that she could put her feelings aside and impose it if a death sentence was called for by the facts and law in the case. USCA5 654-55. When asked about that response during voir dire, Juror No. 3 explained that she had misunderstood the question and said that she likened the death penalty to taking a life: "I believe that when God is ready for us to die, we are going to die and that it should be in that realm that a person's life is taken." USCA5 655. Upon further questioning by the government, she consistently stated that her personal feelings would prevent her from voting for the death penalty. USCA5 656-58.

During voir dire by the defendants' counsel, Juror No. 3 was asked a series of questions— which the court characterized as "unfair" and "disingenuous," USCA5 672— about balancing aggravating and mitigating factors. USCA5 660-63. She responded that she would answer truthfully. USCA5 660-63. When examined further by the government, Juror No. 3 explained that the questions had

confused her, but re-stated that her feelings against the death penalty would prevent her from ever voting for it, irrespective of the evidence or law. USCA5 663, 665-66. She then vacillated under further questioning by the defendants. USCA5 667.

The government challenged Juror No. 3 for cause, and Snarr and Garcia opposed excusing her. USCA5 668-71. The trial court sustained the challenge, noting that the prospective juror's views would substantially impair her ability to serve. USCA5 672. The court based the determination on Juror No. 3's demeanor and testimony. USCA5 671-72.

The district court did not abuse her discretion in excusing Juror No. 3. The record demonstrates that, although the prospective juror wavered during the final questioning, she had already made clear her unequivocal refusal to consider the death penalty. While her inconsistent answers alone were grounds to excuse her, *e.g., Jackson*, 549 F.3d at 973, the record supports the district court's decision that this prospective juror's views or beliefs would prevent or substantially impair her ability to perform her duties as a juror.

**(2). Issue II: Prospective Juror No. 66**

Like Juror No. 3, Juror No. 66 indicated on her questionnaire that she could not vote for the death penalty except for one question that she had misunderstood. USCA5 1462-66. During voir dire, the prospective juror vacillated, explaining: "I feel like if the Holy Spirit was to guide me or tell me what I should do, then if it's death penalty, then that's— if that's my gut feeling, then I'll do what my gut feeling is because I feel like my gut feeling is the Holy Spirit." USCA5 1463-64. She further stated that she would have no difficulty at the guilt/innocence phase of the trial because she was taught that one was "guilty until proven innocent" in her youth. USCA5 1464-65. Juror No. 66 refused to commit to whether she would— or could— impose the death penalty if the law and facts justified it. USCA5 1466-70.

In granting the government's challenge for cause, the district court relied heavily on the prospective juror's apparent confusion, noting that

> "[a]mbiguity" is charitable as to this juror. She was totally ambiguous. Her answers were kind of strange, and her demeanor was strange. She just kind of went off on some garbled explanation of some point that didn't really make any sense. The court had to rein her back in. And it seemed that she was trying to almost say that she would presume people guilty unless proven innocent in her strange comment. I don't think her demeanor is adequate to serve as a juror in this case.

70

USCA5 1474.

The court also based its decision on Juror No. 66's questionnaire and her statements indicating that she would let the Holy Spirit decide on the sentences. USCA5 1473-74.

The district court did not abuse her discretion in excusing Juror No. 66. Although the juror wavered somewhat during voir dire, she never stated that she could follow the law based on the facts proved at trial. Like Juror No. 3, this juror's inconsistent answers alone were grounds to excuse her. *See, e.g., Jackson*, 549 F.3d at 973. Based on the voir dire, Juror No. 66 appeared to be the type of person who simply could not be asked enough questions to ascertain her position with unmistakable clarity. *See, e.g., Brown*, 551 U.S. at 7. The record fully supports the district court's decision that this prospective juror's views or beliefs would prevent or substantially impair her ability to perform her duties as a juror.

**(3). Issue III: Prospective Juror No. 130**

Juror No. 130 had previously served on a capital murder jury that recommended the death penalty. USCA5 1931, 1961. In his questionnaire, he stated that he did not believe he could serve on another capital murder trial and that, although he believed in it as a punishment, he "could not render the death penalty for a second time." USCA5 1961-62.

71

When questioned during voir dire, Juror No. 130 said that his prior service, which had occurred in the 1990's, had bothered him for a long time and, in fact, still bothered him. USCA5 1931-35, 1954-55. He explained that he had dreams about being in the jury room and, at times, would "wake up in the middle of the night and see the defendant's face." USCA5 1934. Based on the emotional fallout from his prior service, the juror could not assure the court that he would be able to vote for the death penalty again, even if the facts and law justified it. USCA5 1937, 1942-44, 1954-55.

In addition to his inability to impose the death penalty a second time, Juror No. 130 had researched the defendants and the case. USCA5 1938-41. As discussed in Issue IX, he had been temporarily excused based on a hearing impairment and, during that time, had looked up both of the defendants on the Internet. USCA5 1939-40. Juror No. 130 discovered that Snarr was "one of three leaders . . . of a vicious white supremacy group in Utah" and read about the case in the online edition of a local newspaper in Beaumont. USCA5 1939-40. The prospective juror candidly observed that, "I don't think you ever forget what you learn," but stated that he could "probably" put the information out of his mind because, if selected, he would learn "much more." USCA5 1941. He also said

that he would base any decision in the case on the evidence produced in court. USCA5 1944-45.

In granting the government's challenge for cause, the court considered Juror No. 130's specific answers on the questionnaire, responses during voir dire, and demeanor in court and concluded that his views about the death penalty— or rendering it a second time— would substantially impair his ability to perform his duties as a juror.  USCA5 1961-62.  The court was also rightfully concerned about the juror's outside investigation and his hearing problem.  USCA5 1962.

The district court did not abuse her discretion in excusing Juror No. 130. Like the venire members excused in *Jackson, Flores,* and *Ortiz*, the juror demonstrated that his personal feelings would substantially impair his ability to serve as a juror, irrespective of his general support for the death penalty.  *E.g., Jackson*, 549 F.3d at 974 (prospective juror Lee); *Flores*, 63 F.3d at 1356; *Ortiz*, 504 F.3d at 501-03.  The district court's decision to excuse Juror No. 130 was appropriate.

### (4).  Issue IV:  Prospective Juror No. 140

During voir dire, Juror No. 140 indicated general support for the death penalty; however, she advised the prosecutor that, "I don't have a problem looking at the facts and going through all the information and deciding for the death

penalty or life in prison . . . [b]ut I don't know that ultimately I could say yes."

USCA5 2038.  She explained that she was unsure whether she could "handle"

voting to impose a death sentence.  USCA5 2040.  She also stated that the

"scariness" of the death penalty would substantially impair her from voting to

impose it even if the facts justified that sentence.  USCA5 2041-42.

When pressed by defense counsel, Juror No. 140 wavered, stating that she

was "on the fence."  USCA5 2045.  She generally expressed doubt about whether

she could vote to impose the death penalty, but when asked if she would answer

correctly "even if it led to the death penalty," she said, "I just— I would say yes,

but I'm still . . . It would be hard."  USCA5 2046-49.  The juror continued to

vacillate until, finally, the prosecutor said:

> Okay.  You're in the jury box.  The government has proved to you
> that the factors— the aggravating factors that weigh in favor of the
> death penalty outweigh the factors that weigh in favor of a life
> sentence and that we've proved to you that the death penalty is
> justified.  I want to know if you are going to be able to vote for the
> death penalty if that's the case.

USCA5 2054.  Juror No. 140 responded, "I— I— I just don't know."  USCA5

2054.  When asked why she did not know, she said, "It just— my gut says no."

USCA5 2054.

The defendants followed up by asking whether she could follow the oath taken by jurors, and Juror No. 140 wavered, finally saying, "I'm not going to." USCA5 2057. Based on the prospective juror's demeanor and answers, including the final one, the district court sustained the government's challenge for cause. USCA5 2059-60.

The district court did not abuse her discretion in excusing Juror No. 140. Like the venire members excused in *Jackson*, *Flores,* and *Ortiz*, the juror demonstrated that her personal feelings would substantially impair her ability to serve as a juror, irrespective of her general support for the death penalty. *E.g., Jackson*, 549 F.3d at 973 (prospective juror Epps); *Flores*, 63 F.3d at 1356; *Ortiz*, 504 F.3d at 501-03. Because the record shows that the juror could not follow her oath, the district court's decision to excuse her was correct.

**(5). Issue V: Prospective Juror No. 200**

On her questionnaire, Juror No. 200 indicated that she had reservations about the death penalty, except for crimes involving the murder, abuse, or molestation of children or the murder of an elderly person. USCA5 2565-68. She maintained this position during voir dire, USCA5 2557-58, but wavered slightly when questioned by the defendants, agreeing that there might be other crimes that could warrant a death sentence. USCA5 2558. Later, while being examined by

the government, the prospective juror volunteered:  "And when he said that awhile ago.  I kind of— I waffled on that; I know that.  But in my heart, I don't think I could live with myself if I voted for [the death penalty in this type of case]."  USCA5 2566.  When asked if she could ever vote for the death penalty in cases not involving children, elderly, or otherwise "helpless" victims, Juror No. 200 responded, "Probably not."  USCA5 2569.  She also stated that she could not follow the oath if the victim of the crime did not fall within her identified categories.  USCA5 2569-70.  While subsequently agreeing that her categories were broad and that there could be other situations that might warrant a death sentence, USCA5 2574-76, Juror No. 200 refused to say that she could vote to impose the death penalty unless the defendant had murdered a child or elderly person, explaining, "I don't think I could live with myself."  USCA5 2576-77.

Juror No. 200 also advised that she was the only babysitter for her two-year-old grandson and that she kept him while her daughter— a single parent— worked.  USCA5 2563.  She stated that her concern for his care would distract her if she was selected as a juror.  USCA5 2564.

The district court granted the government's challenge for cause based on the juror's views and demeanor.  USCA5 2579.  The court also expressed concern about the juror's ability to concentrate while worried about the care of her

grandchild.  USCA5 2579.  This ruling was not an abuse of the court's discretion.

Like the prospective juror in *Jackson*, Juror No. 200 wavered during voir dire, but

ultimately returned to her refusal to consider the death penalty in cases not

involving victims who were children or elderly.  *Jackson*, 549 F.3d at 973

(prospective juror Epps); *see also Webster*, 162 F.3d at 340; *Bernard*, 299 F.3d at

474-75.  The record supports the district court's decision that this prospective

juror's views or beliefs would prevent or substantially impair her ability to

perform her duties as a juror.

> **Issues VI-VIII:  In addressing a district court's failure to remove a prospective juror for cause, the Supreme Court focuses on the impartiality of the jurors actually seated.  Here, after receiving ten additional peremptory challenges, the defendants exercised three challenges on prospective jurors that they had challenged for cause, but another juror the defendants desired to strike— who was not challenged for cause— was selected.  Were the district court's rulings a manifest abuse of discretion?**

## A.  Standard of Review

The Court reviews a district court's ruling as to juror impartiality for

"manifest abuse of discretion."  *United States v. Munoz*, 15 F.3d 395, 397 (5th Cir.

1994); *see also Skilling v. United States*, ___ U.S. ___, 130 S.Ct. 2896, 2903

(2010) ("A trial court's findings of juror impartiality may be overturned only for

manifest error.").  "In reviewing such claims, the deference due to district courts is

at its pinnacle." *Skilling*, 130 S.Ct. at 2903 (*quoting Mu'Min v. Virginia,* 500 U.S. 415, 428 (1991)).

**B. The district court did not violate the defendants' rights when, after giving them ten additional peremptory challenges before trial, she declined to give them even more before the challenges were exercised.**

   **(1). The defendants' Sixth Amendment Right to an impartial jury was not violated.**

In *Ross v. Oklahoma*, 487 U.S. 81, 86 (1988), the Supreme Court pointed out that "[a]ny claim that the jury was not impartial . . . must focus not on [jurors that were removed by peremptory challenges], but on the jurors who ultimately sat." So long as the jurors actually seated could conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case, "the Constitution presupposes that a jury selected from a fair cross section of the community is impartial, regardless of the mix of individual viewpoints actually represented on the jury." *Id. (quoting Lockhart v. McCree,* 476 U.S. 162, 184 (1986)). In this case, Snarr and Garcia are unable to show that the jury actually seated was not impartial.

Before trial, the district court raised the issue of whether Snarr and Garcia would require extra peremptory challenges.[38] USCA5 81-95, 100-103. The court

---

[38] Under Fed. R. Crim. P. 24(b)(1), the defendants were entitled to 20 peremptory challenges.

ultimately decided to give the defendants ten additional peremptory challenges, which they could divide or exercise jointly. USCA5 231-34. This resulted in a total of 30 peremptory challenges for Snarr and Garcia. During individual voir dire, Snarr and Garcia challenged for cause prospective juror Nos. 17, 132, and 184.

After voir dire, Snarr and Garcia moved for "one or more" additional peremptory challenges. Snarr USCA5 653-55; Garcia USCA5 865-67. In their motions, the defendants noted that they had lodged unsuccessful challenges for cause to seven prospective jurors, including juror Nos. 17, 132, and 184. Snarr USCA5 653-54; Garcia USCA5 865-66. Without acknowledging that they had already received ten extra peremptory challenges, Snarr and Garcia claimed that the district court had erroneously denied their challenges and urged the court to reconsider and excuse the seven prospective jurors for cause or to grant the defense "sufficient additional peremptory challenges to remove the objectionable venirepersons." Snarr USCA5 653; Garcia USCA5 866. Snarr and Garcia argued that, if not granted additional peremptory challenges, they would be "unable to remove other objectionable jurors who were not necessarily disqualified as a matter of law but who were nonetheless unable to be fair and impartial jurors in the judgment of defendants." Snarr USCA5 654; Garcia USCA5 867. They listed

five prospective jurors in this category, one of whom was Juror No. 129. USCA5 655. The court denied the motion, Snarr USCA5 660; Garcia USCA5 872, and Juror No. 129 was selected for the jury.

On appeal, Snarr and Garcia claim that the jury was not impartial because they could not exercise a peremptory challenge on Juror No. 129. Appellants' Br. at 55-57. The defendants did not challenge Juror No. 129 for cause during voir dire. USCA5 1876. While acknowledging that Juror No. 129 could not be removed for cause, Snarr and Garcia argue that she was an "objectionable" juror because of her "feelings about the death penalty, leanings in favor of the death penalty, initial thoughts about placing the burden to prove the life sentence on the appellants, and her general prosecutorial demeanor." Appellants Br. at 56-57. The record does not support these contentions.

On her questionnaire, Juror No. 129 placed her feelings about the appropriateness of having the death penalty at seven on a scale of ten, with one being weak and ten being strong. USCA5 1860. She explained that she was slightly over the mid-point because she believed that "life is very precious," but she also believed that life imprisonment without the possibility of parole was also a harsh punishment. USCA5 1864-66. Juror No. 129 consistently stated that she understood that the government bore the burden of proof and that the defendants

were not required to present evidence.  USCA5 1861-63, 1871-74.  She also stated

that she would follow the court's instructions.  USCA5 1861, 1875-76.  She

understood the balancing of factors and believed she could do so fairly.[39]  USCA5

1861-62, 1871-74.

Nothing about Juror No. 129's answers indicated that she could not be

impartial.  Thus, her presence on the jury did not render it unfair.  *See Ross*, 487

U.S. at 86 (noting that none of the jurors actually seated had been challenged for

cause); *see also United States v. Wharton*, 320 F.3d 526, 535-36 (5th Cir. 2003)

(claim that jury was not impartial because one juror's personality clashed with

defense counsel during voir dire found to be spurious); *Webster*, 162 F.3d at 341

(allegation that jurors were "objectionable" insufficient to prove jury was not

impartial).  And because Snarr and Garcia fail to show that the jury actually seated

was not impartial, their complaints about the district court's denial of their

challenges to other prospective jurors fall short.  *Ross*, 487 U.S. at 88-86.

---

[39] Snarr and Garcia imply that Juror No. 129 was biased because she had relatives in law enforcement, Appellants' Br. at 56, but she stated that her relatives' employment would not affect her ability to be fair.  USCA5 1857-58, 1869-70.  These connections did not prompt the defendants to challenge Juror No. 129 for cause, but if they had, the connections would not have been sufficient to remove her from the jury if the district court credited her answers.  *See, e.g., Flores*, 63 F.3d at 1357-58; *United States v. Bryant*, 991 F.2d 171, 174 (5th Cir. 1993).

**(2). The defendants' Fifth Amendment right to due process was not violated.**

Snarr and Garcia further contend that a constitutional violation occurred when they were forced to use peremptory challenges to remove jurors who they believe should have been removed for cause. Appellants' Br. at 61-64. They are incorrect.

