# No. 10-40525

## In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,  *Plaintiff-Appellee,*

v.

MARK ISAAC SNARR, *Defendant-Appellant*

and

EDGAR BALTAZAR GARCIA,  *Defendant-Appellant*

CRIMINAL NO. 1:09CR15
APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

# JOINT REPLY BRIEF OF APPELLANTS
**October 8, 2012**

DOUGLAS M. BARLOW
485 Milam
Beaumont, TX 77701
Tel: (409) 838-4259; Fax: (409) 832-5611
TBL #01753700

G. PATRICK BLACK
Federal Public Defender, EDTX
110 N. College, Ste 1122
Tyler, TX 75702
Tel: (903) 531-9233; Fax: (903) 531-9625
TBL #No.02371200
*Attorneys for Appellant Snarr*

GERALD E. BOURQUE and
ROBERT A. MORROW, III
24 Waterway Ave., Ste 660
The Woodlands, TX 77380
Tel: (281) 379-6901
Fax: (832) 813-0321
TBL #02716500/14542600

JANI J. MASELLI
808 Travis St., 24th Floor
Houston, TX, TX 77002
Tel: (713) 256-7726
TBL #00791195
*Attorneys for Appellant Garcia*

## REQUEST FOR ORAL ARGUMENT

Counsel for appellants Snarr and Garcia in the above-styled and numbered cause previously requested oral argument and continue in that request.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

ARGUMENTS AND AUTHORITIES . . . . . . . . . . . . .   3, 8, 21, 28, 35, 37, 45, 53

       **REPLY - ISSUE NO. NINE** - The trial court erred in
       excluding from the jury potential juror # 130 Kimball
       based on his disability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       **REPLY - ISSUE NO. TEN** - The trial court erred in
       excluding from the jury potential juror # 232 Horton based
       on his disability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       **REPLY - ISSUE NO. ELEVEN -** Snarr's and Garcia's
       convictions must be reversed because the district court
       denied appellants' request for a jury instruction on a lesser
       included offense, in violation of *Beck v. Alabama*, 447 U.S.
       625 (1980), thereby violating each of their rights to due
       process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

       **REPLY - ISSUE NO. TWELVE-** There is insufficient
       evidence to support the jury's findings that the murder was
       committed in an "especially heinous, cruel, or depraved
       manner." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

       **REPLY - ISSUE NO. THIRTEEN** - There is insufficient
       evidence to support the jury's findings regarding the non-
       statutory aggravating factor of future dangerousness. . . . . . . . . . . 28

       **REPLY - ISSUE NO. FOURTEEN** - There is
       insufficient evidence to support the jury's findings
       regarding the statutory aggravating factor of substantial
       premeditation and planning. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**REPLY - ISSUE NO. SEVENTEEN** - Snarr and Garcia's death sentences must be reversed because the district court reversibly erred in keeping out the prior bad acts of the complainant at sentencing depriving the jury of making an informed vote. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

**REPLY - ISSUE NO. EIGHTEEN** - Snarr and Garcia's death sentences must be reversed because the district court reversibly erred in keeping out execution impact evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

**REPLY - ISSUE NO. NINETEEN** - Garcia's and Snarr's death sentences must be reversed because this Honorable Court denied Garcia due process by overruling the district court and denying the funding necessary for Garcia to present a punishment case, which additionally impinged upon the due process rights of Snarr in the joint trial.   . . . . . . . . . . 54

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

CERTIFICATE OF NON-COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

# TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE**

*Aguilar v. Dretke*, 428 F.3d 526, 531 (5th Cir.2005) . . . . . . . . . . . . . . . . . . . . . . 17

*Batson v. Kentucky*, 476 U.S. 79 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Beck v. Alabama*, 447 U.S. 625 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Beck v. State,* 365 So. 2d 985, 988-990 (Ala. Crim. App. 1978) . . . . . . . . . . . . 14

*Cordova v. Lynaugh*, 838 F.2d 764 (5th Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . 16

*Cullen v. Pinholster*, 131 S. Ct. 1388, 1409 n.19 (2011) . . . . . . . . . . . . . . . . . . 49

*Gardner v. Johnson*, 247 F.3d 551, 563 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . 33

*Gardner v. Florida*, 430 U.S. 349, 362 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Godfrey v. Georgia*, 446 U.S. 420, 433 n.16 (1980) . . . . . . . . . . . . . . . . . . . . . . 26

*Gregg v. Georgia*, 428 U.S. 153, 190 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 52

*In re Marcum L.L.P.* 670 F.3d 636, 638 (5th Cir. 2012) . . . . . . . . . . . . . . . . . . 55

*Jackson v. Dretke*, 450 F.3d 614, 618 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . 47

*J.D.B. v. North Carolina,* 131 S. Ct. 2394, 2405 (2011) . . . . . . . . . . . . . . . . . . 47

*Jones v. United States*, 527 U.S. 373, 380-81 (1999) . . . . . . . . . . . . . . . . . . . . . . 26

*Keeble v. United States*, 412 U.S. 205 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Lewis v. Jeffers,* 497 U.S. 764, 781 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Kelly v. Lynaugh,* 862 F.2d 1126, 1133 n. 12 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . 52

*Maynard v. Cartwright,* 486 U.S. 356, 363 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Mosley v. State,* 983 S.W.2d 249, 265 (Tex. Crim. App. 1998). . . . . . . . . . . . . . . . . . . . . 48

*Payne v. Tennessee,* 501 U.S. 808, 825 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 50

*Reed v. Quarterman,* 504 F.3d 465 (5th Cir.2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Rojem v. Workman,* 655 F.3d 1199, 1202 (10th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . 54

*Sears v. Upton,* 130 S. Ct. 3259, 3268 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Simmons v. South Carolina,* 512 U.S. 154, 165 n.5 (1994) . . . . . . . . . . . . . . . . . . 29

*Simon v. Epps* 463 Fed.Appx. 339, 348, 2012 WL 669433, (5th Cir. 2012)(not designated for publication) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Skipper v. South Carolina,* 476 U.S. 1, 6-7 (1986) . . . . . . . . . . . . . . . . . . . . . . . . 46

*Sochor v. Florida,* 504 U.S. 527, 538 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Taylor v. Workman,* 554 F.3d 879 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Agofsky,* 458 F.3d 369, 374 (5th Cir. 2006) . . . . . . . . . . . . . 22, 25

*United States v. Bernard,* 299 F.3d 467 (5th Cir. 2002) . . . . . . . . . . . . . . . . . 23, 29

*United States v. Britt,* 112 Fed. Appx. 352, 355 (5th Cir. 2004) . . . . . . . . . . . . 33

*United States v. Davis,* 124 Fed. Appx. 838, 839, 843-44 (5th Cir. 2005) . . . . . 33

*United States v. Fields,* 516 F.3d 923, 941 (10th Cir. 2008) . . . . . . . . . . . . . . . 30

*United States v. Frye,* 489 F.3d 201, 205 (5th Cir. 2007) . . . . . . . . . . . . . . . . . 33

*United States v. Gulley*, 526 F.3d 809 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . 39

*United States v. Hall*, 152 F.3d 381,415 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . 21

*United States v. Jackson*, 549 F.3d 963, 970 n. 3 (5th Cir. 2008) . . . . . . . . . . . . 46

*United States v. Johnson*, 391 F.3d 946, 949 (8th Cir.2004) . . . . . . . . . . . . . . . 55

*United States v. Medlock*, 200 F.3d 1314, 1322 (10th Cir. 2000) . . . . . . . . . . . . 22

*United States v. Sampson*, 335 F.Supp.2d 166, 203 (D. Mass. 2004) . . . . . . . . . 25

*United States v. Stone*, 53 F.3d 141, 143 (6th Cir.1995) . . . . . . . . . . . . . . . . . . 55

*United States v. Taveras*, 488 F.Supp.2d 246 (E.D. NY 2007) . . . . . . . . . . . . . . 25

*United States v. Webster*, 162 F.3d 308, 325 (5th Cir. 1998) . . . . . . . . . . . . . . . 32

*Woodson v. North Carolina* 428 U.S. at 304.) . . . . . . . . . . . . . . . . . . . . . . . . . . 51

**STATUTES**

18 U.S.C §1111, and 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. §3592(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

18 U.S.C. §3592(c)(6) (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 27

18 U.S.C. § 3593 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Violent Crime Control and Law Enforcement Act of 1994, 140 Cong. Rec. S6018-02, 103rd Cong., 2d Sess., 1994 WL 196834 (May 19, 1994) . . . . . . . . . . . . . . 32

**CONSTITUTIONAL PROVISIONS**

United States Constitution

Fifth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Eighth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 56

Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## STATEMENT OF THE CASE

### 1.    Nature of the Case

This is the reply of appellants regarding an appeal from convictions of capital murder with two sentences of death, regarding two defendants who were tried in a joint trial. Appellants Mark Isaac Snarr, hereinafter referred as "Snarr," and Edgar Balthazar Garcia, hereinafter referred to as "Garcia," were both indicted in a one count indictment in which it was alleged that each appellant killed one Gabriel Rhone, in violation of 18 U.S.C §1111, and 2. After a trial, both defendants were convicted and sentenced to death.

### 2.    Course of Proceedings and Disposition in the Court Below.

The course of proceedings was previously set out in detail in the Joint Brief for Appellants filed August 8, 2011.

Appellants Snarr and Garcia perfected appeal to this United States Court of Appeals, 5th Circuit, complaining of certain issues.  The Government filed a Brief for the United States in response, and Snarr and Garcia reply herein to the Government's Brief.

### 3.    Statement of Facts.

Appellants Mark Isaac Snarr and Edgar Balthazar Garcia were indicted in a one-count indictment, in which it was alleged that each violated 18 U.S.C. §1111 and

1

18 U.S.C. §2 by killing Gabriel Rhone. Each indictment contained allegations of special findings, which if proven, authorized the imposition of the death penalty. Vol. 1, p.26; Vol. 1 [Supp.2], p.41.     Trial was to a jury. The complete salient facts are set out in detail in the Brief for Appellants filed on August 8, 2011 herein.  From said judgments of convictions and sentences of death, appellants Snarr and Garcia perfected this appeal to the United States Court of Appeals, Fifth Circuit, and files this reply to the brief filed by the Government herein.

