# No. 10-40525

## In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA  §
(Appellee)  §
 §  CRIMINAL ACTION NUMBER
vs.  §  1:09-CR-15
 §
MARK ISAAC SNARR and  §
EDGAR BALTAZAR GARCIA  §
(Appellants)  §

CRIMINAL NO. 1:09CR15
APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

## JOINT PETITION FOR REHEARING EN BANC

DOUGLAS M. BARLOW
Attorney at Law
485 Milam
Beaumont, TX 77701
Tel: (409) 838-4259
FAX: (409) 832-5611
Texas Bar Card No. 01753700

G. PATRICK BLACK
Federal Public Defender
Eastern District of Texas
110 N. College, Suite 1122
Tyler, TX 75702
Tel: (903) 531-9233
Fax: (903) 531-9625
Texas Bar Card No. 02371200
*Attorneys for Appellant Snarr*

GERALD E. BOURQUE and
ROBERT A. MORROW, III
24 Waterway Ave., Suite 660
The Woodlands, TX 77380
Tel:   (281) 379-6901
FAX: (832) 813-0321
Texas Bar Card Nos. 02716500
And 14542600

JANI J. MASELLI
Attorney at Law
808 Travis St., 24th Floor
Houston, TX, TX 77002
Tel: (713) 256-7726
Texas Bar Card No. 00791195

*Attorneys for Appellant Garcia*

# NO. 10-40525

## UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>(Appellee)<br><br>vs.<br><br>MARK ISAAC SNARR and<br>EDGAR BALTAZAR GARCIA<br>(Appellees) | § § § § § § § § § | CRIMINAL ACTION NUMBER<br>1:09-CR-15 |

## OPPOSED JOINT PETITION FOR REHEARING EN BANC

COME NOW, Mark Isaac Snarr, and Edgar Baltazar Garcia, by and through their counsel of record, Douglas M. Barlow, G. Patrick Black, Gerald E. Bourque, and Robert A. Morrow, III, and move this Honorable Court to grant rehearing in this cause and to rehear the direct appeal and reverse the judgments as requested in the Brief for Appellants on file herein. In support of this petition, appellants/petitioners would show:

**United States v. Mark Isaac Snarr and Edgar Baltazar Garcia**

**No. 10-40525**

The undersigned counsel of record certify that the persons having an interest in the outcome of this case are those listed below:

1. Mark Isaac Snarr and Edgar Baltazar Garcia, Defendants-Appellants;

2. Joseph Batte, and Traci Kenner, Assistant United States attorneys, who represented the Government in the district court and appellate court;

3. Douglas M. Barlow, attorney at law, and G. Patrick Black, Federal Public Defender, who represented appellant Snarr in the district court; and who represent appellant Snarr in this Court; and

4. Gerald E. Bourque, Robert A. Morrow, III, and Jani J. Maselli, attorneys at law, who represented appellant Garcia in the district court and continue before this Court.

This certificate is presented so that the judges of this Court may evaluate possible disqualification or recusal.

/s/Douglas M. Barlow     /s/ Gerald E. Bourque
DOUGLAS M. BARLOW    GERALD E. BOURQUE

/s/G. Patrick Black      /s/ Robert A. Morrow, III
G. PATRICK BLACK     ROBERT A. MORROW, III
*Attorneys for Appellant Snarr*   *Attorneys for Appellant Garcia*

i

## I.
## STATEMENT OF COUNSEL

The undersigned counsel express a belief, based upon a reasoned and studied professional judgment, that this appeal involves questions of exceptional importance:

(1) THE PANEL ERRED IN UPHOLDING GARCIA'S AND SNARR'S DEATH SENTENCES IN LIGHT OF THE INADEQUATE FUNDING FOR THE DEFENSE. THE SENTENCES SHOULD HAVE BEEN REVERSED BECAUSE THIS HONORABLE COURT DENIED GARCIA DUE PROCESS BY OVERRULING THE DISTRICT COURT AND DENYING THE FUNDING NECESSARY FOR GARCIA TO PRESENT A PUNISHMENT CASE, WHICH ADDITIONALLY IMPINGED UPON THE DUE PROCESS RIGHTS OF SNARR IN THE JOINT TRIAL.

(2) THE PANEL ERRED BY FINDING THERE WAS SUFFICIENT EVIDENCE TO SUPPORT THE JURY'S FINDING REGARDING THE NON-STATUTORY AGGRAVATING FACTOR OF FUTURE DANGEROUSNESS. THE INCLUSION OF THE AGGRAVATOR OF FUTURE DANGEROUSNESS CONSTITUTED A VIOLATION OF THE DEFENDANTS' RIGHT TO DUE PROCESS BY INTRODUCING AN ARBITRARY FACTOR INTO THE SENTENCING PROCESS.

/s/Douglas M. Barlow
DOUGLAS M. BARLOW
Attorney at Law
485 Milam
Beaumont, TX 77701
(409) 838-4259
FAX: (409) 832-5611
Texas Bar Card No. 01753700

/s/ G. Patrick Black
G. PATRICK BLACK
Federal Public Defender
Eastern District of Texas
110 N. College, Suite 1122
Tyler, TX 75702
Tel:  (903) 531-9233
Fax: (903) 531-9625
Texas Bar Card No. 02371200

*Attorneys for Appellant Snarr*

/s/ Gerald E. Bourque
GERALD E. BOURQUE
Attorney at Law
24 Waterway Ave., Suite 6600
The Woodlands, TX 77380
(281) 379-6901
FAX: (832) 813-0321
Texas Bar Card No. 02716500

/s/ Robert A. Morrow, III
ROBERT A. MORROW, III
Attorney at Law
24 Waterway Ave., Suite 660
The Woodlands, TX 77380
Tel: (281) 379-6901
Fax: (832) 813-0321
Texas Bar Card No. 14542600

/s/Jani J. Maselli
JANI J. MASELLI
808 Travis St., 24th Floor
Houston, TX, TX 77002
Tel: (713) 256-7726
TBL #00791195

*Attorneys for Appellant Garcia*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS . . . . . . . . . . . . . . . . . . . . . . . . . i

STATEMENT OF COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 18

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CERTIFICATE OF COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**TABLE OF AUTHORITIES**

**PAGE**

**CASES**

*Abdul-Kabir v. Quarterman*, 550 U.S. 233, 262 (2007) . . . . . . . . . . . . . . . . . . . . . 22

*Barefoot v. Estelle*, 463 U.S. 880 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Brown v. Mississippi*, 297 U.S. 278, 286-87 (1936) . . . . . . . . . . . . . . . . . . . . . . . 21

*Ellis v. Weasler Engineering Inc.* 258 F.3d 326, 342 -343 (5th 2001) . . . . . . . . 16

*Flores v. Johnson*, 210 F.3d 456, 465 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . 25

*Gardner v. Florida*, 430 U.S. 349, 358 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Godfrey v. Georgia*, 446 U.S. 420, 429 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Gregg v. Georgia*, 428 U.S. 153, 188 (1976) . . . . . . . . . . . . . . . . . . . . . . . 2, 20, 21

*Johnson v. Texas*, 509 U.S. 350, 368 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Jurek v. Texas*, 428 U.S. 262 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Kennedy v. Louisiana*, 554 U.S. 407 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Lockett v. Ohio*, 438 U.S. 586, 601 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Mooney v. Holohan*, 294 U.S. 103, 112 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Rice v. Collins*, 546 U.S. 333, 343 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Smith v. Riceland Foods, Inc.*, 151 F.3d 813, 821 (8th Cir.1998) . . . . . . . . . . . . 16

*United States v. Allen*, 488 F.3d 1244, 1254 (10th Cir. 2007) . . . . . . . . . . . . . . . 22

*United States v. Gilbert*, 120 F.Supp.2d 147, 154-55 (D. Mass. 2000) . . . . . . . . 28

*United States v.Martinez-Calles*,  2012 WL 3657531, 1 (5th Cir. 2012) . . . . . . . 15

*United States v. Pepin*, 514 F.3d 193, 206 (2nd Cir. 2008) . . . . . . . . . . . . . . . . . 28

*United States v. Ramos*, 71 F.3d 1150, 1153-54 (5th Cir.1995) . . . . . . . . . . . . . . 16

*United States  v. Snarr*, __ F.3d __, 2013 WL 85975 (5th Cir.  2013) . . . . . . . . 1, 3

*Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) . . . . . . . . . . . . . . . . . 20, 21

**STATUTES**

Federal Death Penalty Act ("FDPA") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 3593 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**CONSTITUTIONAL PROVISIONS**

Eighth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 21

**TREATISES**

Mark D. Cunningham, Thomas J. Reidy, & Jon R. Sorensen, *Assertions of "Future Dangerousness" at Federal Capital Sentencing: Rates and Correlates of Subsequent Prison Misconduct and Violence*, 32 Law & Hum. Behav. 46, 51, 53 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Texas Defender Service, DEADLY SPECULATION: MISLEADING TEXAS CAPITAL JURIES WITH FALSE PREDICTIONS OF FUTURE DANGEROUSNESS 21-22 (2004) http://www.texasdefender.org/deadlysp.pdf. . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# PRELIMINARY STATEMENT

(1)     The panel's opinion erred in failing to appreciate the significance of the denial of necessary funding.  This Court should grant rehearing to reconsider and reverse Garcia's and Snarr's death sentences because this Honorable Court denied Garcia due process by overruling the district court and denying the funding necessary for Garcia to present a punishment case, which additionally impinged upon the due process rights of Snarr in the joint trial.

(2)     The Government alleged, as a non-statutory aggravatory factor in the Selection phase of the trial,  that Snarr and Garcia posed a future danger.  The jury agreed with this factor.  The Panel opinion summarily affirmed the jury's decision.  See *United States  v. Snarr*, __ F.3d __, 2013 WL 85975 (5th Cir.  2013).

The evidence is insufficient to sustain the jury's finding, and the fact that this issue was litigated, in the manner in which it was, introduced an impermissibly arbitrary factor into the sentencing hearing. The evidence was clear that the BOP had the unfettered discretion to house Snarr and Garcia at the Control Unit at ADX for as long as necessary.  The evidence and arguments presented by the Government required the jury to speculate that the BOP would irrationally release the defendants into the general population of ADX or another federal penitentiary. The Government preyed upon this speculation and fear, arguing  that "as sure as the shine is going to

shine again" the two men would be released into the general population of a prison. This fear-mongering argument made it impossible for the jury to fully and properly consider the appellant's mitigating factors. Further, there is no demonstrative empirical evidence that supports the idea that is even possible for a jury to predict future dangerousness.

Like other facts employed in capital sentencing procedures, the evidence must lead to results that are not arbitrary and capricious. *Gregg v. Georgia*, 428 U.S. 153, 188 (1976) (plurality opinion). Here, the evidence produced a result that was arbitrary, capricious, and unreliable because an arbitrary factor was introduced into the sentencing process. It is significant that the Supreme Court has never considered the reliability of the determination of "future dangerousness" under the Constitution or the Federal Death Penalty Act ("FDPA").

The lack of evidence, the fear-mongering and confusion produced by the Government, and the problematic issues created by this particular aggravating factor introduced an arbitrary factor into the sentencing hearing, in violation of the Eighth Amendment. Thus, the defendants' sentences should be vacated.

**ARGUMENTS**

I.    THE PANEL ERRED IN DETERMINING APPELLANTS' RIGHTS TO DUE PROCESS WERE NOT DENIED BY THE DRASTIC FUNDING CUT FOR MITIGATION EXPERTS .

The trial court's ordered budget was unilaterally rejected although there was never a showing that Judge Crone abused her discretion.  The panel opinion stated that "[w]e review a district court's denial of funding for expert witnesses for abuse of discretion," and added the following footnote:

> As noted above, the budget order that reduced Garcia's available funds
>
> was entered by both this court's chief judge and the district court.

*United States v. Snarr,*  2013 WL 85975, 28 (5th Cir. 2013).  It would be a misstatement to aver that Judge Crone *agreed* with Chief Judge Jones' drastic budget cuts in entering the order on the budget.  While Judge Crone may have "entered" the order, there is nothing in the record to establish it was because of an agreement.  In fact, all evidence to the contrary including the clear record of the hearings regarding the issue supports that Judge Crone disagreed with Chief Judge Jones.  Judge Crone wrote detailed orders explaining why, as a trial judge, she felt the expert funding was

necessary.

The district court's Memorandum to Chief Judge Jones explicitly laid out the necessity for three requested experts and the recommendation to the Fifth Circuit:

Proper investigation and presentation to the jury of both the underlying facts and mitigating evidence will in large part determine whether Mr. Garcia is convicted of the charges against him and, if so, the sentence he will receive. Therefore, the court is of the opinion that the requested services are reasonably necessary for an adequate defense. It is requested that advance authorization be granted to obtain additional services in the amount in excess of the maximum allowed for capital cases, as follows:

| | |
|---|---|
| Mental health Neurological Expert | $15,000 |
| Criminologist/Prison Culture Expert and | |
| Prison Administration Expert | $35,000 |
| Cultural Mitigation Expert | $15,000 |
| TOTAL | $65,000. |

I certify that the estimated expenses appear necessary to provide fair

compensation for services of an unusual character or duration for an adequate defense in this capital case. Therefore, I recommend approval of this advance authorization in the amount of $65,000.

(USCA5 812-13). Judge Crone signed this order on November 24, 2009, after a lengthy hearing on this issue. Chief Judge Jones allowed for only an additional $20,000 but specifically excluded any of the money to be spent on a Mexican cultural expert. (USCA5 815). Judge Jones denied the request and overruled the trial court. (USCA5 816).

The panel decision that this was somehow a joint decision of Judge Crone and Chief Judge Jones is inaccurate. Chief Judge Jones overruled Judge Crone. Judge Crone acquiesced to the higher authority of Chief Judge Jones. The district court did not abuse its discretion - the unfettered singular decision of Chief Judge Jones to not accept Judge Crone's findings was the abuse of discretion.

The panel opinion also begs the question of the applicable standard of deference owed to court orders and findings. Are district court's orders not entitled to an abuse of discretion standard any longer? While not overtly holding as such, this court's decision has far-reaching implications regarding whether the findings by a trial court are entitled to deference. The panel's implication that by following Chief

5

Judge Jones' order, Judge Crone withdrew her previous findings is simply not evidenced in the record. What is in the record are findings from Judge Crone, who actually heard live testimony. Judge Crone considered scores of pages of experts CV's and resumes.

*Live testimony at the ex parte hearing - Why did Judge Crone abuse her discretion?*

As the record of the *ex parte* hearing demonstrated - these experts were necessary to present a full picture of Mr. Garcia to the jury. And Judge Crone agreed with that position after the hearing.

Dr. Jolie Brams, a clinical psychologist, did testify at trial. (USCA5 7239-1305). During the hearing on whether there would be sufficient funds to pay for his expertise at trial, Dr. Brams made it quite clear that she had investigated the background of Mr. Garcia, and found the need for a cultural expert was very important. (USCA5 763-64). Dr. Brams testified that Mr. Garcia's background was atypical and that he was raised in "a cartel family." (USCA5 764). She explained that the cultural expert was necessary because of the unique background of Mr. Garcia:

> From almost preschool years, he was very well aware of the criminal
>
> nature of his family. He was part and parcel of witnessing and being
>
> exposed to a variety of problematic and atypical situations; and he was

very indoctrinated into a lifestyle, from really preschool years, in which one lives a life of criminal behavior.

* * *

But we need to understand that this is a history of his family which is generational in its criminality, and this is not just commonplace criminality. This is Mexican mafia. Mr. Garcia was raised almost as an alien in this world, even as compared to other individuals whose family may be criminal in nature to some degree.

(USCA5 764).