The Supreme Court has made clear that, although peremptory challenges play a role in reinforcing a defendant's right to trial by an impartial jury, they "are auxiliary; unlike the right to an impartial jury guaranteed by the Sixth Amendment, peremptory challenges are not of federal constitutional dimension." *United States v. Martinez-Salazar*, 528 U.S. 304, 311 (2000) (*citing Ross*, 487 U.S. at 88; *Swain v. Alabama,* 380 U.S. 202, 212-213, 218-219 (1965) *overruled in part by Batson v. Kentucky* 476 U.S. 79, 100 n.25 (1986); *Pointer v. United States,* 151 U.S. 396, 408 (1894)). In *Martinez-Salazar*, the Court held that the defendant did not "lose" a peremptory challenge by exercising it curatively on a prospective juror who should have been excused for cause. *Martinez-Salazar*, 528 U.S. at 315. Rather, in choosing to remove the prospective juror, the defendant "used the challenge in line with a principal reason for peremptories: to help secure the constitutional guarantee of trial by an impartial jury." *Id.* at 316. Thus, when

a federal defendant exercises the peremptory challenges allotted under Rule 24, he has "received precisely what federal law provided; he cannot tenably assert any violation of his Fifth Amendment right to due process."[40]  *Id.* at 317 (*citing Ross*, 487 U.S. at 91).

In this case, Snarr and Garcia were given ten extra peremptory challenges before voir dire began.  On appeal, they only complain about being "forced" to exercise three peremptory challenges on prospective jurors— Nos. 7, 132, and 184— that they believed should have been removed for cause.  Even if Snarr and Garcia were correct that the trial court erred in denying their challenges for cause, there is no error under *Martinez-Salazar* in using the peremptory challenges curatively.  Moreover, the defendants had 27 peremptory challenges after exercising three on prospective juror Nos. 7, 132, and 184.  Had Juror No. 129 actually been as objectionable to Snarr and Garcia as they assert on appeal, they could have exercised a peremptory challenge on her and still had six above the 20 allotted by Rule 24.  "A hard choice is not the same as no choice."  *Martinez-Salazar*, 528 U.S. at 315.  As the defendants acknowledge, the district court's

---

[40]   In *Martinez-Salazar*, as in this case, there was no allegation that the district court deliberately forced the defendants to use peremptory challenges to correct the court's error. *Martinez-Salazar*, 528 U.S. at 316.  Nor, as discussed above, did the district court's rulings result in the seating of a juror who should have been dismissed for cause.  *Id.*

rulings did not result in the seating of a juror who should have been dismissed for cause. *Id.* at 316. There was no due process violation.

**C. The district court did not abuse its discretion in denying the defendants' challenges for cause.**

As discussed above, Snarr and Garcia cannot complain about the district court's denial of their challenges for cause because they fail to show that the jury actually seated was not impartial. Even if they could, however, their claims about the three prospective jurors also fail. The district court did not commit a manifest abuse of discretion in denying the challenges to prospective jurors 17, 132, or 184.

**(1). Issue VI: Prospective Juror No. 17**

Prospective Juror No. 17 expressed reservations about the fairness of how the death penalty is administered, but stated that he could base any decision on the facts of the case. USCA5 921-24. He had worked in law enforcement while in college, spent 31 years in private industry, and, having retired, was training to be a correctional officer in hopes of eventually becoming a parole officer. USCA5 924-27. Juror No. 17 stated that nothing about his training or experience would affect his ability to be fair and impartial in this case. USCA5 926-27. He considered himself to be in "the middle," respecting both the prosecution and the defense, and understood that the burden was on the government. USCA5 929-31.

Although he expressed the general belief that law enforcement officers would tell the truth, he made clear that he would not automatically believe them and that he would follow the court's instructions regarding witnesses. USCA5 931-34, 938-40. Juror No. 17 did not want to be on the jury, but unequivocally stated that he would be fair and impartial if selected. USCA5 936-37.

In *United States v. Duncan*, 191 F. 3d 569, 573-74 (5th Cir. 1999), the Court found no abuse of discretion where a district court denied a challenge for cause to a prospective juror who stated on her questionnaire that she would give more weight to the testimony of law enforcement officers, noting that such view might reflect "responsible citizenship." Under further questioning, the juror in *Duncan* unambiguously stated that she would be fair and could reject the testimony of a law enforcement witness who lacked credibility. *Duncan*, 191 F. 3d at 574; *see also Munoz*, 15 F.3d at 397 (prospective juror believed law enforcement officers would be "better able to recognize someone" but would base decision on the evidence and instructions). Similarly, in *United States v. Dozier*, 672 F.2d 531, 548-49 (5th Cir. 1982), the Court observed that "a pretrial impression that a grand jury indictment 'make(s) it look like [the defendant is] more guilty than innocent' is hardly an unalterable, or even unusual, notion. Probably many laymen hold such an exalted view of indictments until cautioned

otherwise." Thus, when the juror assured the trial court that he could put aside prior impressions, afford the presumption of innocence and the right to silence, and consider only the evidence presented at trial, the court did not err in denying a challenge for cause. *Dozier*, 672 F.2d at 549; *see also Webster*, 162 F.3d at 343-44 (juror who leaned toward prosecution because defendant had been arrested was not disqualified because he could base his verdict on the evidence and understood the burden of proof).

Like the jurors in *Duncan* and *Dozier*, Juror No. 17 unequivocally stated that he could put his general feelings about the credibility of law enforcement aside and follow the court's instructions. The district court did not commit a manifest abuse of discretion in denying the challenge for cause to this juror.

### (2). Issue VII: Prospective Juror No. 132

When asked about his views on the death penalty, prospective Juror No. 132 responded: "I believe strongly if objective evidence proves guilt, death penalty should be implemented to protect and improve society." USCA5 1968. Nevertheless, he assured the court that his mind would not be "made up" about the sentence, even if the jury had already found the defendant guilty. USCA5 1971. Juror No. 132 explained that, as an auditor, he was accustomed to weighing evidence objectively and would not make an "automatic" decision. USCA5 1971-

72. The juror became confused (USCA5 1984), however, when questioned by defense counsel and stated that he would "[n]ot necessarily" impose the death penalty if guilt were determined, but expressing reservations if the defense chose not to present evidence. USCA5 1973-79. When the burden of proof was explained to him on redirect, Juror No. 132 stated that he would "go by the law, whatever the law is." USCA51981-83. He specifically stated that he would follow the court's instructions on the burden of proof. USCA5 1984.

In *Webster*, 162 F.3d at 343, the Court found that the trial court did not err in denying a challenge for cause to a prospective juror who answered "hypothetical questions in ignorance of the law the court would instruct her to apply," but ultimately then stated that she would be able to follow the court's instructions and procedures. Discussing another prospective juror who had been unsuccessfully challenged for cause based on his personal experiences, the Court noted that "[a] juror need not, and indeed cannot, leave his experiences and circumstances outside the jury room. What he must do is base a decision solely on the evidence presented, as seen in a fair and unbiased manner through the lens of his experiences." *Id.* at 345.

Here, Juror No. 132 affirmed that he would follow the law and, specifically, the district court's instructions regarding the burden of proof. The district court,

which was able to assess his demeanor, found the prospective juror to be credible. The record demonstrates that the court's decision was not a manifest abuse of discretion.

### (3). Issue VIII: Prospective Juror No. 184

With respect to the death penalty, prospective Juror No. 184 stated on her questionnaire that she generally favored the death penalty, but would base her decision on the law and the facts of the specific case. USCA5 2725-26. During voir dire, she explained that "if a person takes another person's life, that there's a possibility that they should— their life should be taken, too, depending on the circumstances." USCA5 2720. Confused by the term "capital" (USCA5 2727, 2734, 2735), however, she appeared to say that she would automatically impose the death penalty if a defendant was convicted of "capital murder." USCA5 2721-25. When the law, procedure and burden of proof were explained to Juror No. 184, she agreed that she could follow the law, including imposition of a life sentence. USCA5 2728-2734. She stated that she would listen to all the evidence and could impose a life sentence even in a "capital" murder case. USCA5 2735-36.

Under a second round of questioning, Juror No. 184 said that the defendant would have to prove that a life sentence was appropriate. USCA5 2739-40. But,

when given the opportunity, she stated that she understood the burden of proof and could impose a life sentence even if the defendant presented no evidence in mitigation. USCA5 2740-43. Finally, despite confusing questioning, the juror stated that, irrespective of her support of the death penalty, she would "listen to all of the testimony and the directions of the judge." USCA5 2743-46.

As noted above, a district court does not err by denying a challenge for cause to a prospective juror who answers "hypothetical questions in ignorance of the law the court would instruct her to apply," but affirms that he or she will be able to follow the court's instructions and procedures. *Webster*, 162 F.3d at 343. In *United States v. Hall*, 152 F.3d 381, 408-10, 412-413 (5th Cir. 1998), *abrogated on other grounds by Martinez-Salazar,* 528 U.S. at 310, the Court evaluated the denial of challenges for cause to six prospective jurors, each of whom expressed views similar to that of Juror No. 184. Because each prospective juror assured the district court that he or she would consider the evidence and follow the court's instructions, the district court did not abuse its discretion in declining to strike them. *Hall*, 152 F.3d at 409-10, 412-13. Similarly, in *Munoz*, 15 F.3d at 396-97, the Court affirmed the district court's denial of a challenge for cause to a prospective juror who was concerned that defendants were not punished harshly enough, but agreed that he could "put aside any general feelings he had

and follow the court's instructions on the burden of proof and presumption of innocence and decide the case on the evidence and the court's instructions."

In denying Snarr and Garcia's challenge for cause to Juror No. 184, the district court recognized that the juror was "a bit confused," but found that her overall demeanor indicated that she would not automatically impose the death penalty. USCA5 2751. The court credited the juror's statements that she would listen to the evidence and follow the law. USCA5 2751. Based on the record, this was not a manifest abuse of discretion.

In sum, the district court did not err in denying Snarr and Garcia's challenges to prospective jurors 17, 132, or 184. Accordingly, Snarr and Garcia's Issues VI, VII, and VIII are without merit.

> **Issues IX and X: A district court may, in its discretion, excuse a prospective juror who has a physical infirmity that impairs his capacity to serve on a jury. Here, the district court excused two veniremen— at their request— after determining that they had physical impairments to service. Did the court abuse its discretion?**

## A. Standard of Review

"Determinations as to the general qualifications of jurors are reviewed for abuse of discretion." *United States v. Whitfield*, 590 F.3d 325, 360 (5th Cir. 2009) (*citing United States v. McCord,* 695 F.2d 823, 828 (5th Cir. 1983)). Thus,

defendants' claim that the district court erred in excusing two jurors based on their physical infirmities is reviewed for abuse of discretion. Snarr and Garcia's related claim that the district court violated the Americans with Disabilities Act in excusing the jurors was preserved and, as a question of law, should be reviewed de novo. *See generally Jackson*, 549 F.3d at 969.

The defendants' claims that excusing the jurors violated their constitutional right to due process and equal protection were not raised at trial. As such, they are reviewed for plain error. Under plain error review, a defendant must prove that (1) there was an error; (2) the error was clear and obvious; and (3) the error affected the defendant's substantial rights. *United States v. Olano*, 507 U.S. 725, 732-34 (1993); *United States v. Mares*, 402 F.3d 511, 520 (5th Cir. 2005). If all three of these conditions are met, an appellate court may, in its discretion, review the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Mares*, 402 F.3d at 520. Under the plain error standard, it is enough that error is plain at the time of appellate consideration. *Johnson v. United States*, 520 U.S. 461, 467-68 (1997); *United States v. Miller*, 406 F.3d 323, 336 (5th Cir. 2005).

Plain error review "requires considerable deference to the district court." *United States v. Peltier*, 505 F.3d 389, 391 (5th Cir. 2007). The defendant, not the

government, bears the burden of persuasion with respect to prejudice, and that burden "should not be too easy." *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004). Appellate review under the plain error standard is "circumscribed," and the court's authority under Fed. R. Crim. P. 52(b) should be used sparingly. *Jones v. United States*, 527 U.S. 373, 389 (1999).

**B. The district court did not abuse its discretion in excusing two jurors because of physical infirmities that significantly impaired their ability to serve as jurors.**

Under 28 U.S.C. 1865(b)(4), a prospective juror is disqualified if he is "incapable, by reason of mental or physical infirmity, to render satisfactory jury service." The trial court has broad discretion in determining whether to grant a challenge for cause based on a juror's mental or physical impairment. *United States v. Solomon*, 273 F.3d 1108, *3 (5th Cir. 2001) (unpublished)[41] (district court properly excused prospective juror with obsessive compulsive disorder who could not assure the court that he would be able to concentrate). The district court did not abuse that discretion here.

---

[41] Although unpublished decisions are not precedent, they may be cited for "factual similarity and persuasive reasoning." *United States v. Stotts*, 397 F. App'x 68, 72 n.2 (5th Cir. 2010); *see also Reyes v. Bridgwater*, 362 F. App'x 403, 408 n.6 (5th Cir. 2010).

**(1). Issue IX: Prospective Juror No. 130**

During general voir dire,[42] the court gave prospective jurors the opportunity to list "severe" hardships to jury service on their questionnaires. USCA5 326. The court told the group that she would visit with individuals who listed some form of hardship after the questionnaires were completed. USCA5 326.

Under hardships, Juror No. 130 listed concerns about already having served on a capital jury, discussed in Issue III above, and about his job. USCA5 438. He also reported that he took five different medications at different times. USCA5 439. When asked if the medications impaired his ability to concentrate, the prospective juror stated: "No, but my hearing does. I've got 40 percent hearing loss in both ears." USCA5 439. He added that he had not understood anything the court had said during voir dire, even though he could hear her voice. USCA5 440. Juror No. 130 had understood the prosecutor around 90 percent of the time and understood "quite a bit" of what one defense counsel said. USCA5 440. He only understood about 30 percent of what the other defense counsel said. USCA5 440. Juror No. 130 explained that he had a congenital condition called "electrodermal dysplasia" and that his hearing aids did not work. USCA5 441.

---

[42] Because of the size of the panel, general voir dire was conducted on two days with two panels. Juror No. 130 appeared for general voir dire on April 6, 2010. USCA5 289.

93

He said that volume was not the issue; rather, it was the pitch, tone, or accent of some voices.  USCA5 449, 450; *see also* USCA5 441-42, 453.  His hearing loss was worse than it had been when he had served on a jury nearly twenty years earlier.  USCA5 447.

During the interview, Juror No. 130 had difficulty understanding the court's questions.  USCA5 448, 451-52.  He stated that he could not be confident that he would be able to understand the witnesses "unless you brought every witness here today and had them talk to me."  USCA5 453.  Based on the prospective juror's statements, the district court excused him based on his physical infirmity.  USCA5 453-55.  Snarr and Garcia objected, arguing that Juror No. 130 could raise his hand if he could not hear a witness.  USCA5 453-54; *see also* USCA5 443-45.  No mention was made regarding the Americans with Disabilities Act (ADA) or other constitutional concerns.  *Id.*

After later discussions about the ADA, however, the government asked the court to bring back the prospective jurors who had been excused for physical hardships over Snarr and Garcia's objection.  USCA5 586.  The defendants expanded the request to include all prospective jurors who were excused for physical infirmities.  USCA5 587-89.  The court declined to recall the prospective jurors who were excused by agreement, but decided to recall those whose excuses

had been opposed.  USCA5 589-93.  Consequently, Juror No. 130 came back for individual voir dire.  USCA5 593.

Although Juror No. 130's individual voir dire focused on his willingness to impose the death penalty a second time, USCA5 1937-55, he advised the court that his hearing problem persisted.  USCA5 1955-56.  As discussed above, the court ultimately dismissed Juror No. 130 for cause based on his views about the death penalty.  USCA5 1957-64.  After a discussion about the ADA, USCA5 1962-64, the court reiterated that she believed the juror could also be excused because of his hearing difficulties, USCA5 1964.

As discussed in Issue III, the district court did not abuse its discretion in granting the challenge for cause to Juror No. 130.  Nevertheless, the court's concerns about his hearing impairment also would have supported excusing him. *See, e.g., United States v. Powell*, 444 F. App'x 517, 519-20 (3rd Cir. 2011) (unpublished) (no error in excusing hearing-impaired juror); *Fendrick v. PPL Services Corp.*, 193 F. App'x 138, 140 (3rd Cir. 2006) (unpublished) (same); *cf. United States v. Leahy*, 82 F.3d 624, 629-30 (5th Cir. 1996) (district court did not abuse discretion in dismissing juror during deliberations because his hearing impairment prevented him from hearing significant portions of testimony and from participating in deliberations); *United States v. Quiroz-Cortez,* 960 F.2d 418, 419

(5th Cir. 1992) (juror dismissed after deliberations had begun because he "was hard of hearing and may not have heard all of the trial testimony").  Snarr and Garcia present no reversible error related to excusing Juror No. 130.