## ARGUMENTS AND AUTHORITIES

**REPLY - ISSUE NO. NINE** - The trial court erred in excluding from the jury potential juror # 130 Kimball  based on his disability.

**REPLY - ISSUE NO. TEN** - The trial court erred in excluding from the jury potential juror # 232 Horton based on his disability.

In its response to Issues Nos. Nine and Ten, Government overlooks the substantive issue of purposeful discrimination.  While the Government concentrates on the standard of review of whether the trial court abused its discretion, the Government fails to appreciate the unconstitutional discrimination foisted upon the two individuals excluded from jury service, and the due process rights of Snarr and Garcia.  Purposeful discrimination that violates the United States Constitution is discussed in *Batson v. Kentucky*, 476 U.S. 79 (1986) wherein the United States Supreme Court discussed the prohibition against purposeful discrimination. The facts in the case of Snarr and Garcia established such purposeful discrimination in that the trial court specifically stated the bases of the exclusion of the jurors based upon their respective disabilities. Any other "excuse" for excusing the jurors could not mask the purposeful discrimination set out in the record.  While one juror had even previously assessed a death sentence, the other juror initially expressed his desire to serve on the jury until he was finally dissuaded from doing so by the discriminatory

3

admonishments of the trial court. Juror Kimball was excused because the trial court felt his hearing was bad and "she couldn't deal with that", noting that he's had a hearing problem since birth, referenced in the Joint Brief for Appellants on file herein. Despite the fact there were remedies for his disability, it is beyond argument that the trial court discriminated against him because of his hearing problem. The court even referenced that she did not want to have someone handicapped serving on the jury. Vol.8[supp.1], pg 454. While in years past persons with disabilities were referred to as "handicapped" there are now ample ways to deal with persons' disabilities such that they may live full lives and participate in society just as those without the disabilities. The trial court was clearly living in a prior age, when she made her rulings. Similarly, juror Horton indicated that he would love to serve on the jury, but the trial court determined that she was not going to allow a juror to influence breaks for "bathroom problems". This discrimination based upon Mr. Horton's physical infirmity likewise demonstrates the purposeful discrimination by the trial court.

The Government even concedes in its brief that an appellate court may review the error of the violation of the constitutional rights to due process and equal protection and may grant relief if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. Brief for the United States, page 91. Snarr and

4

Garcia posit the question of what could impugn the public reputation of judicial proceedings and the fairness and integrity thereof more than purposeful discrimination against jurors because one has a hearing problem and the other a urinary problem, both of which could be dealt with simply. The Government fails in its brief to appreciate that the trial court specifically stated its purposeful discrimination and it does not require any interpretation of the record to establish such. Neither juror was incapable to render satisfactory juror service by physical infirmity; the trial court simply did not want to deal with it. It was easier for the trial court simply to purposely discriminate against these individuals rather then to deal with the issues. While the Government contends that the Americans With Disabilities Act cannot be violated by the federal judiciary, Snarr and Garcia suggest that the principles therein were founded upon constitutional rights including equal protection required by the United States Constitution. Denial of these constitutional protections serves to deny due process of law. While the act does refer to the 14th Amendment to the United States Constitution, the spirit of the act is to prohibit discrimination by a public entity. The trial court flouted this principle. If this Court construes the specific statutory authority not to extend to the federal judiciary, it still does not insulate the federal judiciary from the enforcement of the provisions of the United States Constitution. When the trial court specifically stated that it was excusing a

5

juror because the court intended to discriminate based upon physical disability, what could present more plain error?  While the cited statutes were enacted to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities, what conduct could be more egregious to bring disrepute upon the judicial process?  As Snarr and Garcia previously cited, when the President signed the legislation to signal the end to the unjustified segregation and exclusion of persons with disabilities from the mainstream of American life, it defies logic to add "except when a trial judge chooses to engage in unjustified segregation and exclusion of disabled persons".  Just as purposeful discrimination based upon race had been permitted until *Batson, supra*, the Government argues that this purposeful discrimination is acceptable because the United States Supreme Court has not stopped it.  While the numerous state authorities and other federal authorities cited in Snarr and Garcia's Joint Brief for Appellants have recognized the unconstitutionality of discrimination for these very reasons, it is incumbent upon this Court to so recognize this infringement upon the United States Constitution.  The numerous remedies set out in the Joint Brief for Appellants for Snarr and Garcia that have been utilized in the past could easily have solved the trial court's desire not to be troubled with these persons' disabilities.

Both of these members of the venire panel were qualified to participate in the mainstream of society by volunteering for their civic duty of juror service. It shames the judiciary to allow them to be excluded by such blatant purposeful discrimination based upon physical disabilities that could have quite easily been remedied. The exclusion of the jurors was an unconstitutional deprivation of both the rights of the jurors to serve and appellants Snarr's and Garcia's rights to a fair trial. For these reasons, this cause should be reversed.

**REPLY - ISSUE NO. ELEVEN -** Snarr and Garcia's convictions must be reversed because the district court denied appellants' request for a jury instruction on a lesser included offense, in violation of *Beck v. Alabama*, 447 U.S. 625 (1980), thereby violating each of their rights to due process.

Mr. Snarr and Mr. Garcia requested an instruction during the "guilt/innocence phase" regarding lesser included offenses (Supp. 1, Vol. 2, USCA5 458; Supp. 2, Vol. 3, USCA5 5538). [1] The District Court denied this request on the record outside the

---

[1]  This was the proposed instruction submitted to the jury for the lesser included offense of second degree murder:

**COUNT I**
Murder (Second Degree)
Title 18 U.S.C. § 1111
Title 18, United States Code, Section 1111, makes it a crime for anyone to murder another human being with malice aforethought. For you to find the defendant guilty of murder in the second degree, you must be convinced that the government has proved each of the following beyond a reasonable doubt:
**First**: That the defendant unlawfully killed Gabriel Rhone;
**Second**: That the defendant killed Gabriel Rhone with malice aforethought;
**Third**: That the killing took place within the territorial jurisdiction of the United States; and
**Fourth**: That the defendant did not act in self defense.
**Fifth**: That the defendant did not act in defense of a third person.
**Sixth**: That the defendant's actions were not justified by coercion or duress.

presence of the jury ( Supp. 1, Vol. 24, USCA5 4356; Supp. 2, Vol. 28, USCA5 5407).

The Government states that "the evidence overwhelmingly demonstrated premeditation". *See* Govt. Brief at 108.   For this reason, the Government suggests, the District Court did not err by refusing to submit the instruction as requested by Mr. Snarr and Mr. Garcia.   As stated throughout this Court's prior case law and Mr. Snarr's  and Mr. Garcia's Opening Brief, the proper inquiry is whether or not there was any evidence presented to support second degree murder, not whether there was

---

To kill "with malice aforethought" means either to kill another person deliberately and intentionally, or to act with callous and wanton disregard for human life. To find malice aforethought, you need not be convinced that the defendant hated the person killed, or felt ill will toward the victim at the time.  In determining whether the killing was with malice aforethought, you may consider the use of a weapon or instrument and the manner in which death was caused.

A killing is "premeditated" when it is the result of planning or deliberation. The amount of time needed for premeditation of a killing depends on the person and the circumstances. It must be long enough for the killer, after forming the intent to kill, to be fully conscious of that intent.

"Murder" is the unlawful killing of a person with malice aforethought.

You should consider all the facts and circumstances preceding , surrounding, and following the killing which tend to shed light upon the condition of mind of the defendant, before and at the time of the killing.

No fact, no matter how small, no circumstance, no matter how trivial, which bears upon the questions of malice aforethought and premeditation, should

sufficient evidence to support the offense of conviction. *See, e.g., Taylor v. Workman*, 554 F.3d 879 (10th Cir. 2009).

Because the Government cannot successfully argue that the evidence is insufficient to support giving the second degree murder instruction, the Government merely continues the mantra that, because premeditation is clearly shown, then no lesser included was necessary. As the Tenth Circuit stated in *Taylor*, this is the exact situation where *Beck* must be followed:

> The effect of the [State's] contrary approach is to deny the defendant the benefit of the second-degree murder instruction in precisely the circumstance where it is most important: where the evidence would support conviction for first degree murder but would also support conviction on the lesser included offense. *Taylor* at p. 887.

In *Taylor*, the Tenth Circuit spent considerable time detailing the proper inquiry one must undertake to determine whether the facts of a case warranted a proper second degree murder instruction. *Taylor* at 890-93. The appellant in *Taylor* shot the victim twice in the back while fleeing a residence. The State argued that because "the evidence regarding intent was so one-sided that a reasonable jury had no alternative but to conclude that [the victim's] death was a product of premeditated design." *Id.* at 891. The Tenth Circuit disagreed with the State and held:

10

Even if the jury believed that [appellant] intentionally shot at [the victim]-indeed, even if the jury believed that [appellant] was intentionally seeking to *harm* him-it could have believed that [appellant] had no intent *to kill* him. *Id*.

Likewise in this case, even if the jury believed Mr. Snarr and Mr. Garcia intentionally stabbed Rhone and even if the jury believed they intended to *harm* Rhone, the jury still could have found Mr. Snarr and Mr. Garcia s did not possess the requisite premeditated intent to convict him of capital murder.

As stated by the Tenth Circuit in *Taylor*:

Whether a jury was more likely to convict on first or second degree grounds is not the question. Due process demands that a jury be permitted to consider a lesser-included offense of first degree murder before imposing death so long as 'the evidence would have supported such a verdict.' *Taylor*, at 892-93 (quoting *Beck v. Alabama*).