Dr. Brams then also noted there was another type of expert absolutely necessary for the defense of Mr. Garcia, regarding neurological issues:

Okay. Well, I think that's a very important question: and, as you know, in any case we will look at the neurological and intellectual capacities of the defendant. The history that I have received, it correlates absolutely with my clinical impressions of Mr. Garcia in that his early childhood history is marked by, first of all, insult – physical insults. His mother was beaten while she was pregnant with him, and he was also

7

poisoned as an infant by his grandmother.

All during his childhood, he was extremely impulsive, hyperactive, and had no fear of danger. When I met with Mr. Garcia now, his impulsivity and intentional difficulties are noted not just in the clinical interview but also in the history that he provides.

He appears to be, at least clinically, of normal intelligence; and he's quite verbal. But when we look at his ability to conform his behavior in a voluntary nature, especially when it dovetails with the history in his family and his experiences, it's extremely important that a neuropsychological expert look at his history, his prison capacities, and formulate hypotheses and conclusions as to why, in addition to his very dysfunctional and criminal family background, how he decided to take the path that he took in light of his possible neurological defect.

* * * *

Well, what I'm pointing out to you is that it is would ne remiss and I believe, from my perspective as a consulting psychologist, inappropriate not to explore this. All of us obviously have strengths and weaknesses intellectually: but in terms of Mr. Garcia, his history is very

8

suggestive of lifelong neurological difficulties in terms of frontal lobe functioning, his ability to control his behavior, issues that are neurological and beyond his control. And understanding these issues alone are significant; but understanding them in light of this incredible family history is, I believe, central to providing mitigation for this individual. And, thus, it's my strongest opinion we need a neuropsychological expert to assist in this case.

(USCA5 765-66).

Judge Crone understood after the testimony of Dr. Brams that three more experts were necessary: a prison expert, a cultural consideration person, and a neurological expert. (USCA5 770).

During the *ex parte* hearing. Dr. Richard Cervantes explained his expertise as a cultural expert. (USCA5 773-74). He explained the necessity for a cultural expert:

First, we can talk about the importance of Mr. Garcia being the product of an unwanted pregnancy and how that runs counter to traditional Mexican culture. In Mexican culture there's very strong value placed on the integrity of the nuclear family. Several studies have related to

family stress and destruction in the nuclear family among Mexican Americans as having a much more negative mental health impact than it has in other cultural groups. So, the fact that he is from an unwanted pregnancy and, in essence, was early on rejected by his family is a – runs counter to cultural standards, cultural practices, and cultural norms that I believe are really really important and that need to be fleshed out and investigated throughly and presented to the court.

(USCA5 774-75). Dr. Cervantes did a preliminary evaluation of Mr. Garcia, but explained that his preparation was "absolutely not" completed. (USCA5 775). He also explained a portion of the significance of why a cultural expert was so necessary:

All individuals experience life stress events. However, there are some stress events or traumatic events that are unique to Mexican or Mexican American culture: and that's what we refer to as non-normative stressors. And those are stressors, for example, related to discrimination, language problems, stress related to legal status issues, family conflicts about parenting and child rearing practices. All of these things have been studied and researched, including some of my own published research on these topics.

* * * *

We know that Mexican Americans have some of the highest rates of alcohol abuse and dependence in American particularly Mexican American men, much higher, for example, than even in other Hispanic groups.  Puerto Ricans have much lower rates.  Cuban Americans have lower rates.  Mexican American men have higher rates of alcohol abuse and dependency even than you would find in African-American communities.

What we know is that patterns of high-quantity binge drinking that are found in many traditional Mexican-American households – excuse me – have ben combined with high-frequency drinking patterns that are more common to the U.S. population; and these have produced elevated rates of alcohol abuse, alcoholism, and dependence among Mexican Americans.

* * * *

Fore Edgar, I have evidence that he began drinking at a very early age, started using marijuana at about age 11 but began drinking alcohol also at about age 11.  He reported to me that his early life pretty much revolved around alcohol at a very early age, where he reported drinking

11

approximately a case of beer at his heaviest point of use; and that was

still in his late teen years.  So, his life really revolved around alcohol

abuse, alcohol addiction that was untreated.

I believe that we can best understand his alcoholism and alcohol

addiction by understanding Mexican culture and some of the cultural

values and norms around alcohol abuse and alcohol dependence and that

those things are really really important as part of the mitigation

presentation.

(USCA5 778-80).  The crux of Dr. Cervantes' testimony was that he, as a cultural

expert, could provide a comprehensive framework to understand how Mr. Garcia

grew up.  (USCA5 781).  One striking example that Dr. Cervantes gave about the

Mexican example cultural experience was an example of asking non-Hispanic parents

how their children came to be drug-users.  (USCA5 783).  Dr. Cervantes stated the

answer was typically that all of the child's friends were drug users.  (USCA5 783).

But if you asked a Mexican parent how their child became a drug user or had a mental

health problem, the answer would be:

"It's because of the *bruja* that live next door to us.  Our child was

bewitched.  The witch that lived next door to us, because she didn't like

12

us, put a spell on him: and all of my children have turned out to be substance abusers or have emotional problems." So, culture and the way culture defines problems are very very important.

The practice of *Brujeria, Santeria*, very important in the Hispanic culture; and, in fact, some of the that is evidence and is present in this case. And I will be talking about the role of *Brujeria* and that practice in the Mexican culture, if allowed to testify in terms of Mr. Garcia.

(USCA5 783).

Chief Judge Jones also denied funding for Dr. Craig Haney, a lawyer and Ph.D. from Stanford University. (USCA5 789). His expertise was in mitigation and explaining the role an institution can have on a person's social history. (USCA5 791). He explained that it would be difficult for a juror to understand a defendant's social history without understanding the portion of the defendant's life that were lived in an institutional setting, explaining:

Institutions are powerful environments and they can shape and influence and affect people in very significant ways and that then becomes part of the story of who the defendant is and why his life has taken that court

13

that it has. So, that would be true in any case in which a defendant had been institutionalized in the past.

In this particular case it's even more important for two reasons. One os that the defendant in this case has not only been institutionalized and spent a considerable amount of time in institutional settings ut also has engaged in conflict, had violent physical encounters in the past in institutional settings, which will need to be understood and analyzed and explained to the jury in terms of, at least in part, the nature of the environment in which the defendant was housed, so that there is potential aggravation in this case which will have to be addressed by the defense in addition to the institutional aspects of the defendant's social history.

And then finally and obviously in this case, the crime in which is at issue in this case is a crime which is alleged to have taken place in prison. So, the nature of the prison environment, the immediate nature of that environment, is important but also the defendant's institutional history, how he reacts in institutional settings, what he leaned in institutional settings, how his development was shaped and affected by virtue of his prior incarceration. All of these things are acutely

important in a case where the crime at issue is one that's taken place inside a prison.

(USCA5 792-93).

Only funding for the prison expert was ultimately received by Mr. Garcia - no expertise on his cultural heritage or scientific neurological testing. While Dr. Brams did testify at trial - she lacked the appropriate expertise Mr. Garcia's defense needed; she conceded during her testimony she was not an expert in Spanish culture. (USCA5 7248).

*What deference is afforded Judge Crone's decision the funding was necessary?*

On appellate review, great deference is typically given to district court decisions as fact-finders. *See e.g.* , *Rice v. Collins*, 546 U.S. 333, 343 (2006) (Breyer J. concurring) (In a *Batson* case, the trial judge is best placed to determine whether, in a borderline case, a prosecutor's hesitation or contradiction reflect (a) deception, or (b) the difficulty of providing a rational reason for an instinctive decision."); *United States v.Martinez-Calles*, 2012 WL 3657531, 1 (5th Cir. 2012)(explaining in

sentencing issues the district court was in the best position to evaluate history and characteristics as well as the need for the sentence to further the objectives in § 3553(a) and the district court's reasoned decision is entitled to deference);*United States v. Ramos*, 71 F.3d 1150, 1153-54 (5th Cir.1995)(holding that in possible juror misconduct cases "the trial judge is in the best position to evaluate accurately the potential impact of the complained-of outside influence"); *Ellis v. Weasler Engineering Inc.* 258 F.3d 326, 342 -343 (5th 2001)(holding trial court's ruling on a motion for a new trial must be given deference), *citing Smith v. Riceland Foods, Inc.*, 151 F.3d 813, 821 (8th Cir.1998) ("A district court has discretion to decide whether a jury's findings on a verdict form are incomplete, confusing, or inconsistent and whether to resubmit the claim to the jury. The district judge, who has observed the jury during the trial, prepared the special verdict questions and explained them to the jury, is in the best position to determine whether the answers reflect confusion or uncertainty.").

In this case, the panel has side-stepped the determination that Chief Judge Jones determined Judge Crone's decision was an abuse of discretion by asserting that somehow Judge Crone's entry of the order somehow undid all the previous orders Judge Crone had written requesting appropriate funding.

The panel opinion goes even further in its error. The panel's decision is

16

actually one sitting as a 13th juror determining that no mitigation could have saved

Mr. Garcia - but without any of the evidence in front of it?

In sum, the panel decision determined that no additional expert testimony could

have saved him:

> Equally important, Defendants have failed to establish a reasonable probability that the requested experts would have been of assistance and that their absence resulted in a fundamentally unfair trial. While Defendants focus on the experts Garcia did not retain, they neglect that Dr. Brams provided extensive evidence about the impact on Garcia of his upbringing, his culture, and his life in prison. Thus, the fact that Garcia did not have additional experts did not render his trial fundamentally unfair, given that Dr. Brams was able to present much, if not all, of the evidence Garcia believed to be vital for mitigation purposes.

*Snarr*, 2013 WL 85975 at * 28.

Dr. Brams made clear what she could testify to - and it was not as an expert on

cultural history, prison psychology, or as a neurologist. The panel's decision points

out that *how* the money was spent falls on the defense. But, the *how* is not the

necessary inquiry - the money provided was significantly less and the defense was

well forced into a Hobson's choice that Judge Crone would not have put them in.

Dr. Cervantes never finished his examination. There was no money for the

neurological expert that Dr. Brams stated was necessary. There was no money for

Craig Haney. Dr. Haney - a Stanford J.D. and Ph.D. is a world renowned expert in

"the psychological effects of imprisonment, and the range of social and institutional factors that influence prison adjustments." (Hrg from 10/03/09, Defense Exhibit 3). Dr. Haney explained that Dr. Brams understanding of the prison culture was limited and those issues "must be fully explored and integrated into any understanding of Mr. Garcia's prison behavior. (Hrg from 10/03/09, Defense Exhibit 3).

What could have been discovered by these experts is an unknown. And the unknown was not Judge Crone's decision - but it was the sole decision of Chief Judge Jones. The panel's decision that Judge Crone did not abuse her discretion is not anything Mr. Garcia ever alleged. It was Chief Judge Jones alone who abused her discretion and the panel's decision to not give any deference to the findings of Judge Crone was erroneous. And the determination that no expert testimony could have saved Mr. Garcia is mere guess work. Judge Crone determined the funds were necessary to present mitigation of Mr. Garcia. That was denied by Chief Judge Jones acting alone. The panel's decision endorsing that decision was erroneous.

II.   THE PANEL LIKEWISE ERRED BY FINDING THERE WAS SUFFICIENT EVIDENCE TO SUPPORT THE JURY'S FINDING REGARDING THE NON-STATUTORY AGGRAVATING FACTOR OF FUTURE DANGEROUSNESS. THE INCLUSION OF THE AGGRAVATOR OF

FUTURE DANGEROUSNESS CONSTITUTED A VIOLATION OF THE DEFENDANTS' RIGHT TO DUE PROCESS BY INTRODUCING AN ARBITRARY FACTOR INTO THE SENTENCING PROCESS.

The evidence was insufficient to support the jury's affirmative finding regarding the "future dangerousness" of the appellants. The panel failed to appreciate the significance of the arbitrariness of the future dangerousness issue. The panel opinion stated:

In arguing that this evidence was insufficient to allow the jury rationally to conclude that they posed a threat of future dangerousness, Defendants primarily rely on the testimony of a prison consultant and former warden named Mark Bezy. Bezy testified that Defendants would likely be moved to the ADX prison—"the most secure facility the Bureau [of Prisons] has"—which essentially would preclude them, he contended, from engaging in further dangerous activity. Whatever impact Bezy's testimony had, however, was undercut by a government rebuttal witness named Greg Hershberger, who previously served as the warden at the ADX. Hershberger explained that the goal of the ADX is to prepare inmates to function in the general population of another prison facility.

Hershberger further testified that based on their histories, Defendants likely could successfully complete the ADX's transition program and be moved to the general population of another facility.

Accordingly, based on Hershberger's testimony, the extensive evidence as to Defendants' pattern of violence and institutional misconduct, and Defendants' attack in this case on Rhone and the Beaumont penitentiary's correctional officers, a rational juror could have concluded that Defendants pose a future threat to the safety of other inmates or prison staff. See *Snarr, supra* at 18-19.

The panel opinion is in error in that it significantly reduced the burden of the Government. The Supreme Court in *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion), clearly established that proof all facts in a capital case, which includes proof of future dangerousness, must be highly reliable and accurate. Like other facts employed in capital sentencing procedures, such proof must also lead to results that are not arbitrary and capricious. *Gregg v. Georgia*, 428 U.S. 153, 188 (1976) (plurality opinion). Supreme Court cases such as *Mooney v. Holohan*, 294

20

U.S. 103, 112 (1935) (per curiam), and *Brown v. Mississippi*, 297 U.S. 278, 286-87 (1936), demonstrate why the inclusion of the aggravator of future dangerousness can constitute a violation of the defendants' right to due process by introducing an arbitrary factor into the sentencing process. It is significant that the Supreme Court has never considered the reliability of the determination of "future dangerousness" under the Constitution or the Federal Death Penalty Act ("FDPA"). This Court should rehear these cases en banc to adequately address this arbitrary application of the death penalty.

Because death is a qualitatively different punishment than a term of years, however long, capital defendants are entitled to greater reliability in the facts used to determine an appropriate sentence in their cases than are other criminal defendants. *Woodson v. North Carolina*, 428 U.S. 280, 306 (1976) (plurality opinion); see also *Gardner v. Florida*, 430 U.S. 349, 358 (1977).("It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion."). This need is due in large part to the Eighth Amendment's guarantee that death not be imposed in an "arbitrary and capricious manner." *Lockett v. Ohio*, 438 U.S. 586, 601 (1978) (plurality opinion); *Gregg v. Georgia*, 428 U.S. 153, 188 (1976) (plurality opinion).

The introduction of the future dangerousness aggravator and the unreliable and

speculative evidence produced by the Government in this case achieved the very thing —the introduction of an arbitrary factor-that is prohibited. Such error in the panel opinion warrants rehearing.

The question of future dangerousness is different than an evaluation of the culpability derived from the offense of conviction. See *United States v. Allen*, 488 F.3d 1244, 1254 (10th Cir. 2007) (because evidence of future dangerousness could "otherwise veer into speculation" it is generally "evaluated on the basis of the defendant's recidivism"). In this case, the court had no basis to conclude that the defendants would constitute a future danger. See *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 262 (2007) (evidence of youth "has special relevance to the question of future dangerousness"); *Johnson v. Texas*, 509 U.S. 350, 368 (1993) ( "signature qualities of youth are transient" and the "impetuousness and recklessness that may dominate in younger years may subside" with age). The Government, not the defendants, bore the burden of proof on the issue of future dangerousness and the other aggravating factors. *See* 18 U.S.C. § 3593(c). The Government did not meet its burden of proof that Mr. Snarr and Mr. Garcia would pose a risk of violence ***in prison***, in the control unit of the ADX in Florence, Colorado.[1]

---

[1]In this case, the statutory aggravating factor of future dangerousness is necessarily limited to how the defendants will function in an institutionalized

Although *Jurek v. Texas*, 428 U.S. 262 (1976), and *Barefoot v. Estelle*, 463 U.S. 880 (1983) indicated that reliable and nonarbitrary predictions as to future dangerousness can be made at the time of sentencing, evidence and scientific data adduced in the twenty-plus years since those decisions clearly show otherwise. The use of future dangerousness as an aggravating factor in a capital case thus is unconstitutional, because at no point can a reliable prediction of future dangerousness be made as to the defendants or any other capital defendant.