### (2).  Issue X:  Prospective Juror No. 232

Juror No. 232 appeared on the second day of general voir dire.  USCA5 478. As with the venire panel that included Juror No. 130, the district court told the second panel that they were to report hardships on their questionnaires and that the listed issues would be addressed individually after the questionnaires were completed.  USCA5 519.

On his questionnaire, Juror No. 232 disclosed that he used medication that caused him to use the restroom frequently.  USCA5 535.  Although he said that he would like to serve on a jury, USCA5 536, 541-42, his health kept him from doing so, USCA5 536.  When discussing his condition with the court, he explained that he had hypertension, colon issues, and "things like that."  USCA5 536.  Juror No. 232 took five medications to treat his conditions, and the medicines caused him to need frequent restroom breaks.  USCA5 535-36.  Juror No. 232 estimated that he needed a restroom break every "hour, hour and a half, something like that" but observed that "some days [were] better than others" and that other factors affected the problem.  USCA5 536-37, 542.  He stated that he had been to the restroom five

times since arriving at the courthouse.  USCA5 536.  The prospective juror said that he was willing to alert the court when he needed a break, but observed that, when the urge hit, "I'm going."  USCA5 537.  He also stated that "possibly" he would have difficulty concentrating on the trial if he needed a restroom break.  USCA5 538-40.  He could not assure the court that he could go even two hours without a break.  USCA5 543.

After Juror No. 232 left the room, the court expressed concern regarding the frequent breaks he would require: "If you're in the middle of a witness and we don't want to stop, it's two hours."  USCA5 543.  The government urged that Juror No. 232 be excused, but Snarr and Garcia objected, arguing that he was not substantially impaired or disabled from service.  USCA5 543-47.  The court decided to excuse Juror No. 232, noting that he seemed worried about the issue and had used two exclamation points when discussing the problem on his questionnaire.  USCA5 547.  Snarr and Garcia also objected on the grounds of the ADA, which the court overruled.  USCA5 548-49.

On the first day of individual voir dire, the court advised counsel that she was recalling Juror No. 232 for "more exploration as to his ability."  USCA5 585.  During his individual questioning, the prospective juror clarified some of his answers on the questionnaire.  USCA5 2959-63.  When discussing his medical

condition, he explained that he had more problems in the morning than in the afternoon and said that he had been to the restroom five times between 9:00 a.m. and 11:30 a.m. that day. USCA5 2964. He stated: "I would assume in my own mind that there's going to be times that we're going to literally have to sit for an hour or two and being undisturbed about that. I'm just saying some days that's just not going to work for me, and that's the best way I can say it." USCA5 2966. The court then asked Juror No. 232 if he was asking to be excused, and he said that he was. USCA5 2966.

When the juror left the room, the court and counsel discussed his request. USCA5 2967-68. Snarr and Garcia opposed excusing him. USCA5 2968. The court, however, decided to grant the prospective juror's request, pointing out that taking restroom breaks five times in two and a half hours would be too disruptive. USCA5 2968.

"A trial court may excuse a potential juror for cause due to health issues." *United States v. Flores*, 572 F.3d 1254, 1261 (11th Cir. 2009) (excusing prospective juror who had attention deficit disorder). Here, the district court did not abuse its broad discretion in granting Juror No. 232's request to be excused due to his physical infirmity. The trial in this case was anticipated to be lengthy, and in fact, it was. Taking up to five breaks in a two and one-half hour period

98

would have not only lengthened the trial, it would have significantly affected the concentration of the witnesses, attorneys, and other jurors.  The record supports the court's decision to excuse Juror No. 232.

**C.  The district court did not err in determining that the Americans with Disabilities Act does not apply to the federal courts.**

Snarr and Garcia argue that the district court violated "the spirit of the Americans with Disabilities Act, if not the Act itself" by excusing the two prospective jurors.  Appellants' Br. at 73.  Notwithstanding this argument, the ADA simply does not apply to the federal government.

The ADA was promulgated under the Fourteenth Amendment.  42 U.S.C. § 12101(b)(4) ("It is the purpose of this chapter . . . to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce . . . .").  While the Act prohibits discrimination by "a public entity," 42 U.S.C. § 12132, the statutory definition of public entity does not include the federal government:

The term "public entity" means–

(A) any State or local government;

(B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and

(C) the National Railroad Passenger Corporation, and any commuter authority (as defined in section 24102(4) of Title 49).

42 U.S.C. § 12131; *Calero-Cerezo v. United States Dept. of Justice*, 355 F.3d 6, 19 (1st Cir. 2004) ("[T]he ADA applies to private employers with over 15 employees and state and local governments."); *Isle Royale Boaters Ass'n v. Norton*, 154 F. Supp. 2d 1098, 1135 (W.D. Mich. 2001) ("Plaintiffs may not sue [the National Parks Service], a unit of the federal government, for discrimination under the ADA."); *Zingher v. Yacavone*, 30 F. Supp. 2d 446, 452 (D. Vt. 1997) ("The language of the [ADA] does not include federal executive agencies nor their secretaries as 'public entities.'"). Therefore, to the extent Snarr and Garcia's argument is based on the ADA, it is meritless.

Likewise, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, which the defendants cite for the first time on appeal, does not apply to the federal judiciary. Section 794 prohibits discrimination "under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service." 29 U.S.C. § 794(a); *Calero-Cerezo*, 355 F.3d at 19 (noting that the Rehabilitation Act applies to federal agencies, contractors and recipients of federal financial assistance). But the definition of "program or activity," which covers non-federal entities that

receive federal funding, does not include the federal judiciary.  29 U.S.C. §

794(b); *cf., Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991) ("[T]he Federal

Bureau of Prisons does not fit the definition of 'programs or activities' governed

by [Section 794].").  Accordingly, the defendants' argument based on the

Rehabilitation Act also fails.

As discussed above, the statute applicable to federal jury selection permits a

district court to excuse prospective jurors who are "incapable, by reason of mental

or physical infirmity, to render satisfactory jury service."  28 U.S.C. 1865(b)(4).

After carefully questioning Juror No. 130 and Juror No. 232, the district court

complied with Section 1865 in deciding to excuse them.

## D.  The district court did not violate the defendants' right to a jury drawn from a fair cross section of the community.

Snarr and Garcia argue that the district court violated their right to have a

venire drawn from a fair cross-section of the community by excusing prospective

jurors Nos. 130 and 232 for self-identified physical infirmities that rendered them

incapable of satisfactory jury service.  This complaint, raised for the first time on

appeal, does not present plain error.

First and foremost, the defendants fail to demonstrate error.  The Supreme

Court recently discussed a defendant's right to an impartial jury drawn from a fair

cross section of the community in *Berghuis v. Smith*, ___ U.S. ___, 130 S.Ct. 1382 (2010). There, the Court reiterated the well-established three-part showing a criminal defendant must make to establish a prima facie violation of the Sixth Amendment's fair cross-section requirement:

> [The defendant] must show: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."

*Berghuis*, 130 S.Ct. at 1388 (*quoting Duren v. Missouri,* 439 U.S. 357, 364 (1979)).

The defendant in *Berghuis* complained about the lack of African-Americans in county jury pools based on the process used to assign jurors to various courts. He attempted to make his prima facie case by offering statistics comparing the racial demographics of the county's general population with those of the jury pools after hardship exemptions were granted. *Id.* at 1389-90. He also presented expert testimony tying the alleged underrepresentation to social and economic factors. *Id.* at 1390. The Court found this evidence inadequate to meet the defendant's burden. Significantly, the Court noted that "[n]o 'clearly established' precedent of this Court supports [the defendant's] claim that he can make out a

102

prima facie case merely by pointing to a host of factors that, individually or in combination, *might* contribute to a group's underrepresentation." *Id.* at 1395. Regarding hardship exemptions, the Court pointed out it had long understood that those might well survive a fair-cross-section challenge. *Id.*

Here, Snarr and Garcia offered no evidence to the trial court regarding the three-part prima facie case because they did not raise a fair-cross-section claim below. Nor do they provide anything other than conclusory allegations on appeal. Appellants' Br. at 85-92. The defendants assume, without authority, that individuals with physical infirmities are a distinctive group. Then, they attempt to prove underrepresentation in venires solely on the basis of the district court's excusing jurors for self-reported and fully-examined severe hardships in this one case. Further, the defendants offer no proof of systematic exclusion of persons with physical infirmities from jury pools in the Eastern District of Texas. Without a prima facie showing, Snarr and Garcia cannot advance a fair cross-section claim.

Although they fail the plain-error test by not showing error, Snarr and Garcia could not demonstrate that the alleged error was "plain," either. As addressed above, the two prospective jurors were properly excused— at their requests— under 28 U.S.C. § 1865(b)(4), which disqualifies prospective jurors who are "incapable, by reason of mental or physical infirmity, to render

satisfactory jury service." In *Taylor v. Louisiana*, 419 U.S. 522, 534 (1975), the

Supreme Court made clear that "[t]he States are free to grant exemptions from jury

service to individuals in case of special hardship or incapacity . . . ." Thus, the

Court held that states could "prescribe relevant qualifications for their jurors and .

. . provide reasonable exemptions so long as it may be fairly said that the jury lists

or panels are representative of the community."[43] *Id.* at 537-38. Snarr and Garcia

make no attempt to demonstrate that the federal government is prohibited from

similarly prescribing juror qualifications. Because the district court excused the

two jurors at issue in accordance with the federal juror qualifications, any error

could not be plain.

Finally, Snarr and Garcia cannot demonstrate an error that affected their

substantial rights because the prospective jurors were properly excused. Thus,

they fail to meet the three conditions for plain error review. There is no reason to

evaluate any effect the alleged errors may have had on the fairness, integrity, or

public reputation of the proceeding.

---

[43] As the defendants point out, some jurisdictions require accommodations for deaf and hearing-impaired jurors. Appellants' Br. at 80-85. These juror-qualification decisions are the type authorized by the Supreme Court in *Taylor*, 419 U.S. at 537-38, when it recognized the "leeway" that should be afforded to the States, but are not relevant to federal juror qualifications.

## ISSUE XI:  LESSER INCLUDED OFFENSE ISSUE

**Issue XI:  Courts must give a lesser-included-offense instruction only if a jury could rationally find a defendant guilty of the lesser offense while acquitting on the greater.  The evidence overwhelmingly proved premeditation, which distinguishes first and second degree murder:  Snarr and Garcia obtained weapons, tricked the guards into bringing them in together, attacked the guards for their keys, and taunted the victim while opening his cell.  Did the district court correctly hold that no rational juror could have acquitted on first degree murder but convicted on second?**

## A.  Standard of Review

This Court reviews de novo the district court's determination regarding whether an offense is a lesser included offense of a charged offense.  *United States v. Finley*, 477 F.3d 250, 256 (5th Cir. 2007); *United States v. Harrison,* 55 F.3d 163, 167 (5th Cir. 1995).  The Court reviews the lower court's decision on whether a jury could rationally acquit on the greater offense but convict on the lesser for abuse of discretion.  *Finley*, 477 F.3d at 256;  *Harrison,* 55 F.3d at 167.

**B.  The district court did not abuse her discretion in declining to give an instruction on second degree murder because no rational jury viewing the evidence of premeditation could have convicted on second degree murder while acquitting on first degree murder.**

Under Fed. R. Crim. P. 31(c)(1), a defendant may be convicted of "an offense necessarily included in the offense charged."  The Supreme Court has long held that "the defendant is entitled to an instruction on a lesser included offense *if*

the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." *Keeble v. United States*, 412 U.S. 205, 208 (1973) (emphasis added) (collecting cases). Instructing on a lesser included offense prevents a jury from "improperly resolving . . . doubts in favor of conviction when one or more of the elements of the charged offense remain unproven, but the defendant seems plainly guilty of *some* offense." *Harrison*, 55 F.3d at 166 (*quoting United States v. Browner,* 889 F.2d 549, 551 (5th Cir. 1989) (emphasis in original)). Significantly, however, there must be a rational basis for submitting the lesser charge; it cannot merely permit the defendant to "invoke the mercy-dispensing prerogative of the jury." *Finley*, 477 F.3d at 255-56 (citations omitted).

This Court employs a two-part test to determine whether a defendant is entitled to a lesser-included-offense instruction. First, the district court determines if the elements of the lesser offense are a subset of the elements of the charged offense. *Finley*, 477 F.3d at 255; *see also Browner,* 889 F.2d at 550–51. Second, the court considers whether the evidence at trial is such that a jury could rationally find the defendant guilty of the lesser offense yet acquit him of the greater. *Finley*, 477 F.3d at 255. "A lesser-included-offense instruction 'is not proper where, on the evidence presented, the factual issues to be resolved by the jury are the same as

106

to both the lesser and greater offenses.'" *Id.* at 256 (*quoting Sansone v. United States,* 380 U.S. 343, 349 (1965)).  The instruction is "only proper where the additional element required for the greater offense is actually in dispute." *Id.*  And simply having some evidence to support the instruction is not sufficient.  "[E]ven if there is 'some evidence bearing upon a particular issue in a cause, but it is so meagre as not, in law, to justify a verdict in favor of the party producing it,'" an instruction need not be given.  *United States v. Branch*, 91 F.3d 699, 713 (5th Cir. 1996).

Snarr and Garcia filed pre-trial requests for an instruction on second degree murder, manslaughter, and involuntary manslaughter[44] as lesser included offenses of first degree murder.  Snarr USCA5 517-27; Garcia USCA5 558-68.  At the conclusion of the guilt phase, they urged the district court to give the instruction without argument regarding either prong of the two-part test.  USCA5 4353.  The court declined to submit the requested instruction based on the second prong, finding that "the evidence in this trial is not such that the jury could rationally find the defendants guilty only of the lesser offenses and acquit them of the greater offense."  USCA5 4356-57.  In doing so, the court relied on *Finley, Harrison,*

---

[44]  Defendants only challenge the refusal to give an instruction on second degree murder.

*Browner,* and *United States v. Collins*, 690 F.2d 431 (5th Cir. 1982). USCA5 4356-57.

On appeal, the crux of Snarr and Garcia's complaint regarding the denial of their requested instruction on second degree murder is that the evidence of premeditation was "insufficient and hotly disputed." Appellants' Br. at 112. To the contrary, the evidence overwhelmingly demonstrated premeditation.

Snarr and Garcia obtained weapons along with tools to open their handcuffs and concealed these items while being escorted to and from recreation, all of which demonstrate premeditation. Moreover, one of the officers who was stabbed, Josh McQueen, testified that the chaos in the SHU on the day Rhone was murdered was "inmate manipulated," pointing out that inmates watch the guards "24 hours a day 7 days a week" and that events could create a chain reaction. USCA5 3774-75. Although Snarr and Garcia claim on appeal that they had nothing to do with the timing of their return from the recreation cages, Appellants' Br. at 158, one officer recalled that the inmates had refused to come in during the first shift, USCA5 3818. When guards on the second shift tried to remove them, two inmates— including Garcia's fellow gang member, Delacruz— refused to come in, prompting the officers to take the others in before forcibly extracting them. USCA5 3819-20, 3826. Then, as Garcia was handcuffed for escort back to

his cell, Snarr began to shout that he needed to go to the restroom, pressuring the harried guards to bring him with Garcia. USCA5 3615-16, 3618, 3820-21.

The surveillance video also unquestionably shows premeditation. G Ex. 3A at 14:34:50-14:37:56. From the moment they slipped out of their handcuffs and attacked Baloney, the coordination between Snarr and Garcia was obvious. *Id.* Any doubt about premeditation is resolved by Garcia's taunting Rhone with, "We're going to kill you," while Snarr determinedly struggled to unlock the cell door for nearly one full minute. USCA5 3439-40, 3926-27, 3939; G Ex. 3A at 14:35:57-14:36:53. And Garcia's exultant, "That's how you get your enemy," after the murder shows premeditation. USCA5 3932; G Ex. 3A at 14:38:40-14:38:51.

Snarr and Garcia offer nothing to undercut the district court's conclusion. While true that Snarr and Garcia argued at trial that their crime was one of convenience, based on a "confluence of events" occasioned by the guards' failure to follow BOP policy, USCA5 4414, the real thrust of their defense was that the victim was a vile person who insulted the defendants and, according to one thoroughly-impeached witness, may have threatened them. USCA5 4388-4414. They revisit this theme on appeal, Appellants' Br. at 113-16, but the argument demonstrates premeditation, rather than disproving it, by supplying a motive—

had Rhone really threatened Snarr and Garcia the night before the murder, they had a reason to carefully plan and premeditate the crime.