In *Keeble v. United States*, 412 U.S. 205 (1973), the United States Supreme Court reversed the Eighth Circuit, holding that:

"If the prosecution has not established beyond a reasonable doubt every element of the offense charged, and if no lesser offense instruction is offered, the jury must, as a theoretical matter, return a verdict of acquittal. But a defendant is entitled to a lesser offense instruction--in this context or any other--precisely because he should not be exposed to the substantial risk that the jury's practice will diverge from theory. Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction. In the case before us, for

11

example, an intent to commit serious bodily injury is a necessary element of the crime with which petitioner was charged, but not of the crime of simple assault. Since the nature of the petitioner's intent was very much in dispute at trial, the jury could rationally have convicted him of simple assault if that option has been presented. But the jury was presented with only two options: convicting the defendant of assault with intent to commit great bodily injury, or acquitting him outright. We cannot say that the availability of a third option--convicting the defendant of simple assault--could not have resulted in a different verdict. Indeed, while we have never explicitly held that the Due Process Clause of the Fifth Amendment guarantees the right of a defendant to have the jury instructed on a lesser included offense, it is nevertheless clear that a construction of the Major Crimes Act to preclude such an instruction would raise difficult constitutional questions. In view of our interpretation of the Act, those are questions that we need not face. *Keeble*, 412 U.S. at 212-13, 93 S. Ct. 1997-98 (emphasis added).

In *Beck v. Alabama*, the Supreme Court, citing the above-quoted portion of the *Keeble* decision, ruled that precluding lesser-included jury instructions in a death penalty case was unconstitutional. 447 U.S. 625, 634-35, 100 S. Ct. 2382, 2388 (1980).

The District Court in this case upended the *Beck* standard by failing to assess the evidence in the light most favorable to Mr. Snarr and Mr. Garcia and failing to assess whether that evidence would have supported a lesser included offense instruction. Whether that same evidence could also have supported a first-degree murder conviction under the inferences most favorable to the Government is not part of the *Beck* analysis. The evidence in this case showed that Gabriel Rhone, the

12

inmate who was killed, was violent and mentally disturbed. The evidence also revealed that he had threatened and taunted Mr. Snarr and Mr. Garcia from his cell for hours on end the evening before he was killed. (Supp. 1, Vol. 23, USCA5 4197; Supp. 2. Vol. 27, USCA5 5248). He specifically threatened to kill them and he threatened to harm their families. (Supp. 1, Vol. 23, USCA5 4199; Supp. 2. Vol. 27, USCA5 5250). Rhone's parole was imminent.

There is an inference from the videotaped evidence that, when Mr. Snarr entered Rhone's cell, Rhone was armed and attacked Mr. Garcia first. Rhone was killed as the men were fending off his attacks and once they were able to obtain his weapon.

The District Court denied Mr. Snarr's and Mr. Garcia's claim that they were deprived of their constitutional rights when it did not instruct on second-degree murder in violation of *Beck v. Alabama*, 447 U.S. 625 (1980). The District Court misapplied *Beck.*

In *Beck,* the Supreme Court asked whether a sentence of death could constitutionally be imposed "after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." *Beck*, 447 U.S.

13

at 628 (1980). The Court held that "the death penalty may not be imposed under these circumstances." *Id.*

*Beck* reversed a state court that applied an erroneous sufficiency standard and addressed only the evidence that was favorable to respondent. *See Beck v. State,* 365 So. 2d 985, 988-990 (Ala. Crim. App. 1978). In rejecting this analysis, the Supreme Court focused on evidence that was favorable to the defendant and supported the lesser included offense instruction. *Beck,* 447 U.S. at 629-30 (in addressing evidence in support of lesser included offense, court considers "petitioner's version of the events"). Thus, the appropriate analysis is whether the evidence, taken in the light most favorable to the petitioner, would support a second-degree verdict. *Id.* at 628.

*Beck* did not focus on whether the state's evidence was sufficient to satisfy its burden of proving first-degree murder, but whether "the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense ... when the evidence would have supported such a verdict." *Id.* at 628.

*Beck* considered a defendant's denial in assessing whether an instruction on a lesser included offense should have been given. In that case, petitioner's own testimony established his participation in a robbery. "Under petitioner's version of events, he and an accomplice entered their victim's home in the afternoon, and, after

14

petitioner had seized the man intending to bind him with a rope, his accomplice unexpectedly struck and killed him." *Beck*, 447 U.S. at 629-630.

Like the *Beck* state court that was ultimately reversed, the Government has ignored crucial components of the *Beck* holding in its analysis. As a result, its entire analysis is flawed. It selects and interprets facts to emphasize the version of events most favorable to the Government, whereas *Beck* calls for an exactly contrary analysis. Under this contrary analysis, Mr. Snarr and Mr. Garcia have shown that the jury should have at least been allowed to consider second-degree murder. The District Court ignored the evidence favorable to Mr. Garcia and Mr. Snarr.  The District Court undertook this faulty analysis by turning the standard enunciated in *Beck* on its head. *Beck* assessed the sufficiency of evidence for the lesser included offense rather than the charged offense. The District Court ignored *Beck's* requirement that the facts be considered in the light most favorable to Mr. Snarr and Mr. Garcia.

The District Court's ruling constituted an unreasonable application of clearly established federal law and an unreasonable determination of the facts in light of the evidence presented in the trial.

The Government claims that "the Supreme Court does not require submission of a lesser-included-offense instruction unless it meets the evidentiary standard articulated in *Keeble*. Nor does this Court." *See* Govt. Brief at 111.   Relying on

*Cordova v. Lynaugh*, 838 F.2d 764 (5th Cir.1988), the Government contends that the instruction on second-degree murder was not required in this case. The Government's reliance on *Cordova* is misplaced and actually supports the giving of the instruction in Mr. Snarr and Mr. Garcia's case.

In *Cordova*,  this Court stated that :

> As explained in [ *Hopper* ], *Beck* stands for the proposition that the jury in a capital case *must be permitted to consider* a verdict of guilt of a noncapital offense in every case in which the evidence would have supported such a verdict. Although *Beck,* strictly speaking, holds only that a state cannot impose a blanket ban on the giving of lesser-included-offense instructions in a capital case, we have consistently held that *Beck*'s holding applies when the state trial court *refuses* a lesser included offense instruction .... In other words, due process and the Eighth Amendment require that, in a capital case, the jury *must be allowed to consider* a lesser included noncapital offense if the jury could rationally acquit on the capital crime and convict for the noncapital crime. *Cordova*, 838 F.2d at 767 .

Subsequent Fifth Circuit decisions "have consistently held that a state trial court may not, under *Beck*, refuse a lesser-included-offense instruction if the jury could rationally acquit on the capital crime and convict for the noncapital crime." *East v. Scott*, 55 F.3d 996, 1005 (5th Cir.1995)(quoting *Cordova*, 838 F.2d at 767). "We have applied *Beck* to cases in which a state trial court *refuses* a lesser-included-offense instruction." *Creel*, 162 F.3d at 389 (citing *Cordova*, 838 F.2d at 767). In *Cordova* itself the defendant's counsel unsuccessfully objected to the failure to

16

include an instruction on the lesser-included offense. *Cordova*, 838 F.2d at 766.  In *Reed v. Quarterman*, 504 F.3d 465 (5th Cir.2007), a panel of this Court granted a COA on a claim of *Beck* error. *Id*. at 492.  In *Reed*, the defendant requested an instruction on the lesser-included offense of first degree murder, which the trial court denied. *Id.* at 489-90.

As noted, under *Beck* the lesser-included instruction is required "if the jury could rationally acquit the defendant on the capital crime and convict on the non-capital crime." *Aguilar v. Dretke*, 428 F.3d 526, 531 (5th Cir.2005) (citing *Cordova*, 38 F.2d at 767).

The jurors in this case could have easily found that the defendants  lacked the specific intent, as required under 18 U.S.C. §113(a)(3), and returned a conviction on a lesser-included offense had they been given the option.  The jurors, however,  were never given the opportunity to consider convicting the defendants on the lesser-included crime of second degree murder.

The instant case presented exactly the type of constitutional pitfall that the United States Supreme Court contemplated in *Keeble*.  There was an inherent danger that the jury would convict on an unproved greater offense because some level of wrong-doing had occurred and the jury resolved its doubts in favor of conviction.  Specifically, a jury faced with a choice between voting to acquit a defendant

17

suspected of committing a serious criminal offense and convict of a greater, there is the chance that it will convict of the greater despite reasonable doubt concerning an element to avoid letting a dangerous criminal go free. *Beck,* 447 U.S. 625, 100 S.Ct. 2382. 65 L.Ed.2d 392(1980). In *Beck,* the Supreme Court cited this fear of unwarranted conviction in holding that an Alabama statute that barred instructions on lesser included offenses in capital cases violated the defendant's Due Process rights.

As argued in the Appellant's Opening Brief, Lt. Randal Calhoun testified that Rhone was not viewed as a peaceful, law-abiding inmate (Supp. 1, Vol. 21, USCA5 3489; Supp. 2. Vol. 25, USCA5 4540). The evidence in this case demonstrated that Gabriel Rhone was a troubled, disliked and mentally disturbed inmate who "flew off the rack a lot" according to Government witness and fellow inmate Keenan Hurt (Supp. 1, Vol. 23, USCA5 3966; Supp. 2. Vol. 27, USCA5 5717).

The testimony at trial also revealed that Rhone had made several threats to Mr. Snarr and Mr. Garcia while they were housed in the SHU together. Rhone was facing imminent parole. On the evening of November 27, 2007, the night before Rhone was killed, Rhone shouted to Garcia and Snarr that, if he ever got into the cell with him, he would kill him (Supp. 1, Vol. 23, USCA5 4197; Supp. 2. Vol. 27,

18

USCA5 5248).  He shouted insults and threats to Mr. Snarr and Mr. Garcia all night long (Supp. 1, Vol. 23, USCA5 4199; Supp. 2. Vol. 27, USCA5 5250).

Officer Calhoun testified that "shanks" are common in the prison and in the Special Housing Unit where Rhone, Garcia and Snarr were housed.  Calhoun testified that he did not think Mr. Snarr and Mr. Garcia were the only ones who were equipped with shanks on the day of Rhone's murder  (Supp. 1, Vol. 21, USCA5 3523; Supp. 2. Vol. 25, USCA5 4574).