In order to test the validity of future dangerousness as an aggravator, researchers have subjected it to empirical scrutiny. In one recent study of 145 male federal capital defendants who had entered the Bureau of Prisons with life sentences over a fifteen-year period (seventy of whom had been subject to allegations of future dangerousness), Mark D. Cunningham, Thomas J. Reidy, & Jon R. Sorensen, *Assertions of "Future Dangerousness" at Federal Capital Sentencing: Rates and Correlates of Subsequent Prison Misconduct and Violence*, 32 Law & Hum. Behav. 46, 51, 53 (2008), researchers found that "[r]egardless of the severity

---

prison setting. See *Simmons v. South Carolina*, 512 U.S. 154, 165 n.5 (1994); *United States v. Bernard*, 299 F.3d 467, 482 (5th Cir. 2002). The issue for this jury was whether the defendants would pose a danger to the safety of others in a maximum-security federal penitentiary. This type of institution is a setting specifically designed, organized, and staffed to handle inmates who have been convicted of violent crimes

of disciplinary infraction or institutional violence specified, an assertion that [the defendant would be a future danger] was not a reliable predictor of serious prison misconduct[,]" id. at 61. Indeed, the extent to which this assertion proved meaningless is startling: Only 10% of the [70 inmates sentenced to life without parole against whom the Government alleged future violence] had been cited for a serious assault during a retrospective review period averaging six years, and just less than one in a hundred had perpetrated an assault causing "moderate" injuries (i.e., serious injuries requiring evacuation to an outside hospital, but not life-threatening).

None had perpetrated an assault resulting in "major" (i.e., life-threatening) injury. Similarly, none of the violence-predicted LWOP inmates in the sample had perpetrated a serious assault against staff or killed another inmate. Further, 28% of the offenders whose projected prison violence had been asserted as a rationale for their execution had had *no* disciplinary infractions of any sort during LWOP tenures averaging six years. Id. (emphasis in original). Based on this, the study's authors concluded, "it is *not* possible to reliably identify at trial which of these defendants are more likely than not to commit [serious violence in prison]." *Id.* (emphasis in original).

Another study, conducted by the Texas Defender Service, looked at 155 Texas inmates who had been identified as a "continuing threat to society" and had been

given death sentences. Texas Defender Service, DEADLY SPECULATION: MISLEADING TEXAS CAPITAL JURIES WITH FALSE PREDICTIONS OF FUTURE DANGEROUSNESS 21-22 (2004), *available at* http://www.texasdefender.org/deadlysp.pdf. Of those, eight—5% of inmates—"engaged in assaultive behavior requiring treatment beyond first aid." *Id.* at 23. This means that for *95% of cases*, the state's "predictions of future dangerousness . . . have not proven to be true." *Id.*

Although prosecutors may argue that such factors as a defendant's criminal history, assertions of remorselessness, or disposition provide easy ways for jurors to make reliable determinations of future dangerousness, the plain fact is that there is a "paucity of data" in support of such a belief. *Assertions of "Future Dangerousness"*, *supra*, at 50. "Overall," one Fifth Circuit judge wrote in *Flores v. Johnson*, 210 F.3d 456, 465 (5th Cir. 2000) (Garza, J., specially concurring), "the theory that scientific reliability underlies predictions of future dangerousness has been uniformly rejected by the scientific community absent those individuals who routinely testify to, and profit from, predictions of dangerousness."

The Panel opinion in *Snarr* does not defend the empirical reliability of predictions about future dangerousness in federal prison, and it does not identify any decisions that have addressed a claim like the defendants. Empirical studies that

25

demonstrate the overall rate of significant prison violence by federal capital offenders is vanishingly small, and that there do not exist any data from which jurors, or anyone else for that matter, can predict which few offenders will prove assaultive in prison. Federal defendants like Snarr and Garcia continue to be sentenced to death based on such jury predictions that are not based on a sufficient quantum of evidence.

The unreliability of "future dangerousness" allegations are not proven only by the failure of those allegations to predict whether inmates will be a danger in the future. The allegations *themselves* act to create unreliable results from the very beginning of the penalty phase. One study has found that *simply asking* the jury to predict a defendant's future behavior leads them to "disregard more reliable [statistical] information—'even to the extent that involves gross departures from the prior probabilities.'" *Assertions of "Future Dangerousness"*, *supra*, at 50.

Although *Woodson*, 428 U.S. at 306, and *Gardner*, 430 U.S. at 358, demand that the death decision be grounded, and appear to be grounded, in accuracy and reason, there is a profound lack of reason to be found in continuing to adhere to future dangerousness allegations as a means of persuading juries to vote for death despite the complete lack of scientific support for such allegations. As one study disproving the reliability of these allegations points out, "reason unhinged from science is hollow indeed." *Assertions of "Future Dangerousness"*, *supra*, at 49.

Likewise, the lack of reliable data in support of the idea that jurors can accurately predict whether any criminal defendant might in fact be a future danger simply invites imposition of the death penalty arbitrarily and capriciously. Because the allegation of future dangerousness has no meaning in itself, there is no way to ensure consistency in its application, see *Kennedy v. Louisiana*, 554 U.S. 407 (2008); one jury might put great weight on the need to protect society from a given defendant, not knowing that their prediction as to the level of danger is meaningless, while another might recognize the capacity of people to change, *see, e.g.*, David Bruck, *Foreward to* DEADLY SPECULATION, *supra*.

This produced the kind of "standard less and unchanneled imposition of death sentences in the uncontrolled discretion of a basically uninstructed jury" forbidden by *Gregg*. See *Godfrey v. Georgia*, 446 U.S. 420, 429 (1980). Given the proven unreliability of future dangerousness allegations, and given the fact that they do not impose any standard with which to limit imposition of the death penalty and thus threaten arbitrary and capricious death sentences, the Panel erred by upholding the jury's finding of the "future dangerousness" aggravating factor. Further, viewing "the evidence in the light most favorable to the government," "no rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt." *Bernard*, 299 F.3d at 481.

None of the evidence presented by the Government regarding violence in the general population unit of federal penitentiaries addressed the question of how the defendants would fare in the Control Unit of the ADX in Florence, Colorado. See, e.g., *United States v. Pepin*, 514 F.3d 193, 206 (2nd Cir. 2008) (evidence about defendant's sexual abuse of a child properly excluded because he would not pose a danger to children if incarcerated for life); *United States v. Gilbert*, 120 F.Supp.2d 147, 154-55 (D. Mass. 2000) (defendant's effort, as nurse, to obtain medications to use as poison "lacks any substantial relevance to [her] dangerousness in a prison setting,"since she would have no access to such items in prison).

Because the jury's finding that Snarr and Garcia presented a future danger in prison was based on legally insufficient evidence, its reliance on this factor introduced an arbitrary element into its sentencing decision, in violation of the Eighth Amendment. In this case, there is a prospect, and not merely an abstract legal one, that one or more jurors might have opted against a death sentence for Snarr and Garcia had they not been misled into a faulty finding of future dangerousness -- in other words, had the perceived aggravation been significantly lessened.

Accordingly, this Court should rehear these cases en banc, reverse the defendants' death sentences and remand their cases for a new capital sentencing proceeding.

28

# CONCLUSION

The uniqueness and importance of the issues  involved in this case, that is:

(1)     THE PANEL ERRED IN DETERMINING APPELLANTS' RIGHTS TO DUE PROCESS WERE NOT DENIED BY THE DRASTIC FUNDING CUT FOR MITIGATION EXPERTS , and

(2)     THE PANEL ERRED BY FINDING THERE WAS SUFFICIENT EVIDENCE TO SUPPORT THE JURY'S FINDING REGARDING THE NON-STATUTORY AGGRAVATING FACTOR OF FUTURE DANGEROUSNESS. THE INCLUSION OF THE AGGRAVATOR OF FUTURE DANGEROUSNESS CONSTITUTED A VIOLATION OF THE DEFENDANTS'  RIGHT TO DUE PROCESS BY INTRODUCING AN ARBITRARY FACTOR INTO THE SENTENCING PROCESS, and

each warrants a rehearing before the En Banc Court.  Snarr and Garcia  urge this Court to grant this motion for rehearing and to carefully consider the issues presented.

## CERTIFICATE OF COUNSEL

Counsel for appellants have consulted with the counsel for the government, AUSA Traci Kenner,  and the government is opposed to this request.

WHEREFORE, for the reasons stated above, appellants, petitioners herein, request that the Court grant rehearing en banc in this cause and to reconsider the direct appeal and reverse the judgments as requested in the Brief for Appellants on file herein and in accordance with this petition.

Respectfully submitted,

/s/Douglas M. Barlow
DOUGLAS M. BARLOW
Attorney at Law
485 Milam
Beaumont, TX 77701
(409) 838-4259
FAX: (409) 832-5611
Texas Bar Card No. 01753700


/s/ G. Patrick Black
G. PATRICK BLACK
Federal Public Defender
Eastern District of Texas
110 N. College, Suite 1122
Tyler, TX 75702
Tel:  (903) 531-9233
Fax: (903) 531-9625
Texas Bar Card No. 02371200


*Attorneys for Appellant Snarr*

/s/ Gerald E. Bourque
GERALD E. BOURQUE
Attorney at Law
24 Waterway Ave., Suite 6600
The Woodlands, TX 77380
(281) 379-6901
FAX: (832) 813-0321
Texas Bar Card No. 02716500


/s/ Robert A. Morrow, III
ROBERT A. MORROW, III
Attorney at Law
24 Waterway Ave., Suite 660
The Woodlands, TX 77380
Tel: (281) 379-6901
Fax: (832) 813-0321
Texas Bar Card No. 14542600


*Attorneys for Appellant Garcia*

# CERTIFICATE OF SERVICE

We certify that on the 20th day of February, 2013, we served electronically the foregoing petition, on the following individuals pursuant to Fed. R. App. P. Rule 25:

Mr. Joseph Batte
Assistant U.S. Attorney
US Attorney's Office
350 Magnolia, Suite 150
Beaumont, TX 77701

Ms. Traci Kenner
Assistant U.S. Attorney
U.S. Attorney's Office
110 North College, Suite 700
Tyler, TX 75702

/s/Douglas M. Barlow
DOUGLAS M. BARLOW

/s/G. Patrick Black
G. PATRICK BLACK
*Attorneys for Appellant Snarr*

/s/ Gerald E. Bourque
GERALD E. BOURQUE

/s/ Robert A. Morrow, III
ROBERT A. MORROW, III

/s/Jani J. Maselli
JANI J. MASELLI
*Attorneys for Appellant Garcia*

**REVISED January 29, 2013**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

No. 10-40525

January 8, 2013

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

MARK ISAAC SNARR; EDGAR BALTAZAR GARCIA,

Defendants-Appellants

Appeals from the United States District Court
for the Eastern District of Texas

Before STEWART, Chief Judge, and KING and OWEN, Circuit Judges.

KING, Circuit Judge:

Following their joint trial, a jury found Defendants-Appellants Mark Snarr and Edgar Garcia guilty of murdering Gabriel Rhone, a fellow inmate at the United States Penitentiary in Beaumont, Texas. After the jury unanimously recommended capital punishment for each defendant, the district court sentenced them to death. Defendants appeal their convictions and sentences. For the reasons that follow, we AFFIRM.

No. 10-40525

## I.  FACTUAL AND PROCEDURAL BACKGROUND

On January 21, 2009, a federal grand jury returned a one-count indictment against Mark Snarr and Edgar Garcia ("Defendants"), charging them with murdering Gabriel Rhone in violation of 18 U.S.C. §§ 1111 and 2.  The indictment provided notice of special findings for both Snarr and Garcia, and on February 9, 2009, the government filed notice of its intent to seek the death penalty against both defendants.

The evidence adduced at trial showed that, on November 28, 2007, Rhone, Snarr, and Garcia were incarcerated at the federal penitentiary in Beaumont, Texas.  That day, as prison guards escorted Snarr and Garcia from outdoor recreation areas to their respective cells, Defendants escaped from their handcuffs and produced handmade weapons known as "shanks."  Unaware that Garcia had a shank, and believing that Snarr was preparing to attack Garcia, correctional officer Dwight Baloney positioned himself between the two men, with his back toward Garcia.  Garcia then stabbed Baloney in the back, as Snarr attacked him from the front.  Defendants continued assaulting Baloney as he struggled to reach a secure location, ultimately stabbing him twenty-three times in approximately fifteen seconds.  After Baloney escaped, Defendants turned their attention to correctional officer Josh McQueen.  Snarr stabbed McQueen while demanding from him keys to the inmates' cells.  When McQueen refused to surrender his keys, Garcia stabbed him, at which point Snarr was able to rip McQueen's keys from his duty belt.

Defendants then ran down a corridor to Rhone's cell.  Snarr attempted for almost a full minute to unlock the cell door, while Garcia—who, according to one witness, appeared "to be taunting the inmates" in the cell with his shank—yelled either "I'm going to kill you," or "We going to kill you."  When Defendants finally opened the door, Rhone fled from his cell and Defendants began stabbing him.  One witness to the events testified that, in the midst of the attack, Defendants

2

No. 10-40525

"were in a frenzy . . . repeatedly stabbing [Rhone] over and over." Despite officers' commands that they stop, Defendants continued their assault on Rhone until they saw that officers were preparing to use riot control equipment to clear the area. As Defendants retreated, one of them yelled, "That's how you get your enemy," and Snarr exclaimed, "Dude disrespected us, and that's what he got."

Only then were officers able to attend to Rhone, who by that time already appeared to be dead. Prison officials attempted to resuscitate him, but shortly after the attack, Rhone was pronounced dead at a Beaumont hospital. An autopsy revealed that he had sustained fifty stab wounds: eighteen to the front of his body, and thirty-two to the back. The cause of Rhone's death was listed as "multiple stab wounds of the heart, lung, and liver," with the injury to his heart being the fatal wound.

On May 7, 2010, jurors deliberated for just over one hour before returning guilty verdicts against both Snarr and Garcia for Rhone's murder. During the eligibility phase of the trial, the government submitted several statutory aggravating factors to establish Defendants' eligibility for the death penalty.[1] These included, for both defendants, that the offense had been committed: (1) "in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim," and (2) "after substantial planning and premeditation to cause the death of a person." 18 U.S.C. § 3592(c)(6), (9). To

---

[1] The Federal Death Penalty Act provides a separate post-conviction sentencing proceeding for those convicted of homicide. 18 U.S.C. § 3593(b). In the proceeding's first stage, known as the "eligibility" phase, "a jury must unanimously find beyond a reasonable doubt that: (1) the victim's death resulted from the defendant's intentional engagement in life-threatening activity; and (2) one or more of the aggravating factors proposed by the Government is present." *United States v. Davis*, 609 F.3d 663, 673 (5th Cir. 2010). "If the jury returns both findings, the proceeding moves to the second or 'selection' phase. Here, the jury decides whether the aggravating factors sufficiently outweigh statutory or non-statutory mitigating factors to warrant a death sentence or, absent mitigating factors, whether the aggravators alone warrant that sentence." *Id.* (internal citation omitted).

substantiate these factors, the government introduced a number of exhibits and presented several witnesses over a two-day period.