Notably, Snarr and Garcia's claim that Snarr was unarmed until he took a shank from Rhone, Appellants' Br. at 116-17, finds no support in the record. Both of the guards who were stabbed, saw Snarr with a knife before the attack began. USCA5 3623, 3780. And an officer who observed the attack from the moment the defendants pulled Rhone out of his cell said that he never saw Rhone with a weapon. USCA5 3443. The surveillance video bears out the witnesses' testimony. G Ex. 3A at 14:35:06-14:38:54.

In sum, the record supports the district court's conclusion that a jury could not have rationally convicted Snarr and Garcia of second degree murder while acquitting them of first. Submitting a lesser-included-offense instruction would have merely served as a vehicle for the defendants to invoke the jury's mercy based on their legally insufficient justification defense. The court did not abuse her discretion in declining to permit that to occur.

## C. Defendants' reliance on *Beck v. Alabama* is misplaced.

In their brief, Snarr and Garcia rely on a number of cases from the Supreme Court. None of these decisions compel a district court to give a lesser-included-offense instruction that is not warranted by the evidence.

The defendants' primary authority, *Beck v. Alabama*, 447 U.S. 625, 635 (1980), struck down an Alabama state statute "unique in American criminal law," one that prohibited lesser-included-offense instructions in the state's capital cases. The *Beck* Court favorably cited *Keeble* for the federal court precedent "that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater" and state courts holding that "a defendant is entitled to a lesser included offense instruction where the evidence warrants it." *Beck*, 447 U.S. at 635-36 and n.12; *Schad v. Arizona*, 501 U.S. 624, 648 (1991) ("That is not to suggest that *Beck* would be satisfied by instructing the jury on just any lesser included offense, even one without any support in the evidence."); *Schmuck v. United States*, 489 U.S. 705, 716 n.8 (1989) ("Our decision [to adopt the elements test] in no way alters the independent prerequisite for a lesser included offense instruction that the evidence at trial must be such that a jury could rationally find the defendant guilty of the lesser offense, yet acquit him of the greater.")

In short, the Supreme Court does not require submission of a lesser-included-offense instruction unless it meets the evidentiary standard articulated in *Keeble*. Nor does this Court. *Cordova v. Lynaugh*, 838 F.2d 764, 767 n.2 (5th Cir. 1988)*, overruling on other grounds recognized by Vanderbilt v. Collins,* 994

111

F.2d 189, 195 (5th Cir. 1993) ("A plain reading of *Beck* and *Hopper* [*v. Evans*, 456 U.S. 605 (1982)] inexorably leads to the same conclusion.  If due process is violated because a jury cannot consider a lesser included offense *that the 'evidence would have supported*,' . . . the source of that refusal, whether by operation of state law or refusal by the state trial court judge, is immaterial.") (citation omitted) (emphasis added).  Although favored if proper, *Cordova*, 838 F.2d at 767, a lesser-included-offense instruction is not required when there is no evidentiary support for one.  Such is the case here.  The district court properly denied the defendants' requested instruction on second degree murder.  No abuse of discretion occurred.

## ISSUES XII-XVIII:  SENTENCING ISSUES

**Issue XII:  Evidence showing that a murder involved suffering or mutilation beyond that necessary to cause death is sufficient to support a finding that the crime was committed in an especially heinous, cruel, or depraved manner.  Here, Snarr and Garcia stabbed the victim more than 50 times in a frenzied manner.  Did the district court err in submitting the "especially heinous, cruel, or depraved" statutory aggravating factor to the jury?**

## A.  Standard of Review

This Court reviews jury findings on aggravating factors by asking whether, after viewing the evidence in a light most favorable to the government, any

rational trier of fact could have found the existence of the aggravating

circumstance beyond a reasonable doubt. *Bernard*, 299 F.3d at 481.

If error is found, it is further reviewed for harm. Harmless error review for

findings on aggravating factors may be accomplished in one of two ways:

> First, the appellate court may inquire into whether, beyond a
> reasonable doubt, the death sentence would have been imposed had
> the invalid aggravating factor been properly defined in the jury
> instructions.... Second, the appellate court may inquire into whether,
> beyond a reasonable doubt, the death sentence would have been
> imposed absent the invalid aggravating factor.

*United States v. Jones*, 132 F.3d 232, 251-52 (5th Cir. 1998) (citations omitted).

If an error regarding an aggravating factor is harmless beyond a reasonable doubt,

the appellate court may not reverse or vacate a death sentence unless the error rises

to the level of a denial of a constitutional right. *Id. (citing* 18 U.S.C. § 3595).

**B. A rational trier of fact could have found the existence of the "especially heinous, cruel, or depraved" aggravating factor beyond a reasonable doubt.**

This Court has determined that, "[f]or serious physical abuse to be

aggravating in a murder case, a defendant must inflict suffering or mutilation

above and beyond that necessary to cause death." *United States v. Agofsky*, 458

F.3d 369, 374 (5th Cir. 2006) (*citing Hall*, 152 F.3d at 414-15). The defendant

must intend gratuitous violence for a murder to involve serious physical abuse.

*Agofsky*, 458 F.3d at 374. This Court has found participation in a crime involving

serious physical abuse to be sufficient to support this factor even if the defendant

"was not present or responsible for every act of cruelty." *Bernard*, 299 F.3d at

481-82.

Here, the indictment alleged the statutory aggravating factor found in 18

U.S.C. § 3592(c)(6)— that the offense was committed in an especially heinous,

cruel, or depraved manner in that it involved torture or serious physical abuse to

the victim— as one of the five statutory aggravating factors alleged for Snarr and

one of the seven statutory aggravating factors alleged for Garcia.  Snarr USCA5

27; Garcia USCA5 43.  At the conclusion of the eligibility phase, the district court

gave the following instruction regarding this factor for each defendant:

> To find the existence of this statutory aggravating factor, you must
> unanimously find that the government has proved beyond a
> reasonable doubt that the defendant committed the offense in an
> especially heinous, cruel, or depraved manner in that it involved
> either torture or serious physical abuse to the victim.
>
> . . .
>
> [S]erious physical abuse may be inflicted regardless of whether the
> victim is conscious of the abuse at the time it was inflicted.  The
> defendant, however, must have specifically intended the abuse, apart
> from the killing.  Serious physical abuse means a significant or
> considerable amount of injury or damage to the victim's body which
> involves a substantial risk of death, extreme physical pain, protracted
> and obvious disfigurement, or protracted loss or impairment of the
> function of a bodily member, organ, or mental faculty.

USCA5 4857-58, 4887-88.

114

During closing argument, the government focused on serious physical abuse. USCA5 4907-08. The jury concluded that this and three other statutory aggravating factors alleged against Snarr had been proved beyond a reasonable doubt. USCA5 4945. The jury also found that this and five other statutory aggravating factors had been proved beyond a reasonable doubt against Garcia. USCA5 4946-47. The record provides ample basis for the jury's conclusions.

The surveillance video shows Snarr and Garcia savagely killing Rhone. G Ex. 3A at 14:36:54-14:37:56. Special Investigative Technician Randal Calhoun, who witnessed the murder through the glass door to the range, recalled banging on the door and trying to convince the defendants that Rhone was dead in an effort to stop the assault. USCA5 3420. Snarr and Garcia both looked up, smirked, and continued to stab Rhone repeatedly. USCA5 3420. Calhoun related how the pair attacked the defenseless Rhone "in a frenzy" even when an officer sprayed pepper gas on them. USCA5 3421-23, 3862. And inmate George Sarro, who saw guards remove Rhone's body from the range, struggled to describe the horrific condition of the corpse:

> I don't even still know what I saw. It was unbelievable. I have never seen anything like that in my life. I looked at a human being that was no longer a human being. He just looked like— he looked like he may have been run over by a truck. He just was covered from head to toe . . . .

. . .

> To me it looked more like a person who was actually run over by a truck. It didn't even look like a— it was that— it looked like just— I never seen a stab wound before and I can imagine what it might look like, a small hole with blood trickling down, but this wasn't like that. This was a— his body was a stab wound. He was a stab wound. He became a stab wound. He was pulp.

USCA5 4800-02. Photos of Rhone's bloody body bear out Sarro's description. G. Ex. 13A-13G.

Even though the autopsy photos were taken after Rhone's body had been cleaned, they depict the graphic nature of his wounds. G Ex. 15A-15Y. Snarr and Garcia stabbed Rhone more than 50 times on his head and upper body; Rhone suffered 18 stab wounds on his front and 32 on his back. USCA5 3724, 3725, 3731, 3754; G Ex. 15, 15A-15Y. He also sustained lacerations, abrasions, and trail wounds that were not deep enough to count as stab wounds. USCA5 3734, 3738-39, 3741, 3743-44. Although Rhone actually died from a stab wound to the heart, several of his wounds could have been fatal. USCA5 3725-28, 3748.

Given this evidence, any rational juror could have concluded that the abuse in this case went beyond that necessary to cause death and, indeed, involved serious physical abuse. The jury's finding on the statutory aggravating factor that Snarr and Garcia each committed the offense in an especially heinous, cruel, or

116

depraved manner must stand. But even if the Court concludes that the evidence does not support the existence of the aggravating circumstance beyond a reasonable doubt, remand is not be warranted because the error would be harmless.

As noted above, the jury found three other statutory aggravating factors beyond a reasonable doubt for Snarr. USCA5 4945. They found five other statutory aggravating factors had been proved beyond a reasonable doubt for Garcia. USCA5 4946-47. Under the harmless error analysis employed by this Court in *Jones*, 132 F.3d at 252, the other statutory aggravating factors unanimously found by the jury support the sentences of death, even after considering the mitigating factors found by one or more jurors. Consequently, the alleged error— if it exists— would be harmless because the death sentence would have been imposed even if the aggravating factor regarding the heinous, cruel, or depraved manner of the murder had not been submitted to the jury.

> **Issue XIII: When life imprisonment without parole is an alternative to the death penalty, proof of the non-statutory aggravating factor of future dangerousness may include evidence that a defendant poses a safety threat in prison. Along with substantial evidence of the defendants' violent acts in prison and out, the government rebutted their expert testimony that Snarr and Garcia might be held in the ADX indefinitely. Did the district court err in submitting the non-statutory aggravating factor of future danger to the jury?**

### A. Standard of Review

Jury findings on non-statutory aggravating factors are reviewed under the same standard employed for statutory aggravating factors. *Bernard*, 299 F.3d at 482. Thus, the Court considers whether, after viewing the evidence in a light most favorable to the government, any rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt. *Id.* at 481.

If error is found, it is further reviewed for harm under the standard set out in Issue XII above.

### B. A rational trier of fact could have found that the defendants each posed a future danger.

Evidence of future dangerousness necessarily includes a broad variety of topics. *See, e.g., Fields*, 483 F.3d at 324-25 (evidence included defendant's juvenile record, description of prior attempted murder and other crimes, and prison records); *United States v. Bourgeois*, 423 F.3d 501, 511-12 (5th Cir. 2005) (evidence of defendant's "individual history of systematic violence"). Significantly, where an alternative sentence to the death penalty is life imprisonment without the possibility of parole, the government is "free to argue that the defendant will pose a danger to others in prison and that executing him is the only means of eliminating the threat to the safety of other inmates or prison

staff." *Simmons v. South Carolina*, 512 U.S. 154, 165-66 n.5 (1994); *see Bernard,* 299 F.3d at 482. "What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine." *Jurek v. Texas*, 428 U.S. 262, 276 (1976) (discussing difficult, but necessary, task of predicting future behavior).

On appeal, Snarr and Garcia both allege that the evidence was insufficient to support the jury's verdict on future dangerousness. The record belies their contention.

The notice of intent to seek the death penalty against Snarr alleged that he would be a continuing threat to the safety of others— a future danger— based on his continuing pattern of violence, his repeated institutional misconduct, his lack of remorse, his low likelihood of rehabilitation, and his membership in a racist gang. Snarr USCA5 37-38. In addition to showing the violent attack on Rhone and the guards during the guilt phase of the trial, the government offered substantial evidence of Snarr's pattern of violence during both the eligibility and selection phases. Two of Snarr's 15 juvenile felonies were "life endangering." USCA5 4983; G Ex. 34. As an adult, Snarr stabbed another inmate with a sharpened toothbrush in a Utah state jail. USCA5 4484, 4487, 4994-95, 4997, 4998-99; G Ex. 26A. As part of his federal RICO violation, Snarr admitted that,

while in a state prison, he helped attack Clinton Alls because Alls refused to assault or kill a rival gang member. USCA5 4511-12; G Ex. 27B at 3. At USP-Beaumont, Snarr helped attack inmate Dan Fortner. USCA5 5056-65, 5085-91; G Ex. 38B. Snarr also stabbed inmate David Wengler, a member of the SAC, when Wengler refused to stab another inmate. USCA5 5069, 5255-57, 5207-46, 5263, 5273-74, 5295-98, 5310-11, 5313; G Ex. 40Z. Snarr and another inmate savagely beat inmate Michael Hammonds in one of the USP-Beaumont SHU recreation cages. USCA5 5363-73, 5384-86; G Ex. 42A, 42B. And Snarr was convicted for stabbing his cell mate, Canyon Mason, in the USP-Beaumont SHU.[45] USCA5 4544-46, 4553-54;G Ex. 28G, 28H.

Snarr's other institutional misconduct included two instances of possessing weapons, once in his cell at USP-Beaumont and once in the institution's SHU. USCA5 5140-57, 5339-47, 5352-53; G Ex. 39A; G. Ex. 41A. His lack of remorse was demonstrated by his cavalier attitude after attacking Hammonds, USCA5 5393-94; his celebration with Garcia— "almost like . . . a bunch of guys that just won a softball game"— immediately after murdering Rhone, USCA5 4803; and his continued celebration later that day in the holding cell, USCA5 5423-25.

---

[45] Snarr was awaiting sentencing for that assault when he murdered Rhone. USCA5 4586-88.

Snarr's repeated acts of violence also demonstrated his low likelihood of rehabilitation, as did his comment to inmate George Sarro that he "had no intention of getting out [of prison], that this was his life, this is what he did, this is what he lives for . . . ." USCA5 4805. Finally, the evidence showed Snarr's membership in a violent, racist gang, USCA5 5014-23, and how that affiliation motivated some of his violent acts, including the prior attacks on fellow inmates Alls, Fortner, and Wengler. USCA5 4511-12, 5064-67, 5087-88, 5269, 5273-74, 5295-98, 5310-11, 5313.

Like Snarr's, the notice of intent to seek the death penalty filed against Garcia alleged that he would be a continuing threat to the safety of others based on his continuing pattern of violence, his repeated institutional misconduct, his lack of remorse, his low likelihood of rehabilitation, and his membership in a racist gang. Garcia USCA5 53-55. And, as with Snarr, there was ample evidence on each point.

Garcia's pattern of violence before entering prison included his participation in a drive-by shooting at a residence in Abilene, Texas, USCA5 4653-55, 4670-76-79, 4681-83, 4700-03, and his self-interested murder of Jacob Ponce, USCA5 5491-5595. While in the SHU at USP-Lee County, Garcia attacked inmate Antonio Peregrino-Lujan. USCA5 5654-56, 5659-64, 5667-69,

121

5683; G Ex. 47A-47C.  Garcia later joined two other inmates in beating inmate Luis Saucedo in one of the USP-Lee SHU recreation cages.  USCA5 5695-5700; G Ex. 48 at 2.  Slightly more than one month later, Garcia attacked another inmate named Harvey, who had just been placed in his cell.  USCA5 5711-13.  Then, three days after being transferred to USP-Beaumont, Garcia and Frank Delacruz stabbed inmate Jose Ruiz approximately 21 times.  USCA5 4739-43, 5724-79; G Ex. 32B; G Ex. 50A, 50B.  Finally, while being escorted to his cell in the USP-Beaumont SHU, Garcia kicked an inmate named Barraza-Lopez in the back.  USCA5 5780-84.

Garcia's other institutional misconduct included two instances of possessing weapons, once at USP-Lee County and once in USP-Beaumont's SHU.  USCA5 5636-38, 5644-45, 5650, 5791-95; G Ex. 46B; G. Ex. 52B.  Garcia's lack of remorse was demonstrated by his laughter after shooting Ponce, USCA5 5531; his gloating, "That's how you get your enemy," after murdering Rhone, USCA5 3932; his celebration with Snarr after murdering Rhone, USCA5 4803; and their later celebration in the holding cells, USCA5 5423-25.  Significantly, Garcia later told Shaquan Smith that, although he might "change a few things," he would murder Rhone again.  USCA5 5842-43.  As with Snarr, Garcia's repeated acts of violence also demonstrated his low likelihood of rehabilitation.  His statements did, too.