The videotape in this case shows that, as Mr. Snarr and Mr. Garcia entered Rhone's cell, Rhone appears to leap at and attack Mr. Garcia as evident by the downward slashing motion his hand makes. (USCA5 3410-11, 3412, 3443, 3927-29; G Ex. 3A 14:36:58-14:37:25).  Snarr  punched Rhone with his fist while Garcia and Rhone engage in a knife fight.  Rhone leapt at Snarr and knocked Mr. Snarr's glasses off.  In doing so,  Rhone dropped his shank. When Mr. Snarr bent down to retrieve his glasses, he grabbed Rhone's shank.

The facts surrounding the events relative to the incident  supported the giving of the additional instructions.  Because of the chaos of the attack and Rhone's aggression towards Mr. Snarr and Mr. Garcia, not only during the attack but in the days leading up to it, Mr. Snarr and Mr. Garcia were thus entitled to a lesser-included offense instruction in this case. Denial of the request for the lesser-included offense

19

instruction violated Mr. Garcia's and Mr. Snarr's due process rights leaving the jury no choice but to convict of the capital offense.

Under *Keeble* and *Beck*, the defendants were entitled to certain lesser-included jury instructions which they did not receive. The failure of the district court to include the lesser-included offense instructions deprived the defendants of a fair trial and impinged upon their constitutional rights. Because the jury was precluded from considering lesser-included offense instructions, a new trial must be granted to prevent a miscarriage of justice.

It is patently established federal law that, in a capital case, the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment require the trial court to instruct the jury on lesser-included offenses supported by the evidence. *Beck*, 447 U.S. at 627. Because the District Court refused to follow the law of *Beck* and give the instruction on second-degree murder, Mr. Snarr and Mr. Garcia should be afforded a new trial.

**REPLY - ISSUE NO. TWELVE** - There is insufficient evidence to support the jury's findings that the murder was committed in an "especially heinous, cruel, or depraved manner.

The evidence is insufficient to support the jury's finding that Snarr and Garcia committed the murder in an " especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim." 18 U.S.C. §3592(c)(6) (2000) (listing this as a statutory aggravator).   In this case, the Government argued serious physical abuse and did not propose torture as an aggravating factor.

The Government contends that there is sufficient evidence that the murder of Rhone  was committed in "an especially heinous, cruel, or depraved manner." *See Brief of the United States*, at 115 ("The record provides ample basis for the jury's conclusions"). The Government's position fails to account for this Court's holding that the evidence must prove beyond a reasonable doubt that the defendant intentionally caused "needless mutilation of the victim's body ... above and beyond that necessary to commit the killing." *United States v. Hall*, 152 F.3d 381,415 (5th Cir. 1998).

As the Government notes, this Court has held that, for the "heinousness" factor contained in 18 U.S.C. §3592(c)(6) to be submitted to the jury and sustained on

21

appeal, there must be evidence that the defendant inflicted "suffering or mutilation above and beyond that necessary to cause death"and that he intended that kind of suffering or mutilation. See Gov't Br. 113 citing *United States v. Agofsky*, 458 F.3d 369, 374 (5th Cir. 2006).    Dr. Tommy Brown, a contract forensic pathologist, testified that Rhone had been stabbed fifty times (1 Supp. Vol. 22,  USCA5 3724; Supp. 2. Vol. 26,  USCA5 4775).  The total of 50 stab wounds, however, included numerous  superficial wounds (1 Supp. Vol. 22,  USCA5 3743;  Supp. 2. Vol. 26, USCA5  4794).  Here, there is no evidence of mutilation. As the autopsy photographs show, the wounds were contained and relatively clean. They do not indicate that the stabber intended to "mutilate" the body.  *See* G.Ex. 13A-13G; G Ex. 15A-15Y.

There was no evidence of excessive suffering. In *Agofsky*, a corrections officer testified that, during a brutal beating that included stomping the victim's head into concrete, the victim did not lose consciousness until the end of the assault. *Agofsky*, 458 F.3d at 374--75; *see* also *United States v. Medlock*, 200 F.3d 1314, 1322 (10th Cir. 2000) (torture or physical abuse characterized by conscious suffering). That testimony was sufficient to support the jury's finding that the victim had suffered excessively.

Dr. Brown's  testimony in this case  does not show unusual suffering apart from the killing. Even if there  was  evidence  that Rhone's wounds could  be

considered mutilation, there is no evidence that the resultant mutilation was the intent of Snarr and Garcia. Without such evidence, the finding should not stand.

The Government relies on a case that actually supports Snarr's and Garcia's argument. *See* Gov't Br. 114. In *United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002), the defendant and co-defendants were convicted of murdering a couple and burning their bodies in their van. *Bernard*, 299 F.3d at 472--73. Most of the defendants were sentenced to death. *Id*. at 473. On appeal, defendant Bernard argued that there was insufficient evidence that he had intended that the victims be killed in an especially heinous manner, because he had not been present for or had not participated in most of the acts leading up to their murder or their shootings. Bernard, however, had "bought two cans of lighter fluid from a convenience store," knowing what was to be done with them, had "voluntarily accompanied"the others to the murder scene, had "poured lighter fluid all over [the victims'] car while they were alive, locked in the trunk," and had "set the car ablaze with [one of the victims] unconscious, but still alive, in the trunk." *Id*. at 481. On those facts, the Court correctly found that Bernard himself had committed the offense in a heinous, cruel, or depraved manner. Id. at 482.

The Government suggests that because, like Bernard, the defendants participated in "some" acts leading up to and during Rhone's murder, they are

equally liable under the heinousness aggravator. Gov't Br. 174--75. *Bernard* simply does not support this argument. The conduct engaged in by Bernard--buying lighter fluid, pouring it on a car, and burning a car with victims inside it-- demonstrated individualized, intentional participation in gratuitous violence and suffering. The conduct allegedly engaged in by the defendants in this case-mutually stabbing Rhone-was part of the murder; it shows no intent that mutilation or excessive suffering be inflicted.

The Government's basic proposition is that the fact that Rhone was stabbed numerous times establishes that the assault went beyond that "necessary to cause death and, indeed, involved serious physical abuse". *See* Government's Brief at 116. The problem with this conclusion is that the Supreme Court has "rejected the submission that a particular set of facts surrounding a murder, however shocking they might be, [is] enough in themselves, and without some narrowing principle to apply those facts, to warrant the imposition of the death penalty." *Maynard v. Cartwright*, 486 U.S. 356, 363 (1988) ."Something more than a horrible murder is necessary to make that murder especially heinous, cruel, or depraved as required by the Constitution and the terms of the FDPA." *United States v. Sampson*, 335 F.Supp.2d 166, 203 (D. Mass. 2004); *see* also *United States v. Agofsky*, 458 F.3d 369 (5th Cir. 2006) (defendant must inflict suffering or mutilation above and beyond that necessary

to cause death and must intend gratuitous violence); *United States v. Taveras*, 488 F.Supp.2d 246 (E.D. NY 2007)(properly instructed jury is asked to consider whether there was infliction of gratuitous violence above and beyond that necessary to commit the killing or needless mutilation of the victim's body).

Even the Committee Comments associated with the instruction given the jury expressly reiterate that "the defendant must have specifically intended the abuse apart from the killing." Instruction No. 12.07F, cmt. Properly analyzed, then, the question is not whether the crime scene was especially bloody. Rather, the only question that matters is whether those actions taken by Snarr and Garcia to kill Rhone were gratuitous and more than necessary to bring about death.

The relatively brief duration of the incident belies an intent to cause needless mutilation above and beyond that necessary to kill. Although the attack by Snarr and Garcia resulted in multiple stab wounds, the killing occurred with homemade knives. This type of deadly assault will always involve disfigurement; however, this does not always rise to the level of heinousness as that term is used in death penalty jurisprudence.

The gruesomeness of a murder by itself cannot serve as a constitutionally sufficient aggravating factor. *Cf. Godfrey v. Georgia*, 446 U.S. 420, 433 n.16 (1980) (opinion of four Justice plurality) ("An interpretation of [Georgia's equivalent

aggravating factor] so as to include all murders resulting in gruesome scenes would be totally irrational."); *see also id.* at 435 (Marshall, J., concurring in judgment, joined by Brennan, J.) (specifically agreeing with the plurality opinion regarding its holding that "extensive damage to the victim's body is constitutionally irrelevant"when the victims' deaths were instantaneous).

The Government also errs in contending that any error is harmless because the jury found other statutory aggravating factors. *See* Brief of the United States, at 117 ("remand is not be [sic] warranted because the error would be harmless").  It is impossible to conclude *beyond a reasonable doubt* that, without this invalid aggravating factor in the weighing process, *all twelve jurors* would have voted for the death penalty. A deadlock resulting from even a single holdout juror voting for a life sentencing during the punishment phase would have resulted in the imposition a life sentence. *See Jones v. United States*, 527 U.S. 373, 380-81 (1999) (deadlocked jury during capital sentencing phase  results in automatic imposition of life sentence). Therefore, the Government has not met its heavy burden to show that this constitutional error was harmless beyond a reasonable doubt.

For these reasons, the §3592(c)(6) aggravating factor is based on insufficient evidence, and the jury's death sentence  thus violated the Eighth Amendment.

Consequently, this Court must reverse the death sentences imposed in this case and remand for further proceedings.

**REPLY - ISSUE NO. THIRTEEN** - There is insufficient evidence to support the jury's findings regarding the non-statutory aggravating factor of future dangerousness.

The evidence is insufficient to support the jury's affirmative finding regarding Snarr's and Garcia's "future dangerousness". At the selection stage, the Government proffered two additional non-statutory aggravating factors. One of these was "future dangerousness".