On May 12, 2010, the jury unanimously concluded that Defendants were eligible for the death penalty. That same day, the district court began the selection phase of Defendants' trial. In support of its position that Defendants' crime warranted the death penalty, the government alleged the existence of multiple non-statutory aggravating factors, including, as relevant here, that each defendant "poses a continuing and serious threat to the lives and safety of others because it is likely that he will commit criminal acts of violence in the future." On May 21, 2010, the jury unanimously selected the death penalty for both Snarr and Garcia. The district court subsequently sentenced Defendants to death in accordance with the jury's recommendation. Defendants now appeal their convictions and sentences.

## II. ANALYSIS

On appeal, Defendants raise a host of challenges, which broadly may be characterized as follows: (1) given numerous errors committed during the jury selection process, Defendants were denied their constitutional rights to an impartial jury, due process, and equal protection; (2) the district court improperly denied Defendants' request for a lesser-included-offense instruction; (3) the government presented insufficient evidence to support the jury's conclusion regarding the applicability of three aggravating factors; (4) the district court abused its discretion in denying Defendants' motion for severance; (5) the Federal Death Penalty Act ("FDPA") is unconstitutional; (6) the district court improperly excluded character evidence related to the victim; (7) the district court abused its discretion in excluding Garcia's "execution impact" evidence; and (8) this court's chief judge denied Defendants due process by overruling the district court and issuing an order partially reducing and

No. 10-40525

partially denying funds Garcia requested for the retention of certain investigators and experts. We consider each of these claims in turn.

## A. Jury Selection Challenges

Defendants assign three errors to the district court in connection with the jury selection process. First, Defendants argue that the court improperly excluded for cause five prospective jurors who expressed reservations about imposing the death penalty. Second, Defendants contend that the court erred in dismissing a venire person who indicated that he had a physical infirmity that would impair his ability to render effective jury service.[2] Finally, Defendants submit that the court improperly denied their for cause challenges to three prospective jurors.

## (1) Prospective Jurors Dismissed for Death Penalty Objections
### (a) Standard of Review

A district court's dismissal of a prospective juror for cause because of his or her views on capital punishment is reviewed for abuse of discretion. *United States v. Bernard*, 299 F.3d 467, 474 (5th Cir. 2002). "Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." *Uttecht v. Brown*, 551 U.S. 1, 9 (2007). We thus give "considerable deference" to a district court's decision to dismiss a juror based on his or her opposition to the death penalty. *United States v. Fields*, 483 F.3d 313, 357 (5th Cir. 2007).

### (b) Applicable Law

In *Witherspoon v. Illinois*, the Supreme Court held that a capital defendant's right to trial by an impartial jury is violated when a court

---

[2] Defendants actually maintain that two prospective jurors were dismissed based on their physical infirmities. As explained in further detail below, however, the court clearly dismissed one of these jurors for his views in connection with the death penalty.

No. 10-40525

universally excuses for cause all members of the venire who express conscientious objections to the death penalty.  391 U.S. 510, 521–22 (1968). Nevertheless, "[a] court may excuse a prospective juror for cause because of his views on capital punishment if those views would prevent or substantially impair the performance of his duties as a juror in accordance with the instructions and oath."  *United States v. Webster*, 162 F.3d 308, 340 (5th Cir. 1998) (citing *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)).  A prospective juror, therefore, properly is dismissed if, regardless of the facts and circumstances of a case, he indicates that he personally could not impose the death penalty.  *See Fields*, 483 F.3d at 357.  Additionally, because "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear,'" dismissal for cause is also appropriate if the court "is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law."  *Wainwright*, 469 U.S. at 425–26. Accordingly, this court repeatedly has deemed proper a lower court's dismissal for cause of a prospective juror who has wavered or given conflicting or ambiguous signals as to whether he or she could sentence a defendant to death. *See, e.g.*, *United States v. Jackson*, 549 F.3d 963, 973 (5th Cir. 2008); *Ortiz v. Quarterman*, 504 F.3d 492, 502–03 (5th Cir. 2007); *Bernard*, 299 F.3d at 474–75; *Webster*, 162 F.3d at 340–41.

### (c) Discussion

Here, each member of the venire submitted answers to a written questionnaire, after which he or she was questioned by both government and defense counsel.  Defendants argue that the district court abused its discretion in dismissing for cause five prospective jurors who expressed reservations during this process about their ability to impose capital punishment.  As discussed below, we disagree.

6

No. 10-40525

The first venire person whose dismissal Defendants contest is prospective juror number three ("Lacy"). Although Defendants acknowledge that Lacy expressed conscientious scruples against the death penalty, they argue that when questioned by defense counsel, Lacy indicated that she would follow the law and would answer questions truthfully, even if that resulted in a death sentence. Defendants also emphasize that Lacy indicated that she would "follow the evidence" and was "not going to disregard it."

Even so, Lacy answered in the affirmative when asked whether her "personal feelings against the death penalty would always prevent [her] from voting for the death penalty." Further, when asked if she thought her "feelings against the death penalty would substantially impair [her] or prevent [her] from ever voting for it regardless of what the evidence and the law instructed," she replied that they would. The court observed Lacy's demeanor and heard her testimony. That testimony revealed Lacy's consistent opposition to the death penalty and her view that, because of that opposition, she was unable to affirm that she could faithfully follow her oath as a juror. Accordingly, the district court did not abuse its discretion in excusing her. *See Jackson*, 549 F.3d at 973.

Next, Defendants submit that the court erred in dismissing prospective juror number sixty-six ("Stephenson"). In particular, Defendants contend that the sum of Stephenson's testimony was that "she did not know how she felt" about the death penalty and that she "never said she could not impose it." Defendants argue that Stephenson even stated that she could vote in favor of capital punishment "if the Holy Spirit was guiding her" to do so.

In excusing her, however, the court emphasized that throughout her questionnaire, Stephenson had indicated that she was opposed to the death penalty, that she could not impose it, and that she "thought it was God's job to put persons to death." The court correctly explained that Stephenson never affirmed that she would be able to return a verdict of death if the facts and

7

circumstances warranted it under the law.  In light of Stephenson's ambiguous responses during voir dire, and her "strange" demeanor, the district court was unable to ascertain whether—notwithstanding her opposition to the death penalty—she would be able "to  faithfully and impartially apply the law." *Wainwright*, 469 U.S. at 426.  As such, the court did not abuse its discretion in excusing her.

Defendants also allege that potential juror number 130 ("Kimball") should not have been dismissed.[3]  Kimball previously had served on a jury that imposed the death penalty, which Defendants suggest supports their conclusion that Kimball could have fulfilled his duties impartially as a juror in this case. Defendants also note that Kimball indicated that he generally favored the death penalty, and he affirmed that he "would base a decision to impose it on the facts and the law in the case."

Nevertheless, on his questionnaire, Kimball expressed in response to three separate questions that he did not think he could impose the death penalty a second time.  During individual voir dire, Kimball testified that he might not be able to vote for the death penalty even if it was called for "under the law and the facts."  He stated that imposing capital punishment in the first case for which he had served as a juror had bothered him "an awful lot," and had caused him to experience nightmares wherein he would "see the defendant's face."  When asked if he thought his "personal feelings would substantially impair [his] ability to go ahead and vote for the death penalty," Kimball replied, "I'm not really sure."  Even under questioning by defense counsel, Kimball consistently

---

[3] Defendants suggest that Kimball was dismissed both because of his reservations about imposing the death penalty, and because he had a medical condition that prevented him from hearing the events that were transpiring in court.  To be sure, the lower court did explore Kimball's hearing impairment and, at one point, stated that his disability would "substantially impair[] his ability to serve as a juror."  Nevertheless, the district court was clear that it ultimately dismissed Kimball "because of what he said about the death penalty."

indicated that he did not know whether he could impose the death penalty in a second case. Because Kimball was consistent as to the fact that his personal feelings about imposing the death penalty in this case prevented him from attesting that he would faithfully and impartially apply the law, the district court did not abuse its discretion in dismissing Kimball for cause.[4] *See Bernard*, 299 F.3d at 474–75.

Defendants next maintain that the district court erred in excusing prospective juror number 140 ("Furby"). Although Defendants acknowledge that Furby expressed doubts about her ability to impose the death penalty, they stress that she also indicated that she "would follow [her] oath and follow the law." Additionally, they note that Furby stated that she would not submit a "false answer" on verdict forms simply to avoid voting for the death penalty. Finally, Defendants emphasize that when asked whether she could follow her oath and vote for the death penalty if she "heard enough bad evidence from the government" to satisfy her that the death penalty was warranted, Furby stated that "I guess if I was put in that situation, yes."

Notwithstanding this statement, however, Furby repeatedly indicated that she did not know whether she could vote for the death penalty. Indeed, she stated that the "scariness" of capital punishment would impair her ability to vote "for the death penalty even if [she] felt like the facts justified that verdict." When eventually asked directly whether she was "going to follow [her] oath or not" and impose the death penalty if it was warranted, she stated "I'm not going to." In light of Furby's vacillations as to whether she personally could impose capital punishment, and her explicit statement that her personal feelings would

---

[4] In addition to his inability to affirm that he could adhere to his oath, Kimball also had conducted outside research about the case. The court noted that, in light of this outside investigation, it would be "inappropriate" to have Kimball serve. We agree. *See Marshall v. United States*, 360 U.S. 310 (1959).

No. 10-40525

prevent her from following her oath, the district court did not abuse its discretion in granting the government's motion to strike her for cause. *See Wainwright*, 469 U.S. at 425–26.

Finally, Defendants assert that the district court erred in dismissing for cause prospective juror number two-hundred ("Blackmon"). During voir dire, Blackmon stated to defense counsel that she had a "religious problem" with imposing capital punishment unless the case involved a child or an act of domestic violence. This generally was consistent with her questionnaire, wherein Blackmon had noted that she was against capital punishment except in cases involving "killing a child, abusing a child, child molestation, [or] killing an elderly person." Nevertheless, Defendants argue that Blackmon should not have been dismissed because she testified that she was willing to keep an open mind that there might be other cases that could warrant a death sentence. Further, Defendants also emphasize that, when questioned by defense counsel, Blackmon stated that she could vote for the death penalty if the government established the appropriateness of such a sentence.

Despite this testimony, however, Blackmon stated that although she had "waffled" when answering defense counsel's questions, she did not think she "could live with [herself] if" she voted for the death penalty in this case. When government counsel asked if he would "ever have a chance of getting a death penalty verdict from" Blackmon in cases not involving victims she had listed on her questionnaire, she replied "[p]robably not." Finally, Blackmon stated that she would not be able to follow her oath or the court's instruction if it meant imposing capital punishment in this case. Given Blackmon's position that she would not follow the oath to faithfully and impartially apply the law in this case, the district court did not abuse its discretion in dismissing her. *See Jackson*, 549 F.3d at 973–74.

**(2) Prospective Juror Dismissed for a Physical Infirmity**

No. 10-40525

Defendants also raise a host of challenges to the district court's dismissal of a prospective juror who indicated during voir dire that he had a physical infirmity that might have impeded his ability to render jury service. First, Defendants claim that the court's action in excusing this venire person was contrary to the Jury Selection and Service Act. 28 U.S.C. § 1861, *et seq.* Second, Defendants submit that the court violated the Americans with Disabilities Act ("ADA") by dismissing this juror. 42 U.S.C. § 12101, *et seq.* Finally, Defendants contend that excusing this juror violated their constitutional rights to equal protection and to have a venire drawn from a fair cross section of the community.

### (a) Standard of Review

"Determinations as to the general qualifications of jurors are reviewed for abuse of discretion." *United States v. Whitfield*, 590 F.3d 325, 360 (5th Cir. 2009). As a question of law, the applicability of the ADA is reviewed de novo. *See Jackson*, 549 F.3d at 969. Defendants' constitutional claims were not raised below and, as such, are reviewed only for plain error. *See United States v. Goldfaden*, 959 F.2d 1324, 1327–28 (5th Cir. 1992). Plain error review "requires considerable deference to the district court." *United States v. Peltier*, 505 F.3d 389, 391 (5th Cir. 2007).

### (b) Prospective Juror Number 232

On his questionnaire, prospective juror number 232 ("Horton") indicated that he took medications that caused him to use the restroom frequently. He testified that although he wished to serve as a juror, his health kept him from so doing. Horton first estimated that he needed to use the facilities roughly every sixty to ninety minutes, though he later indicated that he had done so five times during the two-and-a-half hour period he was at the courthouse. He further stated that his inability to use the restroom when needed "would be a distraction" and would impede his ability to concentrate on the proceedings. After the court informed Horton that, during trial, "it could be as much as two

11

No. 10-40525

hours at a time without a break," Horton was unable to assure the court that he could wait that long without using the facilities. He later stated that while he knew he might be required to sit for an hour or two and be "undisturbed about that . . . that's just not going to work for me." The court finally asked Horton directly if he was asking to be excused, to which Horton replied in the affirmative. The court therefore dismissed him.

### (c) The Jury Selection and Service Act

Defendants first imply that Horton's dismissal violated the Jury Selection and Service Act, which sets forth the qualifications for jury service in federal courts. 28 U.S.C. § 1865. As relevant, a person is disqualified from service under the Act's provisions if he is unable "by reason of mental or physical infirmity, to render satisfactory jury service." *Id.* at § 1865(b)(4).

"A court has broad discretion to determine whether to excuse a juror for cause" pursuant to 28 U.S.C. § 1865(b)(4). *United States v. Solomon*, 273 F.3d 1108, 2001 WL 1131955, at *3 (5th Cir. 2001) (per curiam) (unpublished). In *Solomon*, for example, we affirmed the dismissal for cause of a prospective juror who suffered from an obsessive compulsive disorder. *Id.* When asked whether his condition would interfere with his ability to focus on the proceedings, the venire person in *Solomon* had responded that there was "no way to know," although he believed that he would be able to focus "[m]ost of the time." *Id.* In affirming the district court's dismissal of the prospective juror, we stated that "[t]he court properly exercised its discretion in concluding that the prospective juror's mental condition prevented him from rendering satisfactory service." *Id.*

Other courts agree as to the propriety of dismissing prospective jurors whose infirmities would interfere with their jury service. In *United States v. Flores*, for instance, the Eleventh Circuit affirmed the dismissal for cause of a potential juror who suffered from attention deficit disorder ("ADD"). 572 F.3d 1254, 1261 (11th Cir. 2009). The defendants there had argued "that the district

12

court was required to inquire further into [the prospective juror's] medical condition to determine the severity of her ADD." *Id.* The court disagreed, explaining that because the trial was so lengthy, concerned multiple defendants, and involved numerous witnesses and exhibits, and because "ADD could interfere with a juror's ability to pay attention," "the district court acted within its sound discretion when it dismissed [the potential juror] for cause." *Id.*; *see also United States v. Powell*, 444 F. App'x 517, 519–20 (3d Cir. 2011) (unpublished) (affirming a district court's decision to grant a prospective juror's request to be excused based on the individual's hearing impairment).

Defendants do not address this authority or attempt to distinguish it from their case. Instead, they appear to focus on 28 U.S.C. § 1865(b)(2), which states that an individual is disqualified from jury service if he "is unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form." Defendants argue that "[i]t is apparent from [his] educational and work experience, as well as [his] interview[], that [Horton] could read, write and understand the English language with proficiency."