122

When Smith asked Garcia what went through his mind as he stabbed Rhone, Garcia relied: "Man, I be in my zone. When I get in my zone, I'm in my zone." USCA5 5842. He elaborated that "[o]nce I'm in my zone, I got to get my man." USCA5 5842. Finally, Garcia was a member of one of the most violent prison gangs, USCA5 5617-32, and the evidence demonstrated how that affiliation motivated some of his violent acts, including the attacks on inmates Peregrino-Lujan, Barraza-Lopez, and Ruiz. USCA5 5678, 5769-70, 5777, 5784.

Snarr and Garcia address none of this evidence on appeal. Rather, they complain about the evidence regarding how they would be incarcerated if the jury opted to sentence them to life imprisonment without parole.

During the selection phase, Snarr and, by adoption, Garcia offered testimony from prison consultant and former warden, Mark Bezy, regarding how they would be housed if the jury sentenced them to life without parole. Bezy claimed that Snarr and Garcia would probably be placed in BOP's highest level of security, the ADX control unit, for 60-72 months, but that it could be longer "[d]epending on their behavior." USCA5 6121. He further stated that inmates could be kept at the ADX for an unlimited period of time, citing examples and pointing out BOP's discretion regarding how to house inmates. USCA5 6124-25. Bezy admitted, however, that if Snarr and Garcia behaved while in the ADX

123

control unit, they could be moved to the ADX general population unit in less than 60 months.  USCA5 6127-28.  And he acknowledged that the ADX general population unit was designed to move inmates back into a United States penitentiary in three years, but contended that "it does not always happen." USCA5 6130, 6134.

In rebuttal, the government called Greg Hershberger, who had once served as the warden at the ADX.  USCA5 6310-11.  Hershberger explained how the facility differed from other federal penitentiaries and how the ADX control unit differed from its general population.  USCA5 6313-22.  Hershberger pointed out that the goal of the ADX program is to prepare inmates to function in a general population at another prison facility.  USCA5 6526.  Based on their histories, Hershberger believed that Snarr and Garcia could successfully complete the program at the control unit— like "most" inmates, USCA6 6318— and be moved to a general population, USCA5 6323.  The government also called Christopher Rivers, who formerly oversaw operations at the ADX.  USCA5 6379.  Rivers described the ADX facility and the three-year program in its general population, which is designed to prepare inmates for placement at another USP.  USCA5 6378-6402.  Rivers knew Snarr and Garcia and believed that, if sentenced to life

imprisonment, they could successfully complete the program at the ADX and return to a general population at a federal penitentiary.  USCA5 6403-04.

Snarr and Garcia do not dispute the accuracy of the rebuttal evidence. Rather, they argue that it was insufficient to support the jury's findings that they presented a continuing, serious threat to the safety of others.  This argument fails. Significantly, the evidence regarding how Snarr and Garcia might be housed was only one facet of the evidence on future dangerousness.  Given the ample evidence of each defendant's continuing pattern of violence, repeated institutional misconduct, lack of remorse, low likelihood of rehabilitation, and membership in racist gangs, a rational jury certainly could have determined that they presented a future danger while in prison.  Moreover, the government was entitled to present accurate evidence rebutting the impression left by Snarr and Garcia's prison expert.

Finally, Snarr and Garcia argue, without direct support, that review for harm should be heightened for this aggravating factor.  Appellants' Br. at 143-49.  As discussed in Issue XII, even if the Court concludes that the evidence does not support the existence of this statutory aggravating factor beyond a reasonable doubt, remand would not be warranted because the jury found, beyond a reasonable doubt, that four statutory aggravating factors and one other non-

statutory aggravating factor had been proved against Snarr, USCA5 4945, 6583-84, and six statutory aggravating factors and one other non-statutory aggravating factor had been proved against Garcia, USCA5 4946-47, 6594. Under the harmless error analysis employed by this Court in *Jones*, 132 F.3d at 252, the other aggravating factors unanimously found by the jury support the sentence of death, even after considering the mitigating factors found by one or more jurors. *See also Webster*, 162 F.3d at 325-26. Thus, the alleged error, if any, would be harmless because, under the evidence in this case, the jury would have imposed the death sentence even if the non-statutory aggravating factor regarding future danger had not been submitted.

> **Issue XIV: The statutory aggravating factor of "substantial planning and premeditation" contemplates a considerable or significant amount of both. Here, Snarr and Garcia obtained shanks, carried them to recreation, manipulated the guards into bringing them back to the range at the same time, stabbed two guards to get keys, and struggled to open the victim's cell for nearly a minute before murdering him. Did the district court err in submitting "substantial planning and premeditation" to the jury?**

## A.  Standard of Review

As with Issue XII, the Court reviews jury findings on aggravating factors by asking whether, after viewing the evidence in a light most favorable to the government, any rational trier of fact could have found the existence of the

aggravating circumstance beyond a reasonable doubt. *Bernard*, 299 F.3d at 467.

Error, if any, is reviewed for harm. *Jones*, 132 F.3d at 252.

**B.  A rational trier of fact could have found, beyond a reasonable doubt, that Snarr and Garcia engaged in "substantial planning and premeditation."**

As noted above, the indictment alleged the aggravating factor found in 18 U.S.C. § 3592(c)(9)— that the defendant committed the offense after substantial planning and premeditation to cause the death of another person— as one of the five statutory aggravating factors alleged for Snarr and one of the seven statutory aggravating factors alleged for Garcia.  Snarr USCA5 27; Garcia USCA5 43.  At the conclusion of the eligibility phase, the district court gave the following instruction regarding this factor for each defendant:

> The government has also alleged that the defendant killed Gabriel Rhone after substantial planning and premeditation.  The government must prove this aggravating factor to your unanimous satisfaction beyond a reasonable doubt.  The words "substantial planning and premeditation" should be given their ordinary, everyday meaning. "Planning" means the act or process of making or carrying out plans. A plan, as used in these instructions, means a method of achieving something or a way of carrying out a design.
>
> "Premeditation" means thinking or deliberating about something and deciding whether to do it beforehand.  The passage of time is a factor which you may consider in attempting to determine if a defendant acted with premeditation.  The amount of time needed for premeditation of a killing can depend on the person and the circumstances.  The time must be long enough after forming the intent to kill, however, for the killer to have been fully conscious of

the intent and to have considered the killing. "Substantial planning and premeditation" means a considerable or a significant amount of planning and premeditation. This substantial planning and premeditation must relate to the killing of Gabriel Rhone and the acts which directly led to his death. The fact that the killing occurred does not satisfy this requirement. You must find that both the planning and the premeditation were more than the minimum amount necessary to commit the offense of murder. However, the government need not prove that the defendant planned or deliberated for any particular period of time before the killing of Gabriel Rhone.

USCA5 4858-59, 4888-89.

By defining "substantial planning" as planning that is considerable or significant, the district court employed language consistent with that previously approved by this Court. *See United States v. Davis*, 609 F.3d 663, 689-90 (5th Cir. 2010) ("'Substantial' planning requires a considerable amount of planning preceding the killing."); *Flores,* 63 F.3d at 1373-74 ("[T]he term 'substantial' ... denote[s] a thing of high magnitude ...."). And the court correctly pointed out that the planning must be done by the defendant and relate to the killing. *See Webster*, 162 F.3d at 325. As for, premeditation, the instruction accurately stated the law and tracked the pattern jury instructions of this Court, and others previously approved by this Court. *Davis*, 609 F.3d at 690; *cf. United States v. Agofsky*, 516 F.3d 280, 282 n.2 (5th Cir. 2008) (*citing* FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS, CRIMINAL, § 2.55 (2001) (Murder (First-Degree)).

The record provided ample basis for rational jurors to conclude beyond a reasonable doubt that both Snarr and Garcia engaged in substantial planning for and premeditation of Rhone's murder. Committing a murder in the most secure area of a federal penitentiary requires significant preparation, and the record demonstrated that this one was carefully planned. Inmate Sarro described bringing one shank to Snarr from an inmate on the B range and, possibly, another from an inmate on the C range before Snarr went to recreation on the morning of the murder. USCA5 4785-89, 4790-92. Sarro recalled that Garcia's Texas Syndicate brother Delacruz, with whom Garcia stabbed Ruiz and who later created a diversion in the recreation cages by refusing to come out, was urgently trying to get a Skilcraft mechanical pencil, parts of which can be used to open handcuffs, before the murder. USCA5 4809-10. Sarro believed that part of the chaos on the day of the murder was orchestrated, pointing out that, in the SHU, "[e]verything is the same way every single day . . . [s]o it's very easy to predict the future and manipulate the future just by doing small things, small cause-and-effect kind of things." USCA5 4807-08, 4809. He thought the fire alarm going off and the flooding on the C range from a "popped" sprinkler head[46] were significant because

---

[46] Inmates could flood a range in the SHU by breaking, or "popping," the sprinkler head that was part of the fire prevention system in their cells. USCA5 3773, 3814-15.

129

these inmate-initiated events diverted the staff from tasks like bringing inmates in from recreation. USCA5 4808.

One of the officers who was stabbed, Josh McQueen, likewise thought that the chaos was "inmate manipulated," noting that the inmates observed the guards "24 hours a day 7 days a week" and knew events could create a chain reaction. USCA5 3774-75. Special Investigative Services Agent Robert Swain testified that his investigation revealed that Snarr and Garcia were upset by some of Rhone's comments. USCA5 4754. Like Sarro and McQueen, Swain believed the murder was planned— demonstrated by the defendants obtaining weapons. USCA5 4754.

The planning was further demonstrated by the events in the recreation cages. On appeal, Snarr and Garcia claim that they had nothing to do with the timing of their return from the recreation cages, Appellants' Br. at 158, but one of the officers recalled that the inmates in the cages— all of whom were single-celled— had refused to come in during the earlier shift, USCA5 3818. Then, when guards on the second shift tried to remove them, Delacruz and another inmate refused, prompting the officers to take the others in first. USCA5 3819-20, 3826. As Garcia was handcuffed for escort back to his cell, Snarr began to shout that he needed to go to the restroom, which resulted in the guards removing him at the same time. USCA5 3615-16, 3618, 3820-21. This series of events was not

simply coincidental, as the defendants suggest.  Multiple inmates played a part in this carefully orchestrated sequence.

In addition to Snarr and Garcia's efforts to obtain weapons and the tools to open their handcuffs and to conceal these items while being escorted to and from recreation, the surveillance video also shows exhibits their planning and premeditation.  G Ex. 3A at 14:34:50-14:37:56.  From the moment they slipped their cuffs and began the attack, the coordination between Snarr and Garcia is obvious.  And the defendants' words further support this factor.  Garcia taunted Rhone with, "We're going to kill you," while Snarr struggled to unlock the cell door.  USCA5 3439-40, 3926-27, 3939; G Ex. 3A at 14:35:57-14:36:53.  Immediately after the murder, Garcia yelled, "That's how you get your enemy," USCA5 3932; G Ex. 3A at 14:38:40-14:38:51, and Snarr told inmate Keenan Hurt that, "Dude disrespected us, and that's what he got," USCA5 3932-33, 3940; G Ex. 3A at 14:38:51-14:39:10.  Later that day, Snarr told an officer that he had given them 18 months to transfer him to the ADX and that, if he was going to remain "stuck" in USP-Beaumont, this is what they would get.  USCA5 3484.  Garcia also told the officer, "Yeah, well, you're going to ship me now."  USCA5 3484-85.

After the murder, both defendants implicitly admitted planning with their self-serving statements to Swain. Garcia told Swain: "It wasn't supposed to happen that way with the staff. Sorry about the staff. Check the video. You'll see why it had to happen that way." USCA5 4752. Snarr said basically the same thing. USCA5 4752-53. Their separate statements while awaiting trial were even more telling. Snarr told inmate Jonathan Franklin that Rhone had bothered inmates on the range by making noise and had cursed Snarr, so Snarr waited to murder Rhone until guards Snarr knew to be more relaxed with security measures were on duty. USCA5 4605. Garcia went into more detail with Shaquan Smith. USCA5 5827-41. After describing Rhone's disrespectful behavior, USCA5 5829-30, Garcia said

> [d]ay after day, he would just talk and talk and talk; and while he was talking, I was just sharpening my knife. I was just sharpening my knife, like "Come on. Keep on talking. Keep on talking." . . . I was sharpening my knife.

USCA5 5829. Garcia told Smith that he and his co-defendant began talking about murdering Rhone in the recreation cages and described how, on the day of the murder, they "jacked the rec cage" to assure that they would be brought in last. USCA5 5831-33.

Given this evidence, a rational juror could have concluded that both Snarr and Garcia engaged in substantial planning and premeditation. And, as discussed in Issue XII, even if the Court concludes that the evidence does not support the existence of this statutory aggravating factor beyond a reasonable doubt, remand is not warranted because the jury found, beyond a reasonable doubt, that three other statutory aggravating factors had been proved against Snarr, USCA5 4945, and five other statutory aggravating factors had been proved against Garcia, USCA5 4946-47. Under the harmless error analysis used by this Court, the other statutory aggravating factors unanimously found by the jury support the sentence of death, even after considering the mitigating factors found by one or more jurors. *Jones*, 132 F.3d at 252*; see also Webster*, 162 F.3d at 325-26. Thus, the alleged error, if any, would be harmless because the jury would have imposed the death sentence even if the statutory aggravating factor regarding substantial planning and premeditation had not been submitted.

> **Issue XV: A district court should grant a severance only if a joint trial poses a serious risk of compromise to a specific trial right or prevents the jury from making a reliable judgment about guilt. Here, the defendants fail to demonstrate specific, compelling prejudice occasioned by their joint trial. Given the district court's careful instructions regarding separate consideration of the evidence for each defendant, did the court abuse its discretion by denying their motions to sever?**

133

## A. Standard of Review

This Court reviews the denial of a motion for severance for abuse of discretion. *United States v. Owens*, No. 10-40707, 2012 WL 1941836, at *2 (5th Cir. May 30, 2012) (*citing United States v. Lewis,* 476 F.3d 369, 383 (5th Cir. 2007)).

## B. Even capital defendants must show specific, compelling prejudice to reverse the denial of a motion to sever, and Snarr and Garcia do not.

Rule 14 of the Federal Rules of Criminal Procedure permits a trial court to "order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires" if "the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant." Fed. R. Crim. P. 14(a). "Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro v. United States,* 506 U.S. 534, 538-39, 541 (1993). Federal courts prefer joint trials for defendants who are indicted together, and "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Owens*, 2012 WL 1941836, at *2 *(quoting Zafiro,* 506 U.S. at 539).

This Court is "reluctant to vacate a conviction because the district court refused to sever a trial." *Id. (quoting Lewis,* 476 F.3d at 384). To prevail, the defendant must show "specific compelling prejudice" that meets two requirements: (1) that "the joint trial prejudiced him to such an extent that the district court could not provide adequate protection; and (2) [that] the prejudice outweighed the government's interest in economy of judicial administration." *Id. (quoting Lewis,* 476 F.3d at 383; *United States v. Peterson,* 244 F.3d 385, 393 (5th Cir. 2001)). General claims of prejudice do not suffice; rather, the defendant must "isolate events occurring in the course of the trial and then ... demonstrate that such events caused substantial prejudice." *Id. (quoting Lewis,* 476 F.3d at 384). Additionally, the defendant must show that "the district court's instructions to the jury did not adequately protect him or her from any prejudice resulting from the joint trial." *Id. (citing United States v. Posada–Rios,* 158 F.3d 832, 863 (5th Cir. 1998)).

Here, Snarr and Garcia raise legally inadequate, general claims of prejudice. The only specific instances of prejudice they identify are neither compelling nor substantial, and their speculative allegations regarding the need for each other's testimony fall short. Moreover, they complain about the efficacy of jury

135

instructions, but fail to demonstrate how the district court's repeated warnings to the jury— drawn from this Court's pattern instructions— were inadequate.

**(1). General claims of prejudice:**

Snarr and Garcia correctly acknowledge the preference for joint trials and the *Zafiro* requirement of specific, compelling prejudice to overcome that preference. Appellants' Br. at 161-65. Yet they base their argument on the unsupported premise that "[s]everance of defendants in capital cases . . . presents entirely different issues than those which courts regularly confront in ordinary criminal trials." Appellants' Br. at 165. Not so.

Joinder of defendants in a capital case is not novel. "[D]efendants charged with capital murder under federal statutes have been tried jointly in both the guilt and penalty phases of trial." *Bernard*, 299 F.3d at 475 *(citing United States v. Causey,* 185 F.3d 407 (5th Cir. 1999); *United States v. Tipton,* 90 F.3d 861 (4th Cir. 1996)).* This Court pointed out in *Bernard* that "the Federal Death Penalty Act contains no special rules regarding joinder of codefendants." *Id.* at 475 n.5. Thus, in *Bernard*, the Court applied the *Zafiro* requirement for specific harm. *Id.* There is simply no authority for evaluating Snarr's and Garcia's arguments for severance under a less-exacting standard.