In this case, the jury the jury unanimously found that each defendant "poses a continuing and serious threat to the lives and safety of others because it is likely that he will commit criminal acts of violence in the future" and sentenced them to die. (Doc. #349, p.11); (Doc. # 350, USCA5. p.44). The Government argued that the evidence in support of Snarr's and Garcia's future dangerousness in a prison setting was legally sufficient. *See* Govt. Brief at 119 ("On appeal, Snarr and Garcia both allege that the evidence was insufficient to support the jury's verdict on future dangerousness. The record belies their contention").

As stated in the Appellant' Initial Brief, the statutory aggravating factor of future dangerousness is limited to how the defendant will function in an institutionalized prison setting, specifically, the ADX Unit in Florence, Colorado.

28

*See Simmons v. South Carolina*, 512 U.S. 154, 165 n.5 (1994); *United States v. Bernard*, 299 F.3d 467, 482 (5th Cir. 2002). This narrowed examination of dangerousness is warranted because the jury has the option of choosing life imprisonment without the possibility of parole as an alternative to death.[2]

The issue for the jury in this case was whether Mr. Snarr and Mr. Garcia would pose a danger to the safety of others in a maximum-security federal penitentiary. This type of institution is a setting specifically designed, organized, and staffed to handle inmates who have been convicted of violent crimes. It is against this backdrop that the Court must scrutinize the jury's finding that Snarr and Garcia "pose a threat of future dangerousness to the lives and safety of other persons while imprisoned." "[V]iewing the evidence in the light most favorable to the government," it is evident that here "no rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt." *Bernard*, 299 F.3d at 481.

---

[2]This distinguishes it from the future-danger factor employed under capital statutes like that found in Texas, where the alternative to death has been imprisonment for a minimum term of years. In that system, jurors have been asked to consider the threat the defendant may pose to "society,"which includes not only prison staff and other inmates but also the larger community if and when he is released. See Berry v. State, 233 S.W.3d 847, 863 (Tex.Cr.App. 2007) "Our precedent states clearly that 'society'... includes both prison and the 'free world,'and that the jury must consider dangerousness in that context"). Accord Berget v. State, 824 P.2d 364, 374 (*Okl.Cr.App*. 1992) (same, as to Oklahoma aggravating factor of "continuing threat to society").

The government's burden was to prove beyond a reasonable doubt that Mr. Snarr and Mr. Garcia would engage in criminal acts of violence if incarcerated in a federal penitentiary under a life sentence -- not a mere possibility of violence, and not proof that he would cause other, more minor problems for corrections officials. The jury was not authorized to treat, as a reason to execute Mr. Snarr and Mr. Garcia, a finding that, if sentenced to life, they would be unpleasant, argumentative, unrehabilitated, receive disciplinary infractions, etc.

Rather, the aggravating factor as submitted to the jury was that each poses a threat of future dangerousness to the lives and safety of other persons. This meant that the Government had to prove that the appellants will (or at least will probably) commit or cause criminal acts of *violence*. That is how a reasonable jury would logically have construed it. *See United States v. Fields*, 516 F.3d 923, 941 (10th Cir. 2008) (jury, instructed to consider whether capital defendant "poses a future danger to the lives and safety of other persons," would have understood this to mean "criminal acts of violence"), *cert. denied*, 129 S. Ct. 1905 (2009).

This is where the evidence is insufficient. The Government introduced evidence that both Mr. Snarr and Mr. Garcia committed disruptive, violent acts in the generalized population of a medium-security prison. The Government was not able to prove that these types of acts would be committed in the most secure federal

facility. The Government, not Mr. Snarr and Mr. Garcia, bore the burden of proof on the issue of future dangerousness and the other aggravating factors. *See* 18 U.S.C. § 3593(c). The government did not prove beyond a reasonable doubt that Mr. Snarr and Mr. Garcia remained a future danger.

The issue presented was not whether the defense demonstrated that any danger in a general population institution had dissipated. The Government did not meet its burden of proof that Mr. Snarr or Mr. Garcia would pose a risk of violence *in prison*, in the control unit of the ADX in Florence, Colorado.

The Government contends that:

 "even if the Court concludes that the evidence does not support the existence of this statutory aggravating factor beyond a reasonable doubt, remand would not be warranted because the jury found, beyond a reasonable doubt, that four statutory aggravating factors and one other non-statutory aggravating factor had been proved against Snarr, USCA5 4945, 6583-84, and six statutory aggravating factors and one other non-statutory aggravating factor had been proved against Garcia, USCA5 4946-47, 6594. Under the harmless error analysis employed by this Court in *Jones*, 132 F.3d at 252, the other aggravating factors unanimously found by the jury support the sentence of death, even after considering the mitigating factors found by one or more jurors. *See also Webster*, 162 F.3d at 325-26. Thus, the alleged error, if any, would be harmless because, under the evidence in this case, the jury would have imposed the death sentence even if the non-statutory aggravating factor regarding future danger had not been submitted.

31

The Government's position is incorrect, because it cannot show that jurors' unsupported finding that Mr. Snarr and Mr. Garcia would likely threaten the lives and safety of others in prison did not influence their decision to impose a death sentence.

The government's claim of harmless error largely sidesteps Mr. Garcia and Mr. Snarr's factual and legal arguments. The government essentially invites the Court reweigh the other, remaining factors against the mitigating evidence. *See United States v. Webster*, 162 F.3d 308, 325 (5th Cir. 1998). Appellate reweighing, however, is not permitted under the FDPA. The FDPA calls for the Court to assess whether "the Government [has] establishe[d] beyond a reasonable doubt that the error was harmless."18 U.S.C. §3595. It does not mention reweighing. Indeed, the bill ultimately arrived at by the House-Senate Conference Committee and passed by Congress jettisoned a reweighing provision. *See* Violent Crime Control and Law Enforcement Act of 1994, 140 Cong. Rec. S6018-02, 103rd Cong., 2d Sess., 1994 WL 196834 (May 19, 1994).

Further, there is a distinct possibility that one or more jurors might have opted against a death sentence for Mr. Snarr and Mr. Garcia had they not been misled into a faulty finding of future dangerousness -- in other words, had the perceived aggravation been significantly lessened. As presented in the Appellants' initial brief, there have been some extremely aggravated FDPA cases in this circuit in which

32

sentencing juries have declined to vote for death. *See*, e.g., *United States v. Frye*, 489 F.3d 201, 205 (5th Cir. 2007) (defendant and accomplice carjacked and shot to death two robbery victims after driving one around in the trunk of their car for an hour before the killings, then tried to dismember their bodies afterwards); *United States v. Britt*, 112 Fed. Appx. 352, 355 (5th Cir. 2004) (defendant committed two murders for pecuniary gain as part of drug ring); *United States v. Davis*, 124 Fed. Appx. 838, 839, 843-44 (5th Cir. 2005) (defendant committed three murders as enforcer for drug gang). *See* also *Gardner v. Johnson*, 247 F.3d 551, 563 (5th Cir. 2001) (rejecting prosecution claim that sentencing error involving future dangerousness was harmless because crime was egregious and heinous).

A death verdict is not a foregone conclusion, even for crimes arguably more serious than Mr. Snarr's and Mr. Garcia's and it is not a foregone conclusion that the death penalty was inevitable in this case without this error. Accordingly, the jury's finding on this factor violated Mr. Snarr's and Mr. Garcia's right to due process under the Fifth Amendment and their respective right against cruel and unusual punishment under the Eighth Amendment. *See Lewis v. Jeffers,* 497 U.S. 764, 781 (1990); *see* also *Sochor v. Florida*, 504 U.S. 527, 538 (1992).

Because the jury's finding that Mr. Snarr and Mr. Garcia presented a future danger in prison was based on legally insufficient evidence, its reliance on this factor

33

introduced an arbitrary element into its sentencing decision, in violation of the Eighth Amendment. In light of the jury's ultimate finding of future dangerousness despite insufficient proof, the government has failed to prove that the district court's error was harmless beyond a reasonable doubt. This Court should accordingly vacate Mr. Snarr's and Mr. Garcia's death sentences and remand these cases for a new capital sentencing proceeding.

**REPLY - ISSUE NO. FOURTEEN** - There is insufficient evidence to support the jury's findings regarding the statutory aggravating factor of substantial premeditation and planning.

The Government alleged, as a statutory aggravatory factor, that the murder of Gabriel Rhone involved "substantial premeditation and planning". There is insufficient evidence present throughout the trial that this was anything more than a crime of convenience, committed rather spontaneously on an atypical day when the staff was short-handed and numerous, random incidents by various inmates distracted the guards. There is insufficient evidence that Snarr and Garcia committed this offense after "substantial premeditation and planning". The Government contends that the "the record provided ample basis for rational jurors to conclude beyond a reasonable doubt that both Snarr and Garcia engaged in substantial planning for and premeditation of Rhone's murder. Committing a murder in the most secure area of a federal penitentiary requires significant preparation, and the record demonstrated that this one was carefully planned". See Govt Brief at 129. This conclusion belies the evidence that the Beaumont penitentiary was chronically short-staffed and poorly managed, especially in the unit designed for the most secured inmates.

35

The Government also contends that the "error, if any, would be harmless because the jury would have imposed the death sentence even if the statutory aggravating factor regarding substantial planning and premeditation had not been submitted". *See* Govt Brief at 133.    The Government cannot prove beyond a reasonable doubt that any of the errors by itself, or certainly the errors considered together, were   not harmless.   The Government's argument that the remaining aggravating factors found by the jury made death a foregone conclusion ignores the many cases involving similar, or much worse, crimes and criminal histories, in which juries have elected to impose a life sentence rather than the death penalty. Therefore, the Government has not met its heavy burden to show that this constitutional error was harmless beyond a reasonable doubt.

For these reasons, the § 3592(c)(6) aggravating factor is based on insufficient evidence, and the jury's death sentences thus violated the Eighth Amendment.

**REPLY - ISSUE NO. SEVENTEEN** - Snarr and Garcia's death sentence must be reversed because the district court reversibly erred in keeping out the prior bad acts of the complainant at sentencing depriving the jury of making an informed vote.