While this is true, Defendants' argument neglects that in dismissing Horton for cause, the district court acted not under subsection two of 28 U.S.C. § 1865(b), but rather under subsection four. Pursuant to subsection four, it is proper for a court to dismiss prospective jurors based on their infirmities if those infirmities render them unable to perform satisfactory service. *Id.* at § 1865(b)(4). Here, as detailed, Horton indicated that his physical infirmity could interfere with his ability to concentrate on the proceedings. This testimony was especially troubling given that, as in *Flores*, the trial here was lengthy, concerned multiple defendants, and involved numerous witnesses and exhibits. Accordingly, the district court did not violate the Jury Selection and Service Act or otherwise abuse its discretion in excusing Horton.

No. 10-40525

**(d) The ADA**

Defendants also maintain that the district court violated the ADA in excusing Horton based on his physical infirmity.  Under the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The ADA, however, applies only to "public entities," which the Act defines as "(A) any State or local government"; "(B) any department, agency, special purpose district, or other instrumentality of a State or States or local government"; and "(C) the National Railroad Passenger Corporation, and any commuter authority." *Id.* at § 12131(1).  As other courts have observed, "[n]oticeably absent from this definition is any mention of any agency or department of the federal government, other than the National Railroad Passenger Corporation." *Isle Royale Boaters Ass'n v. Norton*, 154 F. Supp. 2d 1098, 1135 (W.D. Mich. 2001) (holding that plaintiffs could not sue the National Park Service, "a unit of the federal government, for discrimination under the ADA"); *see also Calero–Cerezo v. U.S. Dep't of Justice,* 355 F.3d 6, 19 (1st Cir. 2004) ("[T]he ADA applies to private employers with over 15 employees and state and local governments."); *Melton v. Freeland*, Nos. 1:96CV516, 1:96CV517, 1997 WL 382054, at \*1 (M.D.N.C. Feb. 6, 1997) (unpublished) (explaining that the ADA does not apply to federal courts because they are not public entities under the Act).

Defendants point to no federal case in which the dismissal of a juror has been successfully challenged under the ADA, nor have we discovered such a case. We therefore reject Defendants' claim that the district court violated the ADA in dismissing Horton due to his physical infirmity.

**(e) Defendants' Constitutional Challenges**

14

No. 10-40525

Defendants next claim that by dismissing Horton, the district court abridged Defendants' right to have a venire drawn from a fair cross section of the community—as guaranteed by the Sixth Amendment—and violated the Equal Protection Clause of the Fourteenth Amendment.  As noted earlier, because Defendants did not raise this claim below, they are entitled only to plain-error review.  Under plain-error review, a defendant "must establish: (1) an error; (2) that is clear and obvious; and (3) that affected his substantial rights."  *United States v. Hernandez–Martinez*, 485 F.3d 270, 273 (5th Cir. 2007).  "If these conditions are met, this court can exercise its discretion to notice the forfeited error only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *Id.* (citation omitted).

### (i)  Applicable Law

"The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community."  *Berghuis v. Smith*, 130 S. Ct. 1382, 1388 (2010).  To establish a prima facie violation of this right, a defendant must demonstrate:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979).  Similarly, in *Castaneda v. Partida*, the Supreme Court delineated the general contours of an equal protection challenge to jury selection.  430 U.S. 482, 494 (1977).  There, the Court explained:

> The first step is to establish that the group is one that is a recognizable, distinct class . . . .  Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as . . . jurors, over a significant period of time. . . . Finally, . . . a

15

selection procedure that is susceptible of abuse . . . supports the presumption of discrimination raised by the statistical showing.

*Id.* (internal citations omitted); *see also McGinnis v. Johnson*, 181 F.3d 686, 691 (5th Cir. 1999). Thus, to prevail under either theory, a defendant must demonstrate not only that the excluded persons are members of a distinctive class, but also that the class is disproportionally underrepresented due to procedures in the jury selection process that work to exclude class members.

*Duren* provides a roadmap as to how a petitioner might make such a showing.[5] There, the petitioner alleged a Sixth Amendment violation based on the lack of females in his jury pool. *Duren*, 439 U.S. at 360. In explaining that the petitioner had successfully demonstrated a prima facie violation, the Court first stated that prior precedent "without doubt established that women 'are sufficiently numerous and distinct from men' so that 'if they are systematically eliminated from jury panels, the Sixth Amendment's fair-cross-section requirement cannot be satisfied.'" *Id.* at 364 (quoting *Taylor v. Louisiana*, 419 U.S. 522, 531 (1975)). Next, the petitioner's "statistical presentation" evidenced "a gross discrepancy between the percentage of women in jury venires and the percentage of women in the community." *Id.* at 364, 366. Finally, to establish the systematic nature of that underrepresentation, the petitioner had pointed, *inter alia*, to provisions of Missouri's law that granted women automatic exemptions from jury service. *Id.* at 366–67. Given the "statistics and other evidence" presented by the petitioner, the Court held that he had demonstrated a prima facie fair-cross-section violation. *Id.* at 366, 367.

### (ii) Analysis

---

[5] Although *Duren* involved a claim based on the Sixth Amendment and not the Equal Protection Clause, "the equal protection analysis employs a prima facie case test virtually identical to the one used in the fair cross-section analysis." *Bowen v. Kemp*, 769 F.2d 672, 683 (11th Cir. 1985). Indeed, the Supreme Court's analysis in *Duren* largely mirrors that undertaken by the *Castaneda* Court. *Compare Duren*, 439 U.S. at 360–67, *with Castaneda*, 430 U.S. at 495–99.

No. 10-40525

In contrast to the showing made in *Duren*, Defendants here have done nothing more than advance conclusory statements to the effect that "the exclusion from the venire panel of [Horton] established a *prima facie* violation of both the fair cross-section requirement of the Sixth Amendment and the Equal Protection Clause of the Fourteenth Amendment." Defendants provide no supporting authority for their assertion that individuals who need to urinate frequently are a "distinct" class. By extension, Defendants provide no statistical data as to the representation of this supposed class on venires, or in the community at large. They therefore fail to demonstrate any degree of underrepresentation of this group and, relatedly, advance no argument supporting their implicit assumption that the individuals in this group have been underrepresented due to their purposeful or systemic exclusion during the jury selection process. In sum, Defendants simply have not established error, plain or otherwise, in connection with the exclusion of Horton.

**(3) Denial of Defendants' For Cause Challenges**

Defendants next assert that the district court erred in refusing to grant their challenges for cause to three prospective jurors, which they contend violated their right to an impartial jury.

**(a) Standard of Review**

"The appellate court reviews the district court's ruling on jury impartiality for 'manifest abuse of discretion.'" *United States v. Wharton*, 320 F.3d 526, 535 (5th Cir. 2003) (quoting *United States v. Munoz*, 15 F.3d 395, 397 (5th Cir.1994)); *see also Skilling v. United States*, 130 S. Ct. 2896, 2923 (2010) ("A trial court's findings of juror impartiality may be overturned only for manifest error.") (citation omitted). "In reviewing claims of this type, the deference due to district courts is at its pinnacle . . . ." *Skilling*, 130 S. Ct. at 2923.

**(b) Applicable Law**

17

No. 10-40525

As noted above, the general "standard for determining when a venire member may be excluded for cause is whether the prospective 'juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Soria v. Johnson*, 207 F.3d 232, 242 (5th Cir. 2000) (quoting *Wainwright*, 469 U.S. at 424). In addressing a claim that an empaneled jury was not impartial, however, the inquiry turns not on the district court's alleged failure to remove for cause certain prospective jurors, but rather on whether the jurors who ultimately sat were impartial. *Ross v. Oklahoma*, 487 U.S. 81, 86 (1988). In other words, "[a] district court's erroneous refusal to grant a defendant's challenge for cause is only grounds for reversal if the defendant establishes that the jury which actually sat to decide his guilt or innocence was not impartial." *Wharton*, 320 F.3d at 535.

The reasoning behind this approach is that peremptory challenges—which simply "are a means to achieve the end of an impartial jury"—often cure errors purportedly committed when trial courts refuse to grant challenges for cause. *Ross*, 487 U.S. at 88. Because "peremptory challenges are not of constitutional dimension . . . . the fact that the defendant had to use a peremptory challenge to achieve [an impartial jury] does not mean the Sixth Amendment was violated." *Id.* Indeed, the Supreme Court expressly has held that "a defendant's exercise of peremptory challenges . . . is not denied or impaired when the defendant chooses to use a peremptory challenge to remove a juror who should have been excused for cause." *United States v. Martinez–Salazar*, 528 U.S. 304, 317 (2000).

**(c) Discussion**

Here, Defendants were entitled to twenty peremptory challenges. Fed. R. Crim. P. 24(b)(1). Because Defendants were scheduled to be tried jointly, the district court inquired of defense counsel prior to trial as to whether Defendants would require additional challenges. Ultimately, the court granted Defendants

ten additional peremptory challenges for Defendants to divide as they wished.[6] Following voir dire, Defendants moved for "one or more" additional peremptory challenges and urged the district court to reconsider its allegedly erroneous denial of Defendants' challenge for cause to seven prospective jurors. Included in the group of venire members Defendants had unsuccessfully challenged for cause were prospective jurors 17, 132, and 184. Defendants argued that if they were not granted additional challenges, they would be forced to lodge peremptory challenges against these individuals, and therefore would be "unable to remove other objectionable jurors who were not necessarily disqualified as a matter of law but who were nonetheless unable to be fair and impartial jurors in the judgment of defendants." Listed amongst the latter venire members was prospective juror number 129, who ultimately was empaneled.

On appeal, Defendants essentially maintain that they were denied the right to an impartial jury because they could not exercise a peremptory challenge against prospective juror number 129, since they had partially exhausted their challenges on venire persons 17, 132, and 184, whom they argue should have been dismissed for cause.

### (d)   Defendants' Argument Fails Under *Wharton*

Although the parties vigorously disagree about whether prospective jurors 17, 132, and 184 should have been excused for cause, because Defendants ultimately exercised peremptory challenges to remove these venire persons, this disagreement is irrelevant under *Wharton*. There, a defendant appealed the lower court's denial of his challenge for cause to a venire person the defendant claimed was biased. *Wharton*, 320 F.3d at 535. Although the defendant eventually had used a peremptory challenge to exclude the allegedly biased

---

[6] This is expressly permitted by Rule 24(b), which states that "[t]he court may allow additional peremptory challenges to multiple defendants, and may allow the defendants to exercise those challenges separately or jointly." Fed. R. Crim. P. 24(b).

prospective juror, he argued on appeal that this precluded him from using the challenge to exclude from the jury another individual he otherwise would have challenged. *Id.* Relying on *Martinez–Salazar*, the *Wharton* court held that "[a] district court's erroneous refusal to grant a defendant's challenge for cause is only grounds for reversal if the defendant establishes that the jury which actually sat to decide his guilt or innocence was not impartial." *Id.*; *see also Martinez–Salazar*, 528 U.S. at 307 (holding that if a defendant elects to cure the erroneous refusal to dismiss a potential juror for cause "by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been deprived of any rule-based or constitutional right"). Because the defendant had not shown that the empaneled jury was biased, the *Wharton* court rejected the defendant's argument. 320 F.3d at 536.

Thus, even assuming that prospective jurors 17, 132, and 184 should have been dismissed for cause, Defendants still must establish that the seated jury was not impartial. On this score, Defendants point only to prospective juror 129 ("Godkin"), who eventually was selected for the jury. On her questionnaire, Godkin placed her feelings as to the propriety of the death penalty at seven on a ten-point scale (where one indicated that the prospective juror felt capital punishment was always improper). When probed about this, Godkin explained that she arrived at seven given her belief that "life is very precious" and that a "person who takes that life is responsible and should be punished." She stated, however, that she could comply with the law and the judge's instruction about imposing capital punishment, and she affirmed that she did not "have any problem with the fact that it is the government's burden to prove the death penalty is justified." Godkin also acknowledged that, depending on the circumstances of a case—including evidence as to any mitigating and aggravating factors—either the death penalty or a life sentence may be appropriate for "[p]lanned and deliberate murder."

No. 10-40525

Nevertheless, Defendants argue that had they not been required to exhaust their peremptory strikes on prospective jurors who purportedly should have been dismissed for cause, they would have used one on Godkin. Aside from her "leanings in favor of the death penalty," Defendants also emphasize that Godkin had relatives in law enforcement and was acquainted with a crime victim and perpetrator.[7] Defendants neglect, however, the incidental nature of these connections, and ignore that Godkin expressly testified that these experiences would not impact her ability to be fair and impartial.[8] Indeed, Defendants admit that Godkin "was not subject to a challenge for cause." Simply put, despite Defendants' contention to the contrary, there is nothing in the record to suggest that Godkin was not impartial.

Because Defendants point to no other evidence that the jury was not impartial, *Wharton* compels us to conclude that Defendants have not established that the district court erred in refusing to excuse for cause prospective jurors 17, 132, and 184.[9] *See* 320 F.3d at 535–36.

---

[7] Godkin stated that her brother and nephew worked as security guards. She replied, however, that she did not believe their occupation would impact her ability to be a fair juror in this case.

[8] Godkin explained that a friend's brother had been killed in a drive-by shooting and her husband's cousin had been convicted of rape. She was unaware, however, of many details surrounding these occurrences and, in any event, affirmed that "neither of these circumstances [had] any impact . . . on [her] ability to be fair and impartial."

[9] Defendants also assert that *Martinez–Salazar* left open the question of "whether it is reversible error to refuse to afford a defendant a peremptory challenge beyond the maximum otherwise allowed, when he has used a peremptory challenge to cure an erroneous denial of a challenge for cause and when he shows that he would otherwise [have] use[d] his full complement of peremptory challenges for the noncurative purposes that are the focus of the peremptory right." 528 U.S. at 317–18 (Souter, J. concurring). Defendants ignore that the language they rely on emanates not from the majority opinion, but from Justice Souter's concurrence. Moreover, even that authority is inapposite, as Justice Souter's proposed scenario involves a situation, unlike the one here, in which a court refuses to grant a defendant additional peremptory challenges beyond the maximum afforded by Rule 24. Finally, regardless of any relevant "open question" remaining after *Martinez–Salazar*, *Wharton* itself is squarely on point, and Defendants do not argue otherwise.

21

## B.  Lesser-Included-Offense Instruction

At trial, the district court denied Defendants' request for an instruction on second degree murder, manslaughter, and involuntary manslaughter as lesser included offenses of first degree murder.   Defendants now appeal the denial of an instruction on second degree murder.

### (1) Standard of Review

We review de novo the district court's determination of whether a particular offense is a lesser included offense of a charged offense.  *United States v. Finley*, 477 F.3d 250, 256 (5th Cir. 2007).  We review for abuse of discretion the lower court's determination as to "whether a jury could rationally acquit on the greater offense yet convict on the lesser."  *Id.*

### (2) Applicable Law

A defendant is only entitled to a lesser-included-offense instruction if "(1) the elements of the lesser offense are a subset of the elements of the charged offense and (2) the evidence at trial is such that a jury could rationally find the defendant guilty of the lesser offense yet acquit him of the greater."  *Id.* at 255; *see also Keeble v. United States*, 412 U.S. 205, 208 (1973) (noting that a "defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater").  "While a defendant's request for a lesser included offense charge should be freely granted, there must be a rational basis for the lesser charge and it cannot serve merely as 'a device for defendant to invoke the mercy-dispensing prerogative of the jury.'" *United States v. Collins*, 690 F.2d 431, 438 (5th Cir. 1982) (quoting *United States v. Sinclair*, 444 F.2d 888, 890 (D.C. Cir. 1971)), *cert. denied*, 460 U.S. 1046 (1983).

As relevant, the murder statute at issue here provides:

Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or

any other kind of willful, deliberate, malicious, and premeditated killing . . . is murder in the first degree.

Any other murder is murder in the second degree.