Beyond their unsupported theory that severance is different in capital cases, Snarr and Garcia contend that the joint sentencing hearing deprived each of an individualized determination of his sentence, Appellants' Br. at 181-87, claiming that "the unfiltered unstructured barrage of the jury with irrelevant and prejudicial information regarding each co-defendant resulted in the 'wanton' and 'freakish' imposition of the death penalty," Appellants' Br. at 173. By doing so, they appear to argue that the jury could not have given full consideration to their individual mitigating evidence while considering that of the other. In support, they cite this Court's recognition in *Bernard* of the "the inherent tension between joinder and each defendant's constitutional entitlement to an individualized capital sentencing decision." Appellants' Br. at 172 (*citing Bernard*, 299 F.3d at 475). Yet, the Court found no "specific and compelling" prejudice in *Bernard* because the mitigating evidence of one defendant did not "tar" the other. *Id.* at 476. Here, too, neither Snarr nor Garcia "tarred" the other with their mitigating evidence, so this claim lacks merit.

**(2). Specific claims of prejudice from joinder of sentencing proceeding:**

Snarr alleges that he was prejudiced by the evidence of Garcia's murder of Jacob Ponce. Appellants' Br. at 168-71. Garcia claims that he was prejudiced by the evidence of Snarr's lengthy criminal history and membership in the SAC.

Appellants' Br. at 171-72.  At the heart of each claim is the idea that the evidence

was so intermingled that it spilled over onto both defendants.

"A spillover effect, by itself, is an insufficient predicate for a motion to

sever." *Owens*, 2012 WL 1941836, at *3 *(quoting United States v. Bieganowski,*

313 F.3d 264, 287 (5th Cir. 2002)); *see also United States v. Williams,* 809 F.2d

1072, 1085 (5th Cir. 1987) ("[A]dditional evidence adduced at joint trials does not

constitute compelling prejudice by itself.").  Here, the court structured the

selection phase to clearly delineate the evidence as to each defendant and

repeatedly instructed the jury to consider each man separately.  Given the

presumption that the jury followed the instructions, *Bernard*, 299 F.3d at 476,

there was no danger that the jury confused the evidence.

Moreover, the defendants' specific claims fail factually.  While Garcia's

murder of Ponce was compelling against Garcia, Snarr had left his own trail of

seriously injured people, several of whom testified in the sentencing hearing.  The

photographs of Snarr's bloodied victims were equally, if not more, horrific than

the pictures of Ponce's weathered bones.  Likewise, Garcia's history, while not as

long as Snarr's, involved significant acts of violence before prison, including a

drive-by shooting and Ponce's murder.  Coupled with Garcia's prison assaults,

including the savage attack on Ruiz, there was no need for the jury to count

Snarr's history against Garcia. And Snarr's membership in the SAC could not have hurt Garcia because he was a member of the Texas Syndicate, one of the most violent gangs in the BOP. In sum, each defendant's personal history justified the death penalty. The possibility of a spillover effect was remote.

**(3). Claims regarding co-defendant's testimony:**

Both Snarr and Garcia argue that each would have offered "beneficial" testimony for the other had they not been tried together. To obtain a severance based on a desire to have a co-defendant testify, a defendant must establish the following: (1) a bona fide need for the co-defendant's testimony; (2) the substance of the proposed testimony; (3) the exculpatory effect of the testimony; and (4) an indication that the co-defendant would testify if the trial was severed. *Owens*, 2012 WL 1941836, at \*4 (*citing United States v. Nguyen,* 493 F.3d 613, 625 (5th Cir. 2007)). Snarr and Garcia fail on each point.

First, neither Snarr nor Garcia demonstrate a bona fide need for the other's testimony. In their motions, both generally alleged that the other's testimony would be "beneficial" without explaining how. Snarr USCA5 103-112; Garcia USCA5 122-130. On appeal, the closest they come to explaining the need is the statement: "Had each appellant been able to call the co-defendant, the testimony of his co-defendant would have exculpated each appellant at least to the issue of

culpability regarding the death of Gabriel Rhone." Appellant's Br. at 180. Rather than demonstrating need for the testimony, it appears that Snarr and Garcia merely wanted to use a "divide and conquer" trial strategy, each minimizing the involvement of the other in separate trials.

As to the second and third points— the substance of the proposed testimony and its exculpatory effect— Snarr and Garcia provide nothing. In their motions, they offered to submit ex parte a sealed "rendition of the facts which demonstrates that a severance is essential." Snarr USCA5 104; Garcia USCA5 122. The court declined to review ex parte materials, Snarr USCA5 257-58; Garcia USCA5 293-94, and the defendants never hinted at the substance of their testimony. Similarly, in their brief, Snarr and Garcia do not describe their proposed testimony or explain how it could be exculpatory. Thus, they fail to meed the second or third prong of the four-point showing.

Finally, Snarr and Garcia fail to demonstrate that they would have actually testified if their trials had been severed. This point may be established by an affidavit from the co-defendant expressing his willingness to testify "or similar proof." *Owens*, 2012 WL 1941836, at \*4 (*citing Nguyen*, 493 F.3d at 625). "A statement from a defendant's attorney is insufficient to establish that the defendant's co-defendant would be willing to testify or the substance of such

140

testimony." *Id.* Here, Snarr and Garcia merely offered their lawyers' qualified claims that they would testify. These were legally insufficient. And as noted by the district court, the idea that either defendant would have been willing to testify is unrealistic because the Fifth Amendment privilege "continues through sentencing and appeal." Snarr USCA5 256; Garcia USCA5 292.

**(4). Complaint about the district court's instructions:**

In *Bernard*, the Court held that "[t]he district court's instructions sufficiently addressed the risk of prejudice resulting from the joint trial." 299 F.3d at 476. Snarr and Garcia argue that the district court's instructions were insufficient to remedy their concerns. Not so. The district court's careful instructions and trial procedures were designed to assure that the jury would consider each defendant separately.

In its instructions for the guilt phase, the district court gave the jury this Court's pattern instruction for multiple defendants charged in a single count: "The case of each defendant and the evidence pertaining to that defendant should be considered separately and individually. The fact that you may find one of the defendants guilty or not guilty should not control your verdict as to the other defendant." USCA5 4373; *see* FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS, CRIMINAL, § 1.22 (2001) (Multiple Defendants– Single Count).

Before the eligibility phase began, Snarr and Garcia re-urged their motions to sever, alleging a "potential for prejudice." USCA5 4442. The court denied the motion, pointing out that she intended to carefully instruct the jury and to give separate charges for each defendant. USCA5 4442-43. In her preliminary instructions, the court listed the factors to be considered for each defendant separately. USCA5 4447-52. She then instructed the jury: "Remember that although this is a trial of both defendants at the same time, each defendant is entitled to separate consideration by the jury. The case of each defendant and the evidence pertaining to that defendant should be considered separately and individually." USCA5 4452. The presentation of the evidence drove the point home. Evidence related to Snarr came first. USCA5 4476-4630. Only when that was complete did the government present evidence regarding Garcia. USCA5 4632-91, 4699-4745. After the individual evidence related to each defendant, two witnesses whose testimony related to them jointly were called. USCA5 4745-4831. The court gave two sets of instructions to the jury, one for Snarr, USCA5 4837-62, and one for Garcia, USCA5 4867-95. Both contained the pattern instruction for multiple defendants charged in a single count, adapted for the eligibility proceeding. USCA5 4845-46, 4875. The court also prepared separate verdict forms for Snarr and Garcia. USCA5 4862-67, 4895-4901.

142

The separation was even more pronounced during the selection phase. In her preliminary instructions, the court stated: "I remind you again that each defendant is entitled to separate consideration by the jury. The case of each defendant and the evidence pertaining to that defendant should be considered separately and individually. The fact that you may find a sentence of death is justified for one of the defendants should not control your verdict as to the other defendant." USCA5 4956. The government then gave an opening statement as to Snarr. USCA5 4962-69. Snarr opened, USCA5 4969-72, and the government presented its evidence against him, USCA5 4972-5427. After resting for Snarr, USCA5 5427, the government gave an opening statement as to Garcia. USCA5 5453-59. Garcia then opened, USCA5 5459-71, and the government put on its case against him, USCA5 5472-5858. With the exception of one joint witness, USCA5 6114-61, Snarr and Garcia presented their mitigating evidence separately. USCA5 5867-6004 (Snarr), USCA5 6005-6091, 6162-6255 (Garcia). In rebuttal, the government presented one witness relevant to Snarr, USCA5 6263-75; one relevant to Garcia, USCA5 6275-6308; and two relevant to the defendants' joint witness, USCA5 6310-6404.

At counsels' suggestion, USCA5 6432-33, and with the defendants' personal agreement, USCA5 6433-34, the court read the instructions that applied

143

to both defendants jointly only once, but gave specific instructions for each defendant separately.  USCA5 6435-48 (common), USCA5 6448-68 (Snarr), USCA5 6468-92 (Garcia).  The instructions again contained the pattern instruction for multiple defendants charged in a single count, adapted for the selection proceeding.  USCA5 6447-48.  And separate verdict forms were prepared for Snarr and Garcia.  Snarr sealed verdict form; Garcia sealed verdict form.

All phases of the proceeding were carefully and deliberately structured to maintain a distinction between the defendants.  The court's repeated instructions to consider each man and the evidence related to him separately only reinforced the procedural protections employed.

Relying on a 1959 law review article, a 1989 law journal note, and language taken out of context from *Bruton v. United States*, 391 U.S. 123, 129 (1968), Snarr and Garcia claim that jury instructions are ineffective in general.  Appellants' Br. at 185.  This Court has consistently rejected such a notion, holding— in capital and non-capital cases— that it "must presume that the jury heard, understood and followed the district court's instructions."  *Bernard*, 299 F.3d at 476 (*citing Richardson v. Marsh,* 481 U.S. 200, 211 (1987)); *Owens*, 2012 WL 1941836, at *3.  Thus, the Court must presume that the jury followed the district court's instructions in this case.

In sum, Snarr and Garcia's claim that the trial court should have severed their trial lacks merit. The district court's repeated instructions and trial procedures adequately protected the defendants.

> **Issue XVI: As the defendants acknowledge, this Court has determined that the relaxed evidentiary standards applied during a capital sentencing hearing do not render the Federal Death Penalty Act unconstitutional. Although conceding that this issue is foreclosed, defendants raise it to preserve the claim. Did the district court err in declining to declare the FDPA unconstitutional?**

## A. Standard of Review

Constitutional challenges to federal statutes are reviewed de novo. *Jones*, 132 F.3d at 239.

## B. This Court's decision in *Jones* forecloses this issue.

The crux of Snarr and Garcia's argument appears to be that the statutory aggravating factors are elements of the crime for capital murder. Based on this theory, the defendants contend that evidence related to those factors must not be presented in the sentencing hearing because it has relaxed evidentiary standards. Snarr and Garcia concede that this issue is foreclosed.

This Court has determined that "the relaxed evidentiary standard does not impair the reliability or relevance of information at capital sentencing hearings, but helps to accomplish the individualized sentencing required by the

145

constitution." *Jones*, 132 F.3d at 242; *Webster*, 162 F.3d at 354; *cf. Jackson*, 549

F.3d at 972 n.6 (claim that aggravating factors are elements under the FDPA raised

without explanation or citation to supporting authority).

The district court did not err by following the law of this Court. And,

because "one panel of this court may not overrule another panel's earlier

decision," *United States v. Castro-Guevarra*, 575 F.3d 550, 552 (5th Cir. 2009),

this issue is without merit.

> **Issue XVII:  During a capital sentencing, the defendant may offer relevant mitigating evidence— without regard to the Federal Rules of Evidence— unless its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.  Here, the district court excluded as irrelevant and unduly prejudicial character evidence of the victim of which the defendants were unaware when they murdered him, but allowed reputation evidence and prior acts they knew about. Did the court abuse its discretion?**

## A.  Standard of Review

Under 18 U.S.C. § 3593(c), information need not be admissible under the

Federal Rules of Evidence to be submitted at a capital sentencing hearing. *Hall*,

152 F.3d 397. The statute provides, however, that the district court may exclude

information "if its probative value is outweighed by the danger of creating unfair

prejudice, confusing the issues, or misleading the jury." *Id. (quoting* 18 U.S.C. §

3593(c)). The district court retains "considerable discretion in controlling the

presentation of the 'information' to the jury in both content and form." *Id.*

*(quoting United States v. McVeigh*, 944 F. Supp. 1478, 1487 (D. Colo. 1996)).

Review is for abuse of discretion. *Id.* And, if evidence is improperly excluded, it

is further reviewed for harm beyond a reasonable doubt. *Bernard*, 299 F.3d at

486-87; *see also United States v. Gulley*, 526 F.3d 809, 819 n.2 (5th Cir. 2008).

**B. The district court did not abuse its considerable discretion in declining to permit evidence of the victim's bad character during the selection phase because it was not relevant to the jury's decision.**

The Supreme Court has long recognized that a capital sentencing decision

requires consideration of "the circumstances of the offense together with the

character and propensities of the offender." *Woodson v. North Carolina*, 428 U.S.

280, 304 (1976) (*quoting Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55

(1937)). With proper notice, the FDPA permits the government to introduce

victim impact evidence. 18 U.S.C. § 3593(a); *Davis*, 609 F.3d at 684. In *Payne v.*

*Tennessee*, 501 U.S. 808, 825 (1991), the Supreme Court explained that the

government may offer evidence about the victim during a capital sentencing

proceeding to help "the jury . . . assess meaningfully the defendant's moral

culpability and blameworthiness" by demonstrating "the specific harm caused by

the defendant." The Court reasoned that the government could counteract

mitigating evidence offered by a defendant with information showing the full loss

147

caused by his crime. *Payne*, 501 U.S. at 825. Introduction of this evidence remains bound by relevance and Section 3593's requirement that the probative value outweigh "the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c); *see Payne*, 501 U.S. at 825.

Snarr and Garcia contend that the district court impaired their ability to prove their mitigating factors regarding the victim by excluding evidence of his poor character. Appellants' Br. at 195. Characterizing their argument as "reverse 'victim impact,'" they rely on cases permitting victim impact testimony to support their argument that they should have been allowed to submit more evidence of Rhone's bad character. Appellants' Br. at 198-200. This reliance is misplaced, however, because the purpose for permitting victim impact testimony is to fully explain the harm caused by the crime and to counteract mitigating evidence offered by the defendant. *Payne*, 501 U.S. at 825. Significantly, Snarr and Garcia provide no authority permitting a defendant to offer general evidence of the victim's bad character in mitigation— presumably to demonstrate that the defendant is less culpable for murdering an awful person— during the sentencing phase of a capital murder case.[47] The government, likewise, located no federal

---

[47] Defendants rely on Fed. R. Evid. 404(a), which is inapplicable because the rules of evidence do not apply in capital sentencings. Moreover, the construction of Rule 404(a) urged by Snarr and Garcia fails in light of this Court's decision in *Gulley*, 526 F.3d at 817-19. The cases

case on point.  *But see State v. Gaskins*, 326 S.E.2d 132, 145 (S.C. 1985),

*overruled on other grounds State v. Torrence*, 406 S.E.2d 315, 328 n.5 (S.C. 1991)

(victim's confession to the murder of two people offered in mitigation was

properly excluded in a capital sentencing).

Under the facts of this case, the district court did not abuse her discretion by

declining to admit evidence of Rhone's poor character that Snarr and Garcia knew

nothing about when they murdered him.  Such evidence had no relevance

whatsoever.

On appeal, Snarr and Garcia refer to their motion for continuance filed the

day before jury selection and an offer of proof they made at the end of the

selection phase, Appellants' Br. at 193-95; however, they omit relevant pre-trial

rulings and minimize the significant amount of disturbing information about

Rhone admitted during trial, all of which provides the context necessary to resolve

this issue.

---

cited by defendants, likewise, fail to support their argument.  *United States v. Greschner,* 647 F.2d 740, 741 (7th Cir. 1981), involved facts supporting a claim of self defense, which was not at issue here.  In *Bowden v. McKenna*, 600 F.2d 282, 284 (1st Cir. 1979), the excluded evidence was relevant to a key issue regarding liability, also not the case here.  And this Court rejected the D.C. Circuit's decision in *United States v. Burks*, 470 F.2d 432, 434 (7th Cir. 1972), as "inapposite [in this context] because it was promulgated before the Federal Rules of Evidence were adopted."  *Gulley*, 526 F.3d at 819.