Necessary, relevant evidence regarding Rhone was excluded by the court, resulting in verdicts unworthy of confidence. It is the Government's position that the rules of evidence do not apply in capital sentencing. (Gov't Brief at 148, fn 47. ). No authority was cited, but presumably the government is referring to *18 U.S.C. § 3593(c)*:

> Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.

The Government's interpretation does little to address the issuer. By depriving the defense of presenting the evidence about Rhone, under the rules of evidence, or

*18 U.S.C. § 3593(c)*, or the Due Process Clause, or the Eighth Amendment, reversible error occurred.

*The district court abused its discretion in not admitting the most important evidence about Rhone.*

The Government avers that "the purpose for permitting victim impact testimony is to fully explain the harm caused by the crime and to counteract mitigating evidence offered by the defendant," *citing Payne*, 501 U.S. at 825. (Gov't brief at 148). What *Payne* explained was:

> "[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.

*Payne v. Tennessee*, 501 U.S. 808, 825 (1991).  The unique loss to society from the death of Rhone was the exact circumstance the defense should well have been able to explain. As detailed in the Government's file and presented in the defense motion: Rhone was unique in his vileness.  (USCA5 611-12).  His decade long reign of terror

38

was hardly established by the isolated and few incidents the district court did allow. That was established when *zero* jurors found true that Rhone was a behavior management problem in the Bureau of Prisons or that he had engaged in defiant behavior. (Vol. Supp.2, USCA5 p. 50-52; Document 350-1, pages 7-9; Document 349-1, pages 2-3).

*Under the Rules of Evidence and 18 U.S.C. § 3593(c) the evidence was admissible*

There is authority for permitting a defendant to offer general evidence of Rhone's bad character in mitigation – not to demonstrate that the defendant is "less culpable," but to provide a clearer picture of the circumstances which resulted in the murder. The Government relies on *United States v. Gulley*, 526 F.3d 809 (5th Cir. 2008), as authority to undermine the admissibility of the evidence. Their argument fails for three reasons:

1.    The Fifth Circuit limited this holding by explaining:

> This distinction was actually acknowledged by the Ninth Circuit in *Keiser*, where the Ninth Circuit stated that "we need not, and do not, reach the question whether specific acts are admissible to bolster the assertion that the defendant's belief in the need for force was reasonable." 57 F.3d at 853. In any event, it is not relevant to this case because Gulley does not argue that Brown's

> prior violent acts were known to him or that they were relevant to his state of mind. He is simply trying to prove that Brown's prior violent acts make it more likely than not that Brown was the first aggressor.

*Gulley*, 526 F.3d at 819.

2. The evidence was necessary to paint a full picture of the true nature of the circumstances that existed inside the federal prison with an inmate such as Rhone. The Supreme Court has made clear that in capital cases, there is a constitutional right to accurate sentencing information. *Gregg v. Georgia*, 428 U.S. 153, 190 (1976)(joint op. of Stewart, Powell, and Stevens, JJ.

3. This is reverse victim impact where the jury is allowed a skewed vision of the goodness of Rhone (even if the defendants are unaware) but failed to show the type of evidence described by the Government as "highly prejudicial" about Rhone's "criminal history, mental illness, and disciplinary problems." (Gov't brief at 155).

The Government asserts there was a "substantial amount of evidence offered about Rhone's conduct," thus rendering harmless all the evidence *not* introduced. (Gov't brief at 156). The Government is reviewing the record through the patina of rose-colored glasses. Their description of Rhone was that he was basically harmless

and further, when viewed through each and every prior bad act of the defendants, the juxtaposition is startling:

*Selection phase closing argument by Government*

The Government described in argument in great detail, page after page, each prior bad act of the two defendants, including:

- prior crimes and convictions

(USSCA5 7545, 7548-50, 7561-62, 7563-64, 7566-69)

- juvenile convictions (USCA5 7548)

- threatening conduct (USCA5 7547, 7563-69)

- membership in racist or dangerous gang organizations (USCA5 7545, 7562)

- serious prison infractions (USCA5 7547, 7550-53, 7563-68)

- lack of remorse (USCA5 7547)

The presentation of the evidence supporting those bad acts was literally thousands of pages, days and days of testimony, and was cumulatively the bulk of this

41

trial.  Yet, Rhone was described by the Government as a "vulnerable victim in that he was in a locked cell, he was unable to defend himself," and that the defendant was an "armed intruder."   (USCA5 7546).    Rhone was "basically a jerk... was disrespectful .. was vulgar ... was obnoxious."  (USCA5 7572).  The extent of the picture the Government painted was Rhone as a pesky little guy and every single bad act of the two defendants was displayed in detail and at length.  The Government also argued that there was no possible threat that Rhone could have posed to the two defendants.  (USCA5 7572).  Their contention was that he had a loud mouth, but every witness who took the stand told you there wasn't any reason in the world to be afraid of him." (USCA5 7572).

The Government had it both ways.  They fought and won to limit the introduction of aggressive fearful evidence about Rhone and were able to argue that he was harmless and vulnerable.   Rhone had numerous prison violations at various correctional facilities from May 2011 to November 2007. (USCA5 611-12). These incidents at the prisons included assault with serious bodily injury, fighting with another person, threatening bodily harm, possession of a dangerous weapon, setting a fire, possession of intoxicants, indecent exposure, refusing an order, destruction og government property, being in an unauthorized area, engaging in a sex act, making sexual proposals, being insolent to a staff member and engaging in a group

42

demonstration. (USCA5 611-12). Rhone's decade long history of dangerous and provocative behavior makes it clear that Snarr and Garcia did not misperceive the profound threat they felt from Rhone. (DOC. 329) Rhone was hardly harmless or vulnerable, yet that was the picture the Government painted and the trial court allowed through the rejection of available, relevant evidence about Rhone.

*Due Process Denied Through Government's Misrepresentations*

By denying the defense the right to present a truer picture of Rhone, and arguing he was harmless and was not a threat to anyone, due process was denied. The Due Process Clause does not allow the execution of a person "on the basis of information which he had no opportunity to deny or explain." *Gardner v. Florida*, 430 U.S. 349, 362 (1977). Although *Gardner* applies in the information the defense *presents*, it is also axiomatic that when the Government is allowed to proffer misrepresentations which the defense cannot rebut, due process has been denied. This Court considered a state evidentiary ruling regarding the "opening of the door" by the defense and explained:

> The evidence was properly admitted because Lucas "opened the door"
> by presenting other portions of the confession that gave the jury a false
> impression of the confession. *Lucas*, 791 S.W.2d at 53–54. In view of
> these circumstances, we agree that the introduction was proper.

43

*Lucas v. Johnson,* 132 F.3d 1069, 1081 -1082 (5th Cir. 1998). Under the "good for

the goose, good for the gander" rubric, it is equally compelling that the Government

was able to offer the impression Rhone was vulnerable and innocent and the two

defendants were barbarous in their actions. Had the truer picture of Rhone been

presented, the entirety of the nature of the offense and the actions of *all* parties could

have been appropriately considered and due process afforded. The district court

abused its discretion in refusing to admit the evidence about Rhone warranting a

reversal of the convictions and death sentences herein.

**REPLY - ISSUE NO. EIGHTEEN** -Snarr and Garcia's death sentences must be reversed because the district court reversibly erred in keeping out execution impact evidence.

*Audri is Mr. Garcia's 11 year old daughter who lights up when he talks to her. She is very much a daddy's little girl and believes her father is one of a kind. Her older brother Isaiah is fiercely protective of her. Although Isaiah did not know his father was facing execution, just preparing for trial began wearing on him. He began showing signs of frustration and depression. He became isolated from friends and family. But, if his father dies, he will become the man of the house.*

*Oswaldo is Mr. Garcia's brother who would carry the burden of helping their mother survive after the loss of her child. Despite being in prison, Mr. Garcia has remained a constant figure in all of their lives.*

This important, relevant evidence regarding the impact of Garcia's death sentence and ultimate execution on his family was improperly excluded and the exclusion was harmful[3].

The questions proposed and excluded by Appellant were:

1.    Do you want Snarr and Garcia to die?

2.    How would a death sentence and execution affect you?

Appellant made an extensive proffer at trial that has been described at length in both Appellant's brief and in the Government's brief.  In the Government's opinion, the evidence that was proffered "showed nothing about Garcia's background or character or the circumstances of his crime.  Rather, it amounted to a general plea for mercy."   The Government argued, based on a footnote in *United States v. Jackson*, 549 F.3d 963, 970 n. 3 (5th Cir. 2008) that general pleas for mercy are impermissible.

Contrary to the Government's position that the evidence is not relevant, the Supreme Court has expressly acknowledged the constitutional relevance of evidence that seeks to "convinc[e] the jury that [the defendant] should be spared the death penalty because he would pose no undue danger to his jailers or fellow

---

[3] Mr. Garcia's significant other, mother of his son and daughter, was permitted to testify on a very limited basis.  But, because she was under restrictions about her testimony, it may have done more harm than good.  See *Marshall v. Cathel*, 428 F.3d 452, 471 (3rd Cir. 2005) ("[s]urely the jury was left wondering why the sons would not have pled for their father's life, and could have reasonably drawn a negative inference" from the absence of such testimony).

prisoners *and could lead a useful life behind bars." Skipper v. South Carolina*, 476 U.S. 1, 6-7 (1986) (emphasis added).

The *Jackson* Court didn't e v e n  address execution impact.  Rather, it said only that "general pleas for mercy" are not permitted, and thus rejected Jackson's suggestion that, had his trial occurred earlier when his mother was alive, she "could have effectively pleaded for her son's life."

The Government also relies on a procedurally distinguishable case—*Jackson v. Dretke*, 450 F.3d 614, 618 (5th Cir. 2006).  *Jackson v. Dretke*, was a habeas case, which simply said a Texas decision approving the exclusion of execution-impact evidence was not unreasonable.   As the Supreme Court recently emphasized, a habeas decision that a particular view of the law was not objectively unreasonable does not necessarily say anything about "whether such a view would be correct under the law" in a direct appeal.  *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2405 (2011) (holding incorrect a view of the law that, in a case seven years before, it had found was not objectively unreasonable).