18 U.S.C. § 1111(a). We previously have stated that "[a] killing is 'premeditated' when it is the result of planning or deliberation. The amount of time needed for premeditation of a killing depends on the person and the circumstances. It must be long enough for the killer, after forming the intent to kill, to be fully conscious of that intent." *United States v. Agofsky*, 516 F.3d 280, 282 n.2 (5th Cir. 2008) (citation omitted).

### (3) Discussion

The question of whether the elements of second degree murder are a subset of the elements of first degree murder is not in dispute. Rather, the parties disagree as to whether the district court erred in holding that the evidence was not such that a juror could rationally find Defendants guilty only of second degree murder and acquit them of first degree murder. Defendants advance two primary claims in arguing that the district court erred in so holding. First, they assert that the court's ruling conflicts with *Beck v. Alabama*, 447 U.S. 625 (1980). Second, they contend that "[t]he jury should have been instructed on second-degree murder because the evidence of premeditation was insufficient and hotly disputed." For the reasons set forth below, we reject Defendants' arguments.

### (a) *Beck v. Alabama*

In *Beck*, the Supreme Court struck down an Alabama statute, "unique in American criminal law," that prohibited capital defendants from submitting lesser-included-offense instructions. *Id.* at 635. In explaining its reasoning, the Court stated that "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the

No. 10-40525

failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction." *Id.* at 637. The Court thus held that Alabama was "constitutionally prohibited" from statutorily precluding a lesser-included-offense instruction in capital cases. *Id.* at 638.

Relying on *Beck*, Defendants argue that the district court violated their "rights to due process" by denying their request for an instruction on second degree murder. In pressing this argument, however, Defendants overread *Beck*. Nothing in the Court's opinion suggests that district courts are constitutionally compelled to give lesser-included-offense instructions where they are not supported by the evidence. Indeed, *Beck* repeatedly indicates that lesser-included-offense instructions are proper only where the evidence warrants them. *Id.* at 635 n.11, 636 & n.12. This reading of *Beck* is confirmed by subsequent caselaw. *See Schad v. Arizona*, 501 U.S. 624, 648 (1991) (suggesting that *Beck* would not "be satisfied by instructing the jury on just any lesser included offense, even one without any support in the evidence"); *Schmuck v. United States*, 489 U.S. 705, 716 n.8 (1989) (stating that a lesser-included-offense instruction is appropriate only where the evidence at trial is "such that a jury could rationally find the defendant guilty of the lesser offense, yet acquit him of the greater").

Accordingly, to the extent Defendants argue that a lesser-included-offense instruction was constitutionally *required* under *Beck*—even absent evidentiary support for one—we reject their argument.

### (b) Evidence of Premeditation

Defendants next take issue with the district court's conclusion that the evidence that Rhone's murder was premeditated would not have allowed the jury rationally to find them guilty of second degree murder, yet acquit them of first degree murder. The primary thrust of Defendants' argument is that Rhone—an

24

individual they characterize as "a troubled, disliked and mentally disturbed inmate"—was murdered in a fit of "spontaneous violence without premeditation." They emphasize that Rhone allegedly had threatened to kill Defendants the night before the murder, and that they would not have had the opportunity to commit their crime if prison officials had followed proper procedures.

Defendants neglect, however, the extensive evidence the government presented regarding premeditation. This evidence established that both Snarr and Garcia were classified as "single-cell" inmates who were housed in the prison's special housing unit ("SHU") while awaiting transfer to the federal administrative maximum security prison ("ADX") in Florence, Colorado. As such, neither defendant had a cellmate, and each spent his allotted recreation period—one hour per day—alone in an outdoor "recreation cage." Defendants also were classified as "three-man hold" inmates, meaning that they were required to be escorted by three correctional officers when out of their cells, and could not be moved while other inmates were in the same hallway.

On the day of Rhone's murder, the situation in the SHU was not normal. The unit was short-staffed, there had been an altercation in one of the cells, fire alarms were sounding, and one area of the prison was flooding. In the midst of this chaos, four officers began escorting prisoners from recreation cages back to their cells. However, two inmates—both of whom were incarcerated in cells near Defendants—refused to leave their recreation cages.[10] Accordingly, the officers decided to remove compliant inmates, including Defendants, first.

As officers handcuffed Garcia to escort him back to his cell, Snarr began shouting that he needed to use the restroom. In the interest of clearing the recreation cages of all compliant inmates, and to accommodate Snarr's need to

---

[10] The evidence indicated that one of these inmates, Frankie Delacruz, was in the same prison gang as Garcia, suggesting that he was acting in concert with Defendants.

use the restroom, officers decided to remove him too.  Officer Baloney, who was unaware that Garcia was on three-man hold status, began moving Garcia without assistance, while two other officers began moving Snarr.  This confluence of events, which the government argued had been orchestrated to create chaos and divert the staff's attention, set the stage for Rhone's murder.[11]

Beyond introducing testimony supporting the theory that these events were "inmate manipulated" and designed to exploit the guards' weaknesses, the government presented other evidence of premeditation.  In particular, one inmate testified that, on the day of the murder, he had supplied Snarr with at least one shank, and perhaps two.  This same inmate testified to circumstances suggesting that Garcia may have been trying to obtain a mechanical pencil, the parts of which can be used to open handcuffs.  Other witnesses similarly testified as to the planning required merely to obtain weapons in prison.

Witnesses also explained that Defendants were angry at Rhone for what they deemed to be Rhone's "disrespectful" behavior.  Corrections officer Dawn Gallagher testified, for example, that prior to the murder Rhone had exposed his penis to her and ejaculated on her shoe.  Defendants expressed to her that they were "very upset" and offended by Rhone's behavior.  Another witness testified that before the murder, he had heard Rhone yell, "Whoever ain't Muslim on this tier can suck my dick," and another witness testified to hearing one of the defendants say to Rhone during the murder, "You want us to suck your dick." After the murder, Snarr told another inmate that he killed Rhone because Rhone had cursed at him and made too much noise in his cell.  Similarly, after describing Rhone's "disrespectful" behavior, Garcia told a different inmate that,

---

[11] One witness testified that Garcia told him that he and Snarr had "jacked the rec cage" to assure they could carry out the murder.  Other witnesses testified to the general ability of inmates to exploit or precipitate the conditions that enabled Defendants to carry out their attack.

while Rhone "would just talk and talk and talk," Garcia was "sharpening [his] knife" in preparation for the murder.

Finally, the government introduced other statements Defendants made that suggested the crime had been planned. While Snarr struggled to open Rhone's cell door, for example, Garcia shouted either "I'm going to kill you," or "We going to kill you." Shortly after the murder, either Snarr or Garcia yelled, "That's how you get your enemy," and Snarr exclaimed, "Dude disrespected us, and that's what he got." Finally, an agent who investigated the murder testified that Defendants implicitly admitted to planning the murder by stating to him that they did not "intend to get the staff," and that "[i]t wasn't supposed to happen that way with the staff."

**(4) Conclusion**

Simply put, the evidence overwhelmingly demonstrates premeditation.[12] In view of this evidence, a jury could not rationally have found Defendants guilty of second degree murder, while acquitting them of first degree murder. Accordingly, the district court did not abuse its discretion in denying Defendants' request for a lesser-included-offense instruction.

## C. Sufficiency of the Evidence

At the conclusion of the eligibility phase of the trial, the district court instructed the jury on several aggravating factors. Defendants allege that the evidence was insufficient to support the jury's findings as to two: (1) that the murder involved "substantial premeditation and planning," and (2) that it was committed in an "especially heinous, cruel, and depraved manner."[13] Defendants

---

[12] Defendants' arguments painting Rhone as a troublemaker who threatened them *demonstrates* rather than *disproves* premeditation, insofar as it supplies an additional motive for the murder.

[13] As discussed below, each of these is a statutory aggravating factor set forth in 18 U.S.C. § 3592(c).

likewise allege that the evidence was insufficient to support the jury's finding as to the non-statutory aggravating factor that Snarr and Garcia pose a threat of future dangerousness.

### (1) Standard of Review

This court reviews "jury findings of aggravating factors by asking whether, after viewing the evidence in a light most favorable to the government, any rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt." *Bernard*, 299 F.3d at 481.

### (2) Substantial Premeditation and Planning

#### (a) Applicable Law

As noted, the government alleged that Defendants murdered Rhone "after substantial planning and premeditation"—an aggravating factor under 18 U.S.C. § 3592(c)(9). In *United States v. Flores*, we observed that the term "substantial," as used in 18 U.S.C. § 3592(c)(9), "denote[s] a thing of high magnitude." 63 F.3d 1342, 1373–74 (5th Cir. 1995). Elsewhere, we have held that "substantial planning" thus may properly be "defined as requiring a considerable amount of planning preceding the killing." *Davis*, 609 F.3d at 690 (internal quotation marks omitted). And, as previously explained, "[a] killing is 'premeditated' when it is the result of planning or deliberation. The amount of time needed for premeditation of a killing depends on the person and the circumstances. It must be long enough for the killer, after forming the intent to kill, to be fully conscious of that intent." *Agofsky*, 516 F.3d at 282 n.2 (citation omitted).

#### (b) Discussion

We already have discussed above the evidence the government presented in connection with this aggravating factor. Defendants advance no new arguments in the context of this challenge, but instead continue to maintain that the murder was a crime of coincidence, precipitated by events over which they had no control. Given the overwhelming nature of the government's evidence,

No. 10-40525

however, a rational juror easily could have concluded that Defendants murdered Rhone after substantial planning and premeditation. We therefore reject Defendants' contention to the contrary.

### (3) Especially Heinous, Cruel, or Depraved Murder

#### (a) Applicable Law

Under 18 U.S.C. § 3592(c)(6), the government also alleged that Defendants murdered Rhone "in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse." "As indicated by the statute, a murder may be especially heinous, cruel, or depraved if it involves either torture or serious physical abuse." *United Stated v. Agofsky*, 458 F.3d 369, 374 (5th Cir. 2006). Because the government does not assert that Rhone was tortured, the question here is reduced to whether there was sufficient evidence to support the jury's conclusion that the murder involved "serious physical abuse."

In *Agofsky*, we held that "[f]or serious physical abuse to be aggravating in a murder case, a defendant must inflict suffering or mutilation above and beyond that necessary to cause death. Furthermore, a defendant must *intend* such gratuitous violence for the murder to involve serious physical abuse." *Id.* (emphasis added) (internal citation omitted). The *Agofsky* court held that these conditions had been satisfied in that case, as the defendant there repeatedly had stomped on the victim's face and neck even after the victim lost consciousness. *Id.* Beyond presenting eyewitness accounts of the attack, the government also had introduced evidence that the "assault was so violent that it splattered [the victim's] blood and other bodily fluids on the floor and wall." *Id.* at 375. Additionally, the medical evidence adduced at trial revealed the extensive nature of the victim's injuries. *Id.* The court found the totality of this evidence supported the conclusion that "a rational jury could find beyond a reasonable doubt that [the defendant] intended to inflict (and in fact inflicted) more abuse than necessary to cause [the victim's] death." *Id.* at 374.

29

No. 10-40525

Similarly, in *United States v. Ebron*, we held that the evidence in that case supported the determination that "a rational trier of fact could have concluded, beyond a reasonable doubt, that serious physical abuse was involved in [the victim's] murder." 683 F.3d 105, 151 (5th Cir. 2012). As here, *Ebron* involved the murder of an inmate who had been stabbed to death in prison. *Id.* At trial, the government had established that the victim "was stabbed 106 times by a sharp, round instrument in an eight-inch by four-inch area over his heart, left lung, and liver." *Id.* The court explained that, based on this evidence, a rational "trier of fact could have determined that the mutilation of [the victim's] body went above and beyond what [was] necessary to cause death." *Id.* Additionally, the court concluded that, given "the number of stab wounds," as well as the testimony indicating "that the assault appeared to have been a message to the rest of the inmate population," "a rational trier of fact could have also concluded that [the defendant] specifically intended that [the victim] be subjected to serious physical abuse." *Id.*

### (b) Discussion

Here, the government introduced extensive evidence to establish that Rhone's murder involved serious physical abuse that Defendants intended to inflict. First, jurors saw a video of the crime, which shows Defendants savagely killing Rhone. Jurors also heard from a prison official who stated that, during the attack, he tried to persuade Defendants "to stop the assault" on Rhone by telling them, "Look, he's dead. He's dead. The guy is dead. Get off of him." Defendants responded by smirking and continuing their attack, which the witness described as "frenzied." A rational trier of fact could have concluded from this that Defendants intended to subject Rhone to serious physical abuse.

The jury also viewed photographs taken shortly after the attack that showed Rhone's blood pooled on the prison's floor and running down its walls. Moreover, they heard evidence about the state of Rhone's body after the attack.

30

No. 10-40525

For example, one inmate who saw Rhone's corpse described it as "a human being that was no longer a human" because Rhone's whole "body was a stab wound" and "[h]e was pulp." Further, the forensic pathologist who performed Rhone's autopsy testified that Defendants had inflicted fifty stab wounds to Rhone's head and upper body: eighteen to his front side, and thirty-two to his back. The pathologist also stated that Rhone sustained numerous other lacerations, abrasions, and trail wounds that were not sufficiently deep to constitute stab wounds. Although the pathologist testified that the stab wound to Rhone's heart was the ultimate cause of death, he explained that several of his wounds could have been fatal, suggesting that the assault had been gratuitous.

We thus observe that many of the facts here are analogous to those presented in *Agofsky* and *Ebron*: the attack was so violent that it splattered Rhone's blood on the floor and walls, Rhone suffered extensive injuries, and Rhone was stabbed multiple times beyond that necessary to precipitate death. Defendants do not appear to contest these facts, but instead argue that the rapidity with which the murder was carried out demonstrates a lack of intent to inflict physical abuse separate and apart from the murder itself. Nevertheless, we already have rejected elsewhere the notion that the alleged brevity of an attack precludes a finding that it was committed in an especially heinous, cruel, or depraved manner. *Agofsky*, 458 F.3d at 375 ("[V]iolence need not be protracted to be gratuitous.").

In sum, based on the evidence presented at trial, a rational juror could have concluded that Defendants intended to inflict, and in fact did inflict, greater abuse than that necessary to cause Rhone's death.

### (4) Future Dangerousness

#### (a) Applicable Law

Although 18 U.S.C. § 3592(c) sets forth several statutory aggravating factors that a jury may consider when contemplating the propriety of the death

penalty, the statute also permits the jury to "consider whether any other aggravating factor for which notice has been given exists."  Here, the government provided notice as to the non-statutory aggravating factor of future dangerousness.  In particular, the government alleged that Defendants pose "a continuing and serious threat to the lives of others because it is likely that [they] will commit criminal acts of violence in the future."  Where the alternative to the death penalty is life imprisonment, the government "is free to argue that the defendant will pose a danger to others in prison and that executing him is the only means of eliminating the threat to the safety of other inmates or prison staff." *Simmons v. South Carolina*, 512 U.S. 154, 165 n.5 (1994).

Under 18 U.S.C. § 3593(c), the presentation of evidence is not limited by "the rules governing admission of evidence at criminal trials."  Evidence of future dangerousness necessarily touches upon a variety of topics, including a defendant's juvenile record, prior murders and other crimes, and prison records. *See Fields*, 483 F.3d at 324–25; *United States v. Bourgeois*, 423 F.3d 501, 511–12 (5th Cir. 2005). "What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine." *Jurek v. Texas*, 428 U.S. 262, 276 (1976).