Before trial, Snarr and Garcia sought extensive discovery regarding Rhone's mental health, conduct while incarcerated, and prior crimes. Snarr USCA5 203-16; Garcia USCA5 219-31. The government complied with portions of the request and objected to others, Snarr USCA5 274-80; Garcia USCA5 310-16, so the request was discussed extensively at a status conference on March 4, 2010. USCA5 139-85, 193-216. At the final pre-trial conference on March 29, the issue of character evidence about Rhone during the guilt/innocence phase of trial arose in connection with the government's motion in limine. USCA5 259-71, 274-83. The court pointed out that the facts of the case could not legally support a claim of self defense or that Rhone was the first aggressor. USCA5 259, 274. The court further refused to adopt Snarr and Garcia's novel theory of preemptive self defense— in support of which, they compared their crime to the invasion of Iraq— or justification.[48] USCA5 260-71, 274-79. Although extraneous acts of misconduct by Rhone were irrelevant, the government did not oppose evidence regarding his relationship with the defendants or any threats he may have made to them. USCA5 280-81. The court agreed, but questioned whether even that was admissible because self defense was not an issue. USCA5 281-83.

---

[48] Snarr and Garcia do not challenge the district court's determinations regarding self defense, preemptive self defense, or justification on appeal.

150

On April 5, 2010, the day before voir dire was to begin, the defendants filed the motion for continuance cited in their brief, Appellants' Br. at 193-94, seeking more time to investigate Rhone's "bad character." Snarr USCA5 571; Garcia USCA5 612. They contended, without citing authority, that

> [t]he reputation or opinion testimony of the victim's violent character is pertinent to the Defendant's self-defense claim, as well as the defense of justification. Furthermore, should the case progress to the punishment phase, the jury will certainly hear evidence regarding the perceptions of the actors and the relevance of the character and history of the deceased in contributing to the incident.

Snarr USCA5 571; Garcia USCA5 612. The court denied the motion. Snarr USCA5 579-81; Garcia USCA5 620-22.

On the first day of the guilt/innocence phase, Snarr and Garcia said that they wanted to inform the jury that "Rhone was the aggressor in this case" and perhaps refer to threats allegedly made by Rhone during the 48 hour preceding the murder. USCA5 3348. The government advised that it would not object to the defendants' opening statements, but asked that the court to first consider the evidence outside the jury's presence during trial. USCA5 3349. The court agreed, reminding the defendants of her earlier decision regarding preemptive self defense. USCA5 3350. In his opening, Snarr claimed that Rhone was the first aggressor and characterized him as "a rattlesnake in the special housing unit in the Beaumont

151

prison." USCA5 3372. Garcia went further, telling the jury that Rhone was aggressive, threatening, vile, mentally ill, and caustic. USCA5 3374-79. Garcia also said that, by his conduct toward the defendants, Rhone "committed suicide by inmate." USCA5 3379.

During the guilt/innocence phase, the defendants were permitted to elicit that Rhone did not have the reputation of being a peaceful and law-abiding inmate. USCA5 3488-89, 4125. Inmate Keenan Hurt described Rhone as someone who was apt to "fly off the rack," meaning that he was unpredictable. USCA5 3915, 3966-65. According to Hurt, Rhone argued with the guards and other inmates and was a loud mouth. USCA5 3964-66, 4005-06. Hurt recalled Rhone saying, "Whoever ain't Muslim on this tier can suck my dick." USCA5 3967-68. Rhone was described as particularly disrespectful to female guards. USCA5 3986, 4044. Correctional Officer Dawn Gallagher told the jury that Rhone ejaculated on her shoe about two weeks before the murder.[49] USCA5 4115-19. Rhone's cell mate in the SHU, Ricardo Pallaret, described Rhone as manipulative, controlling, and insulting. USCA5 4196-97, 4209. Pallaret claimed that Rhone was particularly

---

[49] The district court accepted a proffer of Gallagher's testimony and correctly limited it to facts within her knowledge and incidents of which the defendants were aware. USCA5 4051-4106.

152

insulting and threatening to Snarr and Garcia the night before the murder.[50]

USCA5 4197-4200.

Despite the court's ruling regarding self defense or justification, Snarr argued in closing that Rhone's threatening and violent nature caused the murder. USCA5 4393-96, 4397-98. Garcia argued the same: "Gabriel Rhone is responsible for everything that happened here." USCA5 4402-03, 4408-09. Neither mentioned Rhone in their opening statements for the selection phase, USCA5 4969-72, 5456-71, but Snarr's expert on prison life discussed how Rhone's lack of respect affected the other inmates. USCA5 5965-66. She also testified about racial threats Rhone allegedly made to Snarr the day before the murder, specifically that Rhone masturbated in front of Snarr and threatened— in graphic and vulgar terms— to rape Snarr's mother and sister. USCA5 5966-67. Upon recall, Pallaret described that incident. USCA5 6007-08. Pallaret also testified that he was in a recreation cage with Rhone the day before the murder, and Rhone exposed his penis to Snarr, who was in a nearby cage, referring to Snarr as a "bitch." USCA5 6009-10. As for Garcia, Pallaret claimed that Rhone

---

[50] As with Gallagher, the court limited Pallaret's testimony to arguably relevant material after a proffer and argument. USCA5 4171-91.

153

dragged a shank along the wall between his cell and Garcia's while saying, "Do you hear this?"  USCA5 6011.

Toward the end of the selection phase, the attorneys and the court discussed additional information Snarr and Garcia wanted to introduce regarding Rhone— including a video from another institution that showed Rhone painting his cell with feces,[51] USCA5 6112— while addressing their proposed instruction on residual doubt.  USCA5 6104-09.  The court explained that "reports of Rhone's criminal history, disciplinary record, mental health, and remote instances of his behavior in various BOP institutions about which the defendants were not aware" were not admissible.  USCA5 6106.  The court also excluded the evidence under Section 3593(c) because its probative value was outweighed by the danger of creating unfair prejudice, confusing the issues, and misleading the jury.  USCA5 6106-07.  The court further held that the evidence was not mitigating.  USCA5 6107-08.

On the final day of testimony, a psychologist who examined Garcia was permitted to testify that Garcia believed Rhone's murder was a means of survival. USCA5 6230-31.  After both sides rested, Snarr and Garcia requested mitigating

---

[51]  When discussing this exhibit, Defendants' Ex. 50, during a pre-trial conference, Garcia's counsel warned the district court to "eat long before you watch it; don't eat after." USCA5 172.

factors of duress, disturbance, and the victim's consent, all of which were refused.

USCA5 6412-20. In conjunction with the request, Snarr and Garcia offered their

exhibits numbered 39, 40, 41, 43, 44, 45, 46, 47, 48, and 50 for three purposes.

USCA5 6420-27.[52] First, they claimed, without explanation, that the exhibits

"would mitigate one's conduct towards life without parole as opposed to death."

USCA5 6423. Second, the defendants wanted to show Rhone's mental health and

how it manifested itself in aggressive and violent behavior. USCA5 6423-4.

Finally, the defendants thought the evidence would show the BOP's failure to

address Rhone's behavior. USCA5 6424-25. The court denied the offer for the

grounds previously stated. USCA5 6425-27. Both defendants were permitted to

argue in closing that Rhone's conduct was a mitigating factor. USCA5 6536-38,

6543-44, 6549-50, 6554.

Based on this record, the district court did not abuse her discretion in

excluding the limited, highly prejudicial, irrelevant evidence regarding Rhone's

criminal history, mental illness, and disciplinary problems. As the court noted, the

facts did not support a claim of self defense or the allegation that Rhone was the

---

[52] Snarr and Garcia cite "USCA5 7471-77" on page 194 of their brief. That citation is to the second supplemental record on appeal, which is the trial transcript for Garcia. As addressed in note 1 above, the government refers to the trial transcript for Snarr found in the first supplemental record on appeal unless otherwise noted.

first aggressor.  Nevertheless, the defendants were given great latitude in admitting evidence regarding Rhone that they knew about.  The court correctly determined that going further into Rhone's conduct would create the danger of confusing the issues or misleading the jury, in addition to being unduly prejudicial.  She did not err: the excluded evidence was apt to lead the jury far afield from consideration of "the circumstances of the offense" and "the character and propensities of the offender[s]."  *Woodson*, 428 U.S. at 304.  Moreover, given the substantial amount of evidence offered about Rhone's conduct, any possible error in excluding even more evidence of Rhone's character would have been harmless.

> **Issue XVIII:  Evidence about the effect a defendant's execution might have on his family and friends is not mitigating because it does not reflect on his background, character, or the circumstances of his crime.  After the government submitted no victim-impact evidence and Garcia offered substantial mitigating evidence, the district court declined to permit a speculative statement regarding the effect Garcia's execution might have on his family.  Did the court err?**

## A.  Standard of Review

As discussed in Issue XVII above, the Court reviews the district court's decisions regarding the presentation of information during a capital sentencing hearing for abuse, *Hall*, 152 F.3d 397, and if evidence is improperly excluded, it is further reviewed for harm, *Bernard*, 299 F.3d at 486-87.

**B. The district court did not abuse its broad discretion in excluding non-mitigating, speculative evidence regarding the effect of Garcia's execution on his family.**

This Court has held that evidence of the effect an execution might have on the defendant's family and friends does not fall within the scope of mitigating information that must be admitted in a capital sentencing hearing because it is not relevant to "either the degree of harm [the defendant's] crime caused or to [the defendant's] moral culpability . . . ." *Jackson v. Dretke*, 450 F.3d 614, 617-18 (5th Cir. 2006) (noting that "the Supreme Court has never included friend/family impact testimony among the categories of mitigating evidence that must be admitted" in the sentencing hearing for a death penalty case); *see also Jackson*, 549 F.3d at 970 n.3 (district court properly ruled that general pleas for mercy from family members not permitted); *Kelly v. Lynaugh*, 862 F.2d 1126, 1133 n.12 (5th Cir. 1988) (stepfather's plea for defendant's life "not mitigating"); *Stenson v. Lambert*, 504 F.3d 873, 891-92 (9th Cir. 2007) ("Stenson cannot point to any federal case requiring admission of 'execution impact' testimony because there are no such cases.").[53]

---

[53] Although some jurisdictions apparently permit execution impact testimony, *e.g., Wright v. Bell,* 619 F.3d 586, 597-98 (6th Cir. 2010); *Sinisterra v. United States*, 600 F.3d 900, 909-10 (8th Cir. 2010), none appear to require trial courts to admit it.

Here, Snarr and Garcia both filed pre-trial motions asking that they be allowed to present two types of "execution impact" evidence if the case proceeded to sentencing. Snarr USCA5 348-57; Garcia USCA5 385-93. First, the defendants intended to ask their friends and family if they wanted Snarr or Garcia to die. Snarr USCA5 348; Garcia USCA5 385. Then, Snarr and Garcia intended to ask how a death sentence and ultimate execution would affect the witness. Snarr USCA5 348; Garcia USCA5 385. The government opposed the motions. Snarr USCA5 422-23; Garcia USCA5 452-53. Based on the unequivocal precedent of this Court and others, the district court denied the motions. Snarr USCA5 484-85; Garcia USCA5 514-15.

In the selection phase, Garcia presented mitigating evidence about his background, childhood, and family through his mother, USCA5 6029-61; brother, USCA5 6062-6082; uncle, USCA5 6083-86; seventh-grade English teacher, USCA5 6087-91; Rachel Rodriguez, who was the mother of two of his children, USCA5 6162-81; and a clinical psychologist, who examined Garcia regarding who he was "as a person both now and hopefully in the future," USCA5 6191, 6188-6255. Rodriguez testified that Garcia was a good father. USCA5 6165. Although the children had not seen Garcia since he had been in prison, USCA5 6169, 6179, Rodriguez stated that he maintained an active relationship with her

children through telephone calls, letters, and artwork, USCA5 6166, 6168-69. During Rodriguez's testimony, Garcia played a recording of interviews with the children about their father. USCA5 6169-72; D Ex. 36.

At the conclusion of the selection phase, Garcia's attorney made a proffer of the "execution impact" testimony. USCA5 6406-08. According to the proffer, Rodriguez would have testified about the loss she believed her children would feel if Garcia was executed. USCA5 6406-07. Rodriguez felt that her daughter would miss Garcia because she would "never again be her daddy's little girl." USCA5 6406. Rodriguez feared that her son would become angry and that "his whole attitude and personality" would change, resulting in rebellion towards the law, choosing the wrong friends, and engaging in risky behavior. USCA5 6407. Rodriguez claimed that her son was already showing signs of depression and was concerned that he would be forced to become a man too soon if Garcia were executed. USCA5 6407. Garcia's brother would have testified that he would be sad and would feel responsible for their mother and Garcia's children if Garcia received the death penalty. USCA5 6407-08.

The district court did not abuse its discretion in excluding this evidence. As noted above, neither this Court nor the Supreme Court has ever "included friend/family impact testimony among the categories of mitigating evidence that

159

must be admitted" in a capital sentencing hearing. *Jackson*, 450 U.S. at 618.

Here, the evidence proffered showed nothing about Garcia's background or character or the circumstances of his crime. Rather, it amounted to a general plea for mercy. In particular, most of what Rodriguez would have offered was merely her speculation as to the effect a death sentence would have on her children. The district court did not err in excluding it, particularly in light of the testimony regarding Garcia's children already in evidence and considering the absence of victim-impact testimony.[54]

On appeal, the defendants urge the Court to extend the Supreme Court's holding regarding victim-impact evidence in *Payne v. Tennessee* to execution-impact evidence offered in mitigation by a defendant, claiming "that what is good for the goose is good for the gander." Appellants' Br. at 206-13. This argument does not accord with the Court's reasoning in *Payne*, which determined that "[v]ictim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities." *Payne*, 501

---

[54] Even the spirited dissent in *Jackson* recognized that "[i]n a case in which the prosecution introduces no victim impact evidence, it might be reasonable and fair for the trial court to exclude execution-impact evidence because of Federal Rule of Evidence 403 concerns." *Jackson*, 450 F.3d at 621 (Dennis, J., dissenting).

U.S. at 825.  The government, thus, may offer victim-impact evidence so that the jury may fully consider the harm caused by the defendant: "there is nothing unfair about allowing the jury to bear in mind that harm at the same time as it considers the mitigating evidence introduced by the defendant." *Id.*  Because victim-impact evidence relates to the harm caused by a defendant, it is relevant to one of the considerations before the jury in a capital sentencing hearing— "the circumstances of the offense together with the character and propensities of the offender." *Woodson*, 428 U.S. at 304.  As such, it fundamentally differs from evidence regarding how an execution might affect a defendant's family and friends, evidence that has nothing to do with the offense or the offender.

Finally, although both defendants complain about the exclusion of the proffered evidence, the issue actually relates to Garcia alone.  Snarr generally contends that if "Garcia was not afforded a fair trial, . . . it is reasonable to conclude that the jury was likely eased into a death sentence for Snarr by the joint death sentence of Garcia."  Appellants' Br. at 213.  This argument overlooks the individual nature of sentencing evidence presented by the government and each defendant.  Moreover, despite the pre-trial order, Snarr asked each friend and family member who testified whether they wanted the jury to spare his life.  Snarr's ex-girlfriend, USCA5 5925; her daughter, USCA5 5943; aunt, USCA5

161

5949; and mother, USCA5 6002, each responded that they did.  Snarr presents no error in this issue.

## ISSUE XIX:  EXPERT FUNDING ISSUE

**Issue XIX:  If the costs for reasonably necessary experts and investigators assisting indigent capital defendants exceed $7,500, they must by certified by the lower court and approved by the chief judge of the circuit.  After careful review, the Chief Judge of this Court reduced expert funds approved for Garcia and denied funding for a cultural expert; nevertheless, Garcia presented an adequate case in mitigation.  If this Court's orders reducing or denying funding are appealable, did the Court err?**

### A.  Procedural History and Facts Related to Issue XIX

Garcia's trial team was appointed in April 2008, and he was indicted in January 2009.  Garcia USCA5 2.  In April 2009, Garcia's counsel submitted an ex parte, pre-discovery proposed case budget and motion to certify expenses under 18 U.S.C. § 3599(g)(2).[55]  Garcia USCA5 683-96.  The proposed budget requested attorneys' fees of $525,000 and funds for the following experts, investigative services, and expenses:

Blood splatter expert/ crime scene expert.. . . . . . . . . . . . . . . $10,000
Criminologist.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $10,000
DNA expert. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $7,500
Cultural expert.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $19,000
Expenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $5,000

---

[55]  The motion cites Section 3599(g)(2)'s predecessor statute, 21 U.S.C. § 848(q)(10)(B), but the provisions are basically identical.

Investigators. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $25,000
Mental health experts (psychiatrist, psychologist,
      organic brain disorder specialist). . . . . . . . . . . . . . . . $45,000
Mitigation expert. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $25,000
Pathologist. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $10,000
Prison experts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $25,000
Travel Costs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $15,000

Total. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $196,500

Garcia USCA5 690-94; D Ex. 1 from Oct. 30, 2009, hearing (sealed).