The Government makes a point of noting the "individual nature of sentencing evidence presented by the government and each defendant." (Government Brief 161). But, it also asserts that execution impact evidence has nothing to do with the offense or the offender and, for Garcia specifically, none of the proffered evidence

47

demonstrated anything about Garcia's background or character or the circumstances of the crime. (Gov't brief at 176).

The evidence showed that Mr. Garcia has two children—a boy and a girl.  He stays in touch with his children despite being incarcerated.  He also has a mother with whom he has a relationship.  The notion that evidence of the types of interpersonal relationships he was capable of maintaining and the profound effect of those relationships on his family has nothing to do with him is absurd.  The Government would be more than happy to have a defendant's family testify about their son, brother, or father if he had abandoned them.

The Government also maintains that the mother of the children was simply speculating on the effect that their father's death would have on them.[4]  It is unclear why this is any more speculative than a victim's family testifying that "I would be there to take care of her and she would be there to take care of me." *Mosley v. State*, 983 S.W.2d 249, 265 (Tex. Crim. App. 1998).

***Federal Death Penalty Act***

The FDPA itself supports the view that a defendant must be entitled to rely on the same kind of third-party sentencing impact as direct mitigation.  It further broadens the expansive Eighth Amendment standard for mitigation.  It lists, as an

---

[4] If a mother explaining the likely effect of trauma on her own children that she has raised is since birth, what is a prediction of future danger?

48

illustrative mitigating factor, one going well beyond the defendant and the offense, namely, that an equally culpable codefendant will not face the death penalty. 18 U.S.C. §3592(a)(4). And its language envisions that there will be mitigation that extends beyond the catch-all provision ("Other factors in the defendant's background, record, or character . . ."). *See* 18 U.S.C. § 3592(a) (list of illustrative factors, including catch-all, is prefaced by requirement that "finder of fact shall consider any mitigating factor, *including the following . . .*")(emphasis added); 18 U.S.C. §3593(c) ("information may be presented as *to any matter relevant to the sentence, including* any mitigating . . . factor permitted or required to be considered under section 3592") (emphasis added).

### *Widespread use*

Many Courts across the country are using mitigation based on a family's belief of what life will be like if their loved one was killed.[5]

---

[5] See, e.g., *Richmond v. Lewis*, 506 U.S. 40,44 (1992) (Arizona sentencing court found mitigator that "the Defendant's family . . . will suffer considerable grief as a result of any death penalty that might be imposed"); *Thessing v. State,* 230 S.W .3d 526, 544 (Ark. 2006) (trial court submitted mitigating factor that "if Billy Thessing is executed, this will have a tremendous detrimental effect on his son"); *State v. Wise*, 596 S.E.2d 475, 481 (S.C. 2004) ("A close relative of a defendant, such as his sister, may be asked whether she wants the defendant to die, which is akin to asking her to make a general plea for mercy"); *Lugo v. State*, 845 So. 2d 74, 115 (Fla. 2003) ("the impact that Lugo's execution would have on his mother and children is properly cognizable" as a mitigating factor); *State v. Simmons*, 944 S.W .2d 165, 189 (Mo. 1997) (noting with approval that "defense counsel raised [with jurors] the issue of the impact of the death sentence on Simmons's family"); *State v. Rhines*, 548 N.W.2d 415,446 (S.D. 1996) (noting defendant's sisters testified about "the negative effect his death would have on their family"); *Lawrie v. State*, 643 A.2d 1336, 1339 (Del. 1994) (sentencing court considered mitigator that "Lawrie's execution would have a substantially adverse impact on his seven-year old son"); *Romine v. State*, 305 S.E.2d 93, 101 (Ga. 1983) (witness's "testimony that he did not wish to see his grandson die would have been admissible in mitigation and the trial court's opinion to the contrary was wrong").

Indeed, so well-established is the use of such mitigation that Justices Scalia and Thomas have characterized a defense built on testimony "that sentencing [defendant] to death would devastate his family and friends" as a perfectly "reasonable mitigation theory." *Sears v. Upton*, 130 S. Ct. 3259, 3268 (2010) (Scalia & Thomas, JJ., dissenting). So, now, has a majority of the Court. See *Cullen v. Pinholster*, 131 S. Ct. 1388, 1409 n.19 (2011) (mitigation defense focused on "creating sympathy for the defendant's family," was reasonable strategy . . . . "the whole premise of the family-sympathy defense is *the family's interest").*

### *Payne v. Tennessee*

The Government implicitly acknowledged the importance of *Payne v. Tennessee* by its extensive recitation of the case and attempt to distinguish it. *Payne v. Tennessee*, 501 U.S. 808 (1991). In *Payne*, the Court removed the ban on the use of victim impact evidence in the sentencing phase of death penalty cases. Examining the Court's factual result in the case is an elementary examination of it. The important thing is the reasoning of the Court.

Death Penalty litigation has and will change as we continue to recognize the particularized need for due process protection when a jury is given the power to declare that someone is to die. The changes in the law generally include expanding

the amount and types of information that a jury shall receive and broadening the context in which the information may be considered.[6]

The Appellants are not asking the Court to extend *Payne v. Tennessee* as the Government suggests, they are only requesting that the Court follow it.  The Government believes that the Court's opinion in *Payne* is limited to the words on the page and only the particular facts of the case.  It ignores the guiding logic and reasoning provided by the Court regarding the types of information that should be put before a jury when they are making a life or death decision.

The Government's simplistic interpretation of *Payne* is that victim-impact testimony is permissible to enable the jury to consider the harm caused by a Defendant.  It quotes *Woodson v. North Carolina* to explain that victim impact evidence is relevant because it goes to "the circumstances of the offense" and "the character and propensities of the offender." (Government's brief quoting Woodson, 428 U.S. at 304.)[7]

The *Payne* Court also stated:

---

[6] *McKoy v. N. Carolina*, 494 U.S. 433, 434, (1990); *Skipper v. S. Carolina*, 476 U.S. 1, 106 (. 1986); *Lockett v. Ohio*, 438 U.S. 586, 605, (1978); *Penry v. State*, 178 S.W.3d 782 (Tex. Crim. App. 2005).

[7] Although not credited by the government, the portion of *Woodson* to which it was referring was a quote from *Com. of Pa. ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55 (1937):

> For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender. His past may be taken to indicate his present purposes and tendencies and significantly to suggest the period of restraint and the kind of discipline that ought to be imposed upon him.

51

> [T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that ***just as the murderer should be considered as an individual***, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.

*Payne*, 501 U.S. at 825 (1991)(emphasis added).

The Court explicitly states that the murderer and the victim should be considered as individuals. That consideration is evidenced by showing their deaths are "a unique loss to society and in particular to" their families. This is exactly the type of evidence Mr. Garcia attempted to admit. His loss would be a unique one to his family and the jury should have known that.

The jury has a right to know, and consider the fact that, its decision might kill a child's father and a woman's son. This Court in *Kelly v. Lynaugh,* 862 F.2d 1126, 1133 n. 12 (5th Cir. 1988), in a footnote, stated that execution impact "matters may very well impact a jury's decision." In *Kelly*, the issue was Kelly's step-father taking the stand to ask the jury to spare his step son's life. That is not the case here—Mr. Garcia's family wanted to testify about what they wanted and how Mr. Garcia's death would be a unique loss to them. The proffer was not a plea to the jury.

Per the Supreme Court, the jury must have accurate information:

> If an experienced trial judge, who daily faces the difficult task of imposing sentences, has a vital need for accurate information about a

52

defendant and the crime he committed in order to be able to impose a rational sentence in the typical criminal case, then accurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die by a jury of people who may never before have made a sentencing decision.

*Gregg v. Georgia*, 428 U.S. 153, 190 (1976)(joint op. of Stewart, Powell, and Stevens, JJ).

The information must not only be accurate, but it must be complete. "We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision." *Gregg* at 204. Here, the jurors were denied extensive testimony by Mr. Garcia's loved ones. Unsurprisingly, without complete evidence, no juror found the mitigators involving Mr. Garcia's relationship with his children. If the jurors knew that Audri and Isaiah still needed their dad, even if he was behind prison walls, one of them may have found value in his role as a father.

Excluding the family's testimony on this issue prevented the jury from considering relevant and accurate mitigating information. Leaving the jury in the dark resulted in them being unable to fairly consider all of the issues to determine the appropriate sentence. These cases should be remanded for a new trial because of this error.

**REPLY - ISSUE NO. NINETEEN** - Garcia's and Snarr's death sentences must be reversed because this Honorable Court denied Garcia due process by overruling the district court and denying the funding necessary for Garcia to present a punishment case, which additionally impinged upon the due process rights of Snarr in the joint trial.

While the Government does not work with limitless resources, it has at its discretion able attorneys, law enforcement officers, experts, and the ability to represent the United States with little concern about whether any of those involved will be paid. The same can be said of the judiciary - regardless of any rulings, every member of the court will be paid. The court reporter and clerks will be compensated. An indigent defendant approaches his defense differently - with supplication and a belief that constitutional protections will ensure a level playing field.

The Government does not believe the denial of this level playing field is reviewable by this Court. (Gov't brief at 167). For that proposition, numerous cases are cited where district court funding reductions were not reviewed based upon district court determinations. *Rojem v. Workman,* 655 F.3d 1199, 1202 (10th Cir. 2011)(explaining 'district court CJA fee determinations are not appealable orders."). This Court noted recently that CJA funding determinations may not be reviewable,

citing:

> *United States v. Johnson*, 391 F.3d 946, 949 (8th Cir.2004) ("The chief
> judge's decision [under Section 3006A(e)(3) ] is ... an administrative
> decision that is beyond our jurisdiction. We conclude that a request for
> reconsideration of the chief judge's decision can be addressed only to the
> chief judge, and if denied, the only possible remedy is a mandamus
> action in the United States Supreme Court.") (internal quotation marks
> and citation omitted); *see also United States v. Stone*, 53 F.3d 141, 143
> (6th Cir.1995) ("We ... hold that § 3006A fee determinations are not
> appealable orders.").