### (b) Discussion

At trial, the government argued that Snarr would be a future threat to the safety of others based on his continuing pattern of violence and institutional misconduct, lack of remorse, low likelihood of rehabilitation, and membership in a racist gang.  The government's evidence on this front included that: two of Snarr's fifteen juvenile felonies were "life endangering"; on numerous occasions, Snarr had stabbed or beaten fellow inmates—crimes often motivated by Snarr's membership in a racist prison gang; Snarr twice had been caught with weapons in the Beaumont prison; immediately after Rhone's murder, Snarr and Garcia had acted in a celebratory manner, "almost like . . . a bunch of guys that just won

a softball game"; and Snarr had indicated to a fellow inmate that he "had no intention of getting out [of prison], that this was his life, this is what he did, this is what he lives for."

As to Garcia, the government argued that he would be a future threat to the safety of others based on his continuing pattern of violence and institutional misconduct, lack of remorse, low likelihood of rehabilitation, and membership in a racist gang. The government's evidence on this front included testimony that: before entering prison, Garcia participated in a drive-by shooting and allegedly murdered a man named Jacob Ponce;[14] Garcia had stabbed or beaten fellow inmates on numerous occasions, often in connection with his membership in a violent prison gang; prison officials twice had caught Garcia with weapons; Garcia gloated about or celebrated the murders of Ponce and Rhone; and he had made numerous statements to fellow inmates indicating his lack of remorse and unlikely rehabilitation.

In arguing that this evidence was insufficient to allow the jury rationally to conclude that they posed a threat of future dangerousness, Defendants primarily rely on the testimony of a prison consultant and former warden named Mark Bezy. Bezy testified that Defendants would likely be moved to the ADX prison—"the most secure facility the Bureau [of Prisons] has"—which essentially would preclude them, he contended, from engaging in further dangerous activity. Whatever impact Bezy's testimony had, however, was undercut by a government rebuttal witness named Greg Hershberger, who previously served as the warden at the ADX. Hershberger explained that the goal of the ADX is to prepare inmates to function in the general population of another prison facility. Hershberger further testified that based on their histories, Defendants likely

---

[14] We note that Garcia apparently was never charged with this murder.

could successfully complete the ADX's transition program and be moved to the general population of another facility.

Accordingly, based on Hershberger's testimony, the extensive evidence as to Defendants' pattern of violence and institutional misconduct, and Defendants' attack in this case on Rhone and the Beaumont penitentiary's correctional officers, a rational juror could have concluded that Defendants pose a future threat to the safety of other inmates or prison staff.

## D. Motion to Sever

Prior to trial, the district court denied Defendants' motion to sever. Defendants appeal that ruling, arguing that it is "likely that [they] would have been acquitted or not received the death penalty had each been tried separately."

### (1) Standard of Review

"There is a preference in the federal system for joint trials of defendants who are indicted together."[15] *Zafiro v. United States*, 506 U.S. 534, 537 (1993). We therefore review a grant or denial of severance for abuse of discretion. *United States v. Lewis*, 476 F.3d 369, 383 (5th Cir. 2007).

### (2) Applicable Law

Under Rule 14, "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14. Rule 14, however, "does not *require* severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro*, 506 U.S. at 538–39 (emphasis added). "[A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a

---

[15] Defendants suggest that this preference does not apply in capital cases. However, as we previously have explained, "the Federal Death Penalty Act contains no special rules regarding joinder of codefendants." *Bernard*, 299 F.3d at 475 n.5.

specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *United States v. Owens*, 683 F.3d 93, 98 (5th Cir. 2012) (quoting *Zafiro*, 506 U.S. at 539).

To establish that the district court abused its discretion in denying a motion to sever, a "defendant must show that: (1) the joint trial prejudiced him to such an extent that the district court could not provide adequate protection; and (2) the prejudice outweighed the government's interest in economy of judicial administration." *Id.* (citation omitted). Because this court is reluctant to vacate a conviction based on a district court's refusal to sever a trial, general claims of prejudice are insufficient to trigger reversal. *See Lewis*, 476 F.3d at 384. Rather, a "defendant must 'isolate events occurring in the course of the trial and then . . . demonstrate that such events caused substantial prejudice.'" *Id.* (alteration in original) (quoting *United States v. Booker*, 334 F.3d 406, 415 (5th Cir. 2003)). "The defendant also must show that the district court's instructions to the jury did not adequately protect him or her from any prejudice resulting from the joint trial." *Owens*, 683 F.3d at 98; *see also United States v. Erwin*, 793 F.2d 656, 665 (5th Cir. 1986) ("[C]ompelling prejudice is not shown if it appears that, through use of cautionary instructions, the jury could reasonably separate the evidence and render impartial verdicts as to each defendant.").

**(3) Discussion**

In asserting that they were improperly denied separate trials, Defendants raise three specific allegations of error. First, Snarr and Garcia each maintain that his co-defendant would have offered beneficial testimony on his behalf had the two not been tried together. Second, each defendant contends that certain evidence presented against his co-defendant prejudiced him by causing a "spillover" effect that essentially caused the jury to impute the other's guilt upon him. Finally, Defendants complain that the district court's jury instructions did

not overcome the prejudice that purportedly resulted from the spillover of evidence.

### (a) Co-Defendant Testimony

Defendants urge that their joint trial prejudiced them in that it precluded Snarr from testifying on Garcia's behalf, and vice versa. To obtain a severance based on the desire to have a co-defendant testify in his defense, a defendant must establish: (1) a bona fide need for the co-defendant's testimony; (2) the substance of the testimony; (3) the exculpatory effect of the testimony; and (4) that the co-defendant actually would testify if the trial were severed. *Owens*, 683 F.3d at 99. In *Owens*, we explained that the final prong of this test is not satisfied merely with "[a] statement from a defendant's attorney . . . that the defendant's co-defendant would be willing to testify," or with statements from the attorney regarding "the substance of such testimony." *Id.* at 100. Rather, a defendant must present an affidavit from the co-defendant, or some other "similar proof." *Id.* at 99.

Here, neither Snarr nor Garcia has satisfied his burden of establishing error, for neither has offered legally sufficient proof that the other would have testified had the trial been severed. The only support Defendants point to is their attorneys' statements that they would have done so. As explained, this is insufficient to demonstrate that a motion to sever should have been granted.[16] *Id.*

### (b) "Spillover" Effect

Next, each defendant contends that certain evidence presented against his co-defendant prejudiced him by causing a "spillover" effect whereby the jury imputed one defendant's guilt upon the other. In particular, Snarr alleges that

---

[16] Because neither Snarr nor Garcia has demonstrated that his co-defendant would have testified if the trial had been severed, we need not reach the other three prongs set forth in *Owens*. 683 F.3d at 99.

evidence about Garcia's previous criminal history—specifically testimony pertaining to the murder of Jacob Ponce—prejudiced the jury against him. Similarly, Garcia argues that evidence as to Snarr's extensive criminal history, membership in a prison gang, and prison misconduct prejudiced Garcia's right to a fair trial and to be sentenced based on his own conduct rather than Snarr's.

"A spillover effect, by itself, is an insufficient predicate for a motion to sever." *United States v. Bieganowski*, 313 F.3d 264, 287 (5th Cir. 2002). Moreover, contrary to Defendants' implication, the trial in this case was carefully structured to prevent a spillover effect.  During the eligibility phase, for example, the government did not introduce any individual evidence against Garcia until after it completed presentation of its evidence against Snarr.[17] Likewise, during the selection phase, the government did not present any evidence against Garcia until after it introduced all evidence against Snarr. With the exception of one joint witness, Defendants also presented their mitigating evidence separately.

Notwithstanding Defendants' assertions, this careful structuring maintained a distinction between each defendant.  Furthermore, Defendants' assertions also fail factually.  Although Garcia's alleged murder of Ponce certainly was compelling evidence against him, the jury had ample evidence to convict and sentence Snarr for his own criminal conduct.  Similarly, while Garcia's history of violence was not as extensive as Snarr's, the weight of the evidence against him made it unnecessary for the jury to impute Snarr's misdeeds upon Garcia.

In sum, given the careful manner by which the district court conducted the trial, the possibility of spillover was remote.  Each defendant's criminal history

---

[17] After the government separately introduced all individual evidence related to each defendant, two witnesses whose testimony concerned both defendants were called.

justified the jury's conclusion that his individual actions warranted the death penalty.

### (c) Jury Instructions

Finally, Defendants advance general claims that the jury instructions were insufficient to "overcome the prejudice that resulted from" what they view as the errors previously discussed. Although we find no error pertaining to Defendants' previously alleged complaints, we also note that Defendants have not demonstrated that the district court's instructions to the jury did not adequately protect them from any prejudice that may have resulted from their joint trial.

The record here reflects that the district court repeatedly instructed the jury that it was required to consider separately each defendant's culpability. After the guilt phase, for example, the court instructed the jury that "[t]he case of each defendant and the evidence pertaining to that defendant should be considered separately and individually. The fact that you may find one of the defendants guilty or not guilty should not control your verdict as to the other defendant." Similar instructions were provided after the trial's eligibility and selection phases. Likewise, in its preliminary instructions preceding each phase, the court stressed that although Defendants were being tried jointly, "each defendant is entitled to separate consideration by the jury. The case of each defendant and the evidence pertaining to that defendant should be considered separately and individually." In accordance with these instructions, the jury returned separate verdict forms for Snarr and Garcia after each phase of the trial.

Neither Snarr nor Garcia has offered any specific argument or evidence suggesting that the court's instructions were insufficient. "Because it is presumed that juries follow the instructions the court gives them, we assume that the evidence against each defendant was considered separately and individually." *Owens*, 683 F.3d at 99.

**(4) Conclusion**

Simply put, Defendants have not demonstrated specific prejudice from the denial of their motion to sever. Accordingly, the district court did not abuse its discretion in denying the motion.

**E.  Constitutionality of the FDPA**

Defendants filed in the district court a motion to have the FDPA declared unconstitutional. In that motion, Defendants essentially argued that the statutory aggravating factors required by the FDPA are equivalent to elements of a crime and, thus, deserve the protections of the Federal Rules of Evidence. Accordingly, they asserted that evidence related to those factors may not be presented in the sentencing hearing, because evidentiary standards are relaxed during that phase of the trial. The district court denied the motion and Defendants now appeal.

**(1) Standard of Review**

Constitutional challenges to federal statutes are reviewed de novo. *United States v. Jones*, 132 F.3d 232, 239 (5th Cir. 1998).

**(2) Applicable Law and Related Discussion**

As mentioned above, the FDPA provides:

> The government may present any information relevant to an aggravating factor for which notice has been provided . . . . Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.

18 U.S.C. § 3593(c). We previously have explained that the FDPA's evidentiary standard is based on the principle that the jury must "receive sufficient information regarding the defendant and the offense in order to make an individual sentencing determination." *Jones*, 132 F.3d at 241. "Consequently, the relaxed evidentiary standard does not impair the reliability or relevance of

information at capital sentencing hearings, but helps to accomplish the individualized sentencing required by the constitution." *Id.* at 242. Accordingly, this court consistently has held that the FDPA's relaxed evidentiary standard during a defendant's sentencing proceeding is not unconstitutional. *See id.*; *Webster*, 162 F.3d at 354.

Defendants acknowledge that we previously have upheld the constitutionality of the FDPA, but explain that they raise the issue to preserve it for appeal to the Supreme Court. Because they advance no further argument in support of their claim, we reject their contention that the FDPA is unconstitutional.

## F. Exclusion of Evidence Pertaining to the Victim's Character

Defendants further argue that the district court committed reversible error by excluding, during sentencing, certain evidence of Rhone's prior bad acts. They essentially argue that because the jury is permitted to consider a "victim's uniqueness" in imposing punishment, that "uniqueness" necessarily includes evidence related to the victim's criminal background. Defendants also assert that the excluded evidence was necessary to give the jury a proper understanding of the circumstances that motivated Defendants to murder Rhone.

### (1) Standard of Review

At a sentencing hearing conducted pursuant to 18 U.S.C. § 3593(c), "information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor." A "district court has 'considerable discretion in controlling the presentation of the 'information' to the jury in both content and form.'" *United States v. Hall*, 152 F.3d 381, 397 (5th Cir. 1998) (quoting *United States v. McVeigh*, 944 F. Supp. 1478, 1487 (D. Colo. 1996)), *abrogated on other grounds by Martinez–Salazar*, 528 U.S. 304. We review for abuse of discretion. *Id.*

No. 10-40525

**(2) Applicable Law**

Under 18 U.S.C. § 3593(c), a defendant may present any information at sentencing "relevant to a mitigating factor." Likewise, the government is permitted to "present any information relevant to an aggravating factor for which notice has been provided." 18 U.S.C. § 3593(c). As previously noted, "[i]nformation is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials." *Id.*

As part of this "information," 18 U.S.C. § 3593(a) permits the government, with proper notice, to introduce victim impact evidence. As explained by the Supreme Court, "[v]ictim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). By considering such evidence, juries are able to assess more "meaningfully the defendant's moral culpability and blameworthiness." *Id.* Introduction of victim impact evidence remains bounded, however, by the requirement that it be relevant, and that its probative value outweigh "the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c); *see also Payne*, 501 U.S. at 827.

**(3) Discussion**

Defendants maintain that the district court impaired their ability to prove their mitigating factors related to Rhone because the court excluded certain evidence of his poor character. Casting their claim as the right to present "reverse victim impact" testimony under *Payne*, Defendants contend that it was impermissible for the court to exclude "evidence of the negative and paint a slanted picture of the positive." In particular, Snarr and Garcia complain of the court's exclusion of evidence pertaining to Rhone's alleged extensive "record of violence and threats to other inmates." This record, Defendants submit, included numerous incidents involving assaults with serious bodily injury,

fighting, threatening bodily harm, possessing dangerous weapons, and other similar misdeeds.

Defendants' argument as to "reverse victim impact" misapprehends, however, the purpose of victim impact evidence. Contrary to Defendants' assertions—which seem to suggest that a defendant is less culpable if he murders a vile person—the purpose of permitting victim impact evidence is to counteract a defendant's mitigating evidence and fully explain to the sentencing authority the harm caused by the defendant's crime. *See Payne*, 501 U.S. at 825. Defendants cite no authority that supports their apparent proposition that a defendant must be permitted to offer general evidence of the victim's bad character during the sentencing phase of a federal capital murder case.

Moreover, to the degree Defendants maintain that the excluded evidence was necessary to provide a clear picture of the circumstances allegedly precipitating the murder, we note that the evidence the court did admit about Rhone gave the jury the context it needed to resolve this issue.[18] During opening arguments, for example, Defendants claimed that Rhone was the first aggressor, that his conduct was "aggressive and caustic," that he yelled racial insults at them "all night long" on the night before the murder, and that he threatened to kill Defendants. Likewise, Defendants elicited testimony during the trial to the effect that Rhone was not viewed as a peaceful and law-abiding inmate, that he was unpredictable and had a violent temper, that he had committed lewd acts

---

[18] The district court allowed much of this evidence—particularly that pertaining to threats Rhone allegedly made against Defendants—despite its view that the evidence was inadmissible. Other evidence pertaining to Rhone's mental health, criminal history, disciplinary records, and remote instances of institutional misbehavior properly was excluded by the court on relevance grounds, as Defendants were unaware of that evidence at the time of the murder. Furthermore, even if relevant, the district court also excluded this evidence based on its holding that its probative value was outweighed by the danger of creating unfair prejudice, confusing the issues, and misleading the jury. Section 3593(c) permits the court to so hold, and Defendants present no compelling argument suggesting that this was an abuse of the court's discretion.

while incarcerated, and that he had threatened Defendants.   Defendants presented similar evidence during the selection phase of the trial.

Because the evidence Defendants sought to introduce was irrelevant or highly prejudicial, the district court did not abuse its discretion in excluding it. Both Snarr and Garcia had ample opportunity to advance their theory that Rhone's conduct was a mitigating factor.  That the jury concluded otherwise reflects the overwhelming nature of the evidence against them, not judicial error.