The district court conducted a budget conference with Garcia's attorneys on

April 24, 2009. Garcia USCA5 5. On April 27, the court approved a budget that

reduced the attorneys' fees to $420,000 and contained the following amounts for

experts, investigative services, and expenses:

Blood splatter expert/ crime scene expert. . . . . . . . . . . . . . . $10,000
Criminologist. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $10,000
DNA expert. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $7,500
Cultural expert (reduced by $4,000). . . . . . . . . . . . . . . . . . . $15,000
Expenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $5,000
Investigators. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $25,000
Mental health experts (psychiatrist, psychologist,
      organic brain disorder specialist). . . . . . . . . . . . . . . . $45,000
Mitigation expert. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $25,000
Pathologist (reduced by $5,000). . . . . . . . . . . . . . . . . . . . . . $5,000
Prison experts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $25,000
Travel Costs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $15,000

Total. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $187,500

Garcia USCA5 698-99; D Ex. 1 from Oct. 30, 2009, hearing (sealed).

After the Chief Judge of this Court reviewed the budget, she and the district court entered an order on September 11, 2009, reducing the funding for expert and investigative services to the following amounts:

Investigators and mitigation experts..................... $30,000
Mental health expert, pathologist, psychologist............ $35,000

Total.. ..................................... $65,000

Garcia USCA5 701-02.  Although removed from the budget, travel and other expenses were to be billed as incurred.  Garcia USCA5 701.

On October 30, 2009, the district court held a hearing regarding the defendants' motion for reconsideration of the reduced budget.  Garcia USCA5 704-803.  Garcia presented testimony from Dr. Jolie Brams, the psychologist who ultimately testified for him during the selection phase.  Garcia USCA5 759-72.  Brams stated that she needed the assistance of a prison expert to help her understand Garcia's adjustment to life in prison and a cultural expert to help her explain Garcia's atypical Hispanic experience because he was from a "Mexican mafia" family.  Garcia USCA5 763-64.  Although the doctor found Garcia to be of normal intelligence and "quite verbal," she thought Garcia should be examined by a neuropsychologist to help understand his "ability to conform his behavior in a voluntary nature."  Garcia USCA5 765-66.  The court also heard testimony from

164

Dr. Richard Cervantes, the proposed cultural expert; Dr. Craig W. Haney, the proposed prison expert; and Richard Burr, a contractor with the Federal Death Penalty Resource Council, who explained why he believed Garcia's proposed budget was reasonable.  Garcia USCA5 711-59, 772-800.

After the hearing, the district court submitted a memorandum to the Chief Judge, requesting approval for the following additional funding:

| | |
|---|---|
| Mental health neurological expert. . . . . . . . . . . . . . . . . . . . . . | $15,000 |
| Criminologist/prison culture expert and prison administration expert. . . . . . . . . . . . . . . . . | $35,000 |
| Cultural mitigation expert. . . . . . . . . . . . . . . . . . . . . . . . . . . . | $15,000 |
| Total. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $65,000 |

Garcia USCA5 805-13.

On December 17, 2009, the Chief Judge entered an order increasing the amount authorized by $20,000.  Garcia USCA5 815-16.  The Chief Judge explained that she had carefully reviewed Garcia's motion for reconsideration and budget information along with memoranda and rulings of the district court. Garcia USCA5 815.  The Chief Judge denied funding for a Mexican cultural expert, however, finding it inappropriate for either party to adduce testimony characterizing a defendant according to his national origin.  Garcia USCA5 815.

With this order, the total authorized funding for experts and investigative services was $85,000, plus travel and other expenses.

Jury selection began on April 6, 2010. Garcia USCA5 15. On April 19, Garcia filed a motion to dismiss the death penalty based on inadequate funding. Garcia USCA5 660-80. Garcia attached an affidavit from Burr, who had examined the actual approved budgets for nine other capital cases tried in this Circuit. Garcia USCA5 818-20. Burr stated that those budgets, which had not been reduced, had approved funds for experts and investigators ranging from $75,000 to "over $200,000." Garcia USCA5 820. The average was $112,000. Garcia USCA5 820.

The district court denied Garcia's motion on April 27. Garcia USCA5 864. Three days later, she amended the order to point out that, although Garcia could not use Criminal Justice Act (CJA) funds for an expert on Mexican culture, he was not precluded "from presenting mitigating information regarding the effects and experiences of race, national origin, and/or culture . . . through other experts, friends, or family members." Garcia USCA5 864. The court further noted that Garcia had reported a "good childhood, with no history of abuse, neglect or other significant issues," in his most recent PSR. Garcia USCA5 864.

**B. The Court's decision to reduce funding under Section 3599(g) may not be reviewable, but to the extent that it can be reviewed, abuse of discretion appears to be the appropriate standard of review.**

It is unclear whether the Court's decision to reduce funding under the CJA is reviewable. If it is, this Court has not articulated a standard of review. Likewise, the Court has not established a standard of review for its decision to deny funding under 18 U.S.C. § 3599(g).

Other circuits have determined that district court orders reducing, rather than denying, requests for funding under the CJA are not reviewable. The Tenth Circuit recently declined to review an order reducing requested attorney's fees for an indigent capital defendant in a Section 2254 proceeding: "[T]his appeal boils down to a dispute about the district court's decision to award an amount less than the requested amount for representation in the pending § 2254 proceeding. This court has determined that such 'district court CJA fee determinations are not appealable orders.'" *Rojem v. Workman*, 655 F.3d 1199, 1201-02 (10th Cir. 2011) (*quoting United States v. French,* 556 F.3d 1091, 1093 (10th Cir. 2009)). The court relied on its earlier decision in *United States v. French*, which noted that the CJA does not provide for appellate review of fee determinations. 556 F.3d at 1093. Rather, the district court's broad discretion is subject to "minimal" review by the chief judge of the circuit, and "the non-adversarial nature of the process

167

supports the conclusion that it is an administrative act, as opposed to a judicial decision." *Id.*

In *French*, the court pointed out that "[e]very circuit court of appeals to consider this jurisdictional question has held that CJA fee compensation determinations made by the district court are not appealable." *Id.* (*citing United States v. Stone,* 53 F.3d 141, 143 (6th Cir. 1995); *Shearin v. United States,* 992 F.2d 1195, 1196 (Fed. Cir. 1993); *Landano v. Rafferty,* 859 F.2d 301, 302 (3rd Cir. 1988); *United States v. Rodriguez,* 833 F.2d 1536, 1537-38 (11th Cir. 1987); *United States v. Walton (In re Baker),* 693 F.2d 925, 927 (9th Cir. 1982); *United States v. Smith,* 633 F.2d 739, 742 (7th Cir. 1980); *cf. United States v. Bloomer,* 150 F.3d 146, 148 (2d Cir. 1998) (holding that orders concerning fee determinations for services already rendered under the CJA are not appealable)). The Fourth and Eighth Circuits have reviewed CJA compensation decisions, however, without discussing jurisdiction. *United States v. Ketchem*, 420 F.2d 901, 904 (4th Cir. 1969); *United States v. Turner*, 584 F.2d 1389 (8th Cir. 1978) (applying abuse of discretion standard).

There appears to be no principled reason to distinguish decisions to reduce CJA funding made by the appellate court from those made by the district court. Similarly, decisions to reduce awards of expert and investigative funding appear to

be no different than those reducing attorney's fees. Thus, under the reasoning of the Third, Sixth, Seventh, Ninth, Tenth, Eleventh, and Federal Circuits and, perhaps, the Second Circuit, Garcia's claim regarding the reduction of funds is unreviewable. But if the Court decides to review the Chief Judge's decision to reduce some of the funding, abuse of discretion appears to be the appropriate standard. *E.g., Turner*, 584 F.2d at 1389 (abuse of discretion standard applied to district court's funding decision).

As for the denial of funding for a cultural expert, Garcia correctly notes that this Court reviews the lower court's decision to deny funds for expert assistance for abuse of discretion. *Smith v. Dretke*, 422 F.3d 269, 288-89 (5th Cir. 2005) (denial of funding for psychologist to assist with motion under 28 U.S.C. § 2244 filed by state capital defendant); *cf., Fautenberry v. Mitchell*, 572 F.3d 267, 268-69 (6th Cir. 2009) (denial of second neuropsychologist requested under Section 3599). The Court, however, has not established a standard for reviewing its own decisions denying expert and investigative funding for indigent defendants. The government urges the Court to afford the Chief Judge the same discretion it would the district court and review only for abuse of discretion.

**C. Under any standard, the funding provided to Garcia, even as reduced, fulfilled the requirements of the Supreme Court as applied by this Court.**

In *Ake v. Oklahoma*, 470 U.S. 68, 77-85 (1985), the Supreme Court determined that meaningful access to the courts requires indigent defendants to be provided with "access to the raw materials integral to the building of an effective defense." For a capital defendant whose mental condition was critical to an insanity defense, the Court found that assistance of one competent psychiatrist was necessary for an adequate defense. "[W]hile the Court has not held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy, . . . it has often reaffirmed that fundamental fairness entitles indigent defendants to 'an adequate opportunity to present their claims fairly within the adversary system.'" *Ake*, 470 U.S. at 77. The Court recognized that the access to court-funded experts was limited: "This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist . . . ." *Id.* at 78, 83. The Court further made clear that the access extends to capital sentencing hearings when expert assistance is necessary to counteract the government's evidence regarding aggravating factors. *Id.* at 8-84.

Most of the "raw materials" for effective defense of an indigent defendant, as contemplated by *Ake*, come "in the form of his court-appointed lawyer." *Moore v. Johnson*, 225 F.3d 495, 502-03 (5th Cir. 2000). Even when the defendant raises an insanity defense, this Court has determined that limits may be placed on CJA funding for experts. *E.g., Barraza v. Cockrell*, 330 F.3d 349, 351-52 (5th Cir. 2003) (funding denied for supplemental psychiatric testing in Section 2254 proceeding); *cf., Griffith v. Quarterman*, 196 F. App'x 237, 242-43 (5th Cir. 2006) (unpublished) (denial of fourth psychologist on future dangerousness not error: indigent defendant must "establish a reasonable probability that the requested experts would have been of assistance to the defense and that denial of such expert assistance resulted in a fundamentally unfair trial") (citation omitted). And non-psychiatric experts must be provided only if the evidence is "both 'critical' to the conviction and subject to varying expert opinion." *Yohey v. Collins*, 985 F.2d 222, 227 (5th Cir. 1993) (*quoting Scott v. Louisiana,* 934 F.2d 631, 633 (5th Cir. 1991)). An indigent defendant does not have an automatic right to "expert assistance upon demand." *Yohey*, 985 F.2d at 227. Rather, he must demonstrate more than a mere possibility that a requested expert would be of assistance. *Id.*

Here, Garcia received more than just a court-appointed lawyer. The Court ultimately authorized $85,000 for experts and investigative services. This amount

falls within the range of $75,000 to "over $200,000" mentioned by Burr in his

affidavit. Garcia USCA5 820. And, despite Garcia's claim to the contrary,

Appellants' Br. at 216, 221, he was not ultimately denied the "right" to present

testimony from a prison expert or a neuropsychologist. In her order increasing

funding, the Chief Judge noted that, except for a Mexican cultural expert, the

funds could be used for "the experts described in the Motion for Reconsideration."

Garcia USCA5 815. While the amounts were less than Garcia wanted, he was not

precluded from hiring a prison expert or a neuropsychologist. *Cf., United States v.*

*Mikos*, 539 F.3d 706, 712-13 (7th Cir. 2008) (defendant's argument that he should

have been permitted to hire expensive expert of choice was a "dud" because funds

approved for less-costly expert). Moreover, Garcia fails to demonstrate that the

prison expert or neuropsychologist were critical for mitigation. He offers no

reason why his testifying psychologist, Brams, could not have relied on the testing

or written work of a neuropsychologist[56] or why his testifying prison consultant,

Bezy, could not have relied on the written work of prison expert Haney. *E.g.,*

*Mikos*, 539 F.3d at 712 (expert who testified could have relied on written work of

---

[56] Garcia never identified a neuropsychologist that he desired to hire. Brams's concerns about Garcia's early childhood development were based on allegations by his mother that she was beaten while pregnant and that Garcia's grandmother had attempted to poison him through witchcraft. Garcia USCA5 765. He did not produce hospital records documenting these claims, but his mother testified about both incidents. USCA5 6032-33, 6038-41.

pricier expert).  The Chief Judge did not abuse her discretion by reducing Garcia's requested funding.

Likewise, the Chief Judge did not abuse her discretion in denying funding for an expert in Mexican culture.  Garcia failed to demonstrate that this evidence was either "critical" to his mitigation case or subject to varying expert opinion as required by *Yohey*, 985 F.2d at 227.  At most, cultural expert Cervantes would have offered insight into Garcia's childhood by showing how it was inconsistent with cultural norms in Mexico.  Yet, the evidence from Garcia's family members, if believed, demonstrated that his childhood was inconsistent with "cultural norms" in the *United States*.  And the government did not vigorously challenge or attempt to rebut the claims Garcia made about his childhood.  Similarly, Cervantes's proposed testimony regarding patterns of alcohol use by Mexican-Americans would have also been of marginal significance, given the lack of evidence regarding Garcia's alcohol use.

In sum, although Garcia did not receive "experts on demand," he was afforded the funding necessary to mount an adequate mitigation case.  The Court provided Garcia "an adequate opportunity to present [his] claims fairly within the adversary system," *Ake*, 470 U.S. at 77, which is precisely what the law contemplates.  Garcia was entitled to nothing more.

Finally, although Snarr joins in this issue, he fails to explain how a reduction in expert fees for Garcia affected his defense. Appellants' Br. at 232. The Court reduced the budget proposed by Snarr, but he does not complain about any ill effects occasioned by that reduction. Given the individual nature of the sentencing evidence, the reduction in funding for Garcia did not hurt Snarr.

## CONCLUSION

Snarr and Garcia received a fair trial, and after conviction, both were afforded individualized sentencing proceedings under the procedures set out in the Federal Death Penalty Act. For the reasons stated above, none of their issues have merit. The district court's rulings and judgment were correct in all respects, and the United States urges this Court to affirm the convictions and the jury's sentences of death.

Respectfully submitted,

John M. Bales
United States Attorney
Eastern District of Texas

/s/ Traci L. Kenner
Traci L. Kenner
Assistant United States Attorney
110 N. College, Suite 700
Tyler, Texas 75702
(903) 590-1400

## CERTIFICATE RELATED TO FIFTH CIRCUIT RULE 25.2

I hereby certify in compliance with Fifth Circuit Rule 25.2 that: (1) all required privacy redactions have been made from this document; (2) this electronically-submitted document is an exact copy of the paper document; and (3) this document has been scanned for viruses with the most recent version of commercially-available virus scanning software used by the United States Attorney's Office for the Eastern District of Texas and is free of viruses.

/s/ Traci L. Kenner
Traci L. Kenner
Assistant United States Attorney

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that this brief has been served on the following by the

Court's ECF system on this the 21st day of June, 2012. When paper copies are

approved by the Court, two true and correct hard copies will be mailed to counsel

for each defendant at one of the following addresses:

Counsel for Snarr:

Douglas Milton Barlow
Barlow Law Firm
485 Milam
Beaumont, Texas 77701
(409) 838-4259
(409) 832-5611 (fax)
barlowlawfirm@gtbizclass.com

George Patrick Black
Federal Public Defender
110 N. College, Suite 1122
Tyler, Texas 75702
(903) 531-9233
(903) 531-9625 (fax)
amy_blalock@fd.org

Counsel for Garcia:

Gerald E. Bourque
Robert A Morrow, III
24 Waterway Avenue, Suite 660
The Woodlands, Texas 77380
(713) 862-7766 (Bourque)
(281) 379-6901 (Morrow)
(832) 813-0321 (fax)
gerald@geraldbourque.com
ramorrow15@gmail.com

Jani Jo Maselli
Attorney at Law
808 Travis Street, 24th Floor
Houston, Texas 77002
(713) 757-0684
(713) 650-1602 (fax)
jmaselli@aol.com

/s/ Traci L. Kenner
Traci L. Kenner
Assistant United States Attorney

<u>**CERTIFICATE OF COMPLIANCE**</u>

On June 15, 2012, the Court granted the government's motion for leave to file a brief in excess of the word count limitations of Fed. R. App. P. 32. Under the order, this brief may not exceed 45,000 words. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), as extended by the Court's June 15, 2012, order, because this brief contains 40,829 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2. This brief has been prepared in a proportionally spaced typeface using Corel WordPerfect X3 in 14-point Times New Roman font.

/s/ Traci L. Kenner

Traci L. Kenner
Assistant United States Attorney
Dated: June 21, 2012