*In re Marcum L.L.P.*  670 F.3d 636, 638 (5th Cir. 2012).   The constitutional

deprivation that occurred in the instant case undermines any statutory authority to *not*

review the funding decision made by the chief judge.

It is axiomatic that the district court was in the best position to determine what

funding was necessary in this case.[8]  Although no standard is elicited, there appears

---

[8]    On appellate review, great deference is typically given to district court decisions as fact-finders.  *See e.g.* , *Ricev. Collins*, 546 U.S. 333, 343 (2006) (Breyer J. concurring) (In a *Batson* case, the trial judge is best placed to determine whether, in a borderline case, a prosecutor's hesitation or contradiction reflect (a) deception, or (b) the difficulty of providing a rational reason for an instinctive decision."); *United States v.Martinez-Calles*,  2012 WL 3657531, 1 (5th Cir. 2012)(explaining in sentencing issues the district court was in the best position to evaluate history and characteristics as well as the need for the sentence to further the objectives in § 3553(a) and the district court's reasoned decision is entitled to deference)*;United States v. Ramos*, 71 F.3d 1150, 1153-54 (5th Cir.1995)(holding that in possible juror misconduct cases "the trial judge is in the best position to evaluate accurately the potential impact of the complained-of outside influence"); *Ellis v. Weasler Engineering Inc.*  258 F.3d 326, 342 -343 (5th 2001)(holding trial court's ruling on a motion for a new trial must be given deference), *citing Smith v. Riceland Foods, Inc.*, 151 F.3d 813, 821 (8th Cir.1998) ("A district court has discretion to decide whether a jury's findings on  a verdict form are incomplete, confusing, or inconsistent and whether to resubmit the claim to the jury. The district judge, who has observed the jury during the trial, prepared the special verdict questions and explained them to the jury, is in the best position to determine whether the answers reflect confusion or uncertainty.").

to be some sort of review contemplated by the statue:

> (f) Upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or the sentence, the court may authorize the defendant's attorneys to obtain such services on behalf of the defendant and, if so authorized, shall order the payment of fees and expenses therefor under subsection (g). No ex parte proceeding, communication, or request may be considered pursuant to this section unless a proper showing is made concerning the need for confidentiality. Any such proceeding, communication, or request shall be transcribed and made a part of the record available for appellate review.

*18 U.S.C.A. § 3599* . Under *§ 3006A*, no review is specifically mentioned.

*Under any standard, even an abuse of discretion, this case must be reversed.*

This was the trial for their lives and the district court concluded the experts requested by Mr. Garcia were necessary. Mr. Garcia presented the testimony of Dr. Cervantes and Craig Haney to the district court who recognized the value and necessity of their testimony. Further, upon Dr. Brams testimony in the *ex parte* hearing that a neurologist was absolutely necessary, the district court agreed. The chief judge's overruling of the district court was constitutionally impermissible.[9] Due Process and the Eighth Amendment are not inapplicable because of statutory interpretation. In *Simon v. Epps* 463 Fed.Appx. 339, 348, 2012 WL 669433, *8 (5th

---

[9] The defense recognizes the awkward position this issue presents: asking three panel judges to rule on the propriety of the chief judge's decision. Yet, without review, and without challenge - the heart of our constitutional system fails. On any given day, any district court can unintentionally err. There is no malice when this court reverses district court decisions. The same can be said of this issue.

Cir. 2012)(not designated for publication), this Court reversed a capital case on habeas because the defense was not afforded a psychiatric examination to rebut the claims of the prosecution and was also prevented from even addressing them with argument. Similarly, the Government spared no expense in detailing each and every bad act of the defendants. Deeming it all relevant and admissible, the lives of the two defendants were splayed before the jury. But, the chief judge denied Mr. Garcia the right to explain those acts. The chief judge denied Mr. Garcia the right to put his bad acts in context with his neurological functions, cultural heritage, and institutional mind set.

*Neuropsychologist Necessary*

The Government states that Mr. Garcia's claim for a neuropsychologist fail because none was ever identified. (Gov't Brief at 172, n. 56). Dr. Brams explicitly stated during the pretrial hearing that one was needed. (USCA5 765-66). The defense requested funds to hire one, the district court granted the funds - and then the chief judge denied the same. So, if Mr. Garcia asked for the funding to do the testing and prepare testimony and that was denied, how would the Government expect Mr. Garcia to pay for it himself? It is unseemly to aver that Mr. Garcia did not lay an appropriate record, when the district court had previously approved the funding for such an expert and then the funds were denied by the chief judge.

*Both men harmed*

There is a reason why the Government wanted the two men tried together - and efficiency was not the only reason. In trying both men together, the jurors get to hear about all the bad acts of each of them. There is necessarily a residual overlap of their bad acts. Similarly, had the jury heard the experts Mr. Garcia proffered, there would well have been some sympathy presented for Mr. Snarr, as well. All the bad and little of the explanation for it harmed both defendants. Both men are entitled to new trials.

# CONCLUSION

For these reasons, and the reasons urged in the Brief for Appellants on file herein, appellant Snarr's and appellant Garcia's convictions should be reversed and the case remanded to the district court for proceedings consistent with this Court's opinion. In the alternative, appellant Snarr's and appellant Garcia's death sentences should be vacated and the cases remanded to the district court for resentencing or proceedings otherwise consistent with this Court's opinion.

Respectfully submitted,

/s/Douglas M. Barlow
DOUGLAS M. BARLOW
Attorney at Law
485 Milam
Beaumont, TX 77701
(409) 838-4259
FAX: (409) 832-5611
TBL #01753700

/s/ Gerald E. Bourque
GERALD E. BOURQUE
Attorney at Law
24 Waterway Ave., Suite 6600
The Woodlands, TX 77380
(281) 379-6901
FAX: (832) 813-0321
TBL #02716500

/s/ G. Patrick Black
G. PATRICK BLACK
Federal Public Defender
Eastern District of Texas
110 N. College, Suite 1122
Tyler, TX 75702
Tel:  (903) 531-9233
Fax: (903) 531-9625
TBL #02371200

/s/ Robert A. Morrow, III
ROBERT A. MORROW, III
Attorney at Law
24 Waterway Ave., Suite 660
The Woodlands, TX 77380
Tel: (281) 379-6901
Fax: (832) 813-0321
TBL #14542600

*Attorneys for Appellant Snarr*

/s/ Jani J. Maselli
Attorney at Law
808 Travis St., 24th Floor

59

Houston, TX 77002
Tel: (713) 256-7726
TBL #00791195

*Attorneys for Appellant Garcia*

# CERTIFICATE OF SERVICE

We certify that on the 8th day of October, 2012, we served electronically the

foregoing Joint Reply Brief for Appellants, on the following individuals pursuant to

Fed. R. App. P. Rule 25:

Mr. Joseph Batte                          Ms. Traci Kenner
Assistant U.S. Attorney                   Assistant U.S. Attorney
US Attorney's Office                      U.S. Attorney's Office
350 Magnolia, Suite 150                   110 North College, Suite 700
Beaumont, TX 77701                        Tyler, TX 75702


/s/Douglas M. Barlow                      /s/ Gerald E. Bourque
DOUGLAS M. BARLOW                         GERALD E. BOURQUE


/s/G. Patrick Black                       /s/ Robert A. Morrow, III
G. PATRICK BLACK                          ROBERT A. MORROW, III
*Attorneys for Appellant Snarr*

                                          /s/Jani J. Maselli
                                          JANI J. MASELLI
                                          *Attorneys for Appellant Garcia*

## CERTIFICATE OF NONCOMPLIANCE

Pursuant to 5th Cir. R. 32.2.7(c), the undersigned certifies this brief does not comply with the type-volume limitations of 5th Cir. R. 32.2.7(b), but counsel has filed a motion to file an oversized reply brief, based on the fact that this is a death penalty case with an extraordinarily length record.

1. EXCLUSIVE OF THE EXEMPTED PORTIONS IN 5th Cir. R. 32.2.7(b)(3), THE BRIEF CONTAINS:

A. 13,014  words.

2. THE REPLY BRIEF HAS BEEN PREPARED:

A. In proportionally spaced typeface using:
WordPerfect 12 in 14 point Times New Roman Font.

3. THE UNDERSIGNED UNDERSTANDS THAT A MATERIAL MISREPRESENTATION IN COMPLETING THIS CERTIFICATE, OR A CIRCUMVENTION OF THE TYPE- VOLUME LIMITS IN 5th Cir. R. 32.2.7, MAY RESULT IN THE COURT''S STRIKING THE BRIEF AND IMPOSING SANCTIONS AGAINST THE PERSON SIGNING THE BRIEF.

/s/Douglas M. Barlow                    /s/ Gerald E. Bourque
DOUGLAS M. BARLOW                  GERALD E. BOURQUE
Attorney at Law                             Attorney at Law
485 Milam                                     24 Waterway Ave., Suite 6600
Beaumont, TX 77701                     The Woodlands, TX 77380
(409) 838-4259                              (281) 379-6901
FAX: (409) 832-5611                     FAX: (832) 813-0321
TBL #01753700                             TBL #02716500

/s/ G. Patrick Black                       /s/ Robert A. Morrow, III
G. PATRICK BLACK                      ROBERT A. MORROW, III
Federal Public Defender                  Attorney at Law
Eastern District of Texas                 24 Waterway Ave., Suite 660
110 N. College, Suite 1122             The Woodlands, TX 77380

Tyler, TX 75702
Tel:  (903) 531-9233
Fax: (903) 531-9625
TBL #02371200

*Attorneys for Appellant Snarr*

Tel: (281) 379-6901
Fax: (832) 813-0321
TBL #14542600

<u>/s/ Jani J. Maselli</u>
Attorney at Law
808 Travis St., 24th Floor
Houston, TX 77002
Tel: (713) 256-7726
TBL #00791195

*Attorneys for Appellant Garcia*