## G.  Exclusion of "Execution Impact" Evidence

At trial, Garcia sought to introduce evidence as to the impact his execution would have on certain of his family members.  The district court excluded the evidence based on its holding that precedent from this court precludes execution impact testimony by a defendant's family and friends.  Defendants appeal.[19]

### (1) Standard of Review

As noted above, this court reviews the district court's decisions regarding the presentation of information during a capital sentencing hearing under the abuse of discretion standard.  *Hall*, 152 F.3d at 397.

### (2) Applicable Law

Because such evidence "does not reflect on [the defendant's] background or character or the circumstances of his crime," "the Supreme Court has never included friend/family impact testimony among the categories of mitigating evidence that must be admitted" during a capital trial. *Jackson v. Dretke*, 450 F.3d 614, 618 (5th Cir. 2006).  Accordingly, this court consistently has affirmed

---

[19] Snarr joins this appeal based on his contention that because "Garcia was not afforded a fair trial, . . . it is reasonable to conclude that the jury was likely eased into the death sentence for Snarr by the joint death sentence of Garcia."   This argument neglects the individual nature of sentencing evidence presented against each defendant, as previously described in connection with Defendants' motion to sever.  Nevertheless, because we find Garcia's claim to be meritless, we need not dwell on Snarr's contention.

the exclusion of execution impact testimony similar to that proffered by Garcia. *See, e.g.*, *Jackson*, 549 F.3d at 970 n.3 (affirming the district court's conclusion "that general pleas for mercy would not be permitted" from the defendant's mother); *Kelly v. Lynaugh*, 862 F.2d 1126, 1133 n.12 (5th Cir. 1988) (a family member's plea to the jury that it spare the defendant's life did not constitute mitigating evidence, as it did "not reflect on [the defendant's] personal culpability"). Other courts are in accord. *See, e.g.*, *Stenson v. Lambert*, 504 F.3d 873, 891–92 (9th Cir. 2007) (highlighting that the defendant could not "point to any federal case requiring admission of 'execution impact' testimony because there are no such cases").[20]

### (3) Discussion

Defendants unpersuasively argue that reliance on our prior cases is misplaced.[21] They urge us to disregard their precedential nature and instead conclude that the Supreme Court's analysis in *Payne*, which upheld the introduction of *victim* impact evidence, applies equally well to *execution* impact evidence. In other words, they contend that just as a sentencing authority should be permitted to know about the individual characteristics of the murder

---

[20] Although some courts evidently *permit* execution impact testimony, *see Wright v. Bell*, 619 F.3d 586, 597–98 (6th Cir. 2010); *Sinisterra v. United States*, 600 F.3d 900, 909–10 (8th Cir. 2010), none appear to require it.

[21] Defendants suggest, for example, that *Dretke* is inapposite because it involved review, under the Antiterrorism and Effective Death Penalty Act, of a state court's decision to exclude execution impact testimony. Although it is true that *Dretke* addressed whether the state court's decision was "an unreasonable application of Supreme Court precedent," 450 F.3d at 615, Defendants do not explain how that leads to their conclusion that *Dretke*'s reasoning is inapt here. Furthermore, Defendants' primary argument against the application of *Jackson* and *Kelly* seems to be that those cases merely addressed this issue via footnote. This too is true, but it does not negate the force of the reasoning underlying those footnotes, nor does it disturb the binding nature of those cases upon this court. "It is a well-settled Fifth Circuit rule of orderliness that one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our en banc court." *Jacobs v. Nat'l Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008). Defendants do not suggest that there has been such an intervening change in the law.

44

victim, it should also be permitted to hear information about the convicted capital defendant—information that necessarily includes evidence about the defendant's family and the impact his execution would have on them.

Defendants again ignore the reasoning behind the Court's holding in *Payne*. Because victim impact evidence relates to the harm caused by the defendant, *Payne* held that it is relevant to the jury's assessment of "the defendant's moral culpability and blameworthiness." 501 U.S. at 825. In this respect, victim impact evidence fundamentally differs from execution impact evidence, which in no way reflects on the defendant's culpability. For this reason, as we already have explained, the Supreme Court never has held that execution impact evidence *must* be admitted in capital cases. *See Dretke*, 450 F.3d at 618. Defendants present no persuasive argument suggesting we should so hold now.

Accordingly, we find no error in the district court's decision to exclude Garcia's proffered evidence regarding the impact his execution would have on his family.

## H. Funding for Investigators and Experts

Defendants next maintain that they were denied due process when this court's chief judge issued an order, pursuant to the Criminal Justice Act ("CJA"), partially reducing and partially denying funds to Garcia for the retention of certain experts and investigators.[22] Because the government suggests that we lack jurisdiction to review this claim, we must first consider the precise nature of Defendants' claim and our authority to review it.

---

[22] Snarr again joins this appeal, though as we already have noted, his argument overlooks the individual nature of the sentencing process. However, because we again find Garcia's claim to be without merit, we need not linger on Snarr's claim.

No. 10-40525

**(1) Background**

Under the CJA, "a person who is financially unable to obtain investigative, expert, or other services necessary for adequate representation may request them in an ex parte application." 18 U.S.C. § 3006A(e)(1). Upon a finding that such resources "are reasonably necessary for the representation of the defendant . . . the court may authorize the defendant's attorneys to obtain such services on behalf of the defendant and, if so authorized, shall order the payment of fees and expenses therefor." *Id.* § 3599(f). Significantly, however, fees and expenses for these resources "shall not exceed $7,500 in any case, unless payment in excess of that limit is certified by the court . . . as necessary to provide fair compensation for services of an unusual character or duration, and the amount of the excess payment is approved by the chief judge of the circuit." *Id.* § 3599(g)(2).

Here, Garcia submitted a proposed budget requesting funds for the following experts, investigative services, and expenses:

- Blood splatter expert/crime scene expert.....................$10,000
- Criminologist...........................................................$10,000
- DNA expert...............................................................$7,500
- Cultural expert.........................................................$19,000
- Expenses..................................................................$5,000
- Investigators...........................................................$25,000
- Mental health experts...............................................$45,000
- Mitigation expert.....................................................$25,000
- Pathologist.............................................................$10,000
- Prison experts.........................................................$25,000
- Travel costs............................................................$15,000
- Total....................................................................$196,500

As relevant here, the district court approved the budget after modifying it by: (1) reducing to $15,000 funds for a cultural expert, and (2) reducing to $5,000 funds for a pathologist. Pursuant to 18 U.S.C. § 3599(g)(2), this court's chief judge

46

reviewed the budget, after which she and the district court entered an order reducing the funding for experts and investigative services to the following:[23]

- Investigators and mitigation experts.................................$30,000
- Mental health expert, pathologist, and psychologist.........$35,000
- Total.............................................................................$65,000

Defendants subsequently entered a motion for the district court to reconsider the budget. At a hearing related thereto, Garcia presented various witnesses who testified as to the necessity for Garcia to retain prison, cultural, and neurological experts. A contractor with the Federal Death Penalty Resource Council also testified that Garcia's proposed budget was reasonable. After the hearing, the district court submitted a memorandum to this court's chief judge requesting approval for the following additional funding:

- Mental health neurological expert....................................$15,000
- Criminologist/prison culture expert
    and prison administration expert................................$35,000
- Cultural mitigation expert...............................................$15,000
- Total.............................................................................$65,000

Based on this request, Garcia was granted approval for an additional $20,000 for experts and other services. Garcia was denied funds for a "Mexican cultural expert," however, based on the chief judge's ruling that "it would be inappropriate for testimony to be adduced by either party characterizing the defendant according to his national origin." Nevertheless, the district court expressly ruled that the chief judge's order did "not preclude the defendant from presenting mitigating information regarding the effects and experiences of race, national origin, and/or culture on the defendant through other experts, friends, or family members." *See Webster*, 162 F.3d at 356–57.

---

[23] Although travel and other expenses were removed from the budget, the order stated that they were to be submitted as incurred.

No. 10-40525

**(2) Jurisdictional Challenge**

On appeal, Defendants argue that the order from this court's chief judge partially denying and partially reducing funds for their experts denied them due process. The government suggests, however, that based on our holding in *In re Marcum L.L.P.*, 670 F.3d 636 (5th Cir. 2012), we lack jurisdiction to consider Defendants' claim.

In *Marcum*, the petitioner ("Marcum") sought to appeal an order this court's chief judge issued pursuant to section 3006A(e)(3) of the CJA. *Id.* at 637. Similarly to section 3599(g)(2) of the CJA—the provision at issue here—section 3006A(e)(3) mandates that payments to experts in excess of $2,400 be certified by the district court and approved "by the chief judge of the circuit." 18 U.S.C. § 3006A(e)(3). Acting pursuant to that provision, the chief judge had issued an order partially approving Marcum's fees in the underlying case, and directing him to "continue [to] work on" it, despite his desire to resign. *Marcum*, 670 F.3d at 637. Marcum appealed to this court for relief, but we held that we were "without jurisdiction to consider [the] appeal." *Id.* at 638.

The CJA, we noted, "is silent on the availability of judicial review . . . of the decision by the chief judge of the circuit denying approval of the full amount certified by the court in which the representation was rendered." *Id.* (alteration in original) (quoting *United States v. D'Andrea*, 612 F.2d 1386, 1387 (7th Cir. 1980)). Furthermore, we observed that such orders clearly were neither final district court decisions under 28 U.S.C. § 1291, nor appealable interlocutory orders under 28 U.S.C. § 1292. *Id.* Accordingly, adopting the view of the *D'Andrea* court, we held that under the CJA:

> [W]hen the chief judge of the circuit has approved compensation or reimbursement less than that amount certified by the court in which the representation was rendered, counsel may request reconsideration by motion. However, this motion is addressed solely to the chief judge. Upon disposition of the request for the chief

judge to review his decision, further review of the chief judge's decision is not available from this Court and any counsel's further remedy lies in a mandamus action in the United States Supreme Court.

*Id.* (alteration in original) (quoting *D'Andrea*, 612 F.2d at 1387–88).[24]

The government thus suggests that *Marcum* precludes our review of Defendants' claim. Unlike in *Marcum*, however, Defendants here do not directly appeal the chief judge's order. Rather, their claim is that *as a result of* that order, they lacked the funds necessary to present an adequate defense, and therefore were denied due process. In other words, the appeal here relates to Defendants' ultimate convictions and sentences, which are final judgments. *See United States v. Bloomer*, 150 F.3d 146, 149 (2d Cir. 1998) (emphasizing the permissibility of appellate review of CJA "determinations that impact a defendant's trial, sentence, or collateral challenge to a conviction or sentence"); *United States v. Fields*, 722 F.2d 549, 550 (9th Cir. 1983) (holding "that in an appeal from a final conviction," the court has "jurisdiction to review a challenge to a denial . . . of defendant's request for additional investigative funds"). Accordingly, we have jurisdiction to consider Defendants' due process claim under 28 U.S.C. § 1291.

**(3) Standard of Review**

We review a district court's denial of funding for expert witnesses for abuse of discretion.[25] *See United States v. Castro*, 15 F.3d 417, 421 (5th Cir. 1994).

**(4) Applicable Law**

---

[24] As explained in *Marcum*, other courts are in accord. *See, e.g.*, *United States v. Obasi*, 435 F.3d 847, 852 (8th Cir. 2006) ("[A] determination by the chief circuit judge [under the CJA] can only be challenged by seeking reconsideration or mandamus in the Supreme Court.").

[25] As noted above, the budget order that reduced Garcia's available funds was entered by both this court's chief judge and the district court.

49

No. 10-40525

"[A] criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense." *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985). However, an indigent defendant does not have an automatic right to expert assistance upon demand. *Yohey v. Collins*, 985 F.2d 222, 227 (5th Cir. 1993). Under *Ake*, the government must "assure the defendant access to a competent psychiatrist" when he "demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial." 470 U.S. at 83. Non-psychiatric experts "should be provided only if the evidence is 'both critical to the conviction and subject to varying expert opinion.'" *Yohey*, 985 F.2d at 227 (quoting *Scott v. Louisiana*, 934 F.2d 631, 633 (5th Cir. 1991) (internal quotation marks omitted)). To demonstrate reversible error on the basis that he lacked inadequate funds for expert witnesses, a defendant must "establish a reasonable probability that the requested experts would have been of assistance to the defense and that denial of such expert assistance resulted in a fundamentally unfair trial." *Id.*

**(5) Discussion**

Here, the essence of Defendants' complaint is that the order reducing funding for experts and investigators denied Garcia the right to present cultural, prison, and neurological experts. Contrary to Defendants' assertions, however, Garcia was not denied the right to present testimony from a prison or neurological expert. The court ultimately authorized Garcia $85,000 for experts and investigators, and largely permitted Garcia to distribute those funds as he saw fit. In particular, the first budget order authorized $30,000 for investigators and mitigation experts, and $35,000 for mental health experts, pathologists, and psychologists. After Garcia's motion for reconsideration, the court authorized an

additional $20,000 specifically for prison and neurological experts.[26]  The only express prohibition placed on Garcia's expenditures was that they could not be used to hire a cultural expert.  Nevertheless, as noted earlier, the district court explicitly indicated that this did not preclude Garcia "from presenting mitigating information regarding the effects and experiences of race, national origin, and/or culture on the defendant through other experts, friends, or family members."  To that end, Garcia did in fact present evidence of his cultural background through family members, as well as an expert psychologist, Dr. Jolie Brams.

Equally important, Defendants have failed to establish a reasonable probability that the requested experts would have been of assistance and that their absence resulted in a fundamentally unfair trial.  While Defendants focus on the experts Garcia did not retain, they neglect that Dr. Brams provided extensive evidence about the impact on Garcia of his upbringing, his culture, and his life in prison.  Thus, the fact that Garcia did not have additional experts did not render his trial fundamentally unfair, given that Dr. Brams was able to present much, if not all, of the evidence Garcia believed to be vital for mitigation purposes.  *See United States v. Mikos*, 539 F.3d 706, 712 (7th Cir. 2008) ("Just as a defendant who relies on counsel at public expense must accept a competent lawyer, rather than Clarence Darrow, so a defendant who relies on public funds for expert assistance must be satisfied with a competent expert." (citing *Morris v. Slappy*, 461 U.S. 1 (1983))).  Moreover, as discussed throughout this opinion, the government's case against Defendants was especially strong.  Indeed, of the eighty-six mitigating factors submitted by Garcia, only eleven were found to

---

[26] To be sure, the second order also authorized Garcia to use—at his preference—the additional funds for experts and services already approved under the first order.

exist by one or more jurors.[27]   Defendants have not advanced a credible argument that additional experts would have changed the jury's calculus.

Simply put, what *Ake* and its progeny guarantee to defendants is "an adequate opportunity [for them] to present their claims fairly within the adversary system."  470 U.S. at 77 (quoting *Ross v. Moffitt*, 417 U.S. 600, 612 (1974)).  Here, Defendants were afforded the funding necessary to do so.  That the district court did not provide "expert assistance upon demand," *Yohey*, 985 F.2d at 227, does not constitute an abuse of the court's discretion.

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM Defendants' convictions and capital sentences in all respects.

---

[27] These eleven factors largely relate to failures by correctional officers to follow procedures at the prison, though they do also include findings pertaining to Garcia's upbringing, and a finding that Rhone provoked the attack by making threats to Garcia.  Sixty-eight mitigating factors were submitted by Snarr, though the jury again found only eleven to exist.  As with Garcia, most of these relate to failures by prison officials to follow their procedures, though the jury also found that Rhone had threatened Snarr, and that Snarr had "learned to cope with life by the violence he experienced as a child."